416R



| EFFECTIVE DATE **5/31/19** | SUBJECT **ELIMINATION OF SEXUAL ABUSE AND SEXUAL HARASSMENT** | |
|---|---|---|
| CLASSIFICATION # **5011R-A** | | |
| DISTRIBUTION **A** | APPROVED FOR WEB POSTING [X] YES [ ] NO | PAGE **23** OF **44** PAGES |



## VI.  PROCEDURES (Cont.)

    a.    An inmate may file a written complaint of sexual abuse or sexual harassment directly to the Warden of the facility, PCM, PREA Coordinator, or any staff.

    b.    An inmate may file a written complaint through the inmate grievance system.

6.    Grievance

    a.    The inmate may file the complaint as a Grievance in accordance with the provisions outlined in Directive 3376, "Inmate Grievance and Request Program."

    b.    If an inmate makes a sexual allegation report through the grievance system, the report will be immediately forwarded to the on-duty Tour Commander, the facility PCM, and ID. The grievance coordinator is not authorized to speak to the inmate who is reporting the allegation. There are no administrative procedures to address or investigate inmate sexual abuse allegations through the grievance process. The established procedure for addressing inmate sexual abuse is via an immediate report to ID for investigation.

    c.    There is no time limit on when an inmate may submit a grievance regarding an allegation of sexual abuse.

    d.    The Department may apply otherwise-applicable time limits to any portion of a grievance that does not allege an incident of sexual abuse.

    e.    The Department shall not require an inmate to use any informal grievance process or to otherwise attempt to resolve with staff an alleged incident of sexual abuse.

    f.    The Department shall respond immediately to protect any inmate who files an emergency grievance alleging that the inmate is subject to a substantial risk of imminent sexual abuse.

    g.    Nothing in this section shall restrict the Department's ability to defend against an inmate lawsuit on the ground that the applicable statute of limitations has expired.

416R



| EFFECTIVE DATE **5/31/19** | SUBJECT **ELIMINATION OF SEXUAL ABUSE AND SEXUAL HARASSMENT** | |
|---|---|---|
| CLASSIFICATION # **5011R-A** | | |
| DISTRIBUTION **A** | APPROVED FOR WEB POSTING [X] YES [ ] NO | PAGE **22** OF **44** PAGES |



## VI.  PROCEDURES

### A.    REPORTING PROCEDURES FOR INMATES

Reporting to Staff

1.  Staff shall accept reports made verbally, in writing, anonymously, and/or from third parties and shall promptly document any verbal reports.

2.  Inmates shall have the opportunity to report sexual abuse, sexual harassment, and retaliation by other inmates or staff as well as staff neglect or violation of responsibilities that may have contributed to such incidents. They can report to any employee privately and are encouraged to report all allegations of sexual abuse and sexual harassment. Any verbal inmate report is a formal notification and the employee shall proceed and report the allegation as directed in this Directive. Staff shall not require the inmate to submit a written report.

3.  An inmate may report such incidents to anyone, including chaplains, medical and/or mental health staff, volunteers, counseling staff, security staff, or administrators, and may do so by informing the person in any manner available. All such reports will be reported and investigated.

4.  Other Reporting Options (see Attachment A)

    a.   Any inmate, or third party on behalf of an inmate, may make a confidential report of sexual abuse or sexual harassment through the DOI twenty-four (24) hour hotline;

    b.   PREA Confidential Hotline – 1 (718) 204-0378

    c.   Department of Investigation – 1 (212) 266-1900

    d.   City of New York – 1 (212) 639-9675 or Dial 311

    e.   Safe Horizon – 1 (212) 227-3000

    f.   Sexual Abuse Advocacy Hotline – 1 (347) 774-7037
         Business Hours: Monday – Friday, 6:00AM to 5:00PM

5.  Written Complaint

416R

| | EFFECTIVE DATE<br>**5/31/19** | SUBJECT<br>**ELIMINATION OF SEXUAL ABUSE AND SEXUAL HARASSMENT** |  |
|---|---|---|---|
| | CLASSIFICATION #<br>**5011R-A** | | |
| | DISTRIBUTION<br>**A** | APPROVED FOR WEB POSTING<br>[X] YES   [ ] NO | PAGE **21** OF<br>**44** PAGES |

## V.   GUIDELINES (Cont.)

viii.   The PREA Compliance Manager (PCM), or PREA Ambassador shall be responsible for conducting random checks of the log entries at least every two weeks to ensure they are happening on all three shifts as stated above. ALL CHECKS SHALL BE DOCUMENTED.

8.   HOUSING INMATES IDENTIFIED AS VULNERABLE OR PREDATOR (PROTECTIVE CUSTODY)

a.   An inmate identified as vulnerable to sexual abuse shall not be housed with an inmate identified as predatory. For the purposes of this Directive, predatory inmates are defined as inmates who have a history of sexually assaultive behavior or who are assessed as presenting a risk to vulnerable inmates.

b.   Inmates at high risk for sexual victimization or inmates who report sexual victimization shall be assessed by the Operations Security Intelligence Unit (OSIU) for placement purposes. OSIU may not place inmates in involuntary segregated housing unless an assessment of all available alternatives has been made and a determination has been made that there is no available alternative means of separation from likely predators. If OSIU cannot conduct such an assessment immediately, OSIU may hold the inmate in involuntary segregated housing for less than twenty-four (24) hours while completing the assessment.

c.   Inmates placed in segregated housing for this purpose shall have access to programs, privileges, education, and work opportunities to the extent possible.

d.   The facility shall document the opportunities that have been limited, the duration of the limitation, and the reasons for the limitation. Such inmates may only be assigned to Protective Custody until another option can be arranged and not ordinarily for more than thirty (30) days.

e.   If the inmate is placed in involuntary segregated housing, OSIU's documentation must include: the basis for the concern for the inmate's safety, the reason why no alternatives are available, and the contents of a review, offered every thirty (30) days, to determine if there is a continuing need for separation.

416R

| | EFFECTIVE DATE **5/31/19** | SUBJECT **ELIMINATION OF SEXUAL ABUSE AND SEXUAL HARASSMENT** | |  |
|---|---|---|---|---|
| | CLASSIFICATION # **5011R-A** | | | |
| | DISTRIBUTION **A** | APPROVED FOR WEB POSTING **X** YES ☐ NO | PAGE **20** OF **44** PAGES | |

## V.   GUIDELINES (Cont.)

i.      Captains shall make tours of their assigned areas at least once per shift, at random times and unannounced to any staff. The goal of these tours is to prevent and identify sexual abuse and sexual harassment. This is not an additional requirement. This goal may be accomplished during already prescribed tours.

ii.      All supervisors should be conducting unannounced rounds and should be looking to see that no cell doors are covered, and secluded places such as closets, storage areas, utility areas, etc., are clear of any inmates being sexually assaulted or harassed, and no other activity is going on that would cause a safety issue, sexual or otherwise.

iii.      Housing area supervisors shall document their PREA unannounced round in all post logbooks, i.e., "a", "b" and "c" post logbooks, where applicable.

iv.      All other areas that service inmates, i.e., law library, clinic, social services, recreation, work details, etc., shall document their PREA unannounced rounds in the respective post main or "a" post logbook.

v.      Captains shall note such in the post logbook by including the following statement: "PREA unannounced round/walk through conducted".

vi.      Members of service and civilian staff shall not alert or inform any person that a member of service in the rank of captain or above is making a tour of inspection, unless there is a legitimate and documented security need to announce the tour.   Any such alert by any staff of an unannounced tour that is not approved and documented will result in disciplinary action for that staff.

vii.      Members of service in the rank of assistant deputy warden and above who conduct unannounced and random tours to identify and deter sexual abuse and sexual harassment shall note such in the same manner.



| | | |
|---|---|---|
| 416R | | |

| | EFFECTIVE DATE **5/31/19** | SUBJECT **ELIMINATION OF SEXUAL ABUSE AND SEXUAL HARASSMENT** |  |
|---|---|---|---|
| | CLASSIFICATION # **5011R-A** | | |
| | DISTRIBUTION **A** | APPROVED FOR WEB POSTING [X] YES  [ ] NO | PAGE **19** OF **44** PAGES |

## V.  GUIDELINES (Cont.)

7.  SEARCHES AND OBSERVATION

    a.  Cross-gender inmate strip searches or visual body cavity searches shall not be conducted except in exigent circumstances (that is, temporary unforeseen circumstances that require immediate action in order to combat a threat to security or institutional order, or when performed by medical practitioners).

    b.  Cross-gender inmate pat/frisk searches of female inmates by male employees are prohibited except in exigent circumstances (that is, temporary unforeseen circumstances that require immediate action in order to combat a threat to security or institutional order).

    c.  If exigent circumstances exist and a cross-gender pat/frisk search of a female inmate or cross-gender strip search or body cavity search of any inmate does occur, the search must be documented using Form HQ/SM 14, "Random Search Report" (Attachment L) in accordance with Directive 4508R-E, "Control of and Search for Contraband." A copy of the completed form must go to all individuals in accordance with Directive 4508R-E, the PCM, and the PREA Coordinator.

    d.  Searches or physical examinations of a transgender or intersex inmate for the sole purpose of determining the inmate's gender are prohibited.

    e.  Inmates may shower, perform bodily functions, and change clothing without non-medical staff of the opposite gender viewing their breasts, buttocks, or genitalia except in exigent circumstances (that is, temporary unforeseen circumstances that require immediate action in order to combat a threat to security or institutional order) or when such viewing is incidental to routine cell/living quarter checks.

    f.  Employees of the opposite gender must announce their presence when entering an inmate housing unit.

    g.  Unannounced Rounds - Supervisors must conduct unannounced rounds on every shift in order to prevent and detect sexual abuse by staff. Rounds shall be random and unannounced, and staff are prohibited from alerting other staff of these tours. Rounds shall be documented in unit and area logbooks.

416R



| | |
|---|---|
| EFFECTIVE DATE **5/31/19** | SUBJECT |
| CLASSIFICATION # **5011R-A** | **ELIMINATION OF SEXUAL ABUSE AND SEXUAL HARASSMENT** |
| DISTRIBUTION **A** | APPROVED FOR WEB POSTING [X] YES [ ] NO |
| | PAGE **18** OF **44** PAGES |



## V.  GUIDELINES (Cont.)

c.  A transgender or intersex inmate's own views with respect to his or her own safety shall be given serious consideration.

d.  Transgender and intersex inmates shall be given the opportunity to shower separately from other inmates.

e.  The Department shall not place lesbian, gay, bisexual, transgender, or intersex inmates in dedicated facilities, units, or wings based solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates.

f.  For more information as it pertains to lesbian, gay, bisexual, transgender, intersex, gender non-binary and gender non-conforming inmates, see Directive 4498, "Lesbian, Gay, Bisexual, Transgender, Intersex and Gender Non-Forming Inmates."

6.  YOUTHFUL INMATES

a.  A youthful inmate shall not be placed in a housing unit in which the youth will have sight, sound, or physical contact with any adult inmate through the use of shared dayroom or other common space, shower area, or sleeping quarters.

b.  In areas outside of housing units, the Department shall maintain sight and sound separation between youthful inmates and adult inmates or provide direct staff supervision when youthful inmates and adult inmates have sight, sound, or physical contact.

c.  Exigent circumstances may require removal to a special housing unit to ensure youthful inmates are not in an environment where they will have sight, sound, or physical contact with an adult inmate. In these cases, the facility shall make its best efforts not to place youthful inmates in isolation cells. If required to be isolated due to exigent circumstances, these inmates will have access to large-muscle exercise and all legally required special education services. They will also have access to programs and work opportunities to the extent possible. All decisions and reasons for those decisions shall be clearly documented.

416R

| | EFFECTIVE DATE **5/31/19** | SUBJECT **ELIMINATION OF SEXUAL ABUSE AND SEXUAL HARASSMENT** | |
|---|---|---|---|
|  | CLASSIFICATION # **5011R-A** | |  |
| | DISTRIBUTION **A** | APPROVED FOR WEB POSTING  [X] YES  [ ] NO | PAGE **17** OF **44** PAGES |

## V.   GUIDELINES (Cont.)

placed in the Inmate Information System (IIS) to prevent these inmates from being housed in the same housing area.

f.   The Department shall use information from the inmate's risk screening to make informed decisions regarding housing, work, education, and program assignments with the goal of keeping separate those at high risk of being victimized from those at high risk of being sexually abusive.

4.   REASSESSMENT

a.   Within a set time period, not to exceed thirty (30) days from the inmate's arrival at the facility, the facility will reassess the inmate's risk of victimization or abusiveness.

b.   An inmate's risk level shall be reassessed when warranted and/or as needed due to a referral, request, incident of sexual abuse, or receipt of additional information that bears on the inmate's risk of sexual victimization or abusiveness using Form PREA-3, "PREA Safety Check - Reassessment" (Attachment D) (Revised).

c.   Inmates may not be disciplined for refusing to answer or for not disclosing complete information in response to screening questions.

d.   The Department shall use information from the inmate's reassessment to reevaluate current housing, work, education, and programs assignments with the goal of keeping separate those at high risk of being sexually victimized from those at high risk of being sexually abusive.

5.   HOUSING LESBIAN, GAY, BISEXUAL, TRANSGENDER, AND INTERSEX INMATES

a.   In deciding whether to assign a transgender or intersex inmate to a male or female facility and in making other housing and programming assignments, the Department shall consider on a case-by-case basis whether a placement would ensure the health and safety of the inmate and whether the placement would present management or security problems.

b.   Placement and programming assignments for each transgender or intersex inmate shall be reassessed at least twice each year to review any threats to safety experienced by the inmate.

416R

| | EFFECTIVE DATE<br>**5/31/19** | SUBJECT<br>**ELIMINATION OF SEXUAL ABUSE AND**<br>**SEXUAL HARASSMENT** |  |
|---|---|---|---|
| | CLASSIFICATION #<br>**5011R-A** | | |
| | DISTRIBUTION<br>**A** | APPROVED FOR WEB POSTING<br>[X] YES   [ ] NO | PAGE **16** OF<br>**44** PAGES |

## V.   GUIDELINES (Cont.)

the performance of first-responder's duties under this Directive, or the investigation of the inmate's allegations.

### C.   INTAKE SCREENING

1.   Inmates will be screened at intake for potential vulnerability to sexual abuse or harassment, or tendencies to act out through sexually aggressive behavior within seventy-two (72) hours, upon admission, transfer, and as needed while incarcerated. Inmates who are returned from another jurisdiction and have been in that jurisdiction for 24 hours or more, must complete a new PREA Intake Screening.

2.   Intake

a.   During the intake process, intake staff shall initiate Form PREA-2, "Intake Questionnaire" (Attachment C) (Revised).

b.   Intake staff shall ask the inmate PREA-related questions and document all responses in the "Intake" column (shaded) of Form PREA-2.

c.   Upon completion, the Intake staff member shall print their name, rank, shield number, and date, and then affix their signature in the section provided as an indication that they have completed their portion of the questionnaire.

3.   CLASSIFICATION

a.   During the Classification process of each inmate, Classification staff shall complete the PREA-2 form that was initiated by the Intake Staff.

b.   Classification staff shall complete the PREA-related questions and document all responses in the "Classification" column.

c.   Upon completion, the Classification staff member shall print their name, rank, shield number, date, and then affix their signature in the section provided as an indication that they have completed their portion of the questionnaire.

d.   Classification staff shall use the Form PREA-2 filled out by Intake staff to make appropriate classification and housing recommendations.

e.   Any inmate assessed as being at risk of victimization shall not be housed with an inmate assessed as being abusive. Appropriate alerts shall be



| 416R | | | | |
|---|---|---|---|---|
| | **EFFECTIVE DATE**<br>**5/31/19** | **SUBJECT** | **ELIMINATION OF SEXUAL ABUSE AND SEXUAL HARASSMENT** | |
| | **CLASSIFICATION #**<br>**5011R-A** | | | |
| | **DISTRIBUTION**<br>**A** | **APPROVED FOR WEB POSTING**<br>[X] YES  [ ] NO | **PAGE 15 OF**<br>**44 PAGES** | |



## V.   GUIDELINES (Cont.)

abuse and sexual harassment and to be free from retaliation for reporting such incidents.

d.   Current inmates who have not received such education shall be educated within one (1) year of the effective date of the PREA Standards and shall receive education upon transfer to a different facility to the extent that the policies and procedures of the inmate's new facility differs from those of the previous facility.

e.   Each inmate shall, by signature, acknowledge this orientation in accordance with this Directive, by signing Form PREA 8, "Comprehensive PREA Orientation Attendance Log" (Attachment I).

2.   The "Taking a Stand against Sexual Abuse and Sexual Harassment Poster" shall be posted in areas accessible to inmates and employees and shall be checked at least monthly by the PCM to ensure all are posted as required.

3.   This Directive shall be maintained on every housing area "A" post for inmates to review upon request.  This Directive shall also be made available to inmates in the Law Library and Clinic areas.  Copies of this Directive shall be made available to all employees via the Facility Information Systems (FIS) office via the Department's internal website.

4.   The Department shall take appropriate steps to ensure that inmates who are not proficient in English (LEP), are deaf or hard of hearing, visually impaired, who have limited reading skills, or who are otherwise disabled have equal opportunity to participate in or benefit from all aspects of the Department's efforts to prevent, detect, report, and respond to sexual abuse and sexual harassment.

5.   The Department shall provide interpreters who can interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary.

6.   The Department shall ensure that written materials are provided in formats or through methods that ensure effective communication with all inmates with disabilities.

7.   The Department shall not rely on inmate interpreters, inmate readers, or other types of inmate assistants except in limited circumstances where an extended delay in obtaining an effective interpreter could compromise the inmate's safety,

416R



| | EFFECTIVE DATE **5/31/19** | SUBJECT **ELIMINATION OF SEXUAL ABUSE AND SEXUAL HARASSMENT** | |
|---|---|---|---|
| | CLASSIFICATION # **5011R-A** | | |
| | DISTRIBUTION **A** | APPROVED FOR WEB POSTING [X] YES [ ] NO | PAGE **14** OF **44** PAGES |



## V.   GUIDELINES (Cont.)

g.   The Department shall ask all applicants and employees who may have contact with inmates directly about previous misconduct described in V.A.5.b above in written applications or interviews for hiring or promotions and in any interviews or written self-evaluations conducted as part of reviews of current employees. The agency shall also impose upon employees a continuing affirmative duty to disclose any such misconduct.

h.   Material omissions regarding such misconduct, or the provision of materially false information, shall be grounds for termination.

i.   Unless prohibited by law, the agency shall provide information on substantiated allegations of sexual abuse or sexual harassment involving a former employee upon receiving a request from an institutional employer for whom such employee has applied to work.

B.   Inmate Training and Notification

1.   Facility Intake

a.   The Commanding Officer of each facility shall ensure that each inmate receives a copy of the inmate handbook during the intake and inmate orientation process, and no later than seventy-two (72) hours upon admission to the facility. The inmate shall be provided with written notice of the prohibition of sexual abuse and sexual harassment and how to report incidents or suspicions of sexual abuse or sexual harassment. The inmate shall also be advised of the Department's zero-tolerance policy and ways to report sexual abuse and sexual harassment.

b.   Within five (5) days of arrival, the Warden of the intake facility shall ensure that each inmate receives facility orientation and training in accordance with Directive 3750, "Inmate Orientation."

c.   Orientation and training shall include comprehensive education to address prevention, intervention, self-protection, reporting sexual abuse and sexual harassment, adjudication procedures, facility policies and procedures for responding to such incidents, accessibility of medical and mental health counseling, and further information on the sexual abuse hotline for inmates to report allegations and on the grievance system. The orientation shall also provide the inmates with comprehensive in person education (also through video and/or written material) of their rights to be free from sexual



| | | |
|---|---|---|
| 416R | | |

| | EFFECTIVE DATE **5/31/19** | SUBJECT **ELIMINATION OF SEXUAL ABUSE AND SEXUAL HARASSMENT** |
|---|---|---|
| | CLASSIFICATION # **5011R-A** | |
| | DISTRIBUTION **A** | APPROVED FOR WEB POSTING  [X] YES  [ ] NO | PAGE **13** OF **44** PAGES |



## V.   GUIDELINES (Cont.)

**b.** The Department shall not hire or promote anyone who may have contact with inmates and shall not enlist the services of any contractor who may have contact with inmates, who:

    **i.** Has engaged in sexual abuse in a prison, jail, lockup, community confinement facility, juvenile facility, or other institution (as defined in 42 U.S.C. 1997);

    **ii.** Has been convicted of engaging or attempting to engage in sexual activity in the community facilitated by force, overt or implied threats of force, or coercion, or if the complainant did not consent or was unable to consent or refuse; or

    **iii.** Has been civilly or administratively adjudicated to have engaged in the activity described in V.A.5.b.i above.

**c.** The Department shall consider any incidents of sexual harassment in determining whether to hire or promote anyone or to enlist the services of any contractor who may have contact with inmates.

**d.** Before hiring new employees, who may have contact with inmates, the agency shall (see Directive 1008 dated 1/11/17):

    **i.** Perform a criminal background records check; and

    **ii.** Consistent with Federal, State, and local law, make its best efforts to contact any/all employers who have the responsibility for inmate custody for information on substantiated allegations of sexual abuse or any resignation during a pending investigation or an allegation of sexual abuse.

**e.** The Department shall also perform a criminal background records check before enlisting the services of any contractor who may have contact with inmates.

**f.** The Department shall either conduct criminal background records checks at least every five years of current employees and contractors who may have contact with inmates or have in place a system for otherwise capturing such information for current employees.

416R

| | EFFECTIVE DATE **5/31/19** | SUBJECT **ELIMINATION OF SEXUAL ABUSE AND SEXUAL HARASSMENT** |  |
|---|---|---|---|
| | CLASSIFICATION # **5011R-A** | | |
| | DISTRIBUTION **A** | APPROVED FOR WEB POSTING  [X] YES  [ ] NO | PAGE **12** OF **44** PAGES |

## V.   GUIDELINES (Cont.)

refusing to shower, suicidal thoughts or actions, seeking protective custody, and refusing to leave segregation);

h.   Be aware of potential sexually aggressive behavior. The sexual aggressor may be known by the general population. Characteristics or warning signs may include a prior history of committing rape, history of institutional violence, use of strong-arm tactics (extortion), associating or pairing up with inmates who meet the profile of a potential victim, exhibiting voyeuristic/exhibitionist behavior, and demonstrated inability to control anger.

3.   In addition to the general training provided to all employees, the Department shall ensure employees conducting sexual abuse and sexual harassment investigations receive specialized training in conducting sexual abuse and sexual harassment investigations in confinement settings.

4.   In addition to the general training provided to all employees, the Department shall ensure that all full-time and part-time medical and mental health care practitioners who work regularly in its facilities be trained in:

a.   How to detect and assess signs of sexual abuse, sexual assault, and sexual misconduct;

b.   How to preserve physical evidence of sexual abuse;

c.   How to respond effectively and professionally to victims of sexual abuse and sexual harassment;

d.   How and to whom to report allegations or suspicions of sexual abuse and sexual harassment;

5.   Hiring and Promotion Decisions

a.   The Department Office of Equal Employment Opportunity, the Legal Division, and the Trials and Litigation Division must be consulted prior to any staff member being promoted or transferred to determine if there are any pending or past charges of sexual allegations against the employee.

416R



| EFFECTIVE DATE **5/31/19** | SUBJECT **ELIMINATION OF SEXUAL ABUSE AND SEXUAL HARASSMENT** | |
|---|---|---|
| CLASSIFICATION # **5011R-A** | | |
| DISTRIBUTION **A** | APPROVED FOR WEB POSTING [X] YES [ ] NO | PAGE **11** OF **44** PAGES |



## V.   GUIDELINES (Cont.)

g.   Contractors who have direct contact with inmates shall be trained in PREA requirements.

h.   Department staff from the program's office shall train volunteers and other individuals such as occasional service providers who have direct contact with inmates or provide services to inmates, of the prohibitions and requirements of this Directive. Volunteers and service providers shall acknowledge that they received such training by signing an acknowledgement of training form.

2.   All Department staff must understand their responsibility in the prevention, detection, response, and reporting of all incidents of sexual abuse and sexual harassment. Professional and trained staff will help prevent incidents of sexual abuse and sexual harassment by following the guidelines below during the performance of their duties:

a.   Know and enforce rules regarding sexual abuse, sexual harassment, and sexualized behavior of inmates;

b.   Use professional language at all times;

c.   Treat all allegations seriously and follow appropriate reporting procedures;

d.   Recognize that incidents can occur virtually anywhere, especially in areas that are not directly supervised at all times (sound correctional practice includes conducting frequent, random area and cell checks and providing direct staff supervision whenever possible);

e.   Maintain an open line of communication with all inmates;

f.   Recognize that first-time, youthful, elderly, mentally and physically disabled, non-English speakers, developmentally disabled, lesbian, gay, bi-sexual, intersex, and transgender inmates, as well as those who have sexual victimization history or have committed sexual offenses (or are accused of committing them) are at an increased risk of sexual abuse;

g.   Be aware of possible warning signs that might indicate that an inmate has been sexually abused or in fear of being sexually abused (warning signs include, but are not limited to: isolation, depression, lashing out at others,



| | EFFECTIVE DATE **5/31/19** | SUBJECT **ELIMINATION OF SEXUAL ABUSE AND SEXUAL HARASSMENT** | |
|---|---|---|---|
| 416R | CLASSIFICATION # **5011R-A** | | |
| | DISTRIBUTION **A** | APPROVED FOR WEB POSTING [X] YES [ ] NO | PAGE **10** OF **44** PAGES |



## IV.  DEFINITIONS AND TERMS (Cont.)

also be categorized as an adolescent within the Department.  In addition to other Department reporting requirements, incidents involving youthful inmates must also be reported by a supervisor to the New York State Central Register of Child Abuse and Maltreatment, Mandated Reporter, child abuse reporting hotline (see Attachment A).

## V.   GUIDELINES

A.   General Requirements

1.   Staff Notification and Training

a.   The Human Resources Division (HRD) shall issue a copy of this Directive to all new employees, volunteers, and contract employees when they receive their photo identification card. HRD shall require each individual to sign an acknowledgement of receipt of this Directive. HRD shall retain the signed receipt and place a copy in the individual's employment folder.

b.   All volunteers that come through the Programs Department must follow the same guidelines as those coming through HRD. Volunteers must receive a copy of the Directive when they receive their photo identification card and sign an acknowledgement receipt of this Directive. The Programs Department shall retain the signed receipt and a copy of the receipt shall be placed in the individual's volunteer folder.

c.   The Department Training Academy and volunteer trainers shall update trainer lesson plans and review requirements of this Directive with new employees, volunteers, and contract employees during orientation training.

d.   Mandatory Pre-Service Training and biennial (once every two years) refresher training of this Directive shall be conducted for all Department employees, volunteers, interns, and contract employees who may have contact with inmates.

e.   This Directive shall be made readily available to all Department employees, contract employees, and volunteers.

f.   Department training staff shall conduct the training for prevention, detection, and responding to sexual abuse and sexual harassment.

416R

| | EFFECTIVE DATE **5/31/19** | SUBJECT **ELIMINATION OF SEXUAL ABUSE AND SEXUAL HARASSMENT** | |
|---|---|---|---|
| | CLASSIFICATION # **5011R-A** | |  |
| | DISTRIBUTION **A** | APPROVED FOR WEB POSTING [X] YES [ ] NO | PAGE **9** OF **44** PAGES |

## IV.  DEFINITIONS AND TERMS (Cont.)

FF.  Sexual Assault Forensic Examiner (SAFE): A medical professional who is an expert at comprehensive assessment, identification, and documentation of injuries of sexual assault victims.

GG.  Sexual Harassment:

1.  Repeated and unwelcome sexual advances, requests for sexual favors, or verbal comments, gestures, or actions of a derogatory or offensive sexual nature by one inmate or detainee directed toward another.

2.  Repeated verbal comments or gestures of a sexual nature to an inmate, detainee, or resident by a staff member, contractor, or volunteer, including demeaning references to gender, sexually suggestive or derogatory comments about body or clothing, or obscene language or gestures.

HH.  Transgender or Trans: Describes an individual whose gender identity is different from the individual's sex assigned at birth.

II.  Undue Familiarity: Conversation, contact, or a personal or business dealing between an employee and an individual under the care, custody, and control of the Department which is unnecessary, not a part of the employee's duties, and/or related to a personal relationship or purpose rather than a legitimate correctional purpose. (Also see Attachment O).

JJ.  Volunteer: An individual who donates time and effort to enhance the activities and programs of the Department.

KK.  Voyeurism (by a staff employee, contractor, or volunteer): An invasion of privacy of an inmate by staff for reasons unrelated to official duties such as peering at an inmate who is using a toilet in his or her cell to perform bodily functions; requiring an inmate to expose his or her buttocks, genitals, or breast(s); or taking images of all or part of an inmate's naked body or of an inmate performing bodily functions.

LL.  Vulnerable Inmate: An inmate who is at high risk to become a victim of sexual abuse by another inmate due to characteristics related to age; physical stature; criminal history; limited proficiency in English; physical, developmental, or mental disabilities; gender identity; or past history of being victimized.

MM.  Youthful Inmate: Any inmate under the age of eighteen (18) who is under adult court supervision and incarcerated or detained in a Department facility. These inmates shall

416R

| | EFFECTIVE DATE **5/31/19** | SUBJECT **ELIMINATION OF SEXUAL ABUSE AND SEXUAL HARASSMENT** |  |
|---|---|---|---|
| | CLASSIFICATION # **5011R-A** | | |
| DISTRIBUTION **A** | APPROVED FOR WEB POSTING [X] YES [ ] NO | PAGE **8** OF **44** PAGES | |

## IV.  DEFINITIONS AND TERMS (Cont.)

3.  Penetration of the anal or genital opening of another person, however slight, by a hand, finger, object, or other instrument; and

4.  Any other intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or the buttocks of another person, excluding contact incidental to a physical altercation.

DD.  Sexual abuse of an inmate by staff, contractor, or volunteer: includes any of the following acts, with or without consent of the inmate:

1.  Contact between the penis and the vulva or the penis and the anus, including penetration, however, slight;

2.  Contact between the mouth and the penis, vulva, or anus;

3.  Contact between the mouth and any body part where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

4.  Penetration of the anal or genital opening, however slight, by a hand, finger, object, or other instrument, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

5.  Any other intentional contact, either directly or through the clothing, of or with the genitalia, anus, groin, breast, inner thigh, or the buttocks, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

6.  Any attempt, threat, or request by an employee, contractor, or volunteer to engage in the activities described in IV.DD.1-5 above;

7.  Any display by a staff member, contractor, or volunteer of his or her uncovered genitalia, buttocks, or breast(s) in the presence of an inmate, detainee, or resident, and

8.  Voyeurism by a staff member, contractor, or volunteer.

EE.  Sexual Assault Nurse Examiner (SANE): A registered nurse (RN) who has advanced education and clinical preparation in forensic examination of sexual assault victims.

416R

| | EFFECTIVE DATE<br>**5/31/19** | SUBJECT<br>**ELIMINATION OF SEXUAL ABUSE AND**<br>**SEXUAL HARASSMENT** | |  |
| --- | --- | --- | --- | --- |
| | CLASSIFICATION #<br>**5011R-A** | | | |
| | DISTRIBUTION<br>**A** | APPROVED FOR WEB POSTING<br>[X] YES  [ ] NO | PAGE **7** OF<br>**44** PAGES | |

## IV.   DEFINITIONS AND TERMS (Cont.)

V.   **LGBTQI:** This acronym is used to refer to individuals who are lesbian, gay, bisexual, transgender, questioning and intersex. It is often used as an umbrella term to identify the full LGBTQ community.

W.   **PREA Coordinator:** An upper level Department employee responsible for managing the development, implementation, and oversight of the Department's plan to comply with the PREA standards. This staff member ensures the proper implementation of the PREA standards at all Department facilities, monitors Department training programs to ensure they comply with PREA training standards, monitors inmate screening procedures, tracks and reviews sexual abuse and sexual harassment investigations, works with medical and mental health professionals to ensure their compliance with the PREA standards, supervises the Department's PREA data collection, and provides appropriate access and materials to PREA auditors.

X.   **PREA Compliance Manager (PCM):** A staff person responsible for coordinating the facility's efforts to comply with the PREA standards. Works very closely with the PREA Coordinator. The PCM shall have sufficient time and authority to coordinate the facility's efforts to comply with PREA standards.

Y.   **PREA Incident:** Sexual abuse or sexual harassment by staff against an inmate or sexual abuse or sexual harassment by an inmate of another inmate.

Z.   **Predatory Inmate:** An inmate whose past behavior or charges indicates they are prone to victimize other inmates especially in regard to sexual behavior.

AA.   **Respondent:** The person accused of any act of sexual abuse or sexual harassment.

BB.   **Retaliation:** Restraint, interference, coercion, acts of covert or overt vengeance, or threats of action to discourage, prevent, or punish an inmate for his/her involvement in the reporting or investigation of a sexual abuse or sexual harassment allegation.

CC.   **Sexual abuse of an inmate by another inmate:** includes any of the following acts, if the victim does not consent, is coerced into such an act by overt or implied threats of violence, or is unable to consent or refuse:

1.   Contact between the penis and the vulva or the penis and the anus, including penetration, however slight;

2.   Contact between the mouth and the penis, vulva, or anus;

416R



| EFFECTIVE DATE<br>**5/31/19** | SUBJECT<br>**ELIMINATION OF SEXUAL ABUSE AND** |  |
| CLASSIFICATION #<br>**5011R-A** | **SEXUAL HARASSMENT** |  |
| DISTRIBUTION<br>**A** | APPROVED FOR WEB POSTING<br>[X] YES [ ] NO | PAGE **6** OF<br>**44** PAGES |



## IV. DEFINITIONS AND TERMS (Cont.)

P. Invasion of Privacy:

    1. Observing, attempting to observe, or interfering in an inmate's activities of a personal nature without a sound penological reason.

    2. Failure of an employee of the opposite sex to announce his/her presence, without a sound penological reason, when entering an inmate's housing unit.

Q. Investigative Outcome: When an investigation concludes, the allegations will be labeled one of the following:

    1. Substantiated: The allegation was investigated and determined to have occurred;

    2. Unsubstantiated: The allegation was investigated, and the investigation produced insufficient evidence to make a final determination as to whether or not the event occurred; or

    3. Unfounded: The allegation was investigated and determined not to have occurred.

R. Official Custody: Detention following arrest for an offense; following surrender in lieu of arrest for an offense; following a charge or conviction of an offense or an allegation or finding of juvenile delinquency; following commitment as a material witness; following or pending civil commitment proceedings, or pending extradition, deportation, or exclusion. Also, custody for purposes incident to any detention described in this paragraph, including during transport, medical diagnosis or treatment, court appearance, work and recreation, probation, or parole.

S. Investigation Division (ID): Office within the Department responsible for conducting all administrative investigations and responsible for calling local law enforcement for all allegations of sexual abuse made by inmates.

T. Department of Investigation (DOI): New York City agency responsible for investigating staff-on-inmate sexual abuse or sexual harassment.

U. Lesbian: Describes women who are physically, romantically, and/or emotionally attracted to women.

416R



| | EFFECTIVE DATE **5/31/19** | SUBJECT **ELIMINATION OF SEXUAL ABUSE AND SEXUAL HARASSMENT** | |
|---|---|---|---|
| | CLASSIFICATION # **5011R-A** | | |
| | DISTRIBUTION **A** | APPROVED FOR WEB POSTING [X] YES [ ] NO | PAGE **5** OF **44** PAGES |



## IV.  DEFINITIONS AND TERMS (Cont.)

E.    Department Staff Member/Employee: A person who works directly for the Department.

F.    False Allegation: An allegation that is untrue in that the events that were alleged did not occur.

G.    Force: The use or threatened use of a weapon; the use of such physical strength or violence as is sufficient to overcome, restrain, or injure a person; or the use of a threat of harm sufficient to coerce or compel submission by the complainant.

H.    Gay: Describes men who are physically, romantically, and/or emotionally attracted to men.

I.    Gender Expression: Refers to external appearance, typically associated with one's gender identity and usually expressed through behavior, clothing, haircut, voice or other related characteristics, which may or may not conform to socially defined behaviors and characteristics typically associated with being either masculine or feminine, or with expectations associated with the individual's gender identity.

J.    Gender Identity: Refers to an individual's internal, personal sense of their own gender as a male, female, both, or neither, regardless of the individual's sex assigned at birth.

K.    Gender Non-Binary: Describes an individual whose gender identity exists outside of the categories of male or female (i.e. outside of "binary" gender identities).

L.    Gender Non-Conforming: Describes an individual whose gender expression is outside of societal assumptions for how they should look or behave based on their gender identity.

M.    Indecent Exposure: The display by an employee or inmate of his or her uncovered genitalia, buttocks, or breast(s) in the presence of another inmate.

N.    Identifier Designation: A term ("vulnerable" or "predatory"), either confirmed or potential, given to an inmate after asking them questions designed to determine if they may be vulnerable to sexual abuse or be possible perpetrators of sexual abuse while incarcerated.

O.    Intersex: A general term used to describe a variety of conditions in which an individual is born with a reproductive or sexual anatomy that doesn't align with anatomy typically assigned to female or male individuals.

416R



| EFFECTIVE DATE **5/31/19** | SUBJECT **ELIMINATION OF SEXUAL ABUSE AND SEXUAL HARASSMENT** | |
|---|---|---|
| CLASSIFICATION # **5011R-A** | | |
| DISTRIBUTION **A** | APPROVED FOR WEB POSTING [X] YES  [ ] NO | PAGE **4** OF **44** PAGES |



## III.   INTRODUCTION (Cont.)

may be potential complainants via proper PREA screening and classification. Prompt reporting of any alleged sexual abuse or sexual harassment is required to be made, a thorough investigation shall be completed, and appropriate discipline shall be taken against employees and inmates who sexually abuse and/or sexually harass other inmates or otherwise violate mandates set forth in this Directive.

C.   Notice of Non-Discrimination

The Department's policy is in accordance with federal and state laws and regulations prohibiting discrimination and harassment. These laws include the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act of 1973, Title VII of the Civil Rights Act of 1964 as amended by the Equal Employment Opportunity Act of 1972, the New York State Human Rights Law, and the New York City Equal Employment Opportunity Policy. These laws prohibit discrimination and harassment based on actual or perceived race, color, religion, national origin, sex, age, marital status, military status, sexual orientation, gender identity or expression, familial status, creed, arrest record, genetic information, disability, status as a victim of domestic violence, stalking, or sexual harassment. Discrimination in violation of the laws and policy will not be tolerated. Violators will be subject to disciplinary action.

## IV.   DEFINITIONS & TERMS – For the purposes of this Directive, the following definitions shall apply:

A.   Bisexual: Describes people of any gender who are physically, romantically, and/or emotionally attracted to people of their own gender and people of different gender identities.

B.   Complainant: A person who is alleged to have been subject to any act of sexual abuse or sexual harassment.

C.   Consent: Words or overt actions indicating a freely given agreement to the sexual act or contact in question. Lack of verbal or physical resistance or submission by the complainant resulting from use of force, threats, or coercion by the respondent shall not constitute consent.

D.   Contractor: Any person who provides services for the Department pursuant to a contractual agreement with the Department.





| 416R | | |
|---|---|---|
| | EFFECTIVE DATE<br>**5/31/19** | SUBJECT<br>**ELIMINATION OF SEXUAL ABUSE AND SEXUAL HARASSMENT** |
| | CLASSIFICATION #<br>**5011R-A** | |
| | DISTRIBUTION<br>**A** | APPROVED FOR WEB POSTING<br>[X] YES  [ ] NO |

PAGE **3** OF **44** PAGES

## II.  POLICY (Cont.)

reported. COD shall not include the name of the alleged victim or perpetrator or the sexual act allegedly committed. COD will document the sexual allegation in the Incident Reporting System (IRS) and designate the incident as either Sexual Abuse or Sexual Harassment.

K.  The Department shall make all aggregated sexual abuse data from facilities under its direct control readily available to the public at least annually through the Department website.

L.  The Department shall consider sexual abuse prevention and detection when upgrading any facilities or technology.

## III.  INTRODUCTION

A.  Applicability

This policy applies to all Department employees, contract employees, and volunteers who have contact with inmates, and any individuals who provide services at Department facilities who have contact with inmates committed to Department custody.

B.  Objectives:

1.  Within seventy-two (72) hours of arrival at each facility, inmates shall receive information about the zero-tolerance policy against sexual abuse and sexual harassment and how to report it. More comprehensive education, such as information on prevention, intervention, self-protection, reporting and investigation procedures, adjudication procedures, and the accessibility of medical and mental health counseling for complainants shall be provided within thirty (30) days of arrival.

2.  Staff will have a clear understanding that a sexual act or sexual contact between an inmate and an employee is sexual abuse, even if the inmate consents, and that sexual abuse is a felony offense under New York State Penal Law Article 130, and that the Department will pursue criminal prosecution in these cases.

3.  The occurrence of sexual abuse and sexual harassment of an inmate by another inmate may be reduced by identifying predators and vulnerable inmates who

416R

| | EFFECTIVE DATE **5/31/19** | SUBJECT | |
|---|---|---|---|
| | CLASSIFICATION # **5011R-A** | **ELIMINATION OF SEXUAL ABUSE AND SEXUAL HARASSMENT** | |
| | DISTRIBUTION **A** | APPROVED FOR WEB POSTING [X] YES [ ] NO | PAGE **2** OF **44** PAGES |



## II.   POLICY (Cont.)

prosecution. The Department shall impose disciplinary sanctions when an inmate engages in consensual or non-consensual sexual acts and/or sexual contact.

E.   Any staff who fails to report sexual abuse or sexual harassment is subject to disciplinary action.

F.   Neither New York State Law nor The Department recognizes as a defense the act of consensual sexual contact between staff and inmates. The presumptive discipline for any consensual sexual contact between a staff and an inmate is termination of the staff and a referral for prosecution. Inmates may also be disciplined for such conduct.

G.   Any contractor or volunteer who engages in sexual abuse with an inmate in Department custody shall be prohibited from any future contact with inmates and shall be reported to the law enforcement authority of jurisdiction, i.e., the New York City Police Department, unless the activity was clearly not criminal.  The Department is also required to report such acts to any relevant licensing organizations the individual may be affiliated with.

H.   The Department prohibits retaliation against any individual because of his/her involvement in the reporting or investigation of an allegation of sexual abuse or harassment. It is Department policy to treat retaliation as a separate actionable offense that is subject to separate administrative sanctions and possible referral for criminal prosecution.

I.   It is Department policy to require that all activities encompassed in reporting and investigating allegations are held in confidence and on an official "need-to-know" basis. Likewise, any records of these allegations are confidential unless the information must be shared in order to make safe housing and care decisions. These may include, but are not limited to, verbal reports, written incident reports, investigations, dispositions, medical information, mental health evaluations and findings, recommendations for post-release treatment and/or counseling, and witness statements. It is Department policy to treat any breach of confidentiality as a separately actionable offense that is subject to administrative sanctions.

J.   The Central Operations Desk (COD) shall ensure that all pertinent report information is obtained, noting who, what, where, when, how, name and shield number, and NYSID and book and case number. However, when transcribing the information on the 24-Hour Report and sending out information over the paging system, COD shall report only: facility, date and time, and the statement that a sexual allegation was

415R



**THE CITY OF NEW YORK
DEPARTMENT OF CORRECTION**

# DIRECTIVE



| [ ] NEW | [ ] INTERIM | [X] REVISED | SUBJECT | | |
|---|---|---|---|---|---|
| EFFECTIVE DATE **5/31/19** | | *TERMINATION DATE / / | **ELIMINATION OF SEXUAL ABUSE AND SEXUAL HARASSMENT** | | |
| CLASSIFICATION # **5011R-A** | SUPERSEDES **5011** | DATED **5/2/16** | APPROVED FOR WEB POSTING [X] YES [ ] NO | DISTRIBUTION **A** | PAGE 1 OF 44 PAGES |
| RECOMMENDED FOR APPROVAL BY REVIEW BOARD MEMBER *Hazel Jennings* | | | AUTHORIZED BY THE COMMISSIONER *Cynthia Brann* | | |
| HAZEL JENNINGS, CHIEF OF DEPARTMENT       SIGNATURE | | | CYNTHIA BRANN                                    SIGNATURE | | |

## I.   PURPOSE

The purpose of this Directive is to establish New York City Department of Correction (Department) policies and procedures for preventing, detecting, reporting, and responding to incidents of sexual abuse and sexual harassment against inmates in Department custody pursuant to the Prison Rape Elimination Act (PREA) of 2003.

## II.   POLICY

A.   The Department has a zero-tolerance policy toward all forms of sexual abuse and sexual harassment against any person who works, visits, or is confined in any of its facilities or contracted facilities. The Department shall respond to, investigate, and support the prosecution of all sexual misconduct within all facilities operated by the agency and its contractors.

B.   Under both Department policy (Department Rules and Regulations 3.20.170 and this Directive) and Mayor's Executive Order No. 16 (MEO-16), all staff, regardless of title, have a duty to report any sexual abuse or sexual harassment or any information regarding inappropriate relationships between an employee and inmate. Such duty to report shall include any allegations, knowledge, or reasonable belief regarding such conduct.

C.   Department Rule and Regulation 3.25.040 prohibits members of the Department from engaging in any undue familiarity with inmates or permitting undue familiarity on the part of the inmate toward themselves.

D.   The Department strictly prohibits sexual abuse, sexual harassment, and sexual contact (including that of a consensual nature) between inmates. When appropriate, sexual abuse or harassment initiated by an inmate shall be referred for criminal

ATTACHMENT C



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES

**Form: 7102R**
**Eff.: 8/23/19**
**Ref.: Dir. 3376R-A**

## DISPOSITION FORM

| Grievance Reference #:<br>**499782** | Date Filed:<br>**November 5, 2021** | Facility:<br>**GRVC – 2a** |
|---|---|---|
| Inmate Name: *Thompson (M)*<br>~~Thomas~~, Kwaine | Book and Case#:<br>**349-19-01450 *NYSID#* 07289661Q** | Category:<br>**Personal Hygiene** |

From OCGS Inmate Statement Form, print or type short description of grievance:

*"I'm grieving haircut, barbershop for not allowing a haircut."*

Action Requested by Inmate:

*"I need a haircut."*

### STEP 1: FORMAL RESOLUTION

Check one box: ■ Grievance    ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process. Grievances not subject to the Grievance Process cannot be appealed.

*OCGS investigated the matter and it has been revealed that as of October 29, 2021 GRVC has no Master Barber and currently awaiting a new hire. GRVC programs supervision has been made aware of the matter. OCGS concludes the matter of Mr. Thompson, Kwaine not receiving a haircut to be substantiated.*

### CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
*(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution   ☐ No   ☐ I request to appeal the resolution of this grievance to the Commanding officer.

*Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.*

| Inmate's Signature: | Date: |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature:<br>*Ms. Nelson* | Date:<br>November 10, 2021 |
|---|---|

Grievant Copy



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES
### INMATE STATEMENT FORM

Form.: 7101R-A
Eff.:9/14/18
Ref.: Dir. 3376R-A

| Inmate's Name: Thompson Kwaine | Book & Case #: 349-19-01450 | NYSID #: |
|---|---|---|

| Facility: G,R,V,C | Housing Area: 2A | Date of Incident: Nov, 4, 2021 | Date Submitted: Nov, 4, 2021 |
|---|---|---|---|

All grievances must be submitted within ten business days after the incident occurred, unless it's a sexual abuse or harassment allegation. The inmate filing the grievance must personally prepare this statement. Upon collection by the Office of Constituent and Grievance Services (OCGS) staff, OCGS staff will time-stamp and issue it a grievance reference number. OCGS staff shall provide the inmate with a copy of this form as a record of receipt.

**Grievance:** I'm grieving haircut, barbershop for not allowing me a haircut

**Action Requested by Inmate:** I need haircut

**Please read below and check the correct box:**

Do you agree to have your statement edited for clarification by OCGS staff?   Yes ☐   No ☐

Do you need the OCGS staff to write the grievance for you?   Yes ☐   No ☐

Have you filed this grievance with a court or other agency?   Yes ☐   No ☐

Did you require the assistance of an interpreter?   Yes ☐   No ☐

| Inmate's Signature: Kwaine Thompson | Date of Signature: Nov, 4, 2021 |
|---|---|

### FOR DOC OFFICE USE ONLY

OCGS MUST PROVIDE A COPY OF THIS FORM TO THE INMATE AS A RECORD OF RECEIPT.

THIS FORM IS INVALID UNLESS SIGNED BY THE INMATE AND GRIEVANCE COORDINATOR

| TIME STAMP: 2021 NOV -5 P 4: 22 | Grievance Reference # 499782 | Category: Personal Hygiene |
|---|---|---|
| | Office of Constituent and Grievances Services Coordinator/Officer Signature: | |

**ATTACHMENT - C**



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

| **OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES** | Form.: 7102R<br>Eff.: 8/23/19<br>Ref.: Dir. 3376R-A |
|---|---|
| **DISPOSITION FORM** | |

| Grievance Reference # 600041 | Date Filed: 11/09/22 | Facility:  GRVC 2A |
|---|---|---|

| Inmate Name: Thompson, Kwaine | Book and Case: 3491901450 | Category:<br>Recreation |
|---|---|---|

From OCGS Inmate Statement Form, print or type short description of grievance:

I was not afforded yard 10/31/22, 11/02/22, 11/06/22. I have hypertension, and I have mental issues, mental illness. I need air, sun, and the pull-up bar to exercise for my physical and mental health.

Action Requested by Inmate: To be taken to the yard daily like the policy states.

### STEP 1: FORMAL RESOLUTION

Check one box: ☑ Grievance     ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process.

The grievant has been informed his complaint has been forwarded to the Warden's office for review.

### CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
*(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution   ☐ No   ☐ I request to appeal the resolution of this grievance to the Commanding officer.

*Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.*

| Inmate's Signature: | Date: 11/09/22 |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature:<br>CO Bynno #18049 | Date: 11/09/22 |
|---|---|

# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

**OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES**
**INMATE STATEMENT FORM**

Form.: 7101 R-A
Eff.:9/14/18
Ref.: Dir. 33-76R-A

| Inmate's Name: Thompson Kusine | Book & Case #: 349-19-01450 | | NYS ID #: |
|---|---|---|---|
| Facility: G.R.V.C | Housing Area: 7A | Date of Incident: 10/30/22 | Date Submitted: 10/31/22 |

All grievances must be submitted within ten business days after the incident occurred, unless it's a sexual abuse or harassment allegation. The inmate filing the grievance must personally prepare this statement. Upon collection by the Office of Constituent and Grievance Services (OCGS) staff, OCGS staff will time-stamp and issue it a grievance reference number OCGS staff shall provide the inmate with a copy of this form as a record of receipt.

**Grievance:** I was not afforded yard, I HAVE Hypertension, and I HAVE Mental issue Mental illness, I need Air, sun, and The pull-up BAr to exercise for my physical and Mental Health

**Action Requested by Inmate:** To be taken to the yard DAily like the policy states

## Please read below and check the correct box:

| | Yes | No |
|---|---|---|
| Do you agree to have your statement edited for clarification by OCGS staff? | ☐ | ☐ |
| Do you need the OCGS staff to write the grievance for you? | ☐ | ☐ |
| Have you filed this grievance with a court or other agency? | ☐ | ☐ |
| Did you require the assistance of an interpreter? | ☐ | ☐ |

| Inmate's Signature: K. T | Date of Signature: 10/31/22 |
|---|---|

### FOR DOC OFFICE USE ONLY

OCGS MUST PROVIDE A COPY OF THIS FORM TO THE INMATE AS A RECORD OF RECEIPT.

THIS FORM IS INVALID UNLESS SIGNED BY THE INMATE AND GRIEVANCE COORDINATOR

| TIME STAMP | Grievance Reference # 60004 | Category: Recreation |
|---|---|---|
| 2022 | Office of Constituent and Grievances Services Coordinator/Officer Signature: CO Byrne 1882 |

ATTACHMENT -B-1

# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES
### INMATE STATEMENT FORM

| | |
|---|---|
| Form.: 7101RA<br>Eff.:9/14/18 | Ref. Dir. 3376R-A |

| Inmate's Name: | Book & Case #: | NYSID #: |
|---|---|---|
| Thompson, Kwame | 349-19-01450 | |

| Facility: | Housing Area: | Date of Incident: | Date Submitted: |
|---|---|---|---|
| G.R.V.C | 2A | 11/9/22 | 11/7/22 |

All grievances must be submitted within ten business days after the incident occurred, unless it's a sexual abuse or harassment allegation. The inmate filing the grievance must personally prepare this statement. Upon collection by the Office of Constituent and Grievance Services (OCGS) staff, OC GS staff will time-stamp and issue it a grievance reference number. OCGS staff shall provide the inmate a copy of this form as a record of receipt.

**Grievance:** I was not taken to the yard today. I need Air and Sunlight to exercise to benefit my medical Ailments. To not be taken to the yard is Hurting my chance of survival.

**Action Requested by Inmate:** To be taken to the yard daily My life depends on it

**Please read below and check the correct box.**

| | | | |
|---|---|---|---|
| Do you agree to have your statement edited for clarification by OCGS staff? | Yes ☐ | No ☐ |
| Do you need the OCGS staff to write the grievance for you? | Yes ☐ | No ☐ |
| Have you filed this grievance with a court or other agency? | Yes ☐ | No ☐ |
| Did you require the assistance of an interpreter? | Yes ☐ | No ☐ |

| Inmate's Signature: | Date of Signature: |
|---|---|
| K. Thompson | 11/7/22 |

**FOR DOC OFFICE USE ONLY**

OCGS MUST PROVIDE A COPY OF THIS FORM TO THE INMATE AS A RECORD OF RECEIPT.

THIS FORM IS INVALID UNLESS SIGNED BY THE INMATE AND GRIEVANCE COORDINATOR

| TIME STAMP | Grievance Reference # | Category: |
|---|---|---|
| NOV 3 22 | R006941 | Rec |

Office of Constituent and Grievances Services Coordinator/Officer Signature:





**ATTACHMENT - C**



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

| **OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES** | Form.: 7102R |
| :---: | :--- |
| **DISPOSITION FORM** | Eff.: 8/23/19<br>Ref.: Dir. 3376R-A |

| Grievance Reference # 600031 | Date Filed: 11/09/22 | Facility: GRVC 2A |
| :--- | :--- | :--- |

| Inmate Name: Thompson, Kwaine | Book and Case: 3491901450 | Category: Medical |
| :--- | :--- | :--- |

From OCGS Inmate Statement Form, print or type short description of grievance:

Today a big fire was set in unit 4A and the smoke travel to my cell.  I could not breath. I request for a medical emergency but was denied my chest ached for hours, between 8am and 11 am. I was never provided medical attention. It was very painful to endure.

Action Requested by Inmate:  To be treated equally and fair and get medical care.

## STEP 1: FORMAL RESOLUTION

Check one box:  ☑ Grievance     ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process.

The grievant has been informed his complaint has been forwarded to the medical unit for review.

## CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
*(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution   ☐ No   ☐I request to appeal the resolution of this grievance to the Commanding officer.

*Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.*

| Inmate's Signature: | Date: 11/09/22 |
| :--- | :--- |

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature:<br>Co Bejane 18049 | Date: 11/09/22 |
| :--- | :--- |

ATTACHMENT-B-I



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES
### INMATE STATEMENT FORM



Form.: 7101 R-A
Eff.:9/14/18
Ref.: Dir. 33 76R-A

| Inmate's Name: Thompson Kwsino | Book & Case #: 349-19- 01450 | NYS ID #: |
|---|---|---|

| Facility: G.R.V.C | Housing Area: 2A | Date of incident: 10/27/22 | Date Submitted: 10/27/22 |
|---|---|---|---|

All grievances must be submitted within ten business days after the incident occurred, unless it's a sexual abuse or harassment allegation. The inmate filing the grievance must personally prepare this statement. Upon collection by the Office of Constituent and Grievance Services (OCGS) staff, OCGS staff will time-stamp and issue it a grievance reference number. OCGS staff shall provide the inmate with a copy of this form as a record of receipt.

**Grievance:** Today A BIG FIRE WAS set IN UNIT 4/A And the smoke travel to my cell I could not breath, I request for a Medical emergency but was denied My chest Ached for hours. Between 8 AM & 11 AM I was Never provided Medical Attention. It was very painful to endure.

**Action Requested by Inmate:** To be treated equally and FAIr and get medical care

**Please read below and check the correct box:**

Do you agree to have your statement edited for clarification by OCGS staff?   Yes ☐   No ☐

Do you need the OCGS staff to write the grievance for you?   Yes ☐   No ☐

Have you filed this grievance with a court or other agency?   Yes ☐   No ☐

Did you require the assistance of an interpreter?   Yes ☐   No ☐

| Inmate's Signature: | Date of Signature: 10/27/22 |
|---|---|

### FOR DOC OFFICE USE ONLY

**OCGS MUST PROVIDE A COPY OF THIS FORM TO THE INMATE AS A RECORD OF RECEIPT.**

THIS FORM IS INVALID UNLESS SIGNED BY THE INMATE AND GRIEVANCE COORDINATOR

| TIME STAMP 2022 NOV -3 A 9:08 | Grievance Reference # 60003/ | Category: Medical |
|---|---|---|
| | Office of Constituent and Grievances Services Coordinator/Officer Signature: C o Byrne # 18847 | |



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

| **OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES** | Form.: 7102R<br>Eff.: 8/23/19<br>Ref.: Dir. 3376R-A |
|---|---|
| **DISPOSITION FORM** | |

| Grievance Reference # 599424 | Date Filed: 11/07/22 | Facility: GRVC 2A |
|---|---|---|

| Inmate Name: Thompson, Kwaine | Book and Case: 3491901450 | Category: NG Staff Complaint |
|---|---|---|

From OCGS Inmate Statement Form, print or type short description of grievance:

6:50pm my constitutional rights to privacy when talking to my legal advisor is being violated 10/17/22. On 10/18/22 CO Graves did not allow me to call my attorney at lunch time, see gentec. On 10/22/22 at 12:30pm CO Young dialed my legal advisor in violation of my constitutional rights, call was given at 8:45pm.

Action Requested by Inmate: To be able to call attorney when needed.

## STEP 1: FORMAL RESOLUTION

Check one box: ☐ Grievance     ☑ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process.

The person in custody has been informed his complaint has been forwarded to the Warden's office for review.

## CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
### *(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution   ☐ No   ☐I request to appeal the resolution of this grievance to the Commanding officer.

*Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.*

| Inmate's Signature: | Date: 11/07/22 |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature:<br>CoByrne 18849 | Date: 11/07/22 |
|---|---|



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES
### INMATE STATEMENT FORM

Form.: 7101 R-A
Eff.:9/14/18
Ref.: Dir. 3376R-A



| Inmate's Name: Thompson Kwaine | Book & Case #: 349-19-01450 | NYS ID #: |
|---|---|---|

| Facility: G.R.V.C | Housing Area: 2A | Date of Incident: 10/24/22 | Date Submitted: 10/31/22 |
|---|---|---|---|

All grievances must be submitted within ten business days after the incident occurred, unless it's a sexual abuse or harassment allegation. The inmate filing the grievance must personally prepare this statement. Upon collection by the Office of Constituent and Grievance Services (OCGS) staff, OCGS staff will time-stamp and issue it a grievance reference number. OCGS staff shall provide the inmate with a copy of this form as a record of receipt.

**Grievance:** I HAve Not been train in Accordance with Directive 3750 "Inmate Orientation" And i'm not allowed to Access the Sexual Abuse Hotline for inmates to Report Retalistion A violation of my Constitutional Rights

**Action Requested by Inmate:** To Be Able to Access The Sexual Abuse Hotline

### Please read below and check the correct box:

| | Yes | No |
|---|---|---|
| Do you agree to have your statement edited for clarification by OCGS staff? | ☐ | ☐ |
| Do you need the OCGS staff to write the grievance for you? | ☐ | ☐ |
| Have you filed this grievance with a court or other agency? | ☐ | ☐ |
| Did you require the assistance of an interpreter? | ☐ | ☐ |

| Inmate's Signature: | Date of Signature: 10/31/22 |
|---|---|

### FOR DOC OFFICE USE ONLY

OCGS MUST PROVIDE A COPY OF THIS FORM TO THE INMATE AS A RECORD OF RECEIPT.

THIS FORM IS INVALID UNLESS SIGNED BY THE INMATE AND GRIEVANCE COORDINATOR

| TIME STAMP 2022 | Grievance Reference # 599144 | Category: Return of Grievance |
|---|---|---|
| | Office of Constituent and Grievances Services Coordinator/Officer Signature: CO Bernett 8849 | |

ATTACHMENT - C



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

| **OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES** | Form.: 7102R<br>Eff.: 8/23/19<br>Ref.: Dir. 3376R-A |
|---|---|
| **DISPOSITION FORM** | |

| Grievance Reference #610859 | Date Filed: 12/16/22 | Facility: **NIC** |
|---|---|---|

| Inmate Name:  Thompson Kwaine | Book and Case#: 349190450<br>349190450 | Category: Law Library |
|---|---|---|

From OCGS Inmate Statement Form, print or type short description of grievance:

I am a pro-se litigant I need a kiosk and a typewriter to address the courts properly and a legal coordinator that I can talk to and exchange ideas.

Action Requested by Inmate:

To be afforded proper law library

## STEP 1: FORMAL RESOLUTION

Check one box: ☑ Grievance          ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process. Grievances not subject to the Grievance Process cannot be appealed.

OCGS staff would like to inform grievant that your requested action will be forwarded to Law Library director for handling.

## CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
*(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution   ☐ No   ☐ I request to appeal the resolution of this grievance to the Commanding officer.

*Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.*

| Inmate's Signature: | Date: |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature: | Date: 12/20/22 |
|---|---|

ATTACHMENT -B-1



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES
### INMATE STATEMENT FORM

Form.: 7101R-A
Eff.:9/14/18
Ref.: Dir. 3376R-A

| Inmate's Name: Thompson Kevin | Book & Case #: 349-9-01450 | NYSID #: 09289001Q |
|---|---|---|

| Facility: West facility | Housing Area: Spring 6 | Date of Incident: 12/16/22 | Date Submitted: 12/16/22 |
|---|---|---|---|

All grievances must be submitted within ten business days after the incident occurred, unless it's a sexual abuse or harassment allegation. The inmate filing the grievance must personally prepare this statement. Upon collection by the Office of Constituent and Grievance Services (OCGS) staff, OCGS staff will time-stamp and issue it a grievance reference number. OCGS staff shall provide the inmate with a copy of this form as a record of receipt.

**Grievance:** I am a Pro-Se litigant I need a Kiosk and a typ writer to address the courts properly and a legal coordinator That I can talk to and exchange ideas

**Action Requested by Inmate:** To be Afforded proper law library

### Please read below and check the correct box:

Do you agree to have your statement edited for clarification by OCGS staff?      Yes ☐   No ☐

Do you need the OCGS staff to write the grievance for you?      Yes ☐   No ☐

Have you filed this grievance with a court or other agency?      Yes ☐   No ☐

Did you require the assistance of an interpreter?      Yes ☐   No ☐

| Inmate's Signature: | Date of Signature: 12/16/22 |
|---|---|

### FOR DOC OFFICE USE ONLY

OCGS MUST PROVIDE A COPY OF THIS FORM TO THE INMATE AS A RECORD OF RECEIPT.

THIS FORM IS INVALID UNLESS SIGNED BY THE INMATE AND GRIEVANCE COORDINATOR

| TIME STAMP | Grievance Reference # 610859 | Category: Law Library |
|---|---|---|
| | Office of Constituent and Grievances Services Coordinator/Officer Signature: K. Kelly | |

ATTACHMENT - C



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

| **OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES** | Form.: 7102R<br>Eff.: 8/23/19<br>Ref.: Dir. 3376R-A |
|---|---|
| **DISPOSITION FORM** | |

| Grievance Reference #~~610852~~  610855 | Date Filed: 12/16/22 | Facility: **W/F** |
|---|---|---|

| Inmate Name:  Thompson Kwaine | Book and Case#: 3491901450 | Category: Laundry |
|---|---|---|

From OCGS Inmate Statement Form, print or type short description of grievance:

I want to change my sheets towels and pillowcase, but I was told they don't do that here at west facility.

Action Requested by Inmate:

To change my sheets weekly like everybody else

### STEP 1: FORMAL RESOLUTION

Check one box: ☒ Grievance      ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process. Grievances not subject to the Grievance Process cannot be appealed.

OCGS verified that grievant housing area have not been provided linen exchange due to the officer being shift reduced. This complaint would be forwarded the Warden for handling.

### CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
***(Failure to sign forms will forgo your right to appeal the proposed resolution.)***

☐ Yes, I accept the resolution   ☐ No   ☐ I request to appeal the resolution of this grievance to the Commanding officer.

*Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.*

| Inmate's Signature: | Date: |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature:  *K. Kelly* | Date:  12/20/22 |
|---|---|



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES
### INMATE STATEMENT FORM



Form.: 7101R-A
Eff.:9/14/18
Ref.: Dir. 3376R-A

| Inmate's Name: Thompson Kwine | Book & Case #: 349-19-01450 | NYSID #: 07289610610 |
|---|---|---|

| Facility: West Facility | Housing Area: Sprung 6 | Date of Incident: 12/16/22 | Date Submitted: 12/16/22 |
|---|---|---|---|

All grievances must be submitted within ten business days after the incident occurred, unless it's a sexual abuse or harassment allegation. The inmate filing the grievance must personally prepare this statement. Upon collection by the Office of Constituent and Grievance Services (OCGS) staff, OCGS staff will time-stamp and issue it a grievance reference number. OCGS staff shall provide the inmate with a copy of this form as a record of receipt.

**Grievance:** I want to change my sheets towels and pillow case, but I was told they don't do that Here at west Facility

**Action Requested by Inmate:** To change my sheets weekly like everybody else

### Please read below and check the correct box:

| | | |
|---|---|---|
| Do you agree to have your statement edited for clarification by OCGS staff? | Yes ☐ | No ☐ |
| Do you need the OCGS staff to write the grievance for you? | Yes ☐ | No ☐ |
| Have you filed this grievance with a court or other agency? | Yes ☐ | No ☐ |
| Did you require the assistance of an interpreter? | Yes ☐ | No ☐ |

| Inmate's Signature: | Date of Signature: 12/16/22 |
|---|---|

### FOR DOC OFFICE USE ONLY

**OCGS MUST PROVIDE A COPY OF THIS FORM TO THE INMATE AS A RECORD OF RECEIPT.**

**THIS FORM IS INVALID UNLESS SIGNED BY THE INMATE AND GRIEVANCE COORDINATOR**

| TIME STAMP | Grievance Reference # 010855 | Category: Laundry |
|---|---|---|
| | Office of Constituent and Grievances Services Coordinator/Officer Signature: K. Kelly #11002 | |

ATTACHMENT - C

 

# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

| OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES | Form.: 7102R |
| | Eff.: 8/23/19 |
| **DISPOSITION FORM** | Ref.: Dir. 3376R-A |

| Grievance Reference #805588 | Date Filed: 11/29/22 | Facility: GRVC 2A |

| Inmate Name: Thompson, Kwaine | Book and Case: 3491901450 | Category: recreation |

From OCGS Inmate Statement Form, print or type short description of grievance:

On 11/14/22 recreation was not afforded 11/15/22 no rec. The Warden has been notified and nothing has changed in this conduct.

Action Requested by Inmate:   To get sunlight and fresh air daily.

## STEP 1: FORMAL RESOLUTION

Check one box:  ☑ Grievance     ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below.
Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process.

The OCGS staff has reviewed your complaint and learned no recreation has been afforded on 11/14/22 or 11/15/22.

## CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
*(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution   ☐ No   ☐ I request to appeal the resolution of this grievance to the Commanding officer.

*Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.*

| Inmate's Signature: | Date: 11/29/22 |

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature: | Date: 11/29/22 |

ATTACHMENT -B-1

# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES
### INMATE STATEMENT FORM

Form: 7101R-A
Eff: 9/14/18
Ref.: Dir. 3376R-A

| Inmate's Name: Thompson Kwame | Book & Case #: 349-19-01450 | NYSID #: 072896610 |
|---|---|---|
| Facility: G.R.V.C | Housing Area: 2A | Date of Incident: 11/14/22 | Date Submitted: 11/15/22 |

All grievances must be submitted within ten business days after the incident occurred, unless it's a sexual abuse or harassment allegation. The inmate filing the grievance must personally prepare this statement. Upon collection by the Office of Constituent and Grievance Services (OCGS) staff, OCGS staff will time-stamp and issue it a grievance reference number. OCGS staff shall provide the inmate with a copy of this form as a record of receipt.

**Grievance:** I was not afforded yard yesterday and Today. I need to Exercise and get Sunlight Because I have serious medical conditions

**Action Requested by Inmate:** To get sunlight and fresh Air daily

### Please read below and check the correct box:

| | Yes | No |
|---|---|---|
| Do you agree to have your statement edited for clarification by OCGS staff? | ☐ | ☐ |
| Do you need the OCGS staff to write the grievance for you? | ☐ | ☐ |
| Have you filed this grievance with a court or other agency? | ☐ | ☐ |
| Did you require the assistance of an interpreter? | ☐ | ☐ |

| Inmate's Signature: | Date of Signature: 11/15/22 |
|---|---|

### FOR DOC OFFICE USE ONLY

OCGS MUST PROVIDE A COPY OF THIS FORM TO THE INMATE AS A RECORD OF RECEIPT.

THIS FORM IS INVALID UNLESS SIGNED BY THE INMATE AND GRIEVANCE COORDINATOR

| TIME STAMP | Grievance Reference # 605588 | Category: RoC |
|---|---|---|
| | Office of Constituent and Grievances Services Coordinator/Officer Signature: CO Byrne #18629 | |

**ATTACHMENT - C**



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

| **OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES** | Form.: 7102R<br>Eff.: 8/23/19<br>Ref.: Dir. 3376R-A |
|---|---|
| **DISPOSITION FORM** | |

| Grievance Reference # 599424 | Date Filed: 11/07/22 | Facility: GRVC 2A |
|---|---|---|

| Inmate Name: Thompson, Kwaine | Book and Case: 3491901450 | Category: NG Staff Complaint |
|---|---|---|

From OCGS Inmate Statement Form, print or type short description of grievance:

6:50pm my constitutional rights to privacy when talking to my legal advisor is being violated 10/17/22. On 10/18/22 CO Graves did not allow me to call my attorney at lunch time, see gentec. On 10/22/22 at 12:30pm CO Young dialed my legal advisor in violation of my constitutional rights, call was given at 8:45pm.

Action Requested by Inmate: To be able to call attorney when needed.

## STEP 1: FORMAL RESOLUTION

Check one box: ☐ Grievance ☑ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process.

The person in custody has been informed his complaint has been forwarded to the Warden's office for review.

## CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
*(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution ☐ No ☐ I request to appeal the resolution of this grievance to the Commanding officer.

*Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.*

| Inmate's Signature: | Date: 11/07/22 |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature:<br>CoByRne 18749 | Date: 11/07/22 |
|---|---|

**ATTACHMENT - C**

# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

| OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES | Form.: 7102R<br>Eff.: 8/23/19 |
|---|---|
| **DISPOSITION FORM** | Ref.: Dir. 3376R-A |

| Grievance Reference #:<br>**620775** | Date Filed:<br>**01/18/2023** | Facility:<br>**GRVC – 1A** |
|---|---|---|
| Inmate Name:<br>**Thompson, Kwaine** | Book and Case#:<br>**3491901450** *NYSID#* **07289661Q** | Category:<br>**Medical** |

From OCGS Inmate Statement Form, print or type short description of grievance:

I was not given my Asthma pump when I was Housed In a freshly painted housing area 1A. They kept my asthma pump in the intake. I beg and pleaded to get my asthma pump.

Action Requested by Inmate:

To be given my asthma pump.

## STEP 1: FORMAL RESOLUTION

Check one box: ■ Grievance        ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process. Grievances not subject to the Grievance Process cannot be appealed.

OCGS informed Mr. Thompson, Kwaine as per NYCH&H Correctional Health Services this matter has been forwarded to Patient Relations for review and handling. In addition, this matter has been forwarded to the GRVC Medical Team as well as the Warden's Office

## CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
*(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution   ☐ No   ☐I request to appeal the resolution of this grievance to the Commanding officer.

*Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.*

| Inmate's Signature: | Date: |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature:<br>*Mr. Parris* | Date:<br>01/19/2023 |
|---|---|

ATTACHMENT - C

# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES

## DISPOSITION FORM

Form.: 7102R
Eff.: 8/23/19
Ref.: Dir. 3376R-A

| Grievance Reference #:<br>**620783** | Date Filed:<br>**01/18/2023** | Facility:<br>**GRVC – 1A** |
|---|---|---|
| Inmate Name:<br>**Thompson, Kwaine** | Book and Case#:<br>**3491901450** *NYSID#* **07289661Q** | Category:<br>**Recreation** |

From OCGS Inmate Statement Form, print or type short description of grievance:

I was not afforded yard.

Action Requested by Inmate:

To be afforded Yard Daily

### STEP 1: FORMAL RESOLUTION

Check one box: ■ Grievance      ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process. Grievances not subject to the Grievance Process cannot be appealed.

OCGS inquired about recreation, and it has been revealed that Mr. Thompson, Kwaine housing area was not provided with recreation on 1/16/2023. OCGS concludes this matter to be substantiated and rectified. No additional action required.

### CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
*(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution   ☐ No   ☐ I request to appeal the resolution of this grievance to the Commanding officer.

*Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.*

| Inmate's Signature: | Date: |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature:<br>*Mr. Parris* | Date:<br>01/19/2023 |
|---|---|

**ATTACHMENT - C**

# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

### OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES

Form.: 7102R
Eff.: 8/23/19
Ref.: Dir. 3376R-A

## DISPOSITION FORM

| Grievance Reference #:<br>**624230** | Date Filed:<br>**01/30/2023** | Facility:<br>**GRVC – 1A** |
|---|---|---|
| Inmate Name:<br>**Thompson, Kwaine** | Book and Case#:<br>**3491901450 *NYSID# 07289661Q*** | Category:<br>**Staff** |

From OCGS Inmate Statement Form, print or type short description of grievance:

I was told by Branche she will not call medical emergency unless I drop the lawsuit.

Action Requested by Inmate:

To not be retaliated against by Officers I sued.

---

### STEP 1: FORMAL RESOLUTION

Check one box: ■ Grievance  ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process. Grievances not subject to the Grievance Process cannot be appealed.

OCGS informed Mr. Thompson, Kwaine that as per DOC Directive 3376R-A.II.5-6 "Staff Complaint" submissions do not fall under the purview of OCGS and that his complaints/concerns have been forwarded to the Warden's Office for investigation/resolution.

---

### CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
*(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution  ☐ No  ☐ I request to appeal the resolution of this grievance to the Commanding officer.

*Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.*

| Inmate's Signature: | Date: |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature:<br>*Mr. Parris* | Date:<br>01/30/2023 |
|---|---|

ATTACHMENT - C



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

| **OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES** | Form.: 7102R<br>Eff.: 8/23/19<br>Ref.: Dir. 3376R-A |
|---|---|
| **DISPOSITION FORM** | |

| Grievance Reference #:<br>**624251** | Date Filed:<br>**01/30/2023** | Facility:<br>**GRVC – 1A** |
|---|---|---|
| Inmate Name:<br>**Thompson, Kwaine** | Book and Case#:<br>**3491901450 *NYSID# 07289661Q*** | Category:<br>**Recreation** |

From OCGS Inmate Statement Form, print or type short description of grievance:

The first 6 days I entered Housing unit 1A. I was not afforded Recreation.

Action Requested by Inmate:

To be given recreation daily like an American Citizen.

## STEP 1: FORMAL RESOLUTION

Check one box: ■ Grievance ☐ Submission is not subjected to the Grievance Process

The Office Of Constituent and Grievance Services proposes to formally resolve your grievance as follows below. Alternatively, OCGS staff shall provide an explanation for why the submission is not subject to the OCGS process. Grievances not subject to the Grievance Process cannot be appealed.

OCGS investigated and it has been revealed that housing area 1A was not afforded Recreation on the dates in question. Your claim is substantiated and was forwarded to the Warden's Office for investigation/resolution.

## CHECK THE APPROPRIATE BOX BELOW AND PROVIDE YOUR SIGNATURE
### *(Failure to sign forms will forgo your right to appeal the proposed resolution.)*

☐ Yes, I accept the resolution   ☐ No   ☐ I request to appeal the resolution of this grievance to the Commanding officer.

*Note: If you appeal, the grievance staff can request for a preliminary based review if they feel the complaint was thoroughly investigated and addressed, prior to forwarding to the Commanding Officer. You will receive the outcome of this review within (3) business days to inform you the appeal will proceed or you exhausted administrative remedies. Grievance not subject to the Grievance Process cannot be appealed.*

| Inmate's Signature: | Date: |
|---|---|

☐ Preliminary Review Requested

| Grievance Coordinator/Officer Signature:<br>*Mr. Parris* | Date:<br>01/30/2023 |
|---|---|

EXHIBIT-H

THIS EXHIBIT IS A SETTLEMENT AGAINST NOTORIOUS RIKER'S ISLAND AND ITS
STAFF FOR ALL THE MISSED MEDICAL APPOINTMENTS, NO FAULT OF DETAINESS.
THIS WILL SHOW YOU A JUDGEMENT BY XHRX  HON. JUDGE ELIZABETH TAYLOR HOLDS
DEPARTMENT OF CORRECTIONS OF CONTEMPT FOR FAILING THE INMATES. AND PLAINTIFF
FALLS AS ANOTHER VICTIM OF DEPARTMENT OF CORRECTIONS FAILED MEDICAL
PRACTICES. PLAINTIFF WILL NEVER PHYSICALLY OR MENTALLY EVER BE THE SAME.

# NYC should pay Rikers inmates $3M for failing to take them to medical appointments, say detainee lawyers

New York City should pay Rikers Island detainees $3 million for failing to bring them to medical appointments between February and October, lawyers representing detainees told a Bronx judge.

The Legal Aid Society and Brooklyn Defender Services want the city to pay detainees $250 for each of the 12,354 missed medical appointments which occurred because Department of Correction staff did not escort them to their doctor visits or there was no space in the jail clinics, according to papers filed in Bronx Supreme Court.

 "Despite having already been held in contempt by a court, DOC has denied thousands more people access to medical appointments, and the department must be held in contempt once again for its continued failure to abide by explicit legal obligations and various court orders," the public defender organizations said in a statement.

In a statement, city Law Department spokesman Nicholas Paolucci said the majority of missed appointments are because detainees refuse to go as is their right. The number attributable to lack of an escort represents only less than half a percent of all scheduled appointments, he said.

"DOC is doing everything it can to meet the demanding number of scheduled appointments for the people in its custodial care. More than 525,000 appointments have been scheduled so far this year," Paolucci said.

The Correction Department did not respond to a request for comment.

Rikers Island (Theodore Parisienne/for New York Daily News)

The demand contained in a legal motion filed Monday stems from a class action lawsuit, Agnew v. City of New York, which alleges that city jail officials systematically failed to bring many people to appointments for more than a year.

In August, Judge Elizabeth Taylor, who is presiding over the case, ordered the city to pay $200,000 in contempt fines for missed visits prior to February. The city is appealing the ruling.

Taylor initially ruled the city was failing to perform its responsibility to get people to appointments in December 2021 and ordered the Correction Department to fix the problem. She then found the city in contempt in May for failing to do so.

Key to the judge's decision was an admission by then Chief of Facility Operations Ada Pressley who acknowledged in an affidavit it was impossible for the Correction Department to comply because of staff absenteeism.

The 12,354 missed appointments between February and October does not include visits missed for a range of other reasons, including lock-downs. Legal Aid has previously alleged that in some cases, staff fudged the numbers to suggest prisoners refused to go to visits when they had not.

In November, the Board of Correction reported a link between missed medical visits and some of the deaths that took place in the jails in 2022. In the death of Dashawn Carter on May 7, for example, the board reported he missed 92 visits including 76 because staff didn't escort him.

Elijah Muhammad, who died of a fentanyl overdose July 10, missed 118 visits from September 2020 until his death including 100 because he wasn't produced, the board said.

"People in the jails continue to suffer countless harms from delay and outright denial of access to injury care, chronic care, and critical medications, contributing to the highest death rate in DOC facilities in over 25 years," the public defender groups said.

Nineteen people have died in DOC custody in 2022, the most since 2013, when there were 23 — but the jail population is about half the size it was then.

SUPPLEMTAL DUE PROCESS ARGUMENT:

DUE PROCESS VIOLATION

PETITIONER/PLAINTIFF KWAINE THOMPSON WAS CLASSIFIED AS I.C.R./RED I.D AND
ENHANCE RESTRAINT INMATE.

PLAINTIFF WAS NEVER SERVED NOTICE,NOR WAS HE EVER PRODUCE TO ANY OF THE
HEARINGS THAT DEFENDANT(S) CLAIM PLAINTIFF REFUSED TO GO TO.
40 RCNY & 6-24 DUE PROCESS AND PROCEDURAL JUSTICE FOR DOC STATES UNDER
(C)(6) THAT DOC  OFFICIALS MUST VIDEO RECORD ANY/ALL INMATES REFUSAL TO
SIGN ANY NOTICE OF INFRACTION AND (D)(5) STATES DOC MUST VIDEO RECORD
ANY INMATE REFUSAL TO ATTEND HEARING.

DEFENDANT(S) CANNOT PRODUCE PRODUCE EITHER SUPPORTING EVIDENCE THE THREE
CLASSIFICATIONS OF I.C.R/RED I.D AND ENHANCE RESTRAINTS THAT PLAINTIFF
KWAINE THOMPSON WENT TO A HEARING FOR. NOR CAN DEFENDANT(S) SUPPLY THE
COURTS WITH ANY DOCUMENTATION THAT PLAINTIFF KWAINE THOMPSON WAS FOUND
GUILTY AT THIS HEARING SUBJECTING HIM TO ANYONE OF THESE CLASSIFICATIONS.
DOC DIRECTIVE 4518 R-A STATE THAT AN INMATE MUST BE SERVED "NOTICE" BEFORE
THE DEPARTMENT INSTITUTE/IMPLEMENT ANY OF THESE 3 CLASSIFICATIONS.
DOC IS IN VIOLATION WHICH IS ESTABLISH BY THE COURTS IN, McCRAY-V-LEE,963
F.3d 110, 117 (2d CIR.2020). STATING THAT THE "SUBSTANTIAL" DUE PROCESS
SECTION OF THE NEW YORK STATE AND THE UNITED STATES CONSTITUTION THAT
DETAINEES ARE PROTECTED FROM DEPRIVATION OF LIBERTY WITHOUT DUE PROCESS.

     IT IS WELL KNOWN THAT PLAINTIFF KWAINE THOMPSON RIGHTS ARE CONSTRUED
UNDER THE 14TH AMENDMENT DUE PROCESS CLAUSE THE DEFENDANT(S) HAS BEEN PLACED
ON NOTICE OF THESE DUE PROCESS RIGHTS IN WOLFF-V-McDONNELL  ALLAH-V-MILLING
876 F.3d 58; BELL-V-WALFISH,441 U.S. 520; BEST-V- NYC DEPARTMENT OF CORR;
14 F. SUPP 3d 348 AND BENJAMIN-V-FRASER 26 F.3d 175.

     FOR REASONS STATED PLAINTIFF DEMANDS DEFENDANT(S) SHOW CAUSE OF WHY
CLASSIFICATION OF I.C.R/RED I.D AND ENHANCE RESTRAINTS WAS PLACED ON PLAINTIFF
?  AND IF THEY CAN'T THEY ENTER INTO SUMMARY JUDGEMENT TALKS.

F.A.L.T. ACT VIOLATIONS

## HALT ACT VIOLATIONS:

Respondents ADW Harris, Co Mcniel (OSIU OFFICER) , Wraden Cort and Thomas Griffin tours the petitioners housing unit weekly to make logbook notations that there is nothing to report wrong on housing unit 1a.

Adw Harris and CO Mcniel have both stated to the petitioner that 23/1 had been abolished but that they were going to do what it was that they wanted until someone physically chnaged that.

Each of the respondents named herein are aware that they are in violation of Correction law and state law as it relates to the Humane Alterntiv to longterm solitary confinement act because each of the respondents are aware that the facility GRVC were they are assigned to as high ranking DOC officials no longer maintain a BOX/SHU like housing unit.

It is the Halt Act that brought about the end of a DOC era for the BOX/SHU and in that same new york state bill that also abolished any form of confinement stating that DOC if prohibited from maintiang any housing unit "SEGREGATED CONFINEMENT" were an inmate is housed in the manner of being confined to their cell more than 17 hours a day.

Therefore the respondents have no argument that can support the existance of housing unit 1a where as ARTICLE III of the New York State Const., clearly explains that the judges authority/power exxtends as far as the state law goes. Meaning that a Judge does not have the power/authority to override state and correction law.

To further support this argument the petitioner directs the court attention to the current battle in the Bial Reform isue where the judical system is arguing that the judges need more leeway in judicial discretion in remaining defendants when they get arrested due to arguments that the bail reform law forces / prohibits a judge from over riding and remanding

an arrestee because the judge lacks the power/authority to do so by law.

The petitioner argument is verus to that current arguemnt by way of displaying that a judge must act within the coinfines of the law.

In this instance matter the respondents are liable for failing to inform not just his judge byy way of officials communication channels but the entire judicial system that New york City is no longer by law (HALT ACT) allowed to legally housed inmates more than 17 hours a day in a cell under confinement.

Furthermore as a secondary arguemnt the petitioner JLO Judicial Lockdown order is not suppose to be implemented in a punitive fashion, but in this case the respondents have used the JLO to circumvent the law and ap is current appying punitive measures under the petitioners and others alike.

An example of this is in Respondents Mcniel conduct of threatening the petitioner and ordering correction officers working the housing unit floor not to allow the petitioner to engage in protected acts such a taking a shower, sending and reciving mail and cleaning his cell when needed.

The respondent ADW Harris harras correction oficers by way of forcing them to write essay's and report under the illusion that they are in violation of Departmental rules when they allow the petitioner to take a shower and/or walk to the garbage can to empty out trash that was colletced in their cells over s short period of time.

Other condition of the petitioners confinement that is currently in violation of the law as well as the petitioners rights are as followed:

- UNIT 1A LACKS MAILBOX AND DOC CORRESPONDACE DIRECTIVE CLEARLY STATES THAT"INMATES SHALL PLACE THEIR MAIL IN A LOCKED RECIPTICLE BOX TO BE PICKED UP BY MAILROOM CORRECTION STAFF ONLY"

- SHOWER AREA DOES NOT HAVE MATS TO ENSURE PETITIONERS AND OTHERS
  DO NOT SLIP AND INJURE THEMSELVES AS WELL AS CLEAN REGULARLY TO PREVENT
  FUNGUS LIKE THE PETITIONER HAS ACQUIRED SINCE BEING HOUSED IN UNIT 1A.

- PETITIONER IS NOT ALLOWED TO SEE MEDICAL/SICK-CALL IN THE FACILITY
  CLINIC AREA WHIHC IS A CUTOM, PRACTICE, POLCTY BEING USED BY THE RESPONDI
  WHIHC WAS CUASED THE PETITIONER NOT TO BE ABLE TO SEEK ADQAUTE
  MEDICAL CARE AND TO BE SEEN BY DOCTORS THROUGH HIS CELL WINDOW WHICH IS I
  NOT PROPER AREA FOR MEDICAL EXAMINATION NOR AN AREA THAT FITS THE LEGAL I
  CRITERIA OF A MEDICAL TREATMENT AREA.

- PETITIONER IS NOT GIVEN ANY CLEANING SUPPLIES TO CLEAN HIS CELL.

- PETITIONER IS NOT GIVEN ANY PROGRAMS, LIBRARY BOOKS, TV ACCES ETC.

- PETITIONER DOESN NOT HAVE A TABLE AND CHAIR IN HIS CELL.

- PETITIONER IS MUSLIM AND HIS FOOD IS SERVED BY CORRECTION OFFICERS
  WHO DO NOT POSESS FOOD HANDLING CERTIFCATES.

- PETITIONER IS NOT ALLOWED TO GET A HAIR AND RESPONDENTS HAVE NO
  BARBERSHOP DAY (STATING PETITIONER CAN NOT BE AROUND POPULATION
  INMATES BUT RESPONDENTS ALLOW THESE SAME INMATES TO ENTER UNIT 2X DAILY *
  TO CLEAN HOUSING UNIT 1A)

- PETITIONER HAS NOT BE AFFORDED HIS HALAH MEALS PURSUNAT TO HIS RELIGIOUS
  DIETARY.

These condition amount to being punitive in nature but the respondents
have not afforded due process allowing petitioner opportunity to present
legal arguemnt in his favor.

## VIOLATION OF STATE EQUAL PROTECTION RIGHTS;

Respodnets New York City Dep't of correction currently maintain
three other city facilities where Court Order lockdown inmates are held
pursuant to a JLO.

These jails are N.I.C. North Infirmary Command, MDC Manhattan Detention
Complex and west Facility.

At each of these other three jails the inmates housed there are
not under punitive measures and do not receiev the same treatement as the
respondnets at GRVC give to the petitioner and others alike.

At each of the listed facilities Court Ordered lockdown inamtes received medical and sick-call when reqquested without delay or retaliation as petitioner has constant recived from respondent CO Mcniel and ADW Harris.

At each of the facilities listed above the court ordered lockdown inmates have access to a TV in their cell unlike the petitioners and otherds alike at GRVC.

At each of the facilities listed above court ordered lcokdown inmates recived their meals under proper conditions and served by food handling certifcation personal as wel las reciving meals that in accordance with their reeligious Diet.

The respondents herein has a hátory history of being in violation of GRVc inmate at court order lcokdwon religious belifs and religious diets and the petitioner points to the following cases as support of this . FLORES V. CITY OF NEW YORK, 2022 U.S. DIST LEXIS 140941; WILLIAMS V. CITY OF NEW YORK ET AL, 2022 U.S. DIST 140969, where DOC officials and City of New york wa found to be in violation of maintaining a custom policy as it relates to religious restriction including religious diets.

Also in the matter of respondent CO Mcniel he was also found liable to be enagging in conduct that violated court order inmates rights by way of the First Amendment Retalaition as seen in WILLIAMS V. CITY OF NEW YORKET AL, 2022 U.S. DIST 140969. FLORESX V. CITY OF NEW YORK ET AL, 2022 U.S. DIST LEXIS 140941; AND JOHMANNI ANDUZE V. CITY OF NEW YORK ET AL, 2022 U.S. DIST LEXIS 140929.

At the other listed facilities where the court ordered inmates are detainee those inmates have tables and chairs in thier cell for workinhg, writing letter, etc.

The petitioner and other inmates housed in 1a are under same callsificat aand when the  respondents herein house them in diffrent fashion/manners/nature that housing can constitute violation of the petitioners Equal Protection Rights. See HARNAGE V. DZURENDA,  176 F. Supp. 3d 40; AND OBA HASSAN HAT BEY V. CITY OF NEW YORK ,  2009 U.S. DIST LEXIS 87793.


## DENIAL OF MEDICAL IN ADQAUTE FASHION:

Seeing being housed in 1a unit from Jan 16, 2023 to present date on at least once occassiuon the petitioner was in need of medical and having difficulties breathing.

It is belived to be the date of Jan 16 or 17, 2023 that while in need of medical emergency the respondent CO Mcniel walked into housing unit 1a, witness petitioner in need of medical and was informed by Correction officer St Hillare that he had called medical emergency some 30 mintues and respondent CO Mcniel smiled at the petitioner who was on his cell door gasping for air and loged in housing unit logbook that their was no incidents to report.

On a seperate medical incident of another court order inmate on February 4, 2023 in Alexander Williams was gasping for air, close to be unconcsious and was not responding to correction officer calls and when medical emergency was called by a Capt Palmero 18888 respondent ADW Harris called housing unit 1a and transmitted over facilkity wailkie talkie that inmate williams and court order inmates were not allowed to facility clinic.

When Capt Pelmero 1888 explained over radio that the medical need looked to be dire in nature respondent ADW Harris answered that their were (3) other medical emergencies in front of inmate Alexander Williams.

Needless to say inmate Williams was not taken to clinic until doctors arrived some close to an hour later.

The respondents had already been placed on notice that this exact type of conditions were in violation of inmates at rikers iakisland rights and was fined 500K whne Bronx County Suprepem court order respondent to get in acordance with state and correction law, See <u>MATTER OF AGHEW V. CITY OF NEW YORK DEPARTMENT OF CORRECTION,</u> 2021 N.Y. MISC. LEXIS 6134 (N.Y. Sup. Ct DECEMBER 3, 2021)

This is also something that was already addressed by a fedral judge from the second circut involving this same inmate under the same court order lockdown status in <u>WILLIAMS V. CITY OF NEW YORK ET AL,</u> 2022 U.S. DIST 140969, where inmate williams denial of medical lead to his gallbladder getting removed and defendants named in that matter being held liable as being deliberate indifference to his medical needs.

## <u>HISTORY OF ASSISTANT COMMISSIONER THOMAS GRIFFIN:</u>

Upon reserach in preparation of this ART 78 the petitioner has learned that the respondent AC Thomas Griffin has a civil record where he was found to be liable for simular conduct or at least was the supervisor where other indiviuls were found liable in. Some of these case are listed below:

<u>AYUSO V. GRIFFIN, 2020 U.S. DIST LEXIS 8925:</u>

Eight Amendment and Fourteenth Amendment violation on officers directly under suopervision of Respondent Thomas Griffin after laiblity was dismissed on him directly. (8th amend. tied to deliberate indiffenct to medical)

<u>BROWN V. GRIFFIN , 2022 U.S. DIST 45096:</u>

Excessive Force, 1st amend and seual violation against officersunder direct supervision of THOMAS GRIFFIN.

<u>RANDOLPH V. GRIFFIN, 816 FED. APPX. 520</u>

Excessive Force, failure to intervene 8th amend violation

Respondnet Thomas Griffin as seen above has been found liable in federal court in many instance for violation of inmates rights and his failure to interve and prevent violation as in the instant matter.

This supports the petitioners claims of violation of right and correction law stated herein where respondents own coinduct has shown that he THOMAS GRIFFIN has a perpensity to violate constitutional rights of inmates and the respondent NYC Dep't of Correction should have knonw this ahead of time.

### HISTORY OF ASSISTANT COMMISSIONER CHRISTOPHER MILLER:

Upon research in preparation of this ART 78 the petitioner has learned that the respondent asisstant commissioner Christopher Miller has a civil record where he was found to be liable for similar conduct or at leasty was the direct supervisor where other indivurllas were for liable in. Some of these cases are listed below:

### BRYANT V. MILLER 2019 U.S. DIST LEXIS 102635:

Held liable directly for violation of FIRST AMENDMENT ESTABLISHMENT CLAUSE as the same in the instance of petitioner religious rights stated herein; and other correction officer held liable in violation  in condition of confinement the same as stated herein under Christopher Miller's supervison.

### PARSON V. YORK, 2017 U.S. DIST LEXIS 28951:

Directly held liable in violation of inmates Fourteenth Amendment rights.

### JOHNSON V. OWENS, 2022 U.S. DIST LEXIS 53897:

Dimissed against Christopher Miller but liability found on officers under his direct supervison.

As in Respondet Thomas Griffin Respondent Christopher Miller has also ben found liable to violate inmates/prisoners rights in matters simular to those mentioned herein this ART 78.

In conclusion the petitioned demand that these respondents who all / each play a pivitol role in the confinement of the petitioner court order classification be order to SHOW CAUSE why relief sought by the petitioner should not be granted by the courts.

The petitioner demand that he be tarnsfered to a CITY facility that can meet the needs of his confinement under the provision of the Humane Alternative To long-term Solitary Confinement, where he is not confined no more then 17 hours per day, where his medical needs and limitation are addressed, where his religious rights are not burden , where his confinement is equal to that of other Court Ordered Lockdown inmates and his communication with the outside weurl--world is not restricted.

Currently the petitioner is prohibit from placing his mail in the lcoked recipticle box are per DOC polciy and is forced to hand his mail over to correction officers and hope that they place his mail in mailbox that is outside of housing unit 1a.

This exposes petitioner legal, personal information and contact address to correctional personal that he is otherwise engaged in civil litigation against or grieving.

DATED: FEBRUARY 8, 2023
     QUENS NY 11370

PETITIONER PRO-SE
G.R.V.C.
09-09 HAZEN STREET
QUEENS NY 11370

EXHIBIT - I

THIS EXHIBIT IS FROM DISABILITY RIGHTS SABINA KHAN WHO SENT NUMEROUS
LETTERS AND E-MAILS AND PHONE CALLS TO THE LEGAL DEPT FOR RIKER'S
ISLAND, LETTING THEM KNOW THE LAW IS 7HOURS OUT THE CELL FOR EVERY
INMATE. THERE IS NO MORE BOX

command level order 13/21

THis policy cause plaintiff
Major Damage to body and mind.

| | CORRECTION DEPARTMENT<br>CITY OF NEW YORK | |
|---|---|---|
| | **GEORGE R. VIERNO CENTER** | |
| | COMMAND LEVEL ORDER | |

| ORDER NUMBER:<br>**#13/21** | SECTION:<br>**SECURITY** | [ X ] NEW<br>[ ] REVISED | SUBJECT: COURT ORDERED LOCKDOWN<br>INMATES | **AREAS**<br><br>**ALL STAFF** |
|---|---|---|---|---|
| EFFECTIVE DATE:<br>**07/19/21** | [ ] ADMINISTRATION<br>[ ] PROGRAMS<br>[ X ] SECURITY | PAGE 1 OF 6 | REFERENCE:  Facility Generated | |
| AUTHORIZED BY THE COMMANDING OFFICER<br>**JEAN RENE, WARDEN** | | SIGNATURE | | |

## I.     PURPOSE

This command level order is to establish policy and procedures for the Care , Custody and Control of the inmates under Court Order lockdown status.

## II.    POLICY

It shall be the policy of the George R. Vierno Center to comply with the mandates of all Court Orders dealing with inmates housed in this facility.  Additionally, the restrictions imposed on "Lockdown Status" inmates by the Court supercedes any rights these inmates may ordinarily have under the Minimum Standards.

## III.   PROCEDURES

The inmates housed in Court Ordered lock-down areas shall be governed by the following:

a.  Twenty-three (23) hour lock-in, feed -in status.
b.  Inmates housed in Court Ordered Lock-Down areas will be allowed to possess the following property in their cell:

   1.  One (1) Bible
   2.  Three (3) Magazines
   3.  Three (3) Books
   4.  One (1) Bar of Soap
   5.  One (1) Container of Shampoo
   6.  One (1) Toothbrush
   7.  One (1) Toothpaste
   8.  One (1) Plastic Cup
   9.  One (1) Towel
   10. Deodorant

|  | **CORRECTION DEPARTMENT CITY OF NEW YORK** | **GEORGE R. VIERNO CENTER** |  |
|---|---|---|---|
| | **COMMAND LEVEL ORDER** | **ORDER NUMBER # 13/21** | |
| | **EFFECTIVE DATE: 07/19/21**  **SUBJECT: COURT ORDERED LOCKDOWN INMATES** | **PAGE   3 OF  6 PAGES** | |

## V.    PROCEDURES (CONTINUED)

### Telephone Calls and Visit Privileges:

1. The court ordered inmates are barred from Visits and Telephone calls to anyone other than their attorney of record. These numbers are listed in each inmate's court order folder.
2. All calls will be placed between the hours of 1330-1430 hours and 1630-1730 hours.
3. The Correction Officer assigned to the post shall make the telephone call using a P.I.N. Number which will be changed weekly by Security. Inmates are not allowed to know the P.I.N. numbers. The Correction Officer shall maintain a log of each attorney called. Such a log will detail the following information for each attempted call:

   a. Date and Time call requested
   b. Time call was placed
   c. Whether or not contact was made with the Attorney
   d. Time call ended.

### Inmate Showers

Inmates will be afforded a ten-minute shower, a day. The showers are to be recorded in a shower logbook. As stated earlier, a Captain shall be present when the inmate is removed from his cell to the shower and again when he is returned from the shower to his cell. All shower activity shall be logged in the Housing Area Logbook.

### Incoming Mail

Any incoming mail for inmates housed in court ordered areas will be forwarded to the GRVC Security Office. No mail shall be forwarded to these inmates until approved by the Commanding Officer or his/her designee.

### Commissary

The only items inmates housed in court ordered areas may purchase from commissary are:

1. Soap                4. Toothpaste
2. Shampoo          5. Paper
3. Deodorant



| CORRECTION DEPARTMENT CITY OF NEW YORK | GEORGE R. VIERNO CENTER |
|---|---|
| COMMAND LEVEL ORDER | ORDER NUMBER # 13/21 |
| EFFECTIVE DATE: 07/19/21   SUBJECT: COURT ORDERED LOCKDOWN INMATES | PAGE    4 OF  6 PAGES |



## VI.    PROCEDURES (CONTINUED)

Custodial staff assigned to the housing area will complete the Commissary request form for the inmate. This shall prevent subject from communicating with commissary help. All commissary products will be thoroughly searched prior to giving them to the intended inmate. Appropriate logbook entries shall be made relative to the delivery of this service.

### Social Service

All request for Social Services shall be forwarded to the Security Office. At no time will these inmates have any contact with Social Service personnel. Additionally, at no time will interview slips be forwarded to any Service area.

### Religious Services

If these inmates request religious services, the Chaplain will be called to visit them. However, the Chaplain will first be instructed that he/she may not:

1. Communicate on the inmate's behalf with anyone other than the Warden, the Security Office, or the Court -appointed Special Master.
2. Convey any written messages from these inmates to anyone else.
3. May not give anything to or receive anything from these inmates.

### Medical/Mental Health Services

Any necessary medical or mental health services are to be provided to these inmates in the housing area. They will not be removed to go to the Clinic unless it is physically impossible to provide them with necessary medical services in the cell/housing area. Mental Health services, if required, will be provided to them in the housing area, not the clinic.

If the inmate must be removed to the Clinic for medical services, he shall be escorted by a Correction officer and a Captain and kept separate from all other inmates in such a manner as to assure that he is unable to communicate in any manner with other inmates.

Medical Staff who come to see these inmates in the housing area should first be instructed that they may not:

|  | **CORRECTION DEPARTMENT CITY OF NEW YORK** | **GEORGE R. VIERNO CENTER** |  |
|---|---|---|---|
| | **COMMAND LEVEL ORDER** | **ORDER NUMBER # 13/21** | |
| | **EFFECTIVE DATE: 07/19/21** | **SUBJECT: COURT ORDERED LOCKDOWN INMATES** | **PAGE   5 OF  6 PAGES** |

## VII.   PROCEDURES (CONTINUED)

1. Communicate on the inmate's behalf with anyone other than the Warden or the Security Office.
2. Convey any written messages.
3. May not give anything to or from these inmates unless the item is necessary to provide medical services (i.e. medical supplies, medication).

### Hospital Runs

If the inmate requires hospitalization, he is to be treated and outposted at Bellevue Hospital as a medical emergency.  In the event of a medical emergency, the inmate is to be transported to the nearest hospital.

### Inmate Recreation

Inmates housed in the Court Ordered area may be afforded recreation in accordance with the details delineated in the court order or as amended in a separate memo.  These stipulations shall be reflected in the posted "Recreation Schedule".  A Captain shall be present when the inmate is removed from his cell and returned to his cell, following the recreation period.  While at recreation, these inmates shall be separated from all other inmates verbally, in writing or through hand signals.   These inmates will be restrained in waist chains handcuffs and mitts whenever they are out of their cells for recreation.

Appropriate logbook entries shall be made relative to delivery of this service.

## CELL AREA ACCESS AND SUPERVISION

1. Civilian personnel (i.e. Chaplain and Medical Staff) must always enter the cell area accompanied by a Supervisor .
2. The area Captain will conduct at least three (3) tours of inspection in the court ordered inmates cell area during each tour of duty.
3. The on-duty Tour Commander will conduct at least one (1) tour of inspection during each tour of duty.  He/she is responsible for ensuring that the provisions of this order are fully complied with.

## LEGAL JUSTIFICATION

1. This order is justified as per Supreme Court Order.





| | | |
|---|---|---|
| **CORRECTION DEPARTMENT**<br>**CITY OF NEW YORK** | **GEORGE R. VIERNO**<br>**CENTER** | |
| **COMMAND LEVEL ORDER** | **ORDER NUMBER # 13/21** | |
| **EFFECTIVE**<br>**DATE: 07/19/21** | **SUBJECT: COURT ORDERED**<br>**LOCKDOWN INMATES** | **PAGE    6 OF  6 PAGES** |

**PREPARED BY:**

JONELLE SHIVRAJ, Deputy Warden for Security

**REVIEWED BY:**

LISA BARNABY, Deputy Warden for Administration

JOANNE MATOS, Deputy Warden for Programs/Operations

TIFFANY MORALES, Deputy Warden for Enhanced Supervision Housing



**DISABILITY RIGHTS NEW YORK**

🌐 www.drny.org    ✉ mail@drny.org    📞 800-993-8982

George R. Vierno Center (GRVC)
09-09 Hazen Street
East Elmhurst, NY 11370
Attn: ADA/Disabilities Coordinator

Cc: Office of Counsel
New York City Department of Correction
75-20 Astoria Blvd
Queens, NY 11370

October 11, 2022

### *Introduction.*

I am a staff attorney at Disability Rights New York (DRNY), Protection and Advocacy for People with Mental Illness Unit (PAIMI). DRNY is the Protection and Advocacy (P&A) system for people with disabilities in New York State, designated by the governor and pursuant to its statutory authority. N.Y. Exec. Law § 558(b); 42 U.S.C. § 10801 *et seq.*; 42 U.S.C. § 15041 *et seq.*; 29 U.S.C. § 794e.

### *Client: Kwaine Thompson, BC #349190145.*

I am writing to you regarding legal rights and health and safety related matters raised by an incarcerated individual, currently housed at GRVC, named Mr. Kwaine Thompson (BC# 349190145). Upon information and belief, Mr. Thompson is a person with mental health and physical disabilities, as defined by the American Disabilities Act of 1990 (ADA). Mr. Thompson specifically reports a history of suicidal ideations and chronic asthma.

### *Concerns.*

Below are a list of concerns reported by Mr. Thompson. DRNY urges that these concerns be investigated immediately.

### 1.  **Isolation/Solitary Confinement**

During my last conversation with Mr. Thompson, he indicated that he remains confined in solitary confinement for 23 hours a day. As you are aware, the New York State HALT Solitary Act, signed into law in March 2020, limits isolation of inmates for more than 15 consecutive days or 20 out of 60 days, and prohibits segregated confinement for people with mental or physical disabilities in solitary confinement for any length of time, for any reason.

### 2.  **Denial of Rights re: Disability Coordinator**

Mr. Thompson states that he requested to speak with the ADA/Disabilities Coordinator at GRVC. He reports that this request was denied.

### 3. Cell Temperatures

Mr. Thompson states that he experienced a number of medical incidents related to the extreme temperature conditions of his cell. He particularly noted that the cell temperatures during the summer rose dangerous high, and that as someone with chronic asthma and heat-sensitivity, he suffered heat related illness on numerous occasions. Mr. Thompson reports going to the clinic several times, and reports being taken to Bellevue Hospital this year due to a heat related illness.

### 4. Monkey Pox Testing & Vaccine

Mr. Thompson also informed DRNY that he has developed blisters and a rash for over a month, which he is concerned is the viral disease known as monkey pox. It is my understanding, based on my conversations with Mr. Thompson (who represents himself pro se in his criminal matter) and the criminal defense attorney who is serving as an advisor to Mr. Thompson in his trial matter, that the court has ordered Mr. Thompson to be tested for monkey pox, but that testing was unreasonably delayed.

### 5. Lack of Mental Health Support

Mr. Thompson is concerned that he is not receiving proper mental health support while housed at GRVC.

### 6. Law Library Access

Mr. Thompson has indicated that he has not received access to the law library. As he is pro-se, it is imperative that he is able to have access to the legal research he needs to properly defend himself in his criminal matter.

#### *DRNY's Requests on Behalf of Mr. Thompson:*

On behalf of Mr. Thompson, DRNY requests that Mr. Thompson be put into contact with the ADA Coordinator immediately. Moreover, the above concerns must be immediately investigated to ensure that:

1. Mr. Thompson is not being held in isolation and/or solitary confinement in violation of the HALT Act;
2. Mr. Thompson is not denied access to the ADA/Disabilities Coordinator;
3. Mr. Thompson is not subjected to extreme heat and/or cold temperatures in his cell;
4. Mr. Thompson is tested for the monkey pox disease;
5. Mr. Thompson receives the monkey pox vaccine if deemed medically eligible;
6. Mr. Thompson is assessed and provided access to proper mental health support at GRVC;

7. Mr. Thompson is provided full and appropriate access to the law library.

**_Conclusion._**

Please note, I have sent Mr. Thompson HIPAA forms to sign. I will provide the signed copies immediately upon receipt. I can be contacted at 929-699-3578 and/or Sabina.Khan@drny.org.

Thank you for your time and attention to this matter.

Sincerely,

*Sabina Khan*

Sabina Khan



**279 Troy Road, Ste 9**
**PMB 236**
**Rensselaer, NY 12144**

DRNY has office locations in
**Albany | Brooklyn | Rochester**

Phone
518-432-7861

TTY
518-512-3448

Fax
518-427-6561

EXHIBIT-J

THIS IS MY PROPERTY MOVEMENT RECIEPT. AS YOU CAN SEE THERE IS NO
NOTATION OF MY PROPERTY BEING MOVED WHEN I GOT TRANSFERED TO WEST
FACILITY ON DEC/2/22. AND THERE'S NO NOTATION THAT I GOT MY PROPERTY
WHEN I RETURNED BACK TO GRVC FROM WEST FACILITY ON JAN/16/23..
OVER 3,000 IN LOST PROPERTY BECAUSE OF RETAILIATION FROM PENDING CIVIL
LAWSUITS FILED AGAINST DOC STAFF AND OFFICERS.

```
01/24/2023          New York City Department of Correction      IPTS0100
                    Inmate Property Query Receipt Screen

Inmate Name: THOMPSON,KWAINE        BAC: 3491901450      NYSID: 07289661Q

   Select a record from the list below - use up/down arrows to navigate

Receipt #      Receipt     Disp.   Disposition    Bag   Property   Storage Location
                Date                  Date        Type  Facility   Bin  Shelf  Slot
----------   -----------   ---    -----------    ----  --------   ----------------
172565819    09/17/2019    RPG    09/21/2021      B     MTF3
175763819    03/05/2019    PIC    05/09/2019      B     BKHD
175763919    03/05/2019    PIC    05/09/2019      B     BKHD
1773921 19   04/11/2019    RTI    04/16/2019      B     BKHD
184692721    07/10/2021    RTI    07/12/2021      B     MTF3
184730421    07/06/2021    RTI    07/12/2021      B     MTF3
A172565819   09/21/2021    ACT    09/21/2021      B     GRVC       035    1      3
A1847793     03/09/2022    RTI    05/04/2022      B     GRVC



   <Help>=Help     <Select>=Select Record    <F18>=Receipt History    <F11>=Exit
```

2/3

ATTACHMENT -B-1

# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES
### INMATE STATEMENT FORM

Form.: 7101R-A
Eff.:9/14/18
Ref.: Dir. 3376R-A

| Inmate's Name: Thompson Kwane | Book & Case #: 349-19-01450 | NYSID #: |
|---|---|---|

| Facility: G.R.V.C | Housing Area: 2A | Date of Incident: 11/3/22 | Date Submitted: 11/3/22 |
|---|---|---|---|

All grievances must be submitted within ten business days after the incident occurred, unless it's a sexual abuse or harassment allegation. The inmate filing the grievance must personally prepare this statement. Upon collection by the Office of Constituent and Grievance Services (OCGS) staff, OCGS staff will time-stamp and issue it a grievance reference number. OCGS staff shall provide the inmate with a copy of this form as a record of receipt.

**Grievance:** I HAVE extensive medical conditions that I must get fresh Air and sun light everyday. And be afforded Free Exercise. I was not taken to the yard today. A violation of my constitutional Rights.

**Action Requested by Inmate:** To Be take to the yard as being American citizen

**Please read below and check the correct box:**

Do you agree to have your statement edited for clarification by OCGS staff?  Yes ☐  No ☐

Do you need the OCGS staff to write the grievance for you?  Yes ☐  No ☐

Have you filed this grievance with a court or other agency?  Yes ☐  No ☐

Did you require the assistance of an interpreter?  Yes ☐  No ☐

| Inmate's Signature: K.T | Date of Signature: 11/3/22 |
|---|---|

## FOR DOC OFFICE USE ONLY

OCGS MUST PROVIDE A COPY OF THIS FORM TO THE INMATE AS A RECORD OF RECEIPT.

THIS FORM IS INVALID UNLESS SIGNED BY THE INMATE AND GRIEVANCE COORDINATOR

| TIME STAMP NOV 23, 22 | Grievance Reference #: 600041 | Category: Recreation |
|---|---|---|
| | Office of Constituent and Grievances Services Coordinator/Officer Signature: CO R. Rene 18049 | |

ATTACHMENT -B-1

# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

**OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES**
**INMATE STATEMENT FORM**

Form.: 7101 -R-A
Eff.:9/14/18
Ref.: Dir. 33 -76R-A

| Inmate's Name: Thompson Kwaine | Book & Case #: 349-19- 01450 | NYS ID #: |
| Facility: G.R.V.C | Housing Area: 2A | Date of Incident: 10/30/22 | Date Submitted: 10/30/22 |

All grievances must be submitted within ten business days after the incident occurred, unless it's a sexual abuse or harassment allegation. The inmate filing the grievance must personally prepare this statement. Upon collection by the Office of Constituent and Grievance Services (OCGS) staff, OCGS staff will time-stamp and issue it a grievance reference number. OCGS staff shall provide the inmate with a copy of this form as a record of receipt.

**Grievance:** Today C. Ograves only came one time to Afford me a call, a violation of my Constitutional Right to Access counsel

**Action Requested by Inmate:** To be Able to speak to counsel

## Please read below and check the correct Box:

Do you agree to have your statement edited for clarification by OCGS staff?  Yes ☐  No ☑

Do you need the OCGS staff to write the grievance for you?  Yes ☐  No ☑

Have you filed this grievance with a court or other agency?  Yes ☐  No ☑

Did you require the assistance of an interpreter?  Yes ☐  No ☑

| Inmate's Signature: KT | Date of Signature: 10/30/22 |

### FOR DOC OFFICE USE ONLY

OCGS MUST PROVIDE A COPY OF THIS FORM TO THE INMATE AS A RECORD OF RECEIPT.

THIS FORM IS INVALID UNLESS SIGNED BY THE INMATE AND GRIEVANCE COORDINATOR  NG

| TIME STAMP | Grievance Reference # 599 #24 | Category: Staff Complaint |
| 2022  -3  A:01 | Office of Constituent and Grievances Services Coordinator/Officer Signature: CO Byrne 18047 | |

ATTACHMENT-B-1



# CITY OF NEW YORK - DEPARTMENT OF CORRECTION

## OFFICE OF CONSTITUENT AND GRIEVANCE SERVICES
## INMATE STATEMENT FORM

Form.: 7101 R-A
Eff.: 9/14/18
Ref.: Dir. 33-76R-A

| Inmate's Name: | Book & Case #: | NYS ID #: |
|---|---|---|
| Thompson Kwaine | 349-19-01450 | |

| Facility: | Housing Area: | Date of Incident: | Date Submitted: |
|---|---|---|---|
| G.R.V.C | 2A | 10/17/22 | 10/24/22 |

All grievances must be submitted within ten business days after the incident occurred, unless it's a sexual abuse or harassment allegation. The inmate filing the grievance must personally prepare this statement. Upon collection by the Office of Constituent and Grievance Services (OCGS) staff, OCGS staff will time-stamp and issue it a grievance reference number. OCGS staff shall provide the inmate with a copy of this form as a record of receipt.

**Grievance:** 6:50 pm my Constitutional Rights to Privacy when talking to my legal advisor IS being Violated. 10/17/22 On 10/18/22 C.O (Graves) Did not allow me to call my Attorney at lunch time, see Gentec. On 10/22/22 At 12:30pm C.O Yang dialed my legal Adivisor IN Violation of my Constitutional Rights. Call was given at 8:30 pm

**Action Requested by Inmate:** To Be Able to call Attorney when needed

### Please read below and check the correct Box:

| | Yes | No |
|---|---|---|
| Do you agree to have your statement edited for clarification by OCGS staff? | ☐ | ☐ |
| Do you need the OCGS staff to write the grievance for you? | ☐ | ☐ |
| Have you filed this grievance with a court or other agency? | ☐ | ☐ |
| Did you require the assistance of an interpreter? | ☐ | ☐ |

| Inmate's Signature: K. Thompson | Date of Signature: 10/24/22 |
|---|---|

### FOR DOC OFFICE USE ONLY

OCGS MUST PROVIDE A COPY OF THIS FORM TO THE INMATE AS A RECORD OF RECEIPT.

THIS FORM IS INVALID UNLESS SIGNED BY THE INMATE AND GRIEVANCE COORDINATOR  NG

| TIME STAMP | Grievance Reference # 599424 | Category: STAFF complaint |
|---|---|---|
| 2022 NOV -3  A 10:06 | Office of Constituent and Grievances Services Coordinator/Officer Signature: CO Byrne #8049 | |

EXHIBIT-K

THIS IS  A MEDICAL EXHIBIT SHOWING PLAINTIFF NEED FOR HEAT SENSITIVE HOUSING, WHICH

THE DOC DID NOT ABIDE BY UNITL PLAINTIFF SUFFERED A HEAT STROKE AND STILL WAS NOT

MOVE TO AN HEAT SENSITIVE UNIT.



| **PATIENT NAME**: KWAINE THOMPSON | **FACILITY**: GRVC |
|---|---|
| **NYSID**: 07289661Q | **BOOKCASE#**: 3491901450 |

### DEPARTMENT OF CORRECTION COPY

### RECEIPT OF NOTIFICATION OF PATIENT NEED FOR HEAT SENSITIVE HOUSING

## KWAINE THOMPSON

*Provider Signature*

Ordering Provider: **Charles Appiah PA**
Name/Date/Time: **August 12, 2022 6:22 PM**
Printed By: **Appiah PA, Charles**

DOC Signature/Shield Number

**If MO Housing Required**:

*Facility Name*                    Print

Dorm: _____    Cell: _____

8/12/22
Date

EXHIBIT-L

THIS EXHIBIT IS THE PREA INTAKE QUESTIONNAIRE, WHICH WAS NEVER SUBMITTED IN PLAINTIFF

FILE. THIS COULD HAVE PREVENTED PLAINTIFF FROM MANY GRIEFS AND DISPAIR, DOC NEVER

FOLLOW ITS OWN POLICIES. ON THE BACKSIDE OF THIS EXHIBIT IS IMPORTANT TELEPHONE

NUMBERS THAT EVERY INMATE ON RIKER'S ISLAND CAN CALL EXCEPT PLAINTIFF MR. K THOMPSON

BECAUSE IN RETAILIATION THEY REMOVE THESE NUMBERS FROM MR. THOMPSON PHONE CALL LIST.

THEY DID NOT WANT MR. THOMPSON TO REACH OUT TO NOBODY THAT CAN PUT A STOP TO DOC MISDEEDS.



**CORRECTION DEPARTMENT**
**CITY OF NEW YORK**

**PREA INTAKE QUESTIONNAIRE**



| Form: PREA-2 |
| Rev. : 5/31/19 |
| Ref. : Dir. 9011R-A |

**Form Instructions:** Intake Staff shall initiate this form upon intake of each inmate. Upon completion of the required sections (shaded), Intake Staff shall sign and date this form. Classification Staff shall complete the remainder of the form. Classification Staff shall also sign and date this form upon completion. Question and Scoring instructions are below.

| Inmate's Last Name: | Inmate's First Name: | Book & Case Number: | NYSID Number: |
|---|---|---|---|

| AT RISK OF VICTIMIZATION | INTAKE | CLASSIFICATION |
|---|---|---|
| 1. " Do you have any mental, physical or developmental disabilities?" | | |
| 2.   (INTAKE STAFF: Does the inmate require interpreter services due to a language barrier?) | | |
| 3. "How old are you?" | | |
| 4. (Is the inmate small in stature?) | | |
| 5. "Is this your first time being incarcerated?" | | |
| 6. (Does inmate have a non-violent offense history only?) | | |
| 6. "Do you have any prior convictions for sex offenses against an adult or child?" | | |
| 7. "Do you consider yourself to be lesbian, gay, bisexual, transgender, intersex, or gender non-conforming?" *(INTAKE STAFF: If NO, does the inmate appear lesbian, gay, bisexual, transgender, or gender non-conforming? If YES, check the Documentation Reflects box to the right)* | Inmate   Staff | |
| 8. "Have you ever experienced prior sexual abuse, been molested, or been sexually assaulted?" | | |
| 9. "Do you have any concerns for your own safety while you are here? (INTAKE STAFF: If YES, note what the inmate says in the NOTES below.) | | |
| 10. (Is the inmate here only for civil immigration purposes?  The answer is typically NO.) | | |

| AT RISK OF ABUSIVENESS | INTAKE | CLASSIFICATION |
|---|---|---|
| 11. "Have you ever committed sexual abuse or a sex crime such as rape or a sex offense?" *(INTAKE STAFF: Tell inmate this does not include Prostitution.)* | | |
| 12. "Have you committed a violent act or a sexual act while in jail or prison before?" | | |
| 13. "Do you have convictions for a violent crime (such as Robbery, Murder, Rape, Carjacking, or any type of Assault)?" | | |

**INTAKE NOTES**

| Intake Staff Preparing: | Signature: | Rank/Title: | Shield/ID: | Date: |
|---|---|---|---|---|

**CLASSIFICATION NOTES**

| Classification Staff Preparing: | Signature: | Rank/Title: | Shield/ID: | Date: |
|---|---|---|---|---|

***QUESTION AND SCORING INSTRUCTIONS:***

1) Intake Staff shall ask the inmate each question and record the inmate's answers in the "Intake" column. For questions 3, and 10, Intake Staff shall provide the required information, NOT ask the inmate these questions. For question 7, Intake Staff shall ask the required question and provide a personal evaluation.

2) Classification Staff shall provide answers for each question based on knowledge gained via prior documentation in the "Classification" column.

3) A YES answer in any row (horizontal) is considered a YES for the purposes of this screening.

4) Two (2) or more YES answers to Questions 1-10 indicates the inmate may be prone to sexual victimization. **FOR WOMEN'S JAIL: three (3) or more YES answers to Questions 1-10 indicates the inmate may be prone to sexual victimization.** *However, any concerns about the inmate's safety, even if no 'YES' answers are given, should be shared with and reported to your supervisor.*

5) **FOR WOMEN'S JAIL: A YES to Questions 3, 5, 7, and 8 shall be considered in making safe housing, bed, and program decisions but their weight may not be as indicative of risk of victimization for women.**

6) Any combination of two (2) or more YES answer to Questions 6, 11, and 12 indicate inmate may be prone to sexual aggression or abusiveness.

7) A YES answer to Question 8 by any inmate requires Medical or Mental Health to offer a meeting with a clinician within fourteen (14) days of intake.

8) Question 2: Any inmate who is under twenty-one (21) years old should have the totality of their responses and known history weighed to make appropriate bed, housing, and programming decisions to ensure safety (including ensuring inmates under eighteen (18) years old are always under direct staff supervision until housed with other youthful inmates).

9) A YES answer to Question 13 should be weighed along with the inmate's known history and used to make appropriate bed, housing, and programming decisions to ensure safety.

**ATTACHMENT - A**



### CORRECTION DEPARTMENT
### CITY OF NEW YORK

## IMPORTANT TELEPHONE NUMBERS

Rev. : 5/31/19
Ref. : Dir. #5011R-A



The following telephone numbers are furnished for your use when processing a PREA Allegation or Incident.

1. PREA Confidential Hotline - (718) 204-0378

2. Department of Investigation  - (212)-266-1900

3. City of New York - (212)- 639-9675 or Dial 311

4. Safe Horizon - (212) 227-3000

5. Sexual Abuse Advocacy Hotline - (347) 774-7037
   **a. Business Hours: Monday - Friday, 6:00AM to 5:00PM**

6. NYS Central Register of Child Abuse and Maltreatment, Mandated Reporter Number (Child Abuse Hotline) - (800)-635-1522

# Help for Victims of Sexual Abuse in Prison

*What you need to Know About the DOCCS Enhanced Victim Services and Rape Crisis Hotline Pilot Project*



THE NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION HAS **ZERO TOLERANCE** FOR SEXUAL ABUSE AND SEXUAL HARASSMENT

# Victim Support

# Report Sexual Abuse

To report an incident of sexual abuse, notify facility staff or contact DOCCS Office of the Inspector General:

**Office of the Inspector General
Department of Corrections and Community Supervision
The Harriman State Campus, Building 2
1220 Washington Avenue
Albany, New York 12226-2050**

**Additional Rape Crisis Program contact information is available from:**

**NYSCASA
New York State Coalition Against Sexual Assault
28 Essex Street
Albany, NY 12206**



PREVENTION
EDUCATION
VICTIM SUPPORT

Sexual Abuse Prevention & Education Office

Sexual Abuse Prevention
& Education Office
Department of Corrections and
Community Supervision
The Harriman State Campus, Building 2
1220 Washington Avenue
Albany, New York 12226-2050

**Andrew M. Cuomo**
**Governor**

**Anthony J. Annucci**
**Acting Commissioner**

March 2014

DC132C (3/14)

As a victim of sexual abuse in detention, you have the right:

- to decide who to tell;
- to have any fears of retaliation taken seriously;
- to request a housing or cell change for your safety;
- to request to speak with mental health staff;
- to contact a support agency such as Just Detention International or a rape crisis program;
- to seek advice from a lawyer.

As a victim of sexual abuse in detention, you can expect:

- staff you report the abuse to will treat you with respect;
- to be given information about how best to take care of yourself;
- that your questions about what will happen if you report and how to get medical care will be answered;
- it will take time to heal and you will have a wide range of feelings that will change as you work to heal;
- if you choose to utilize outside support services to help with healing, those services will be available to you.



EXHIBIT-M

---

THIS EXHIBIT IS A POLICY THAT SHOWS ALL OF DOC WRONG DOING AND WHY THE PLAINTIFF SUFFERED
SO SEVERLY WHILE IN THE HANDS OF DOC.

SUBCHAPTER E: SCREENING FOR RISK OF SEXUAL VICTIMIZATION AND ABUSIVENESS &5-17. IF ONLY
DOC WOULD HAVE FOLLOWED THIS POLICY PLAINTIFF WOULD NOT HAVE EXPERINECE HEARTACH AND
PAIN. 5-14 EDUCATION: PLAINTIFF ENTIRE TIME ON 23/HOUR LOCKDOWN NOT ONE PROGRAM OFFICIAL
OR OFFICER CAME AND GAVE PLAINTIFF READING EDUCATION MATERIALS.

&5-15 SPECIALIZED TRAINING INVESTIGATIONS: 40 RCNY & 5-12 DOC FAILED PLAINTIFF BY HAVING
MS.BRANCHE ON POST WITH A SEPARATION ORDER IN EFFECT. BUT THE INVESTIGATORS NEVER FOLLOWED
UP TO MAKE SURE DOC WAS RESPECTING THE SEPARATION ORDER, SO THE PLAINTIFF DON'T HAVE TO
KEEP EXPERIENCING PAIN FROM HIS ABUSERS. AND THE MEDICAL STAFF SHALL BE TRAINED IN
REPORTING ABUSE. THE DOC SHOULD HAVE MULTIPLE WAYS FOR INMATES TO REPORT SEXUAL ABUSE,
BUT PLAINTIFF WAS LIMITED BY DOC. &5-21 INMATE ACCESS TO OUTSIDE CONFICENTIAL SUPPORT
SERVICES. PLAINTIFF WAS NOT PROVIDED NO OUTSIDE SUPPORT SERVICES WHILE HE WAS IN 23/HRS
LOCKDOWN. &5-28 AGENCY PROTECTION AGAINST RETAILIATION.(a) THE DEPT SHALL ESTABLISH A
POLICY TO PROTECT ALL INMATES AND STAFF WHO REPORT SEXUAL ABUSE OR SEXUAL HARRASSMENT OR
COOPERATE WITH SEXUAL ABUSE OR SEXUAL HARRASSMENT INVESTIGATIONS FROM RETAILIATION BY
OTHER INMATES OR STAFF AND SHALL DESIGNATE WHICH STAFF MEMBERS OF DEPARTMENTS ARE
CHARGED WITH MONITORING RETAILIATION, PLAINTIFF KNOWS DOC DID NOT ADHERE TO&5-28(a).
&5-24 AGENCY PROTECTION DUTIES. WHEN THE DEPARTMENT LEARNS THAT AN INMATE IS SUBJECT TO
A SUBSTANTIAL RISK OF IMMINENT SEXUAL ABUSE, IT SHALL TAKE IMMEDIATE ACTION TO PROTECT
THE INMATE. &6-03 DEFINITON OF RESTRICTIVE HOUSING AND RELATED TERMS. (a) FOR THE PURPOSE
OF THIS CHAPTER,"RESTRICTIVE HOUSING" MEANS UNITS WHERE THE DEPT HOUSES PEOPLE IN CUSTODY
SEPARATELY FROM PEOPLE HOUSED IN THE "GENERAL POPULATION",AND(1) THE OUT-OF-CELL TIME
OFFERED PER DAY IN THE UNIT IS LESS THAN FOURTEEN(14) HOURS

provided for by permitting such [prisoners] <u>individuals</u> to attend congregate religious activities with appropriate security either with each other or with other [prisoners] <u>people in custody</u>.

(i)  *Recognition of a religious group or organization.*

(1)  A list shall be maintained of all religious groups and organizations recognized by the Department. This list shall be in Spanish and English and shall be distributed to all [incoming prisoners] <u>persons entering custody</u> or posted in each housing area.

(2)  Each facility shall maintain a list of the religious advisor, if any, for each religious group and organization, and the time and place for the congregate service of each religion. This list shall be in Spanish and English and shall be distributed to all [incoming prisoners] <u>persons entering custody</u> or posted in each housing area.

(3)  [Prisoner requests] <u>People in custody may make requests to the Department</u> to exercise the beliefs of a religious group or organization not previously recognized [shall be made to] <u>by</u> the Department.

(4)  In determining requests made pursuant to paragraph (3) of this subdivision, the following factors among others shall be considered as indicating a religious foundation for the belief:

(i)  whether there is substantial literature supporting the belief as related to religious principle;

(ii)  whether there is formal, organized worship by a recognizable and cohesive group sharing the belief;

(iii)  whether there is an informal association of persons who share common ethical, moral, or intellectual views supporting the belief; or

(iv)  whether the belief is deeply and sincerely held by the [prisoner] <u>individual making the request</u>.

(5)  In determining requests made pursuant to paragraph (3) of this subdivision, the following factors shall not be considered as indicating a lack of religious foundation for the belief:

(i)  the belief is held by a small number of individuals;

(ii)  the belief is of recent origin;

(iii)  the belief is not based on the concept of a Supreme Being or its equivalent; or

(iv)  the belief is unpopular or controversial.

(6)  [In determining] <u>Before the Department determines a</u> request[s] made pursuant to paragraph (3) of this subdivision, [prisoners] the <u>requestor</u> shall be permitted to present evidence indicating a religious foundation for the belief.

(7)   The procedure outlined in paragraphs (1) and (3) of this subdivision shall apply when a [prisoner] request made pursuant to paragraph (i)(3) of this subdivision is denied.

(j)   *Limitations on the exercise of religious beliefs.*

(1)   Any determination to limit the exercise of the religious beliefs of any [prisoner] <u>person in custody</u> shall be made in writing and shall state the specific facts and reasons underlying such determination. A copy of this determination, including the appeal procedure, shall be sent to the Board and to any person affected by the determination within <u>one business day</u> [24) hours] of the determination.

(2)   This determination must be based on specific acts committed by the [prisoner] <u>individual in custody</u> during the exercise of his or her religion that demonstrate a serious and immediate threat to the safety and security of the facility. Prior to any determination, the [prisoner] <u>individual</u> must be provided with written notification of the specific charges and the names and statements of the charging parties and be afforded an opportunity to respond.

(3)   Any person affected by a determination made pursuant to this subdivision may appeal such determination to the Board.

(i)   The person affected by the determination shall give notice in writing to the Board and the Department of [his or her] <u>the person's</u> intent to appeal the determination.

(ii)   The Department and any person affected by the determination may submit to the Board for its consideration any relevant material in addition to the written determination.

(iii)   The Board or its designee shall issue a written decision upon the appeal within 14 business days after receiving notice of the requested review.

§ 6. Section 1-08 of Title 40 of the Rules of the City New York is amended to read as follows:

## § 1-08 Access to Courts and Legal Services.

(a)   *Policy.* [Prisoners] <u>People in custody</u> are entitled to access to courts, attorneys, legal assistants and legal materials.

(b)   *Judicial and administrative proceedings.*

(1)   [Prisoners] <u>People in custody</u> shall not be restricted in their communications with courts or administrative agencies pertaining to either criminal or civil proceedings except pursuant to a court order.

(2)   Timely transportation shall be provided to [prisoners] <u>people</u> scheduled to appear before courts or administrative agencies. Vehicles used to transport [prisoners] <u>people in custody</u> must meet all applicable safety and inspection requirements and provide adequate ventilation, lighting and comfort.

(b)   **"CHA"** means the Correctional Health Authority designated by the City of New York as the agency responsible for health and mental health services for people in the care and custody of the Department.

(c)   **"Department"** means the New York City Department of Correction.

(d)   **"Facility"** means a place, institution, building (or part thereof), set of buildings, structure, or area (whether or not enclosing a building or set of buildings) used by the Department for confinement of individuals.

(e)   **"Health staff"** means a medical health or mental health professional employed by CHA who, by virtue of education, credentials, and experience, is permitted by law to evaluate and care for patients within the scope of his or her professional practice.

(f)   **"Person in custody"** means any person confined in a facility.

(g)   **"Security staff"** means Department employees primarily responsible for the supervision and control of people in custody in housing units, recreational areas, dining areas, and other program areas of the facility.

(Added City Record 6/9/2021, eff. 7/9/2021)

## § 6-03 Definition of Restrictive Housing and Related Terms.

(a)   For the purposes of this Chapter, **"restrictive housing"** means units where the Department houses people in custody separately from people housed in the general population, and:

(1)   The out-of-cell time offered per day in the unit is less than fourteen (14) hours; or

(2)   People in the unit are subject to one or more of the following conditions:

(i)   Services mandated under other Chapters of the Minimum Standards are provided in a more restricted manner than they are provided to people housed in the general population. This would include, for example, the provision of law library services other than in a facility law library or religious services other than in a facility chapel.

(ii)   A person is housed alone in the unit.

(iii)   The physical design of the unit cannot accommodate more than four (4) people in custody congregating in a dayroom.

(b)   For the purposes of this Chapter, the following terms related to restrictive housing have the following meanings:

(1)   **"Disciplinary hearing"** means a hearing on an infraction with which a person in custody has been charged.

(2)   **"General population"** or **"general population housing"** means all housing units that are not restrictive housing units, specialized medical units, or specialized mental health units as defined in this section

(3)   **"Grade I, II or III offense"** means the degree of offense defined in 39 RCNY § 1-03, the Department of Correction Inmate Rule Book. Grade I is the most serious grade of offense.

(4)   **"Hearing Adjudicator"** is a Department employee of the rank of Captain or above who presides at disciplinary hearings or placement review hearings of people in custody.

(5)   **"Housing area"** or **"housing unit"** means facility housing, including common areas, used to house people in custody.

(6)   **"Infraction"** means a violation of Department rules.

(7)   **"Intake"** or **"intake area"** is an area designated by a facility to temporarily secure a person in custody while awaiting further assessment of the person for appropriate housing placement.

(8)   **"Legal Representative"** is an attorney or layperson who works under the supervision of an attorney.

(9)   **"M'" Designation"** is a designation assigned pursuant to a settlement in *Brad H. v. City of New York*, if a person, during one incarceration event, has engaged with the mental health system at least three (3) times, has been prescribed certain classes of medication, or has otherwise been assessed by the Health Authority as needing further mental health treatment.

(10)   **"Mandated services"** means services the Department is obligated to provide under the Board's Minimum Standards.

(11)   **"Pre-hearing detention"** means the placement of a person in custody in RMAS Level 1 pending the investigation or adjudication of the person's disciplinary infraction.

The Department or CHA may apply for a variance from a specific subdivision or section of these 40 RCNY Chapter 5 rules in accordance with the procedures and criteria set forth in 40 RCNY § 1-15.

(Added City Record 11/25/2016, eff. 1/2/2017)

# Chapter 6: Restrictive Housing in Correctional Facilities

## Subchapter A: Core Principles

### § 6-01 Purpose.

(a)   These 40 RCNY Chapter 6 rules are based upon and promote the following core principles:

(1)   Protection of the safety of people in custody and the staff who work in facilities by:

(i)   Ensuring that all people in custody and all staff who work in facilities are treated with dignity and respect;

(ii)   Prohibiting restrictions that dehumanize or demean people in custody;

(iii)   Placing restrictions on people in custody that are limited to those required to achieve the appropriate objectives for which the restrictions are imposed; and

(iv)   Confining people in custody to the least restrictive setting and for the least amount of time necessary to address the specific reasons for their placement and to ensure their own safety as well as the safety of staff, other people in custody, and the public.

(2)   Placement of people in custody into restrictive housing in accordance with due process and procedural and restorative justice principles by:

(i)   Explaining disciplinary rules and the sanctions for violating them when people are first admitted to Department custody;

(ii)   Imposing sanctions that are proportionate to the offenses committed;

(iii)   Applying disciplinary rules and imposing sanctions fairly and consistently; and

(iv)   Ensuring that people in custody understand the basis for their placement into restrictive housing, and that they understand the basis for any individual restrictions imposed in conjunction with their placement in such housing.

(3)   Promotion of the rehabilitation of people in custody and their reintegration into the community by:

(i)   Incentivizing good behavior;

(ii)   Allowing people placed into restricting housing as much out-of-cell time and programming participation as practicable, consistent with safety and security; and

(iii)   Providing necessary programming and resources.

(4)   Monitoring and tracking compliance with these 40 RCNY Chapter 6 rules and the core principles on which they are based by:

(i)   Developing performance measures; and

(ii)   Regularly reporting performance outcomes to the public.

(Added City Record 6/9/2021, eff. 7/9/2021)

## Subchapter B: Definitions

### § 6-02 General Definitions.

For the purposes of this Chapter, the following terms have the following meanings:

(a)   **"Board"** means the New York City Board of Correction.

(Added City Record 6/9/2021, eff. 7/9/2021)

### § 6-29 Canines.

(a)  The Department may only use canines inside the secure perimeter of a facility only for searches.

(b)  The Department may never use canines as a use of force, including to extract people in custody from their cells.

(c)  Canines may never be used to harass, threaten or otherwise control people in custody.

(d)  Canines may not be stationed in RMAS.

(Added City Record 6/9/2021, eff. 7/9/2021)

## Subchapter H: Variances

### § 6-30 Variances.

The Department or CHA may apply for a variance from a specific subdivision or section of these 40 RCNY Chapter 6 rules in accordance with the procedures and criteria set forth in 40 RCNY § 1-15.

(Added City Record 6/9/2021, eff. 7/9/2021)

89

(4) Visitation rights shall not be denied, revoked, limited or interfered with based on a[n] inmate['s] person in custody's or a prospective visitor's actual or perceived:

    (i)   sex;

    (ii)  sexual orientation;

    (iii) race;

    (iv)  age, except as otherwise provided in this section;

    (v)   nationality;

    (vi)  political beliefs;

    (vii) religion;

    (viii) criminal record;

    (ix)  pending criminal or civil case;

    (x)   lack of family relationship;

    (xi)  gender, including gender identity, self-image, appearance, behavior or expression; or

    (xii) disability

(5) Any determination to deny, revoke or limit a [n inmate's] person in custody's visitation rights pursuant to paragraphs (1) and (2) of this subdivision shall be in writing and shall state the specific facts and reasons underlying such determination. A copy of this determination, including a description of the appeal procedure, shall be sent to the Board and to any person affected by the determination within 24 hours of the determination.

(i)  Appeal procedure for visitation restrictions.

(1)  Any person affected by the Department's determination to deny, revoke or limit access to visitation may appeal such determination to the Board, in accordance with the following procedures:

    (i)  The person affected by the determination shall give notice in writing to the Board and the Department of intent to appeal the determination.

    (ii)  The Department and any person affected by the determination may submit to the Board for its consideration any relevant material in addition to the written determination.

    (iii)  The Board or its designee shall issue a written decision upon the appeal within five (5) business days after receiving notice of the requested review, indicating whether the visitation determination has been affirmed, reversed, or modified.

prospective visitor to secure in a lockable locker his or her personal property, including but not limited to bags, outerwear and electronic devices. A visit may not be delayed or denied because an operable, lockable locker is not available.

(5) Supervision shall be provided during visits solely to ensure that the safety or security of the facility is maintained.

(6) Visits shall not be listened to or monitored unless a lawful warrant is obtained, although visual supervision should be maintained.

(h) *Restrictions on visitation rights.*

(1) The visitation rights of a [n inmate] person in custody with a particular visitor may be denied, revoked or limited only when it is determined that the exercise of those rights constitutes a serious threat to the safety or security of a facility, provided that visitation rights with a particular visitor may be denied only if revoking the right to contact visits would not suffice to reduce the serious threat.

This determination must be based on specific acts committed by the visitor during a prior visit to a facility that demonstrate the visitor's threat to the safety and security of a facility, or on specific information received and verified that the visitor plans to engage in acts during the next visit that will be a threat to the safety or security of the facility. Prior to any determination, the visitor must be provided with written notification of the specific charges and the names and statements of the charging parties and be afforded an opportunity to respond. The name of an informant may be withheld if necessary to protect the informant's safety.

(2) A [n inmate's] person in custody's right to contact visits as provided in subdivision (f) of this section may be denied, revoked, or limited only when it is determined that such visits constitute a serious threat to the safety or security of a facility. Should a determination be made to deny, revoke or limit a [n inmate's] person's right to contact visits in the usual manner, alternative arrangements for affording the [inmate] individual the requisite number of visits shall be made, including, but not limited to, non-contact visits.

This determination must be based on specific acts committed by the [inmate] person while in custody under the present charge or sentence that demonstrate the [inmate's] person's threat to the safety and security of a facility, or on specific information received and verified that the [inmate] person must be provided with or security of the facility. Prior to any determination, the [inmate] person must be provided with written notification of the specific charges and the names and statements of the charging parties and be afforded an opportunity to respond. The name of an informant may be withheld if necessary to protect the informant's safety.

(3) Restrictions on visitation rights must be tailored to the threat posed by the [inmate] person in custody or prospective visitor and shall go no further than what is necessary to address that threat.

(iv) the Department of Health shall develop written criteria to be approved by the Department of Mental Health, Mental Retardation and Alcoholism Services defining the nature and the specificity of the treatment plan;

(v) there shall be documented evidence of initial treatment planning within three days of the inmate being placed in special housing, and a treatment plan shall be prepared no later than one week after placement;

(vi) treatment plans shall be reviewed and assessed for effectiveness by professional mental health services staff at least every two weeks. Both the review and the inmate's progress shall be recorded in the medical chart;

(vii) a range of treatment modalities other than the provision of medication shall be made available.

(4) There shall be facilities appropriate for the observation, evaluation and treatment of acute psychiatric episodes.

(5) Where required, an inmate shall be transferred to a municipal hospital prison ward in accordance with New York State Correction Law §§ 402 and 508.

(6) Inmates identified as developmentally disabled shall be evaluated within seventy-two hours and mental health services staff shall make a recommendation to the Department of Correction as to whether such developmental disability makes it necessary for the inmate to be placed in special housing or otherwise separated from the general inmate population:

(i) inmates who suffer from developmental disabilities shall be housed in areas sufficient to ensure their safety;

(ii) if it is determined by mental health services that an inmate's developmental disability makes it clinically contraindicated that the inmate be housed in a correctional facility, then the Department of Correction shall immediately notify the court and a written notice shall be filed in the inmate's court papers.

(7) The Departments of Health and Correction shall use mechanisms approved by the Department of Mental Health, Mental Retardation and Alcoholism Services to identify inmates who are suffering from drug addiction or the disease of alcoholism. Inmates so identified shall be referred to available programs approved by the Departments of Correction and Health. Detoxification shall take place in a setting appropriate to the level of care required.

(d) *Informed consent.* Except as otherwise provided herein, mental health treatment may be administered only upon the informed consent of the inmate after a disclosure of the risks and benefits of the proposed treatment in accordance with good clinical practice. The Departments of Health and Mental Health, Mental Retardation and Alcoholism Services shall develop procedures for the implementation of this section, which shall include the use of a written form to document the informed consent of the inmate.

(e) *Right to refuse treatment.* The city may not require treatment of an inmate without the inmate's consent unless, in an emergency, that person, by reason of mental disability or mental illness, poses a clear and present danger of serious physical injury to self or others. Then and only then may an inmate be examined, treated or medicated against the inmate's will, subject to the following conditions:

(1) the attending physician shall use only those measures which in his or her best professional judgment are deemed appropriate in response to the emergency;

(2) these measures may be used only with a written medical order;

(3) these measures may be used only with adequate explanation in the inmate's chart by the physician responsible detailing the length of the period of observation, the inmate's condition, the threat the inmate poses and the specific reasons for the specific intervention proposed;

(4) no order to treat an inmate against the inmate's will shall be valid for longer than twenty-four hours, without review and renewal and appropriate notation in the inmate's medical records;

(5) the Departments of Correction and Health shall develop procedures to be approved by the Department of Mental Health, Mental Retardation and Alcoholism Services for the implementation of this subdivision including the use of a written form to document an inmate's refusal to consent to a particular examination, procedure or medication.

## § 2-05 Medication.

(a) *Policy.* Medication shall not be used solely as a method of restraint or means of control, but only as one facet of a treatment plan (as defined in 40 RCNY § 2-04(c)(3)).

(b) *Procedures.*

(1) The Department of Health, with the approval of the Department of Mental Health, Mental Retardation and Alcoholism Services shall develop and implement procedures governing the prescription, dispensing, administration and review of medication:

(i)  medication for mental and emotional disorders is to be prescribed only by a psychiatrist, except in an emergency when a physician other than a psychiatrist may prescribe medication for mental and emotional disorders. Such a prescription must be reviewed by a psychiatrist within twenty-four hours;

(ii)  except in an emergency, medication for mental and emotional disorders may not be prescribed to an inmate unless that inmate has had a physical examination including a detailed clinical history within the previous six months; in all cases the prescribing physician must first review the medical chart and all other medicine the inmate is receiving;

(iii)  medication is to be administered only by appropriately trained medical or health services personnel.

(2)  Psychotropic medication shall be dispensed only when clinically indicated, consistent with the treatment plan:

(i)  all prescriptions for psychotropic medication must include a stop order; no prescription for psychotropic medication shall be valid for longer than two weeks;

(ii)  every inmate receiving psychotropic medication shall be seen and evaluated by the prescribing psychiatrist, or, in cases of emergency when a physician other than a psychiatrist prescribes medication under 40 RCNY § 2-05(b)(1)(i) by the reviewing psychiatrist, at least once a week until stabilized and thereafter at least every two weeks by medical personnel;

(iii)  female inmates who are prescribed psychotropic medication shall be informed of the potential risk of taking such drugs while pregnant and shall be given the opportunity to be tested for pregnancy.

(c)  *Pharmacy.*

(1)  When stock medications are maintained within a correctional facility, the agency providing medical services shall develop and maintain a formulary of medications stored in that facility.

(2)  The Departments of Health and Correction shall develop and implement a written policy to provide for the maximum security storage and weekly inventory of all controlled substances, syringes, needles and surgical instruments:

(i)  "controlled substances" are defined as those so listed by the Drug Enforcement Administration of the United States Department of Justice;

(ii)  written notice of this policy shall be given to all staff with potential access to any controlled substances or items under maximum security storage.

(d)  *Research.* Biomedical or behavioral research involving any inmate in the custody of the New York City Department of Correction is prohibited, except insofar as it meets the requirements for approval of research which is subject to the Department of Health and Human Services' regulations, and in addition, has the approval of the Department of Mental Health, Mental Retardation and Alcoholism Services.

## § 2-06 Restraints and Seclusion.

(a)  *Policy.* The Departments of Correction and Health shall develop and implement procedures subject to the review of the Department of Mental Health, Mental Retardation and Alcoholism Services governing the physical restraint and seclusion of inmates being observed or treated for mental or emotional disorders. Consistent with the New York State Mental Hygiene Law restraints or seclusion shall not be used as punishment, for the convenience of staff, or as a substitute for treatment programs.

(b)  *Definitions.*

**Physical restraint.** "Physical restraint" is the deliberate use of a device to interfere with the free movement of an inmate's arms and/or legs, or which totally immobilizes the inmate, and which the inmate is unable to remove without assistance:

(i)  the Departments of Health and Mental Health, Mental Retardation and Alcoholism Services shall develop procedures defining permissible forms of physical restraints;

(ii)  in no instance shall metal handcuffs be used to restrain an inmate; however, this proscription shall not preclude the application of appropriate security precautions during the transportation of inmates.

(iii)  in an emergency, when an inmate presents a clear and present danger to himself or others, the inmate may be restrained, including with metal handcuffs, pending the arrival of a psychiatrist. Correction personnel shall immediately notify the mental health staff for response. The psychiatrist shall respond immediately, but in no event more than one hour after notification. When there is no institutional psychiatrist on duty, correction personnel shall immediately transport the inmate to a facility where a psychiatrist is present.

## Chapter 2: Mental Health Minimum Standards

(1)   Prior to a decision on an application for a limited or continuing variance, the Board shall consider the position of all interested parties, including correctional employees, prisoners and their representatives, other public officials and legal, religious and community organizations.

(2)   Whenever practicable, the Board shall hold a public meeting or hearing on the variance application, and hear testimony from all interested parties.

(3)   The Board's decision on a variance application shall be in writing.

(4)   Interested parties shall be notified of the Board's decision as soon as practicable, and no later than 5 business days after the decision is made.

(e)   *Granting of variance.*

(1)   The Board shall grant a variance only if it is presented with convincing evidence that the variance is necessary and justified.

(2)   Upon granting a variance, the Board shall state:

(i)   the type of variance

(ii)   the date on which the variance will commence

(iii)   the time period of the variance, if any, and

(iv)   any requirements imposed as conditions on the variance.

(f)   *Renewal and review of variance.*

(1)   An application for a renewal of a limited or emergency variance shall be treated in the same manner as an original application as provided in subdivisions (b), (c), (d) and (e) of this section. The Board shall not grant renewal of a variance unless it finds that, in addition to the requirements for approving an original application, a good faith effort has been made to comply with the subdivision or section within the previously prescribed time limitation, and that the requirements set by the Board as conditions on the original variance have been met.

(2)   A petition for review of a continuing variance may be made upon the Board's own motion or by the Department, correctional employees, prisoners or their representatives. Upon receipt of a petition, the Board shall review and re-evaluate the continuing necessity and justification for the continuing variance. Such review shall be conducted in the same manner as the original application as provided in subdivisions (b), (c), (d) and (e) of this section. The Board will review all the facts and consider the positions of all interested parties. The Board will discontinue the variance, if after such review and consideration, it determines that:

(i)   full compliance with the standard now can be achieved; or

(ii)   requirements imposed as conditions upon which the continuing variance was granted have not been fulfilled or maintained; or

(iii)   there is no longer compliance with the intent of the subdivision or section in an alternative manner as required by subparagraph (b)(2)(ii) of this section.

(3)   The Board shall specify in writing and publicize the facts and reasons for its decision on an application for renewal or review of a variance. The Board's decision must comply with the requirements of subdivision (e) of this section, and, in the case of limited and continuing variances, paragraphs (d)(3) and (4) of this section. Where appropriate, the Board shall set an effective date for discontinuance of a continuing variance after consultation with all interested parties.

(4)   The Board shall not grant more than two consecutive renewals of emergency variances.

### § 1-16 Enhanced Supervision Housing. [Repealed]

(Repealed City Record 6/9/2021, eff. 11/1/2021)

### § 1-17 Limitations on the Use of Punitive Segregation. [Repealed]

(Amended City Record 12/24/2015, eff. 1/23/2016; repealed City Record 6/9/2021, eff. 11/1/2021)

## § 2-01 Service Calls.

Services for the detection, diagnosis and treatment of mental illness shall be provided to those persons in the care and custody of the New York City Department of Correction. The New York City Department of Health or a contracted service provider,* and the Department of Correction, with the approval of the Department of Health, Mental Retardation and Alcoholism Services shall design and implement a mental health program to provide:

(a)  crisis intervention and the management of acute psychiatric episodes;

(b)  suicide prevention;

(c)  stabilization of mental illness and the alleviation of psychological deterioration in the prison setting; and

(d)  elective therapy services and preventive treatment where resources permit.

## § 2-02 Identification and Detection.

(a)  *Policy.* Procedures shall be developed and implemented which promote the timely identification of inmates requiring mental health evaluation.

(b)  *Receiving screening.*

(1)  Screening for mental and emotional disorders is to be performed on all inmates before they are placed in general population. This initial screening shall take place within twenty-four hours after an inmate's arrival at the correctional facility.

(2)  Screening shall be performed by mental health services personnel or by appropriately trained medical personnel. Screening may be incorporated within the medical intake procedure.

(3)  The Department of Health, with the approval of the Department of Mental Health, Mental Retardation and Alcoholism Services shall develop written procedures setting the topics to be reviewed in receiving screening. The review shall include, but need not be limited to: psychiatric history, including neuropsychiatric hospitalizations, contacts with mental health professionals, suicidal and violent behavior, history or presence of delusions or hallucinations, and an assessment based on behavioral observations of mood, orientation, impaired consciousness, indications of gross mental retardation and significant presenting complaints.

(4)  The professionals conducting intake screening shall record their findings in a standard, written mental health intake form which the Department of Health shall develop with the approval of the Department of Mental Health, Mental Retardation and Alcoholism Services for use in all facilities.

(5)  Receiving screening shall include a description of available mental health services and the procedures for access to those services.

(i)  inmates shall receive a written communication in English and Spanish describing available mental health services, the confidentiality of those services and the procedures for gaining access to them.

(ii)  the Department of Correction shall make provisions to assist in assuring that the procedures for gaining access to mental health services are verbally explained to illiterate inmates, and that inmates whose native language is other than English or Spanish are given prompt access to translation services for the explanation of these procedures.

(c)  *Training of staff.*

(1)  All correction officers and medical services personnel are to receive training and continuing education in programs approved by the Departments of Correction, Health and Mental Health, Mental Retardation and Alcoholism Services regarding the recognition of mental and emotional disorders. This training shall incorporate, but need not be limited to, the following areas:

(i)  the recognition of signs and symptoms of mental and emotional disorders most frequently found in the inmate population

(ii)  the recognition of signs of chemical dependence and the symptoms of narcotic and alcohol withdrawal;

(iii)  the recognition of adverse reactions to psychotropic medication;

(iv)  the recognition of signs of developmental disability, particularly mental retardation;

(v)  types of potential mental health emergencies, and how to approach inmates to intervene in these crises;

(vi)  identification and referral of medical problems of mental health inmates;

(vii) suicide prevention; and

(viii) the appropriate channels for the immediate referral of an inmate to mental health services for further evaluation, and the procedures governing such referrals.

(2) No later than nine months from the effective date of these standards, there shall be at least one officer in every housing area on every tour trained in the application of basic first aid, including life support cardio-pulmonary resuscitation.

(3) Mental health services staff shall receive explicit orientation as well as continuing education and training appropriate to their activities:

(i) there shall be a written plan developed by the Department of Health and approved by the Department of Mental Health, Mental Retardation and Alcoholism Services for the orientation, continuing education and training of all mental health services staff.

(ii) in-service training shall include regular individual supervision of not less than one hour per week and not less than one hour per week of continuing education to be prorated for part-time staff.

(d) *Observation aides.*

(1) There is to be an organized program of observation aides trained to monitor those inmates identified as potential suicide risks as well as to recognize in those inmates not previously identified the warning signals of suicidal behavior. Inmates, including those housed in mental observation areas, may be employed as observation aides and shall be paid for their services.

(2) Written procedures shall be developed by the Department of Correction and Health, to be approved by the Department of Mental Health, Mental Retardation and Alcoholism Services, defining the selection criteria for observation aides, the training they shall receive, the procedures they shall follow and the criteria for the evaluation of their performance as well as for terminating their employment where necessary:

(i) in developing a program of observation aides the Department of Correction shall consult with the Department of Health in order to provide for coordination of effort between the two agencies.

(ii) observation aides shall be trained to promptly inform correction or mental health services staff when they believe an inmate poses a suicide risk, presents an immediate danger of suicide or is engaging in bizarre behavior. This information shall be recorded in a systematic manner.

(3) Observation aides shall operate in all correctional facilities in the following housing areas: mental observation, punitive segregation, administrative segregation and new admission. They shall be employed in other areas as required.

## § 2-03 Diagnosis and Referral.

(a) *Policy.* The Departments of Correction and Health, with the approval of the Department of Mental Health, Mental Retardation and Alcoholism Services, shall develop procedures to provide for the prompt evaluation and appropriate referral of inmates whose behavior suggests that they are suffering from a mental or emotional disorder, as well as the immediate evaluation and treatment of those in need of emergency psychiatric care.

(b) *Access.*

(1) There is to be non-emergency access to mental health services. Inmates may refer themselves for preliminary evaluation, and they shall be seen by a member of mental health services staff as soon as possible but in no instance later than three working days after receipt of referral by mental health services staff. The Department of Correction shall ensure that notice of the request is received by mental health services staff within twenty-four hours.

(2) Inmates shall have twenty-four hour access to mental health services personnel for emergency psychiatric care and the management of acute psychiatric episodes:

(i) all inmates who report having been sexually assaulted shall be referred for emergency assessment;

(ii) inmates awaiting emergency evaluation are to be housed in a specially designated area with close staff supervision and sufficient security to protect inmates and staff;

(iii) the Departments of Correction and Health shall develop a written form for emergency evaluation referrals.

(3) Correction staff and medical services personnel are required to refer to mental health services those inmates in the general population who exhibit signs of mental or emotional disorders. A standard written procedure to include a description of the behavior upon which the referral is based shall be developed by the Departments of Health and Correction.

30/111

(4)   The Department of Correction shall provide sufficient escort officers to ensure delivery of service in a manner that promotes the maximum efficiency of mental health services staff. The Department of Correction shall develop and implement procedures to provide that inmates requested for evaluation or follow-up be escorted to mental health services staff, or accounted for, the same day. In all cases where the inmate is still in custody, he or she shall be brought to mental health services staff within twenty-four hours.

### § 2-04 Treatment.

(a)   *Policy.* Adequate mental health care is to be provided to inmates in an environment which facilitates care and treatment, provides for maximum observation, reduces the risk of suicide, and is minimally stressful. Inmates under the care of mental health services, if in all other respects qualified and eligible shall be entitled to the same rights and privileges as every other inmate.

(b)   *Criteria of adequacy.*

(1)   The Department of Health shall develop written criteria to be approved by the Department of Mental Health, Mental Retardation and Alcoholism Services defining in accordance with current professional standards the mental health staff, supplies and equipment necessary to provide adequate mental health care.

(2)   The Departments of Health and Correction shall develop written criteria to be approved by the Department of Mental Health, Mental Retardation and Alcoholism Services defining in accordance with current professional standards the space necessary to provide adequate and appropriate housing and treatment of inmates under the care of mental health services.

(3)   No later than ninety days from the effective date of these standards, the written criteria shall be submitted to the Board of Correction for promulgation as an amendment to these standards.

(c)   *Programs.*

(1)   Special housing shall be provided to those inmates in need of close supervision due to mental or emotional disorders, and to those inmates in the process of being evaluated for such disorders:

(i)   twenty-four hour observation aides shall be assigned to special housing areas;

(ii)   correction officers who have received not less than thirty-five hours of special training within the first year of their assignment shall be assigned to steady posts within these areas. These officers shall receive annual training enhancement. The Departments of Health and Correction shall develop a written curriculum to be approved by the Department of Mental Health, Mental Retardation and Alcoholism Services specifying the components and hours of the training programs;

(iii)   inmates placed in special housing areas shall be seen and interviewed by mental health services staff at least once per week;

(iv)   an individual member of mental health services staff shall be directly responsible for mental health services in each special housing area;

(v)   the Department of Correction shall make provision for the allocation of dormitory space as special housing for the observation of potentially suicidal inmates.

(2)   The Departments of Correction and Health shall develop specific written criteria and procedures for the admission to and the discharge from special housing areas for mental observation:

(i)   it shall be the prerogative of mental health services to admit and discharge inmates from special housing areas for mental observation;

(i)   the placement of an inmate in special housing shall be reviewed by mental health services at least once per week.

(3)   An individualized written treatment plan based upon the evaluation of the treatment team shall be developed for each inmate placed in special housing for mental observation and for all inmates to whom medication for mental or emotional disorders is prescribed:

(i)   the treatment team must include a psychiatrist who shall personally examine each inmate evaluated by the treatment team;

(ii)   those members of the treatment team who are providing care to an inmate shall prepare a treatment plan, which shall be signed by the psychiatrist;

(iii)   the Chief of Service or his or her designee shall approve all treatment plans;

| SECTION | IMPLEMENTATION |
|---|---|
| **§ 6-26: Transition** | |
| (b) (comprehensive transition plan) | Within 1 month of Effective Date |
| (c) (monthly public progress reports) | August 1, 2021 |

(a)   The Department shall provide the Board with the architectural renderings for RMAS housing units prior to their submission to the New York State Commission of Correction (SCOC). The Department shall provide the Board with the architectural renderings for such units as approved by SCOC within two (2) business days of SCOC's approval.

(b)   Within one (1) month of the Effective Date, the Department shall provide a comprehensive transition plan, in writing to the Board, which shall include the following documents and information concerning the elimination of punitive segregation and the implementation of RMAS:

(1)   A list of written policies to implement RMAS;

(2)   Specific plans related to implementation of RMAS for women in custody;

(3)   Staffing plans for uniform and non-uniform staff who will work in RMAS;

(4)   Training curricula for uniform and non-uniform staff who will work in RMAS;

(5)   Programming to be provided to people housed in RMAS, and how, where, and by whom such programming will be afforded;

(6)   Youth-specific staffing and programming plans for young adult RMAS units;

(7)   Plans for conducting a process and outcome evaluation with proposed metrics to determine success of the RMAS model.

(c)   Starting the first business day of August 2021 and of each month thereafter until RMAS implementation is complete, the Department shall submit to the Board, on a monthly basis and in writing, a public progress report for the previous month, which shall include the Department's progress toward achieving:

(1)   Progress in reducing the PSEG population (i.e., PSEG I/Central Punitive Segregation Unit (CPSU), PSEG II, Restrictive Housing Unit (RHU));

(2)   Progress in reducing the population housed in other restrictive housing units, including Enhanced Supervision Housing (ESH) and Secure;

(3)   Construction, opening, and use of new RMAS housing units, including when plans are submitted to and approved by SCOC and explanations for unanticipated delays;

(4)   Development of Department policies governing the operation of RMAS disaggregated by the stage of their development, as follows:

(i)   Commenced drafting;

(ii)   Signed by DOC and posted on DOC's public website;

(iii)   Integrated into training of DOC staff.

(5)   Implementation of training on RMAS, including:

(i)   Status of curriculum development;

(ii)   Number of staff scheduled to be trained disaggregated by uniform and non-uniform status;

(iii)   Number of staff who have been trained, disaggregated by uniform and non-uniform status.

(6)   Implementation of programming in RMAS.

(7)   The provision of services such as recreation, visits, and privileges in the general population which exceed the requirements of the Minimum Standards outlined in 40 RCNY Chapter 1;

(8)   Any deviations from the detailed timelines and benchmarks set forth in the plan required by 40 RCNY § 6-26(b);

(3)   The total number of placements and unique people placed during the reporting period; the number and percent of people placed by age, race, ethnicity, gender, and "M" designation status, Security Risk Group, Red ID, and Enhanced Restraint status at time of placement; the average daily population; and the number of adults and young adults currently housed in RMAS as of the last day of the reporting period;

(4)   Number of determinations to extend a person's time in RMAS Level 1 or Level 2 pursuant to 40 RCNY § 6-15(a) during the reporting period by whether the extension was approved and whether it was appealed, and number of people for whom extensions and appeals were granted, in total and by number of extensions and appeals received;

(5)   Number of exits of people from RMAS during the reporting period and their cumulative and consecutive days in RMAS during current incarceration (i.e., minimum, maximum, mean, median days) and, for each exit, the date of exit, the reason for exit (e.g. time served, discharged from custody, medical transfer, mental health transfer, etc.), and the facility, housing unit, and housing category in which the person was housed prior to and upon exit;

(6)   Number of people in RMAS as of the last day of the reporting period and their cumulative and consecutive days in RMAS (i.e., minimum, maximum, mean, median days);

(7)   The number of periodic reviews required and conducted by whether people attended their review, and whether any modifications were made to a person's individual behavior support plan.

(8)   Average number of out-of-cell hours received per day; and average rate of participation in daily recreation.

(9)   Numbers and rates of: person-in-custody on person-in-custody fights, slashings/stabbings, assaults on staff, and uses of force, compared to the comparable age group in the general population;

(10)   Facility and housing unit locations for each RMAS unit, indicating RMAS level and whether the unit houses young adults or adults;

(11)   Any other information the Department or the Board deems relevant to understanding the Department's use of RMAS.

(d)   The Department shall produce monthly public reports of time spent out of cell; times spent in separate programming space that is not adjacent to cell or in regular lock-out space; access to law library; access to showers; participation in recreation; and time spent participating in programming for each individual in RMAS. Reports shall include the number, length of, and reasons for late lockouts in RMAS units and recommendations or corrective action(s) taken to address report findings related to improving access to and participation in mandated services. Reports shall indicate whether access to each type of mandated service or programming required a routine strip search. Information gathering to prepare this report shall not be conducted by staff regularly assigned to the facilities or units. At least four (4) dates per month shall be selected at random and shall not be previously disclosed to staff with responsibilities related to the units reviewed.

(e)   On a monthly basis, the Department shall provide the Board with the individually identified data used to create the public reports required by 40 RCNY §§ 6-25(c) and (d) and all supporting documentation including but not limited to RMAS placement, review, and IBSP documentation.

(f)   The Board and the Department shall jointly develop the reporting templates for the public reports required by 40 RCNY § 6-25(c) and (d). Such templates shall be subject to the Board's approval. Upon submission and review of the Department's disciplinary system plan submitted pursuant to 40 RCNY § 6-23, the reporting provisions outlined in 40 RCNY § 6-25(c) and associated templates shall be reviewed and revised as necessary.

(g)   The Board shall review the information provided by the Department and any other information it deems relevant to the assessment of RMAS. No later than eighteen months (18) after implementation of RMAS, the Board shall meet to discuss the effectiveness of RMAS. The Board's discussion shall address but not be limited to findings regarding the conditions of confinement in RMAS, the impact on the mental health of people housed therein, and the quality and effectiveness of programming provided in RMAS.

(Added City Record 6/9/2021, eff. 7/9/2021)

## § 6-26 Transition.*

**\* Editor's note:** Section 10 of the rule enacted on June 9, 2021, and effective on July 9, 2021, provides for impementation as follows:

The policies, procedures, criteria, programs, plans, reports, and forms required by this rule shall be developed, approved and implemented by the dates specified below. Unless otherwise stated, all time periods are computed from the effective date of these rules. Any provisions not specifically referenced below shall take effect as of the effective date of the rule.

(3)  Equal status and protection shall be afforded to all [prisoners] people in the exercise of their religious beliefs except when such exercise is unduly disruptive of facility routine.

(c)  *Congregate religious activities.*

(1)  Consistent with the requirements of subdivision (a) of this section, [all prisoners] all persons in custody shall be permitted to congregate for the purpose of religious worship and other religious activities, except for [prisoners] people confined for medical reasons in the contagious disease units.

(2)  Each facility shall provide [all prisoners] all persons in custody with access to an appropriate area for congregate religious worship and other religious activities. Consistent with the requirements of paragraph (b)(1) of this section, this area shall be made available to [prisoners] people in custody in accordance with the practice of their religion.

(d)  *Religious advisors.*

(1)  As used in this section, the term "religious advisor" means a person who has received endorsement from the relevant religious authority.

(2)  Religious advisors shall be permitted to conduct congregate religious activities permitted pursuant to subdivision (c) of this section. When no religious advisor is available, a person in custody belonging to the [member of a prisoner] religious group may be permitted to conduct congregate religious activities.

(3)  Consistent with the requirements of paragraph (b)(1) of this section, [prisoners] people shall be permitted confidential consultation with their religious advisors during lock-out periods.

(e)  *Celebration of religious holidays or festivals.* Consistent with the requirements of paragraph (b)(1) of this section, [prisoners] people shall be permitted to celebrate religious holidays or festivals on an individual or congregate basis.

(f)  *Religious dietary laws.* [Prisoners] People in custody are entitled to the reasonable observance of dietary laws or fasts established by their religion. Each facility shall provide [prisoners] people with food items sufficient to meet such religious dietary laws.

(g)  *Religious articles.* Consistent with the requirements of paragraph (b)(1) of this section, [prisoners] people in custody shall be entitled to wear and to possess religious medals or other religious articles, including clothing and hats.

(h)  *Exercise of religious beliefs by [prisoners] people in [segregation] restrictive housing.*

(1)  [Prisoners] People confined in [administrative or punitive segregation] in RMAS housing shall not be prohibited from exercising their religious beliefs, including the opportunities provided by subdivisions (d) through (g) of this section.

(2)  Congregate religious activities by [prisoners] people in [close custody or punitive segregation] Levels 1 and 2 of RMAS housing as defined in Chapter 6 of these Rules shall be

    (i)   table games;

    (ii)   exercise programs; and

    (iii)   arts and crafts activities.

    (2)   Recreation taking place within cell corridors and tiers, dayrooms and individual housing units shall supplement, but not fulfill, the requirements of subdivision (c) of this section.

   (f)  *Recreation for [inmates] persons housed in the contagious disease units.* In place of out-of-cell recreation, the Department, in consultation with medical providers, may provide [inmates] people confined for medical reasons in the contagious disease units with appropriate recreation equipment and materials for in-cell recreation. The Department must provide such [inmates] individuals with daily access to publications, such as newspapers, books, and magazines, which shall be made available in the six (6) most common languages spoken by the [inmate] jail population.

   (g)  *Recreation for [prisoners] people in [segregation] restrictive housing.* [Prisoners] Persons confined in [close custody or punitive segregation] RMAS as defined in Chapter 6 of these Rules shall be permitted recreation in accordance with the provisions of subdivision (c) of this section.

   (h)  *Limitation on access to recreation.* A [prisoner's] person's access to recreation may be denied for up to five days only [upon conviction of an infraction for misconduct on the way to, from or during recreation] due to imminent safety and security risks, which must be recorded and transmitted to the Board within one business day of the restriction.

        § 5. Section 1-07 of Title 40 of the Rules of the City New York is amended to read as follows:

## § 1-07 Religion.

   (a)  *Policy.* [Prisoners] People in custody have an unrestricted right to hold any religious belief, and to be a member of any religious group or organization, as well as to refrain from the exercise of any religious beliefs. A [prisoner] person in custody may change his or her religious affiliation.

   (b)  *Exercise of religious beliefs.*

    (1)  [Prisoners] People in custody are entitled to exercise their religious beliefs in any manner that does not constitute a clear and present danger to the safety or security of a facility.

    (2)  No employee or agent of the Department or of any voluntary program shall be permitted to proselytize or seek to convert any [prisoner] person in custody, nor shall any [prisoner] person in custody be compelled to exercise or be dissuaded from exercising any religious belief.

(2)   The Department may deny optional lock-in to a [prisoner] person in mental observation status if a psychiatrist or psychologist determines in writing that optional lock-in poses a serious threat to the safety of that [prisoner] person. A decision to deny optional lock-in must be reviewed every ten (10) days, including a written statement of findings, by a psychiatrist or psychologist. Decisions made by a psychiatrist or psychologist pursuant to this subdivision must be based on personal consultation with the [prisoner] person in custody.

(d)   *Schedule.* Each facility shall maintain and distribute to all [prisoners] people in custody or post in each housing area its lock-out schedule, including the time during each lock-out period when [prisoners] people may exercise the options provided by paragraph (c)(1) of this subdivision.

§ 4. Section 1-06 of Title 40 of the Rules of the City New York is amended to read as follows:

## § 1-06 Recreation.

(a)   *Policy.* Recreation is essential to good health and contributes to reducing tensions within a facility. [Prisoners] People in custody shall be provided with adequate indoor and outdoor recreational opportunities.

(b)   *Recreation areas.* Indoor and outdoor recreation areas of sufficient size to meet the requirements of this section shall be established and maintained by each facility. An outdoor recreation area must allow for direct access to sunlight and air.

(c)   *Recreation schedule.* Recreation periods shall be at least one hour; only time spent at the recreation area shall count toward the hour. Recreation shall be available seven (7) days per week in the outdoor recreation area, except in inclement weather when the indoor recreation area shall be used.

(d)   *Recreation equipment.*

(1)   The Department shall make available to [prisoners] people in custody an adequate amount of equipment during the recreation period.

(2)   Upon request each facility shall provide [prisoners] people in custody with appropriate outer garments in satisfactory condition, including coat, hat, and gloves, when they participate in outdoor recreation during cold or wet weather conditions.

(e)   *Recreation within housing area.*

(1)   [Prisoners] People shall be permitted to engage in recreation activities within cell corridors and tiers, dayrooms and individual housing units. Such recreation may include but is not limited to:

(iii)   It shall provide for an initial classification upon entrance into the corrections system. Such classification shall take into account only relevant factual information about the [prisoner] person in custody, capable of verification.

(iv)   It shall provide for involvement of the [prisoner] person in custody at every stage with adequate due process.

(v)   [Prisoners] People placed in the most restrictive security status shall only be denied those rights, privileges and opportunities that are directly related to their status and which cannot be provided to them at a different time or place than provided to other [prisoners] individuals in custody.

(vi)   It shall provide mechanisms for review of [prisoners] people placed in the most restrictive security status at intervals not to exceed four (4) weeks for [detainees] individuals awaiting trial and eight (8) weeks for sentenced [prisoners] people.

§ 3. Section 1-05 of Title 40 of the Rules of the City New York is amended to read as follows:

**§ 1-05 Lock-in.**

(a) *Policy.* The time spent by [prisoners] people confined to their cells should be kept to a minimum and required only when necessary for the safety and security of the facility. The provisions of this section are inapplicable to [prisoners confined in punitive segregation] people confined in RMAS housing or [prisoners] people confined for medical reasons in the contagious disease units.

(b)   *Involuntary lock-in.* [No prisoner] People shall not be required to remain confined to [his or her] their [cell] cells except for the following purposes:

(1)   At night for count or sleep, not to exceed eight hours in any 24-hour period;

(2)   During the day for count or required facility business that can only be carried out while [prisoners] people are locked in, not to exceed two hours in any 24-hour period. This time may be extended if necessary to complete an off count. [This paragraph shall not apply to prisoners confined in enhanced supervision housing, who may be locked in during the day for up to nine hours in any 24-hour period.]

(c)   *Optional lock-in.*

(1)   [Prisoners] People shall have the option of being locked in their cells during lock-out periods. [Prisoners] Individuals choosing to lock in at the beginning of a lock-out period of two (2) hours or more shall be locked out upon request after one-half of the period. At this time, [prisoners] people who have been locked out shall be locked in upon request.

(K) The number and percent of young adults in custody with an Individual Behavioral Support Plan; and

(L) Any other information the Department or the Board deems relevant to assessment of the Young Adult Plan.

(M) The Board and the Department shall jointly develop reporting templates for information required by 40 RCNY § 1-02(c)(3) for approval by the Board.

(d) [Civil prisoners.] *People in Custody for Civil Offenses.*[(1) Prisoners] People who are not directly involved in the criminal process [as detainees or serving sentence] and are confined for other reasons including civil process, civil contempt or material witness, shall be housed separate and apart from [other prisoners] the rest of the jail population and, if possible, located in a different structure or wing. They must be afforded at least as many of the rights, privileges and opportunities available to other [prisoners] people in custody.

(2)  Within this category, the following groupings shall be housed separate and apart:

(i)  male adults, ages 22 and over;

(ii)  male young adults, ages 18 to 21 inclusive;

[(iii)  male minors, ages 16 and 17];

([iv]iii)  female adults, ages 22 and over;

([v]iv)  female young adults, ages 18 to 21 inclusive.

[(vi)  female minors, ages 16 and 17.]

(e)  *Limited commingling.* Nothing contained in this section shall prevent [prisoners] people in custody in different categories or groupings from being in the same area for a specific purpose, including, but not limited to, entertainment, classes, contact visits or medical necessity.

(f)  *Security classification.*

(1)  The Department shall use a system of classification to group [prisoners] people in custody according to the minimum degree of surveillance and security required.

(2)  The system of classification shall meet the following requirements:

(i)  It shall be in writing and shall specify the basic objectives, the classification categories, the variables and criteria used, the procedures used and the specific consequences to the [prisoner] person in custody of placement in each category.

(ii)  It shall include at least two (2) classification categories.

52

(ii)  The Department shall report to the Board the locations of all units operating as young adult-only housing units at each facility, including the dates each unit started operating as a young adult-only unit and the date each unit stopped operating as a young adult-only unit (if applicable).

(iii)  The Department shall provide the Board with monthly, public reports on its plans for housing and providing age-appropriate programming and services to young adults in custody (i.e., Young Adult Plan). The monthly report shall include but not be limited to the following information as of the first day of the reporting month:

(A)  Number of young adults, in total and disaggregated by gender, custody status (i.e., detainee, sentenced), and "M" designation, and the percent of young adults in each category out of the total young adult population and the DOC population as a whole;

(B)  Number of young adults, in total and disaggregated by facility and by young adult-only versus commingled housing units, and percent of the young adult population in each category out of the total young adult population in custody;

(C)  Number of young adults in young adult-only housing units, in total and disaggregated by classification level and custody status;

(D)  Number of young adults in commingled housing units, in total and disaggregated by classification level and custody status;

(E)  Number of young adults in medical and mental health housing units, in total and disaggregated by type of unit (e.g., CAPS, PACE, Detox, and Mental Observation);

(F)  Number of young adults in restrictive housing units, in total and disaggregated by type and level of housing;

(G)  Number of active young adult-only housing areas by facility during the reporting month;

(H)  A list and description of the staff trainings focusing on working with the young adult population offered by the Department (e.g., Safe Crisis Management, Direct Supervision);

(I)  For each training offered, the number and percent of staff working with young adults, in total (Department-wide) and disaggregated by facility and by status of young adult training received (qualified, trained but expired, never trained);

(J)  A list and description of young adult program offerings by facility, housing type (young adult-only, commingled), and provider, specifying Department-led programming and programming offered by external providers;

(2)   Where sentenced [inmates] individuals are housed with [inmates] people awaiting trial or examination in the housing areas listed in subparagraphs (i) through [(vii)] (v) of paragraph (1) of this subdivision, the sentenced [inmates] individuals shall be treated as [inmates] people awaiting trial or examination for all purposes other than housing.

(3)   Within the categories set forth in paragraph (1), and subject to the exceptions set forth in 40 RCNY § 1-02(b)(4), the following groupings shall be housed separate and apart:

    (i)   male adults, ages 22 and over;

    (ii)   male young adults, ages 18 to 21 inclusive;

    [(iii)   male minors, ages 16 and 17;]

    ([iv] iii)   female adults, ages 22 and over;

    ([v]iv)   female young adults, ages 18 to 21 inclusive[;].

    [(vi)   female minors, ages 16 and 17.]

(4)   Young adults shall be housed separate and apart from adults, except when housed in:

    (i)   specialized medical housing units, as defined in 40 RCNY § 6-03(b)(14);

    (ii)   specialized mental health housing, as defined in 40 RCNY § 6-03(b)(15);

    (iii)   pregnant person housing and the Department nursery.

(c)   *Inmates ages 18 to 21 inclusive*

    (1)   No later than [October 15, 2015] six (6) months after the Effective Date, the Department shall implement the requirement of paragraph [2](3) of subdivision (b) of this section that [inmates] people in custody ages 18 through 21 be housed separately and apart from [inmates] people over the age of 21.

    (2)   Housing for [inmates] people in custody ages 18 through 21 shall provide such [inmates] people with age-appropriate programming. [No later than August 1, 2015, the Department shall provide the Board with a plan to develop such age-appropriate programming.]

    (3)   Data Collection and Review.

        (i)   The Department shall provide the Board with a monthly public census showing which housing units and facilities house 18-year-olds and 19-21-year-olds. The census shall indicate how many young adults are in each unit, the housing category of each unit (e.g., general population, protective custody, etc.), and whether the unit is a young adult-only unit or a commingled housing unit.

50

**VERSION 2.0**
**NEW PROPOSED RULES**

"Shall" and "must" denote mandatory requirements and may be used interchangeably in the rules of the Board of Correction, unless otherwise specified or unless the context clearly indicates otherwise.

      Section 1.  Chapter 1 of Title 40 of the Rules of the City of New York is amended by repealing sections 1-16 and 1-17 upon implementation of RMAS.

      § 2. Section 1-02 of Title 40 of the Rules of the City New York is amended to read as follows:

**§ 1-02 Classification of [Prisoners] <u>People in Custody</u>.**

  (a)  *Policy.* Consistent with the requirements of this section the Department shall employ a classification system for [prisoners] <u>people in custody</u>.

  (b)  *Categories.*

    (1)  Sentenced [inmates] <u>individuals</u> shall be housed separate and apart from [inmates] <u>people</u> awaiting trial or examination, except when housed in:

      [(i)  punitive segregation;]

      [(ii)  medical housing areas;]

      [(iii)  mental health centers and mental observation cell housing areas;]

      [(iv)  enhanced supervision housing;]

      [(v)  nursery;]

      [(vi)  adolescent housing areas;]

      <u>(i)</u>  RMAS housing units, defined in 40 RCNY § 6-03(b)(13);

      <u>(ii)</u>  Specialized medical housing units, defined in 40 RCNY § 6-03(b)(14);

      <u>(iii)</u>  Specialized mental health housing, defined in 40 RCNY § 6-03(b)(15);
      <u>(iv)</u>  pregnant person housing and the Department nursery; and

      [(vii)] <u>(v)</u>  housing areas designated for [inmates] <u>people</u> ages 18 to 21 inclusive.

| SECTION | IMPLEMENTATION |
|---|---|
| (a) The use of all forms of punitive segregation as defined in 40 RCNY § 6-03(b)(10) shall be prohibited in all existing and future DOC facilities.<br><br>(b) Upon the Department's elimination of punitive segregation, the only form of restrictive housing permitted in DOC facilities will be RMAS housing pursuant to 40 RCNY § 6-08 through § 6-26. | November 1, 2021 |
| **§ 6-10: Placement Criteria**<br>(e) Written penalty grid. | Within 3 months of Effective Date |
| **§ 6-12: Case Management** | Within 3 months of Effective Date |
| **§ 6-18: Staffing**<br><br>(a) (Semiannual report on staffing in restrictive housing)<br><br>(b) (Staffing plans) | Within 6 months of RMAS implementation<br><br>November 1, 2021 |
| **§ 6-19: Training**<br>(a) (training for hearing adjudicators and staff involved in sentencing and placement decisions)<br><br>(c) (information to the Board re: Training) | November 1, 2021 |
| **§ 6-20: Programming**<br>(f) (Quarterly public reports) | Within 3 months of RMAS implementation |
| **§ 6-21 Access to Health Services**<br>(f) CHS monthly public reports | Within 1 month of RMAS Implementation |
| **§ 6-23: Disciplinary System Plans** | Within 3 months of the Effective Date |
| **§ 6-24 Due Process and Procedural Justice**<br>(c)(6) (videotaping of refusals to sign notice of infraction)<br><br>(d)(5) (recording of refusal to attend hearing) | November 1, 2021 |

| SECTION | IMPLEMENTATION |
|---|---|
| (i)(1) system to track due process requirements and documentation | Within 1 year of Effective Date |
| (i)(2) Semiannual public report | |
| **§ 6-25: RMAS Data Collection and Review**<br>(b) (system to track RMAS placements and RMAS documentation) | Within 1 year of Effective Date |
| (c) (monthly public data reports) | Within 1 month of RMAS implementation |
| (d) (monthly public reports) | Within 1 month of RMAS implementation |
| **§ 6-26: Transition**<br>(b)     (comprehensive transition plan) | Within 1 month of Effective Date |
| (c)     (monthly public progress reports) | First business day of July 2021 |
| **§ 6-27: Restraints**<br><br>(m) (Semiannual public report) | Within 1 year of Effective Date |

(c)   *Access to counsel.*

(1)   [Prisoners] People in custody shall not be restricted in their communication with attorneys. The fact that [a prisoner] someone is represented by one attorney shall not be grounds for preventing [him or her] that person from communicating with other attorneys. Any properly identified attorney may visit any [prisoner] person in custody with [the prisoner's] that person's consent.

(i)   An attorney may be required to present identification to a designated official at the central office of the Department in order to obtain a facility pass. This pass shall permit the attorney to visit any [prisoner] person in the custody of the Department.

(ii)   The Department only may require such identification as is normally possessed by an attorney.

(2)   The Department may limit visits to any attorney of record, or an attorney with a court notice for [prisoners] individuals undergoing examination for competency pursuant to court order.

(3)   Visits between [prisoners] people in custody and attorneys shall be kept confidential and protected, in accordance with provisions of 40 RCNY § 1-09. Legal visits shall be permitted at least eight hours per day between 8 a.m. and 8 p.m. During business days, four (4) of those hours shall be 8 a.m. to 10 a.m., and 6 p.m. to 8 p.m. The Department shall maintain and post the schedule of legal visiting hours at each facility.

(4)   Mail between [prisoners] people in custody and attorneys shall not be delayed, read, or interfered with in any manner, except as provided in 40 RCNY § 1-11.

(5)   Telephone communications between [prisoners] people in custody and attorneys shall be kept confidential and protected, in accordance with the provisions of 40 RCNY § 1-10.

(d)   *Access to co-defendants.* Upon reasonable request, regular visits shall be permitted between [a detainee] people awaiting trial and all of [his or her] their co-defendants who consent to such visits. If any of the co-defendants are incarcerated, the Department may require that an attorney of record be present and teleconferencing shall be used, if available.

(e)   *Attorney assistants.*

(1)   Law students, legal paraprofessionals, and other attorney assistants working under the supervision of an attorney representing a [prisoner] person in custody shall be permitted to communicate with [prisoners] that person by mail, telephone and personal visits, to the same extent and under the same conditions that the attorney may do so for the purpose of representing the [prisoner] individual. Law students, legal paraprofessionals and other attorney assistants working under the supervision of an attorney contacted by a [prisoner] person in custody shall be permitted to communicate with that [prisoner] individual by mail, telephone, or personal visits to the same extent and under the same conditions that the attorney may do so.

(2)   An attorney assistant may be required to present a letter of identification from the attorney to a designated official at the central office of the Department in order to obtain a facility pass. A pass shall not be denied based upon any of the reasons listed in 40 RCNY § 1-09(h)(1).

(3)   The pass shall permit the assistant to perform the functions listed in subdivision (e) of this section. It may be revoked if specific acts committed by the legal assistant demonstrate [his or her] the legal assistant's threat to the safety and security of a facility. This determination must be made pursuant to the procedural requirements of paragraphs (2), (4) and (5) of subdivision (h) of 40 RCNY § 1-09.

(f)   *Law libraries.* Each facility shall maintain a properly equipped and staffed law library.

(1)   The law library shall be located in a separate area sufficiently free of noise and activity and with sufficient space and lighting to permit sustained research.

(2)   Each law library shall be open for a minimum of five (5) days per week including at least one (1) weekend day. On each day a law library is open:

(i)   in facilities [with] housing more than six hundred (600) [prisoners] people, each law library shall be operated for a minimum of ten (10) hours, of which at least eight (8) shall be during lock-out hours;

(ii)   in facilities [with] housing six hundred (600) or fewer [prisoners] people, each law library shall be operated for a minimum of eight (8) and a half hours, of which at least six (6) and a half shall be during lock-out hours;

(iii)   in all facilities, the law library shall be operated for at least three (3) hours between 6 p.m. and 10 p.m.; and

(iv)   the law library will be kept open for [prisoners'] people's use on all holidays which fall on regular law library days except New Year's Day, July 4th, Thanksgiving, and Christmas. The law library may be closed on holidays other than those specified provided that law library services are provided on either of the two days of the same week the law library is usually closed. On holidays on which the law library is kept open, it shall operate for a minimum of eight (8) hours. No changes to law library schedules shall be made without written notice to the Board of Correction and shall be received at least five (5) business days before the planned change(s) is to be implemented.

(3)   The law library schedule shall be arranged to provide access to [prisoners] people in custody during times of the day when other activities such as recreation, commissary, meals, school, sick call, etc., are not scheduled. Where such considerations cannot be made, [prisoners] people shall be afforded another opportunity to attend the law library at a later time during the day.

(4)   Each [prisoner] person in custody shall be granted access to the law library for a period of at least two (2) hours per day on each day the law library is open. Upon request, extra time may be provided as needed, space and time permitting. In providing extra time, [prisoners]

people who have an immediate need for additional time, such as [prisoners] people on trial and those with an impending court deadline shall be granted preference.

(5)  Notwithstanding the provisions of paragraph (f)(4), [prisoners] people housed for medical reasons in the contagious disease units may be denied access to the law library. An alternative method of access to legal materials shall be instituted to permit effective legal research.

(6)  The law library hours for [prisoners] people in [punitive segregation or enhanced supervision] Levels 1 and 2 of RMAS housing as defined in Chapter 6 of these Rules may be reduced or eliminated, provided that an alternative method of access to legal materials is instituted to permit effective legal research.

(7)  Legal research classes for people housed in general population [prisoners] shall be conducted at each facility on at least a quarterly basis. Legal research training materials shall be made available upon request to [prisoners] people in [special housing] Levels 1 and 2 of RMAS housing.

(8)  The Department shall report annually to the Board detailing the resources available at the law library at each facility, including a list of titles and dates of all law books and periodicals and the number, qualifications and hours of English and Spanish-speaking legal assistants.

(g)  *Legal documents and supplies.*

(1)  Each law library shall contain necessary research and reference materials which shall be kept properly updated and supplemented and shall be replaced without undue delay when materials are missing or damaged.

(2)  [Prisoners] People in custody shall have reasonable access to typewriters, dedicated word processors, and photocopiers for the purpose of preparing legal documents. A sufficient number of operable typewriters, dedicated word processors, and photocopy machines will be provided for [prisoner] people's use.

(3)  Legal clerical supplies, including pens, legal paper and pads shall be made available for purchase by [prisoners] people in custody. Such legal clerical supplies shall be provided to indigent [prisoners] individuals at Department expense.

(4)  Unmarked legal forms which are commonly used by [prisoners] people in custody shall be made available. Each [prisoner] person shall be permitted to use or make copies of such forms for [his or her own] the person's use.

(h)  *Law library staffing.*

(1)  During all hours of operation, each law library shall be staffed with trained civilian legal coordinator(s) to assist [prisoners] people with the preparation of legal materials. Legal coordinator coverage shall be provided during extended absences of the regularly assigned legal coordinator(s).

(2)   Each law library shall be staffed with an adequate number of permanently assigned correction officers knowledgeable of law library procedures.

(3)   Spanish-speaking [prisoners] people in custody shall be provided assistance in use of the law library by employees fluent in the Spanish language on an as needed basis.

(i)   *Number of legal documents and research materials.*

(1)   [Prisoners] People in custody shall be permitted to purchase and receive law books and other legal research materials from any source.

(2)   Reasonable regulations governing the keeping of materials in cells and the searching of cells may be adopted, but under no circumstances may [prisoners'] people's legal documents, books, and papers be read or confiscated by correctional personnel without a lawful warrant. Where the space in a cell is limited, an alternative method of safely storing legal materials elsewhere in the facility is required, provided that a [prisoner] person in custody shall have regular access to these materials.

(j)   *Limitation of access to law library.*

(1)   [A prisoner] People in custody may be removed from the law library if [he or she] they disrupt[s] the orderly functioning of the law library or do[es] not use the law library for its intended purposes. [A person may be excluded from the law library for more than the remainder of one law library period only for a disciplinary infraction occurring within a law library.]

(2)   Any determination to limit a [prisoner's] person's right of access to the law library shall be made in writing and shall state the specific facts and reasons underlying such determination. A copy of this determination, including the appeal procedure, shall be sent to the Board and to any person affected by the determination within one business day [24 hours] of the determination.

(3)   An alternative method of access to legal materials shall be instituted to permit effective legal research for any [prisoner] person excluded from the law library. A legal coordinator shall visit any excluded [prisoner] person to determine his or her law library needs upon request.

(4)   Any person affected by a determination made pursuant to this subdivision (j) may appeal such determination to the Board.

(i)   The person affected by a determination shall give notice in writing to the Board and to the Department of his or her intent to appeal the determination.

(ii)   The Department and any person affected by the determination may submit to the Board for its consideration any relevant material in addition to the written determination.

(iii)   The Board or its designee shall issue a written decision upon the appeal within five (5) business days after receiving notice of the requested review.

§ 7. Section 1-09 of Title 40 of the Rules of the City New York is amended to read as follows:

## § 1-09 Visiting.

(a)  *Policy.* All [inmates] people in custody are entitled to receive personal visits of sufficient length and number. Maintaining personal connections with social and family networks and support systems is critical to improving outcomes both during confinement and upon reentry. Visitation with friends and family plays an instrumental role in a [n inmate's] person's ability to maintain these connections and should therefore be encouraged and facilitated by the Department. Additionally, the Board recognizes that a [n inmate's] person's family may not be limited to those related to the [inmate] individual by blood or by legally-recognized bonds, such as marriage or adoption. Therefore, the term "family" as it is used in this subdivision should be construed broadly to reflect the diversity of familial structures and the wide variety of relationships that may closely connect a [n inmate] person in custody to others. This should include, for example, but may not be limited to: romantic partners; godparents and godchildren; current and former step-parents, children, and siblings; and those connected to the [inmate] individual through current or former domestic partnerships, foster arrangements, civil unions, or cohabitation.

(b)  *Visiting and waiting areas.*

(1)  A visiting area of sufficient size to meet the requirements of this section shall be established and maintained in each facility.

(2)  The visiting area shall be designed so as to allow physical contact between [prisoners] people in custody and their visitors as required by subdivision (f) of this section.

(3)  The Department shall make every effort to minimize the waiting time prior to a visit. Visitors shall not be required to wait outside a facility unless adequate shelter is provided and the requirements of paragraph (b)(4) of this section are met.

(4)  All waiting and visiting areas shall provide for at least minimal comforts for visitors, including but not limited to:

(i)  sufficient seats for all visitors;

(ii)  access to bathroom facilities and drinking water throughout the waiting and visiting periods;

(iii)  access to vending machines for beverages and foodstuffs at some point during the waiting or visiting period; and

(iv)  access to a Spanish-speaking employee or volunteer at some point during the waiting or visiting period. All visiting rules, regulations, and hours shall be clearly posted in English and Spanish in the waiting and visiting areas at each facility.

63

(5)   The Department shall make every effort to utilize outdoor areas for visits during the warm weather months.

(c)   *Visiting schedule.*

(1)   Visiting hours may be varied to fit the schedules of individual facilities but must meet the following minimum requirements for [detainees] people awaiting trial:

(i)   Monday through Friday. Visiting shall be permitted on at least three (3) days for at least three (3) consecutive hours between 9 a.m. and 5 p.m. Visiting shall be permitted on at least two (2) evenings for at least three (3) consecutive hours between 6 p.m. and 10 p.m.

(ii)   Saturday and Sunday. Visiting shall be permitted on both days for at least five (5) consecutive hours between 9 a.m. and 8 p.m.

(2)   Visiting hours may be varied to fit the schedules of individual facilities but must meet the following minimum requirements for sentenced [prisoners] individuals:

(i)   Monday through Friday. Visiting shall be permitted on at least one (1) evening for at least three (3) consecutive hours between 6 p.m. and 10 p.m.

(ii)   Saturday and Sunday. Visiting shall be permitted on both days for at least five (5) consecutive hours between 9 a.m. and 8 p.m.

(3)   The visiting schedule of each facility shall be available by contacting either the central office of the Department or the facility.

(4)   Visits shall last at least one (1) hour. This time period shall not begin until the [prisoner] person in custody and visitor meet in the visiting room.

(5)   Sentenced [prisoners] individuals are entitled to at least two (2) visits per week with at least one (1) on an evening or the weekend, as the sentenced [prisoner] individual wishes. [Detainees] People awaiting trial are entitled to at least three (3) visits per week with at least one (1) on an evening or the weekend, as the [detainee] person wishes. Visits by properly identified persons providing services or assistance, including lawyers, doctors, religious advisors, public officials, therapists, counselors, and media representatives, shall not count against this number.

(6)   There shall be no limit to the number of visits by a particular visitor or category of visitors.

(7)   In addition to the minimum number of visits required by paragraphs (1), (2) and (5) of this subdivision, additional visitation shall be provided in cases involving special necessity, including but not limited to, emergency situations and situations involving lengthy travel time.

(8)   [Prisoners] People in custody shall be permitted to visit with at least three (3) visitors at the same time, with the maximum number to be determined by the facility.

(9)   Visitors shall be permitted to visit with at least two (2) [prisoners] people in custody at the same time, with the maximum number to be determined by the facility.

(10)   If necessitated by lack of space, a facility may limit the total number of persons in any group of visitors and [prisoners] people in custody to four (4). Such a limitation shall be waived in cases involving special necessity, including but not limited to, emergency situations and situations involving lengthy travel time.

(d)   *Initial visit.*

(1)   [Each detainee] People awaiting trial shall be entitled to receive a non-contact visit within twenty-four (24) hours of [his or her] their admission to the facility.

(2)   If a visiting period scheduled pursuant to paragraph (c)(1) of this section is not available within twenty-four (24) hours after a [detainee's] person awaiting trial's admission, arrangements shall be made to ensure that the initial visit required by this subdivision is made available.

(e)   *Visitor identification and registration.*

(1)   Consistent with the requirements of this subdivision, any properly identified person shall, with the [prisoner's] individual in custody's consent, be permitted to visit [the prisoner] that individual.

(i)   Prior to a visit, a [prisoner] person in custody shall be informed of the identity of the prospective visitor.

(ii)   A refusal by a [prisoner] person in custody to meet with a particular visitor shall not affect [the prisoner's] that person's right to meet with any other visitor during that period, nor [the prisoner's] that person's right to meet with the refused visitor during subsequent periods.

(2)   [Each visitor] Visitors shall be required to enter in the facility visitors log:

(i)   [his or her] their name;

(ii)   [his or her] their address;

(iii)   the date;

(iv)   the time of entry;

(v)   the name of the [prisoner or prisoners] individual or individuals to be visited; and

(vi)   the time of exit.

(3)   Any prospective visitors who [is] under sixteen (16) years of age shall be required to enter, or have entered [for him or her] on their behalf, in the facility visitors log:

(i)   the information required by paragraph (2) of this subdivision;

(ii)   [his or her] their age; and

(iii)   the name, address, and telephone number of [his or her] their parent or legal guardian.

(4)   The visitors log shall be confidential, and information contained therein shall not be read by or revealed to non-Department staff except as provided by the City Charter or pursuant to a specific request by an official law enforcement agency. The Department shall maintain a record of all such requests with detailed and complete descriptions.

(5)   Prior to visiting a [prisoner] person in custody, a prospective visitor under sixteen (16) years of age may be required to be accompanied by a person eighteen (18) years of age or older, and to produce oral or written permission from a parent or legal guardian approving such visit.

(6)   The Department may adopt alternative procedures for visiting by persons under sixteen (16) years of age. Such procedures must be consistent with the policy of paragraph (e)(5) of this subdivision and shall be submitted to the Board for approval.

(f)   *Contact visits.* Physical contact shall be permitted between [every inmate] all people in custody and all of [the inmate's] their visitors. Permitted physical contact shall include a brief embrace and kiss between the [inmate] person in custody and visitor at both the beginning and end of the visitation period. [Inmates] People in custody shall be permitted to hold children in [the inmate's] their family who are ages fourteen (14) and younger throughout the visitation period, provided that the Department may limit a [n inmate's] person in custody to holding [of children to] one child at a time. Additionally, [inmates] people in custody shall be permitted to hold hands with their visitors throughout the visitation period, which the Department may limit to holding hands over a partition that is no greater than six (6) inches. The provisions of this subdivision are inapplicable to [inmates] individuals housed for medical reasons in the contagious disease units. The Department may impose certain limitations on contact visits for [inmates] people confined in [enhanced supervision] RMAS housing in accordance with the procedures and guidelines set forth in 40 RCNY § [1-16] 6-17(g).

(g)   *Visiting security and supervision.*

(1)   All [prisoners] people in custody, prior and subsequent to each visit, may be searched solely to ensure that they do not possess [no] any contraband.

(2)   All prospective visitors may be searched prior to a visit solely to ensure that they do not possess [no] any contraband.

(3)   Any body search of a prospective visitor made pursuant to paragraph (2) of this subdivision shall be conducted only through the use of electronic detection devices. Nothing contained herein shall affect any authority possessed by correctional personnel pursuant to statute.

(4)   Objects possessed by a prospective visitor, including but not limited to, handbags or packages, may be searched or checked. Personal effects, including wedding rings and religious medals and clothing, may be worn by visitors during a visit. The Department may require a

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 99

---

THE PEOPLE OF THE STATE OF NEW YORK

-against-

KWAINE THOMPSON,

Defendant.

---

ORDER TO MONITOR
AND RESTRICT
DEFENDANT'S
TELEPHONE CALLS

Indictment Nos.
00794/2019
00801/2019
01421/2019

---

TO:   The Superintendent/Warden of the Department of Correction

WHEREAS the defendant, KWAINE THOMPSON, is charged in the above indictments with Rape in the First Degree, Criminal Sexual Act in the First Degree, Strangulation in the Second Degree, Coercion in the Second Degree, Robbery in the First Degree, Assault in the Second Degree, Aggravated Family Offense, Criminal Contempt in the Second Degree and Tampering with a Witness in the Fourth Degree and related charges, and his case is currently pending in New York State Supreme Court, New York County, located at 100 Centre Street; the defendant is incarcerated under NYSID number 07289661Q and Book and Case number 5491901450; it is hereby ORDERED that the Commissioner, New York City Department of Correction, or whoever shall have supervision or control of the defendant, shall prevent the defendant from making

telephone calls except to the defendant's attorney, Harlan Greenberg, Esq. at (212) 964-0503 and (917) 868-6765, while in the custody of the Department of Corrections by any means necessary, including 23 hour lockdown; and that a Department of Corrections staff member will dial the phone and, after determining that defendant's attorney is on the receiving end, will hand the telephone to the defendant.

_____

HON. JAMES M. BURKE

Justice of the Supreme Court

Dated: New York, New York

**OCT 1 2 2021**



<u>*1 Prosecutorial Misconduct § 5.22(a)*</u>

**Prosecutorial Misconduct  >  CHAPTER 5 ABUSES OF THE DISCOVERY PROCESS**

## § 5.22(a) The Stevens prosecution: Lying and cheating to get a conviction

On July 29, 2008, Alaska Senator Ted Stevens, the longest sitting Republican member of the United States Senate, was indicted by a federal grand jury on seven felony counts of failing to properly report gifts. He was found guilty in a quickly scheduled trial some three months later. The charges related to renovations to his home and alleged gifts from VECO Corporation, claimed to be worth more than $250,000. The indictment followed a lengthy investigation by the Federal Bureau of Investigation (FBI) and the Internal Revenue Service (IRS) into possible corruption by Alaskan politicians and was based on his relationship with one Bill Allen. Allen, then an oil service company executive, had earlier pleaded guilty to bribing several Alaskan state legislators, including a disputed claim about Stevens's son, former State Senator Ben Stevens. Allen's sentencing was suspended pending his cooperation in gathering evidence and giving testimony in other trials.

Stevens asserted his right to a speedy trial so that he could have the opportunity to promptly clear his name and requested that the trial be held before the 2008 election. During the trial, Stevens's defense counsel, Brendan V. Sullivan of Williams & Connolly, moved for a mistrial on the grounds that the government had repeatedly withheld *Brady* material. While the Court denied the mistrial motion, it had earlier admonished the prosecution for sending a witness home to Alaska who might have helped the defense and had dealt with a series of similar complaints throughout the trial.

On October 27, 2008, Stevens was found guilty of all seven counts of making false statements, making him the fifth sitting senator ever to be convicted by a jury and the first since Senator Harrison A. Williams (D-NJ) in 1981. Three months later, things changed.

In February 2009, FBI agent Chad Joy filed a whistleblower affidavit, alleging that prosecutors and FBI agents conspired to withhold and conceal evidence that could have resulted in a verdict of "not guilty" for Stevens. In his affidavit, Joy alleged that prosecutors intentionally sent a key witness back to Alaska after the witness performed

be prepared to argue the impact of a *Brady* violation in light of the entire record, and demonstrate the prejudicial effect of the violation upon the outcome of the case.[206]

If one wonders why prosecutors still believe they can run roughshod over the constitutional rights of criminal defendants, one only need look at the ultimate result, with respect to the prosecutor, in *Ramming*. The simple fact is that, had defense counsel been the recipient of the comments of Judge Hoyt, they would have lost their job and been disciplined, if not disbarred, by the state bar. This AUSA, "blinded by ambition or ignorance of the law and ethics," is still a prosecutor.

Prosecutorial Misconduct

Copyright 2022,  Matthew Bender & Company, Inc., a member of the LexisNexis Group.

**End of Document**

State statutory law; the Due Process Clause of N.Y. Const., Art., I, Sec. VI; and the Equal

Protection Clauses of the State and federal constitutions.

### MOTION TO DISMISS OR REDUCE COUNTS OF THE INDICTMENT BECAUSE THEY ARE NOT SUPPORTED BY LEGALLY SUFFICIENT EVIDENCE

8. The defendant moves this Court, upon the court's inspection of the grand jury minutes,

as requested, <u>ante</u>, for an order dismissing the indictment, or in the alternative, dismissing or

reducing counts therein, pursuant to C.P.L. §210.20(1)(b), on the grounds that the evidence

before the grand jury was not legally sufficient to establish the offenses charged or any lesser

included offense.

A. As to the charges of Criminal Sexual Act in the First Degree, the evidence failed to establish that on February 17, February 27 or March 1, 2019, the defendant engaged in sexual contact with the complaining witness by forcible compulsion.

B. As to the charges of Assault in the Third Degree, the evidence failed to establish that on or about February 10 to on and about February 17, 2019, the defendant intended to and did cause physical injury to the complaining witness.

C. As to the charges of Coercion in the Second Degree, the evidence failed to establish that on February 27, 28 or March 1, 2019, the defendant compelled and induced the complaining witness to engage in sexual conduct.

D. As to the charge of Rape in the First Degree, the evidence failed to establish that on February 28, 2019, the defendant engaged in sexual intercourse by forcible compulsion.

E. As to the charge of Strangulation in the Second Degree, the evidence failed to establish that on March 1, 2019, the defendant, with the intent to impede the normal breathing and circulation of the blood, applied pressure on the throat and neck of the complaining witness causing stupor, loss of consciousness or any other physical injury or impairment.

F. As to the charge of Criminal Mischief in the Fourth Degree, the evidence failed to establish that on February 19, 2019, the defendant intentionally damaged the property of the complaining witness.