**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KWAINE THOMPSON, | No. 22-cv-1458 (JPO) (KHP) |
| *Plaintiff*, | |
| vs. | |
| THE CITY OF NEW YORK, *et al.*, | |
| *Defendants*. | |

| | |
|---|---|
| KWAINE THOMPSON, | **No. 23-cv-2102 (JPO) (KHP)** |
| *Plaintiff*, | |
| vs. | **FIRST AMENDED COMPLAINT FOR** |
| | **DAMAGES AND EQUITABLE RELIEF** |
| THE CITY OF NEW YORK, LYNELLE MAGINLEY-LIDDIE, THOMAS GRIFFIN, CHRISTOPHER L. MILLER, WARDEN COLLINS, ASSISTANT DEPUTY WARDEN HENRY, DEPUTY WARDEN MILLER, ERNEST FLUKER, JIMMY GUAN, ADAM ROLLINSON, CAPT. LOPEZ, CAPT. PALMERO, CHARLTON LEMON, C.O. LOTT, C.O. TAYLOR, STELLA BETHEA, PRZEMYSLAW WOLOSIK, WALTER MCNEIL, FEDIR MERENYCH, MARVA BRANCHE, KEESIA LEITCH, ANTHONY MARDEN, ANTONIO GRAVES, NURSE BLOUNT, and DOES 1-30, | <u>DEMAND FOR JURY TRIAL</u> |
| *Defendants*. | |

Plaintiff Kwaine Thompson, by and through his undersigned *pro bono* counsel, brings this action for damages and equitable relief, and alleges as follows:

## PRELIMINARY STATEMENT

1.      Plaintiff brings this action under federal and state law against the City of New York and its employees following the retaliation he experienced on Rikers Island, particularly at West Facility and GRVC, after he filed suit against correctional officers.

2.      This complaint asserts claims based on Plaintiff's conditions of confinement, medical and health issues, excessive force, due-process violations, among other things, as well as violations of Plaintiff's rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq., the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101 et seq. ("ADA"), the New York State and City Human Rights Law, New York Executive Law §§ 290, et seq., Admin. Code of the City of New York §§ 8-101 et seq.

3.      As more fully explained below, Defendants deprived Plaintiff of the rights, remedies, privileges, and immunities guaranteed to every person by the First, Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution, without limitation.

4.      Plaintiff seeks damages and equitable relief, including declaratory relief and nominal damages, based on Defendants' violations of his rights.

## THE PARTIES

### A.    Plaintiff

5.      Plaintiff Kwaine Thompson ("Plaintiff" or "Thompson") is a natural person and resident of the State of New York. At all times relevant, Plaintiff was a pretrial detainee on Rikers Island.

1

### B.    Defendants

#### 1.  Institutional and Supervisory Defendants

6.      Defendant the City of New York (the "City") is a municipal corporation organized under the laws of the State of New York. Through its Department of Corrections ("Department" or "DOC"), the City manages and operates correctional facilities like Rikers Island.[1]

7.      Defendant Lynelle Maginley-Liddie is the Commissioner of the New York City Department of Corrections, and she is sued in her official capacity. As Commissioner, she is responsible for the policy, practice, supervision, and conduct of all City-run correctional facilities, as well as the care, custody, and control of detained individuals.

8.      Defendant Thomas Griffin is the DOC Assistant Commissioner; he is sued in both his official and individual capacities.

9.      Defendant Christopher L. Miller is the DOC Assistant Commissioner; he is sued in both his official and individual capacities.

10.     Defendant Collins is the Warden of West Facility and directly responsible for its operation, and s/he is sued in their official capacity.

11.     Defendant Henry is the Assistant Deputy Warden ("ADW") of the George R. Vierno Center ("GRVC"), and he is sued in both his official and individual capacities.

12.     Defendant Miller is the Deputy Warden ("DW") of West Facility; he is sued in both his official and individual capacities.

---

[1] Relevant here, the City and Department are interchangeable and synonymous with one another; whenever reference is made to one, it includes the other.

13.     Defendant Fluka (a/k/a Ernest Fluker) is a captain with the Correction Intelligence Bureau ("CIB"); he is sued in both his official and individual capacities.

14.     Defendant Jimmy Guan is a captain on Rikers Island; he is sued in both his official and individual capacities.

15.     Defendant Lopez (shield no. 462) is a captain employed by the Department; he is sued in both his official and individual capacities.

16.     Defendant Rollinson (a/k/a Rollins) (a/k/a Adam Rollison) is a captain employed by the Department and assigned to West Facility. He is sued in both his official and individual capacities.

17.     Defendant Palmero is a captain employed by the Department and assigned to GRVC. He is sued in both his official and individual capacities.

18.     Defendant Charlton Lemon (a/k/a Captain Lemon) is a correctional officer on Rikers Island; he is sued in both his official and individual capacities. It appears that Lemon currently holds the position of DOC Assistant Chief of Security.

### 2. CO Defendants

19.     Defendant Lott is a correctional officer on Rikers Island; he is sued in both his official and individual capacities.

20.     Defendant Taylor is a correctional officer on Rikers Island; he is sued in both his official and individual capacities.

21.     Defendant Stella Bethea is a correctional officer on Rikers Island; she is sued in both her official and individual capacities.

22.    Defendant Przemyslaw Wolosik is a correctional officer on Rikers Island; he is sued in both his official and individual capacities.

23.    Defendant Walter McNeil is a correctional officer on Rikers Island; he is sued in both his official and individual capacities.

24.    Defendant Fedir Merenych is a correctional officer on Rikers Island; he is sued in both his official and individual capacities.

25.    Defendant Marva Branche is a correctional officer on Rikers Island; she is sued in both her official and individual capacities.

26.    Defendant Keesia Leitch is a correctional officer on Rikers Island; she is sued in both her official and individual capacities.

27.    Defendant Anthony Marden is a correctional officer on Rikers Island; he is sued in both his official and individual capacities.

28.    Defendant Antonio Graves is a correctional officer on Rikers Island; he is sued in both his official and individual capacities.

29.    Defendant Blount is a nurse that provided services to Plaintiff on Rikers Island; she is sued in both her official and individual capacities.

### 3. DOC Employee-Defendants/Doe Defendants

30.    Defendant Does 1 through 30, inclusive, refers to DOC employee-defendants whose identities are unknown to Plaintiff. In the original complaint, there are multiple employee-defendants whose identities are unclear, including officers that staffed West Facility like the Department's Special Response Team ("SRT") or the Emergency Services Unit ("ESU"), for example.

31.     Accordingly, Plaintiff refers to these Doe defendants as Does 1 through 30, inclusive, until he can amend his complaint to reflect their name and information once discovered. The true names and capacities of these defendants are presently unknown to Plaintiff. Regardless, each Doe defendant is responsible in some way for the events described herein and thus liable to Plaintiff.

32.     The foregoing defendants were acting as employees, agents or representatives of the Department and performed duties and responsibilities acting under color of state law.

## JURISDICTION AND VENUE

33.     The acts set forth in this complaint arise under 42 U.S.C. § 1983 based on violations of Plaintiff's rights under the United States Constitution, unless otherwise indicated (e.g., it arises under the laws of the State of New York), in which case the Court has supplemental or pendent jurisdiction.

34.     The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343, as well as jurisdiction to issue a declaratory judgment under 28 U.S.C. §§ 2201(a) and 2202.

35.     The Court has supplemental jurisdiction over the related state and local law claims under 28 U.S.C. § 1367(a).

36.     Venue is proper under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to this suit occurred within this District.

## INTRODUCTION

37.     In March 2019, Plaintiff made his latest trip to Rikers where he was exploited and mistreated. Plaintiff later disclosed the abuse and, while still on Rikers Island, filed a string of lawsuits about his experiences.

38.     In response, Plaintiff faced retaliation and efforts to intimidate and harass him in an apparent attempt to dissuade him from continuing with his litigation. This complaint represents the last months of Plaintiff's detention on Rikers Island.

## FACTUAL ALLEGATIONS

## I.     RELEVANT CONTEXT: THOMPSON AND NEW YORK CITY JAILS

39.     Plaintiff has a long, storied history with the City's jails and criminal justice system. Starting in the 1990s and until today, Plaintiff has made around thirty trips to Rikers.

40.     Throughout, Plaintiff consistently experienced the age-old stories that have been associated with Rikers Island: violence, brutality, and mistreatment. Notably, up until a brutal stabbing in 2010, Plaintiff never brought suit despite a number of injuries while in DOC custody.

41.     That 2010 attack involved, among other things, nearly 15 gang members—left unsupervised by the COs— who beat and stabbed Plaintiff and caused him to fracture his left orbital floor. Plaintiff found himself in a wheelchair after that attack.

42.     Almost two years later, once again, Plaintiff was victim to another horrific, violent episode—only this time, guards (not inmates) were responsible. Several COs struck and battered Plaintiff, which ultimately required Thompson undergo surgery and wiring his jaw shut. That experienced ended up with Thompson at Bellevue for almost a week.

43.     Plaintiff is diagnosed with Post-Traumatic Stress Disorder (PTSD), which followed in the aftermath of his experiences on Rikers Island.

44.     In addition to PTSD, Plaintiff has asthma and struggles with breathing, and difficulty with both his hearing and walking.

45.     Plaintiff also relies on a cane for help, which he has used since at least 2022.

6

## II.    THOMPSON'S LATEST TRIP TO RIKERS IN MARCH 2019

46.    Thompson arrived on Rikers Island in March 2019 and remained there until on or about February 14, 2023.

47.    At first, Plaintiff did not have any assigned or permanent facility placement. He bounced between various buildings—spending, for example, seventeen (17) days at the Anna M. Kross Center ("AMKC") and five (5) days at the Brooklyn Detention Complex ("BKDC"), among others—before eventually arriving to the Vernon C. Bain Center ("VCBC") on or about August 1, 2020.

48.    VCBC marked the beginning of Plaintiff's efforts to report and protest the abuse, mistreatment, and prison conditions on Rikers Island. After he left, Plaintiff went on to file several complaints in an attempt to raise awareness and protest prison conditions, as well as mistreatment and abuse at the hands of DOC guards and employees on Rikers

49.    Critically, Plaintiff was subject to a lockdown order, which required that his telephone and internet access be limited to a handful of people[2]

50.    Defendants, however, enforced that directive at their own whim and when convenient. Some facility assignments allowed Plaintiff outdoor recreation, social opportunities with other inmates, and to freely make telephone calls.

**The Mistreatment and Forced Sex Acts on VCBC and GRVC**

51.    On VCBC, for example, several guards sexually exploited Thompson and, in exchange for his compliance, rewarded him with special privileges, cell phone access, and cigarettes, as alleged in the related action (no. 22-cv-1458).

---

[2] *See Thompson v. City of New York, et al.,* 22-cv-1458, ECF No. 113 at ¶ 6.

52. On or about October 8, 2021, months after Plaintiff first disclosed the abuse on VCBC, he was transferred to another facility, the George R. Vierno Center, or GRVC, where he experienced similar sexual abuse and mistreatment by various guards and DOC employees.

53. For example, one CO requested Plaintiff's assistance with smuggling contraband and other illicit substances. Another officer sought sexual favors from Plaintiff. In either case, in exchange for Plaintiff's cooperation, rewarded him with special treatment, gifts, and other perks.

54. Almost eight months later, in or about August 2022, Plaintiff could no longer agree to participate or perform sex acts at GRVC.

## III. RETALIATION FOLLOWING PLAINTIFF'S MULTIPLE REPORTS AND LITIGATION AGAINST THE SAME DEFENDANTS

**Thompson Is Inexplicably Transferred to West Facility**

55. On or about December 2, 2022, Plaintiff was inexplicably transferred to West Facility, where he experienced all types of retaliation until he eventually returned to GRVC on or about January 16, 2023.

56. West Facility did not prove to be any easier for Plaintiff, although it became increasingly clear that was intentional.

57. For instance, DW Miller visited Plaintiff's cell on or about January 6, 2023, to reinforce Defendants' retaliatory motive. Miller said that, so long as Thompson was at West, he'd be placed in enhanced restraints even though they were not required or helpful. "You better drop your lawsuits if you know what's good for you," Miller added.

58. At one point, Thompson was on suicide watch for 37 days during this entire ordeal. Throughout this period, Plaintiff repeatedly made attempts at suicide and engaged in other self-injurious behavior in response to Defendants' conduct.

**West Facility Has a Sordid History and Reputation of Isolating Inmates**

59.     There is an alarming number of reports from other inmates who can attest to the conditions and practices at West Facility, including unsanitary conditions, inmate mistreatment, and the lack of oversight or accountability over guards. [3]

60.     The Department euphemistically refers to West Facility as offering "structurally restrictive housing" for inmates that are regularly locked in solitary confinement for 23 to 24 hours a day without contact or access to the outside or social/group programming. [4]

61.     Several inmates with substantially similar stories of indefinite isolation brought a class action and successfully sued the City for its practices at West Facility. [5]

62.     Apart from that, West Facility's poor cleaning and unsanitary conditions are equally well reported. [6]

63.     When it comes to staffing, the Department has a litany of problems. [7] To name one thing: COs rarely face any serious consequences because there is a culture of impunity. [8]

---

[3] *Cf., e.g.,* Courtney Gross, *How does DOC punish detainees on Rikers Island?,* NY1 (Jan. 29, 2024) (inmate reporting West Facility is used for solitary confinement), available at https://tinyurl.com/ms3n6f7j.

[4] Center for Justice at Columbia University, *Solitary by Many Other Names: A Report on the Persistent and Pervasive Use of Solitary Confinement in New York City Jails* (Dec. 2023), available at https://tinyurl.com/mr2vsvcw.

[5] *See* Jane Wester, *City to Pay Up to $53 Million in Settlement*, New York Law Journal (Apr. 19, 2023), available at https://tinyurl.com/3zv6hdcn.

[6] *See, e.g.,* Graham Rayman, *Rikers Island, NYC jails plagued with bugs, mice, cleanliness violations, says federal court monitor*, Corrections1 (Mar. 1, 2024) (finding "thousands of violations"), available at https://tinyurl.com/4spsksk6.

[7] *See, e.g.,* Graham Rayman, Widespread deterioration at Rikers Island uncovered in NYC jails monitor report, new photos, N.Y. Daily News (July 5, 2023) ("fire safety posts in the West Facility, which consists of temporary structures called "sprungs," were unstaffed at least 82 times for periods ranging from three hours to 18 hours"), available at https://tinyurl.com/46umhtx6.

[8] *See, e.g.,* Reuven Blau, *City to Shell Out $1.6 Million to Rikers Detainee Abused by Therapist*, The City (May 13, 2024) (allegations against DOC employees are "rarely substantiated" observing that only one correction officer has been terminated over the past five years), available at https://tinyurl.com/3rsw7jjr; Graham Rayman, *Rikers Island*

**Thompson's Personal Experiences at West Facility**

64.     Shortly after he arrived to West, several guards openly expressed that Plaintiff was sent to West because of his pending lawsuit. According to defendants McNeil and Henry, the transfer was part of an attempt to stymie Plaintiff's various lawsuits against the City and officers. They even added that, apart from being sent to West Facility, Plaintiff would soon face other repercussions for his decision to sue (e.g., family visits would soon be cut off).

65.     Worse enough, Plaintiff could not make any reports/complaints—whether in writing or by phone through the Department's 311 hotline—while at West Facility, for several reasons.

66.     West Facility does not have any drop box for inmates to make written complaints.

67.     Plaintiff's alternative—calling 311—similarly proved futile. The hotline had been removed from his telephone list (numbers allowed to call). Plaintiff was thus left to make reports to officers verbally, but unsurprisingly, officers did not take any serious action on those reports.

68.     Additionally, even though Plaintiff had made PREA complaints before his transfer to West Facility, Department investigators did not make any further follow-ups or even enforced their separation orders.

69.     Consider that Plaintiff made multiple reports about CO Branche and obtained a separation order. However, the separation order was nothing more than an exercise in futility because, Branche nonetheless continued in the same position, working in close proximity to Plaintiff and finding new ways to harass him.

---

*corrections officer suspended after jail search finds contraband cache*, Corrections1 (Mar. 7, 2024) (finding no staff suspensions for contraband in 2022), available at https://tinyurl.com/msjajj6f.

70.     While at West, Plaintiff was subject to arbitrary searches, including strip searches and inside his cell, on an almost daily basis by unnamed SRT officers (badge nos. 102, 120, 182, 74, 75, 78, 77, 79, 65, 80, 88, 82, 203, 111, 113, and 112), as well as an ESU captain and officer (badge nos. 28 and 4190, respectively).

71.     In several instances, Defendants randomly confiscated or deprived Plaintiff of his property, including when he had received a gift or item in the mail, for no reason.

72.     Unlike other inmates on Rikers—who received outdoor and recreational privileges—Thompson had little to zero opportunities for recreation. And that appeared deliberate by some COs' admission.

73.     Defendant Bethea openly aired her disdain for Thompson and acknowledged that other inmates could access the outdoors and common areas. In part, this was because of Bethea's relationship to CO Kenol—her biological sister—who Plaintiff had named as a defendant in another lawsuit.

74.     One of the unfortunate aspects of West Facility is the lack of privacy for inmates when showering since there are no curtains, among other things.

75.     Plaintiff often was exploited and purposely forced to shower in front of female officers, which is not a first for West Facility's detainees.[9]

76.     McNeil even added that Plaintiff would never have a shower curtain and thus be forced to shower fully exposed to female COs.

---

[9] *See* supra, <u>Solitary by Many Other Names</u>, p. 9 ("officers forced [an inmate] to remain naked in the squatting position while making sexually explicit comments, then pepper spayed him in the face and across his nude body" before locking him in a "shower cell for four hours").

11

77.    The forced and public displays of Plaintiff nude were contrary to his religious beliefs/practices as a Muslim.

78.    To make matters worse, Plaintiff was housed in cell 614, which was made up of glass entirely and allowed others to watch him around the clock in an apparent attempt to humiliate him.

79.    In another incident on or about January 3, 2023, Captain Fluka entered Plaintiff's cell and searched it before ordering Plaintiff to strip naked, all of which appeared to be for the purpose of harassing Plaintiff. Two other CIB officers were present at the time.

80.    On or about January 9, 2023, while showering, SRT officers walked by Plaintiff every couple of minutes.

81.    Meanwhile, another high-ranking DOC official—who Plaintiff later learned was Assistant Commissioner Miller—stood outside the cell. Once Fluka and the other CIB officers left, Plaintiff heard a conversation between Fluka and the commissioner, in which Fluka stated that he would continue to harass and intimidate Plaintiff and others with litigation against the City.

82.    Defendants frequently pressed Thompson to dismiss his pending litigation, often finding new ways to impress their message on him.

83.    Defendants frequently placed Thompson in restraints, even for short trips from one cell to another, for no apparent reason.

84.    On or about January 7, 2023, CO Anderson approached Plaintiff to escort him to the yard. Anderson placed Plaintiff in restraints, however, for no apparent reason. Although,

Anderson added that, should Thompson drop his litigation, the shackles "would never happen again."

85.     Thompson replied that he would think about it, but before anything else, he requested that he move out of West Facility. Anderson said he'd see what he can do. About ten days later, Plaintiff was transferred out of West to GRVC on or about January 16, 2023.

86.     Both at West and GRVC, Plaintiff experienced multiple issues when it came to his health and medical conditions. For example, Plaintiff takes medication for high blood pressure every morning—but those morning rounds would occur in the afternoon, or whenever the CO defendants agreed.

87.     The irregularities and delay in medication were noticeable for Thompson, who had chest pains, panic attacks, and other health conditions.

**Thompson Returns to GRVC After West**

88.     To be clear, the delay and gaps in medication were not by accident. For instance, on one occasion after Plaintiff left West, defendant Blount—who Plaintiff named as a defendant in another lawsuit—said "Make him wait!" referring to Thompson's medications. "This a**hole is suing me," Blout added, referring to Thompson.

89.     On or about February 7, 2023, Plaintiff alerted defendants Merenych and Paulino of the missed medication issues. The officers replied that, in reality, Plaintiff had missed medications because of his ongoing cases against the City.

90.     A few days later, while on the way to the clinic, Thompson tried to bring up the medication issue again with defendants Lott and Taylor on or about February 10, 2023. Both officers similarly unbothered by their own admission.

13

91.     "We heard about your numerous lawsuits. We are here to tell you that your services will be a lot slower than other inmates. You brought that on yourself," Lott and Taylor explained.

92.     Lott and Taylor's remarks were distressing to Thompson, who experienced a mental health emergency that day.

93.     Indeed, Plaintiff had multiple experiences where he felt like difficulty breathing and chest pain. His complaints simply were ignored by the CO defendants.

94.     In the words of one guard, "You're a scumbag… Stop filing lawsuits and then you will get treated right."

95.     And the abuse was not only verbal. As if words were not enough, some CO defendants were more aggressive.

96.     On one February morning, for example, defendant ADW Henry walked into Plaintiff's cell and sprayed mace or another similar chemical agent throughout the room before closing the door, which exacerbated Plaintiff's breathing and respiratory issues. Thompson already has trouble breathing since he suffers from chronic asthma, which dates back to his childhood.

97.     Barely able to breathe, Plaintiff lost consciousness and laid bare on the floor of his cell for hours. Plaintiff also began to vomit and, unable to get up, was forced to lay in his vomit for hours before a CO ever came.

98.     Defendants often tried to impede Plaintiff's ability to use the law library and prepare for his legal cases, especially his criminal case.

14

99.     On some days, Thompson could not access the law library or review evidence, which harmed both his criminal case and civil cases against the City.

100.    Other days, when allowed to access the law library, Defendants forced him to urinate and defecate in a plastic trash bag. When Plaintiff expressed that using a plastic bag felt inhumane and humiliating, defendant Lott did not seem to care. "Use the bag or piss on yourself or on the floor," she said. Plaintiff had use to a plastic bag several times that day to urinate…

101.    And it was not a one-off incident. Plaintiff had to use a bag on several occasions, including the very next day, on or about February 11, 2023, at the direction of defendants Merenych and Wolosik.

102.    Not to mention, Plaintiff's cell had a litany of problems: rats, water bugs, rats, and roaches, to name a few things.

103.    Plaintiff was even denied access to standard cleaning supplies (like a broom) by the CO defendants in an apparent attempt to further retaliate against Thompson.

104.    Nor could Thompson rely on regular access to the laundry room, which defendant Merenych said was punishment for Thompson's lawsuits against the Department. As a result, Plaintiff began to develop sores from re-wearing the same, unwashed clothing… That's not even accounting for the overwhelming distress and depression that Plaintiff experienced as a result.

105.    Fundamentally, whether at West or GRVC, there was no reasonable basis to support or even rationalize Defendants' decisions and actions.

**Thompson's Disability and Requests for Accommodations**

106.    As previously mentioned, Plaintiff has hearing problems with one ear. He also has problems with maintaining his balance and walks with a cane.

15

107.    These conditions affect Thompson's daily life and quality of living.

108.    Plaintiff has another unrelated issue—he is hard of hearing. As a hearing-impaired individual, Thompson needs an auxiliary aid, or reasonable accommodation, in order to hear properly.

109.    Among other things, Plaintiff's hearing affects his ability to use the telephone—whether to, say, speak with his criminal lawyer or call family.

110.    And Plaintiff made repeated requests for accommodations to DOC employees, none of which proved to be successful.

111.    Plaintiff's ability to access the law library as well as other inmate programming was substantially hindered.

**Religious Discrimination and Harassment**

112.    Both at West and GRVC, Plaintiff experienced all kinds of harassment about his religious beliefs.

113.    Plaintiff is a practicing Muslim and, as part of his beliefs, maintains a halal diet. In the past, Plaintiff received halal food without issue, although Defendants began frequently ignoring Plaintiff's diet and, on several occasions, refused to provide him with halal food.

114.    Some defendants, particularly the unnamed SRT officers, regularly tried to serve Plaintiff food with pork in it.

115.    Plaintiff experienced various forms of religious discrimination, as previously mentioned, which grew worse once he returned to GRVC from West Facility.

116.    On or about January 17, 2023, defendant Assistant Commissioner Griffen informed Thompson that, so long as there was litigation pending against the City, Thompson would not receive halal food consistent with his religious beliefs and dietary restrictions.

117.    Griffen walked to the housing unit at GRVC (unit 1/a) and reiterated that the campaign of harassment and intimidation would not let up. "Do not give the Muslims halal food," Griffen added apparently as part of that campaign.

118.    Plaintiff had always carried a Quran as part of his belongings, but when he returned to GRVC this time, it went missing. Thompson asked the CO defendants, one of whom did not mince words: "I hate your dirty religion."

## IV.    PROCEDURAL HISTORY

119.    On March 10, 2023, Plaintiff filed a complaint in the present lawsuit proceeding *pro se*. ECF No. 1.

120.    The case subsequently changed departments and became associated/related with Plaintiff's other case (22-cv-1458).

121.    Plaintiff filed a request for *pro bono* counsel on May 31, 2024, seeking assistance to amend his complaint. The court subsequently granted Plaintiff's request and appointed counsel (who was already representing Thompson in the related case). *See* ECF Nos. 7, 9, 13.

122.    Importantly, for this complaint, Plaintiff's communication capabilities are limited, as he remains detained, and this complaint reflects counsel's best effort to capture all of Thompson's allegations and claims as set forth in the original complaint.

## CAUSES OF ACTION

### COUNT I
### Conditions of Confinement
### Fourteenth Amendment to the U.S. Constitution

123.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

124.    The Fourteenth Amendment applies to Plaintiff, as a pretrial detainee, not the Eighth Amendment, which governs claims for post-conviction inmates.

125.    To establish a claim for unconstitutional conditions of confinement, a pretrial detainee must satisfy two prongs: 1) an objective prong showing that the challenged conditions were sufficiently serious and 2) a *mens rea* prong that shows the officer-defendant acted with at least deliberate indifference to the challenged conditions.

126.    Defendants subjected Plaintiff to poor and inhumane conditions, and on top of that, withheld cleaning supplies in violation of the Fourteenth Amendment.

127.    Defendants exhibited deliberate indifference to Plaintiff's reports about his health and medical conditions.

128.    As a result, Plaintiff has suffered damages.

### COUNT II
### Inadequate Medical Care and Medical Indifference
### Fourteenth Amendment to the U.S. Constitution

129.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

130.    To prevail, a plaintiff must meet two requirements: (1) that he had a serious medical need, and (2) that the defendant acted with deliberate indifference to such need.

131.    Defendants repeatedly demonstrated their indifference to Plaintiff's medical needs and overall health.

132.    Defendants frequently delayed Plaintiff's daily medication trips intentionally.

133.    On a few occasions, Plaintiff experienced medical emergencies, but whenever he informed officers, they essentially ignored them.

134.    As a result, Plaintiff has suffered damages.

## COUNT III
### Excessive-Force Claims
### Fourteenth Amendment to the U.S. Constitution

135.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

136.    To establish a claim of excessive force, a pretrial detainee must show only that force purposely or knowingly used against him was objectively unreasonable.

137.    Defendants wrongfully subjected Plaintiff to excessive force.

138.    For example, defendant Henry entered Plaintiff's cell and used pepper spray to fumigate the room entirely and causing Plaintiff to nearly suffocate. That is, standing alone, sufficient.

139.    As a result, Plaintiff has suffered damages.

## COUNT IV
### Failure to Protect/Intervene
### Fourteenth Amendment to the U.S. Constitution

140.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

141.     As described herein, the CO defendants and other DOC employees of all different ranks targeted Plaintiff as part of their intimidation and harassment efforts.

142.     It is a constitutional violation if an officer acts with deliberate indifference to a substantial risk of harm to an inmate that caused unquestioned and serious deprivation of basic human needs.

143.     Defendants repeatedly failed to protect or intervene in instances that resulted in violations of Plaintiff's rights.

144.     As a result, Plaintiff has suffered damages.

**COUNT V**
**Due-Process Violations**
**Fourteenth Amendment to the U.S. Constitution**

145.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

146.     To present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process.

147.     Defendants violated Plaintiff's due process rights, including his procedural due process and substantive due process rights.

148.     Likewise, Defendants violated Plaintiff's due process rights by refusing him an opportunity for a hearing, notice, and so on while on lockdown.

149.     The Second Circuit has recognized a due process right to be free from pretextual administrative confinement.

150.    Defendants repeatedly subjected Plaintiff to enhanced restraints without justification and brazenly ignored his pleas.

151.    Plaintiff did not have any hearing or process to contest his isolation/solitary confinement or the shackles and restraints that he was forced to wear.

152.    As a result, Plaintiff has suffered damages.

## COUNT VI
### Access to the Courts
### First Amendment to the U.S. Constitution

153.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

154.    The First Amendment protects an individual's right to the courts, including the right to petition the government, raise grievances, and so on.

155.    Defendants repeatedly imposed unfair and impermissible restrictions on Plaintiff's access to the courts.

156.    Defendants repeatedly tried to find new ways to stymie and thwart Plaintiff from accessing the courts, including to raise complaints about constitutional violations as well as to effectively defend and prepare his criminal case.

157.    Plaintiff later had to accept a plea deal as a result of Defendants' conduct.

158.    As a result, Plaintiff has suffered damages.

## COUNT VII
### Religious Discrimination
### First Amendment to the U.S. Constitution

159.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

160.    A plaintiff asserting a First Amendment Free Exercise Clause claim must demonstrate that he or she has a sincerely-held religious belief which was substantially burdened by the defendants' conduct and that the defendants' conduct was not reasonably related to some legitimate penological interest.

161.    Plaintiff is a practicing Muslim.

162.    Defendants regularly ignored Plaintiff's dietary restrictions and, perhaps worse, served meals with pork in clear violation of Plaintiff's religious beliefs.

163.    Defendants also forced Plaintiff to shower fully exposed to female guards and other COs despite his religious beliefs, which he had tried to explain to Defendants on several occasions.

164.    Defendants did not have any legitimate penological interest to support their decisions like forcing Plaintiff to choose between pork or skipping meals/not eating.

165.    As a result, Plaintiff has suffered damages

**COUNT VIII**
**Religious Discrimination**
**Religious Land Use and Institutionalized Persons Act of 2000**

166.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

167.    Under the Religious Land Use and Institutionalized Persons Act, ("RLUIPA"), "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution 42 U.S.C. § 2000cc-1(a).

168.    Plaintiff's religious exercise was substantially burdened.

169.    Defendants do not have any compelling, or even legitimate, governmental interest.

170.    As a result, Plaintiff has suffered damages

## COUNT IX
## Equal-Protection Violations
## Fourteenth Amendment to the U.S. Constitution

171.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

172.    A plaintiff must show 1) he was selectively mistreated, and 2) that mistreatment was motivated by discrimination on an impermissible basis.

173.    Plaintiff experienced multiple forms of mistreatment and the like on the basis of religion as a Muslim.

174.    Defendants, especially Griffin, took great lengths to aggravate Plaintiff, including on the basis of his religion.

175.    As one example, Defendants confiscated Plaintiff's Quran and refused his requests for one, reasoning that only a Bible is allowed.

176.    Defendants did not have any legitimate penological interests in their mistreatment of Plaintiff.

177.    As a result, Plaintiff has suffered damages.

## COUNT X
## Retaliation
## First Amendment to the U.S. Constitution

178.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

179.    To state a retaliation claim, a plaintiff must show that (1) he engaged in protected activity; (2) the defendant took adverse action against him; and (3) there was a causal connection between the protected activity and adverse action.

180.    Plaintiff engaged in protected activity—namely, filing suit against the City and filing grievances through the Department's internal process, as established by the First Amendment.

181.    In an apparent attempt to punish Plaintiff for filing lawsuits against the DOC and its employees, Plaintiff was repeatedly subject to all forms of harassment and mistreatment.

182.    Confining a prisoner to keeplock—that is, a form of confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities—is sufficient to establish an adverse action.

183.    Plaintiff was transferred to West Facility as punishment in response to his litigation and grievances.

184.    As a result, Plaintiff has suffered damages.

## COUNT XI
## Supervisory Liability

185.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

186.    A plaintiff may establish supervisory liability under section 1983 through evidence that (1) the defendant participated directly, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed its continuance, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful

acts, or (5) the defendant exhibited deliberate indifference to a plaintiff's rights by failing to act on information indicating that unconstitutional acts were occurring. *See, e.g., Tchatat v. City of New York*, No. 14 CIV. 2385 LGS, 2015 WL 5091197, at *8 (S.D.N.Y. Aug. 28, 2015).

187.    The Supervisory Defendants were involved in multiple aspects and contexts for the duration of Plaintiff's detention.

188.    To name one thing: Defendant Griffen directly participated in the foregoing constitutional violations.

189.    Other supervisory defendants simply looked the other way despite knowing full well of the constitutional violations and misconduct.

190.    As a result, Plaintiff has suffered damages.

## COUNT XII
### Municipal Liability
### *Monell* v. *Department of Social Services*, 436 U.S. 658 (1978)

191.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

192.    A municipality may be liable when the deprivation of a plaintiff's rights is caused by a governmental custom, policy, or usage of the municipality. And a custom or policy need not be formally written; it may be inferred.

193.    Particularly for its failure to supervise and discipline its employees/agents, the City is liable where, as here, DOC leadership and policymakers are "knowingly and deliberately indifferent to the possibility that its officers violate the constitutional rights of individuals…"

194.    The Department's need for better supervision to protect against constitutional violations was obvious, especially where inmate civil-rights complaints are ignored or not taken seriously as here.

195.    No doubt, City's failure to supervise or even discipline its employees amounted to deliberate indifference.

196.    As a result, Plaintiff has suffered damages

## COUNT XIII
### Disability Discrimination
### Americans with Disabilities Act and Section 504 of the Rehabilitation Act

197.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

198.    To establish a claim, a plaintiff must demonstrate 1) that he is a qualified individual with a disability; (2) that he was excluded from participation in a public entity′s services, programs or activities or was otherwise discriminated; and (3) that such exclusion or discrimination was due to his disability.

199.    A plaintiff may base his claim on any of three theories of liability: disparate treatment (intentional discrimination), disparate impact, or failure to make a reasonable accommodation.

200.    Plaintiff is a qualified individual with a disability.

201.    Defendants are public entities covered by Title II of the ADA and Section 504 of the Rehabilitation Act.

202.    Title II of the ADA prohibits Defendants from discriminating against individuals with disabilities in programs and services.

203.    Likewise, Section 504 provides that "[n]o person otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded…be the denied benefits of, or be subjected to discrimination…" 29 U.S.C. § 794.

204.    Defendants engaged in multiple forms of disability discrimination.

205.    Defendants repeatedly refused to provide Plaintiff a reasonable accommodation, making arbitrary denials without justification.

206.    Defendants, moreover, failed to make an individualized inquiry despite Plaintiff's repeated requests.

207.    Defendants failed to provide assistive devices, including for Plaintiff's hearing and walking.

208.    Defendants are obligated to administer state programs consistent with federal law.

209.    Defendants ran afoul of their obligations under both the ADA and Section 504.

210.    As a result, Plaintiff has suffered damages.

**COUNT XIV**
**Constitutional Violations**
**New York State Constitution**

211.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

212.    The New York State Constitution, Article I, §§ 3, 9, 11 and 12, likewise applies here.

213.    Defendants violated multiple of the aforesaid constitutional provisions.

214.    As a result, Plaintiff has suffered damages.

27

**COUNT XV**
**Statutory Violations**
**New York State Law**

215.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

216.    Defendants are subject to Section 40 of the New York State Civil Rights Law and Section 290 of the New York State Executive Law, among others.

217.    Defendants' acts and conduct contravened these statutes.

218.    As a result, Plaintiff has suffered damages.

**COUNT XVI**
**Negligence**

219.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

220.    To state a claim, a plaintiff must establish 1) the existence of a duty on defendant's part, 2) a breach of that duty, and 3) injury to the plaintiff.

221.    Defendants owed a duty to Plaintiff.

222.    Defendants breached their duty.

223.    As a result, Plaintiff has suffered damages.

**COUNT XVII**
**Negligent Hiring, Training, and Supervision**

224.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

225.    DOC failed to adequately train and manage staff.

226.    DOC had knowledge and notice of the individual defendants' wrongdoing.

227.    The Department, however, failed to take any serious steps to remediate those problems.

228.    As a result, Plaintiff has suffered damages.

## COUNT XVIII
### Negligent or Intentional Infliction of Emotional Distress

229.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

230.    Under New York law, a claim of negligent infliction of emotional distress requires a showing of (1) extreme and outrageous conduct, (2) a causal connection between the conduct and the injury, and (3) severe emotional distress.

231.    Similarly, a claim for intentional infliction of emotional distress under New York law requires (1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress.

232.    For either claim, the conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.

233.    Defendants' conduct was extreme and outrageous.

234.    Defendants' conduct caused Plaintiff significant emotional distress.

235.    Plaintiff experienced extensive mental health issues, including panic attacks, chest pain, etc., as well as worsened his preexisting PTSD diagnosis.

236.    Further, as a result of Defendants' conduct, Plaintiff was suicidal and placed on suicide watch for over a month.

237.    As a result, Plaintiff has suffered damages.

**COUNT XIX**
**Violations of Local Law**
**New York City Administrative Code**

238.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

239.    Defendants' acts, omissions, and conduct ran afoul of New York City law, including the Humans Rights Law, sec. 8-101, et seq., sections 8-107(4), 8-603, 9-108(c), of the New York City Admin. Code, and the Rules of the City of New York.

240.    As a result, Plaintiff has suffered damages.


//

//

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Kwaine Thompson respectfully requests that the Court enter

judgment and an award in his favor against Defendants, as follows:

A.      Declare that the policies, practices, actions, and omissions of Defendants violate federal and state law, as described herein, including but not limited to the U.S. Constitution, the New York State Constitution, and statutory and common law;

B.      Award any and all available damages, including punitive, compensatory, statutory, and consequential, without limitation, in an amount to be determined at trial;

C.      Award nominal damages for Defendants' violation of Plaintiff's rights;

D.      Award pre- and post-judgment interest at the highest rate allowed by law;

E.      Award reasonable attorney fees and costs pursuant to 42 U.S.C. §§ 1988, 12205, 29 U.S.C. § 794a, and all other applicable law; and

F.      Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff requests a trial by jury on all triable claims and issues of fact.

Dated:  October 28, 2024                    THE ATLANTIC FOUNDATION
        New York, NY

                                            By:     */s/ Sami Elamad*

                                            Sami Elamad (*pro hac vice*)
                                            442 Fifth Avenue, # 2441
                                            New York, NY 10018
                                            Tel. (646) 685-3954
                                            Fax (646) 712-9501
                                            sami@the-atlantic-foundation.org

                                            *Pro Bono Counsel for*
                                            *Plaintiff Kwaine Thompson (limited*
                                            *appearance)*

31