# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

KWAINE THOMPSON,

                    Plaintiff,

     vs.

CITY OF NEW YORK,
THOMAS GRIFFIN, CHRISTOPHER
MILLER, KAREN COLLINS, CHANELE
HENRY, ANNAIS MORALES, RONALD
MILLER, ERNEST FLUKER, JIMMY
GUAN, ADAM ROLLINSON,
CHRISTOPHER LOPEZ, ABRAHAM
PALERMO, KEISHA LEMON, MONIQUE
LOTT, C.O. TAYLOR, STELLA BETHEA,
PRZEMYSLAW WOLOSIK, WALTER
MCNEIL, FEDIR MERENYCH, MARVA
BRANCHE, KEESIA LEITCH, ANTHONY
MARDEN, ANTONIO GRAVES,
NURSE BLOUNT, MURPHY WHITE,
PAUL WHITE, MICHAEL
ZDERKO, CLARENCE CURLEY,
ANDRE ANDERSON, ALONZO BUTLER,
SAMANTHA ELIZER, and
Does 1–25,

                    Defendants.

**No. 23-cv-2102 (JPO) (KHP)**
No. 22-cv-1458 (JPO) (KHP) [related]

**VERIFIED SECOND AMENDED
COMPLAINT FOR DAMAGES
AND EQUITABLE RELIEF**

**DEMAND FOR JURY TRIAL**

Plaintiff Kwaine Thompson, by and through his undersigned *pro bono* counsel, brings this action for damages and equitable relief, including declaratory relief and nominal damages, based on Defendants' violations of his rights, and alleges as follows:

## INTRODUCTION

1.      Whether you talk to a supervisor, whether you file a grievance, or whether you institute a string of lawsuits, for any inmate seeking reprieve, it makes no difference. All roads lead to the same conclusion.

2.      By now, DOC officials' M.O. is pretty well known by now: ignore, ignore, ignore.

3.      In March 2019, Plaintiff made his latest trip to Rikers where he was exploited and mistreated. Plaintiff later disclosed the abuse and, while still on Rikers Island, filed a string of lawsuits about his experiences.

4.      Plaintiff tried to comply with nearly every DOC rule, but it made no difference— the outcome remained the same.

5.      In response, Plaintiff faced retaliation and efforts to intimidate and harass him in an apparent attempt to dissuade him from continuing with his litigation. This complaint represents the last months of Plaintiff's detention on Rikers Island.

## PRELIMINARY STATEMENT

6.      Plaintiff brings this action under federal and state law against the City of New York and its employees following the retaliation he experienced on Rikers Island, particularly at West Facility and GRVC, after he filed suit against correctional officers.

7.      This complaint asserts claims based on Plaintiff's conditions of confinement, medical and health issues, excessive force, due-process violations, among other things, as well as

violations of Plaintiff's rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§

701 et seq., the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101 et seq.

("ADA"), and state and local law, including the Human Rights Law, New York Executive Law

§§ 290, et seq., Admin. Code of the City of New York §§ 8-101 et seq.

8.      As more fully explained below, Defendants deprived Plaintiff of the rights,

remedies, privileges, and immunities guaranteed to every person by the First, Fourth, Eighth,

and Fourteenth Amendments to the U.S. Constitution, without limitation.

**THE PARTIES**

**A.  Plaintiff**

9.      Plaintiff Kwaine Thompson ("Plaintiff" or "Thompson") is a natural person and

resident of the State of New York. Plaintiff was a pretrial detainee on Rikers Island.

**B.  Defendants**

10.      Defendant the City of New York (the "City") is a municipal corporation

organized under the laws of the State of New York. Through its Department of Corrections

("Department" or "DOC"), the City manages and operates correctional facilities including

Rikers Island.[1]

11.      Defendant Thomas Griffin is the DOC Assistant Commissioner; he is sued in

both his official and individual capacities.

12.      Defendant Christopher L. Miller is the DOC Assistant Commissioner; he is sued

in both his official and individual capacities.

---

[1] Relevant here, the City and Department are interchangeable and synonymous with one another;
whenever reference is made to one, it includes the other.

13.     Defendant Karen Collins is the Warden of West Facility and directly responsible for its operation; she is sued in her official capacity.

14.     Defendant Chanele Henry is the Assistant Deputy Warden of GRVC, and she is sued in both her official and individual capacities.

15.     Defendant Annais Morales is employed is the DOC Deputy Commissioner; she is sued in both her official and individual capacities.

16.     Defendant Ronald Miller is the Acting Warden of West Facility; he is sued in both his official and individual capacities.

17.     Defendant Ernest Fluker (a/k/a Fluka) is a captain with the Correction Intelligence Bureau ("CIB"); he is sued in both his official and individual capacities.

18.     Defendant Jimmy Guan is a captain on Rikers Island; he is sued in both his official and individual capacities.

19.     Defendant Christopher Lopez (shield no. 462) is a captain employed by the Department; he is sued in both his official and individual capacities.

20.     Defendant Adam Rollison (a/k/a Rollins) (a/k/a Rollinson) is a captain employed by the Department and assigned to West Facility. He is sued in both his official and individual capacities.

21.     Defendant Abraham Palermo is a captain employed by the Department and assigned to GRVC. He is sued in both his official and individual capacities.

22.     Defendant Keisha Lemon (a/k/a Captain Lemon) is a captain on Rikers Island; she is sued in both her official and individual capacities.

23.     Defendant Monique Lott is a correctional officer on Rikers Island; she is sued in both her official and individual capacities.

24.     Defendant Taylor is a correctional officer on Rikers Island; he is sued in both his official and individual capacities.

25.     Defendant Stella Bethea is a correctional officer on Rikers Island; she is sued in both her official and individual capacities.

26.     Defendant Przemyslaw Wolosik is a correctional officer on Rikers Island; he is sued in both his official and individual capacities.

27.     Defendant Walter McNeil (a/k/a Willie McNeil) is a correctional officer on Rikers Island; he is sued in both his official and individual capacities.

28.     Defendant Fedir Merenych is a correctional officer on Rikers Island; he is sued in both his official and individual capacities.

29.     Defendant Marva Branche is a correctional officer on Rikers Island; she is sued in both her official and individual capacities.

30.     Defendant Keesia Leitch is a correctional officer on Rikers Island; she is sued in both her official and individual capacities.

31.     Defendant Anthony Marden is a correctional officer on Rikers Island; he is sued in both his official and individual capacities.

32.     Defendant Antonio Graves is a correctional officer on Rikers Island; he is sued in both his official and individual capacities.

33.     Defendant Blount is a nurse that provided services to Plaintiff on Rikers Island; she is sued in both her official and individual capacities.

34.     Defendant Murphy White is known as SRT Officer No. 74 in the original complaint, ECF No. 1.

35.     Defendant Paul White is known as SRT Officer No. 75 in the original complaint.

36.     Defendant Michael Zderko is known as SRT Officer No. 88 in the original complaint.

37.     Defendant Clarence Curley is known as SRT Officer No. 102 in the original complaint.

38.     Defendant Andre Anderson is known as SRT Officer No. 120 in the original complaint.

39.      Defendant Alonzo Butler is known as SRT Officer No. 80 in the original complaint.

40.     Defendant Samantha Elizer is known as SRT Officer No. 111 in the original complaint.

41.     Defendant Does 1 through 25, inclusive, refers to DOC employee-defendants whose identities are unknown to Plaintiff. In the original complaint, there are multiple employee-defendants whose identities are unclear, including officers that staffed West Facility like the Department's Special Response Team ("SRT") or the Emergency Services Unit ("ESU"), for example.

42.     Accordingly, Plaintiff refers to these Doe defendants as Does 1 through 25, inclusive, until he can amend his complaint to reflect their name and information once discovered. The true names and capacities of these defendants are presently unknown to

Plaintiff. Regardless, each Doe defendant is responsible in some way for the events described herein and thus liable to Plaintiff.

43.    The foregoing defendants were acting as employees, agents or representatives of the Department and performed duties and responsibilities acting under color of state law.

## JURISDICTION AND VENUE

44.    The acts set forth in this complaint arise under 42 U.S.C. § 1983 based on violations of Plaintiff's rights under the United States Constitution, unless otherwise indicated (e.g., it arises under the laws of the State of New York), in which case the Court has supplemental or pendent jurisdiction.

45.    The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343, as well as jurisdiction to issue a declaratory judgment under 28 U.S.C. §§ 2201(a) and 2202.

46.    The Court has supplemental jurisdiction over the related state and local law claims under 28 U.S.C. § 1367(a).

47.    Venue is proper under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to this suit occurred within this District.

## FACTUAL ALLEGATIONS

### A.    Relevant Background: Thompson and New York City Jails

48.    Plaintiff has a long, storied history with the City's jails and criminal justice system. Starting in the 1990s and until today, Plaintiff has made around thirty trips to Rikers.

49.    Throughout, Plaintiff consistently experienced the age-old stories that have been associated with Rikers Island: violence, brutality, and mistreatment. Notably, up until a brutal stabbing in 2010, Plaintiff never brought suit despite a number of injuries while in DOC custody.

50.     That 2010 attack involved, among other things, nearly 15 gang members—left unsupervised by the COs— who beat and stabbed Plaintiff and caused him to fracture his left orbital floor. Plaintiff found himself in a wheelchair after that attack.

51.     More recently, Thompson arrived on Rikers Island in March 2019 and would remain there until on or about February 14, 2023, when he would relocate upstate.

52.     At first, Plaintiff did not have any assigned or permanent facility placement. He bounced between various buildings before eventually arriving to the Vernon C. Bain Center ("VCBC") (a/k/a the Boat) on or about August 1, 2020.

53.     Thompson's VCBC-related experiences would give rise to the underlying events in the related litigation (no. 22-cv-1458), which he commenced on February 22, 2022 (proceeding initially through counsel and later *pro se*).

54.     On VCBC, for example, several guards sexually exploited Thompson and, in exchange for Plaintiff's cooperation, the officers rewarded him with special privileges, cell phone access, and cigarettes, as alleged in the related action (no. 22-cv-1458).

55.     After VCBC, Plaintiff returned to GRVC, where he experienced much of the same as before. For example, one CO requested Plaintiff's assistance with smuggling contraband and other illicit substances.

56.     Another officer sought sexual favors from Plaintiff. In either case, in exchange for Plaintiff's cooperation, rewarded him with special treatment, gifts, and other perks.

57.     Almost eight months later, in or about August 2022, Plaintiff could no longer agree to participate or perform sex acts at GRVC.

58.     He backed out and immediately felt the blowback of his decision.

**B.      Thompson's Inexplicable Transfer to West Facility**

59.      On or about December 2, 2022, Plaintiff was inexplicably transferred to West Facility, where he experienced all types of retaliation.

60.      Primarily intended to house inmates with infectious diseases, West Facility features single-cell units, each of which contain an individual shower stall. Detainees at West are left with zero privacy, isolated, and left in their cells for nearly 23 hours a day.

61.      There is an alarming number of reports from other inmates who can attest to the conditions and practices at West Facility, including unsanitary conditions, inmate mistreatment, and the lack of oversight or accountability over guards. [2]

62.      The Department euphemistically refers to West Facility as offering "structurally restrictive housing" for inmates that are regularly locked in solitary confinement for 23 to 24 hours a day without contact or access to the outside or social/group programming. [3]

63.      Several inmates with substantially similar stories of indefinite isolation brought a class action and successfully sued the City for its practices at West Facility. [4]

---

[2] *Cf., e.g.,* Courtney Gross, *How does DOC punish detainees on Rikers Island?,* NY1 (Jan. 29, 2024) (inmate reporting West Facility is used for solitary confinement), available at https://tinyurl.com/ms3n6f7j.

[3] Center for Justice at Columbia University, *Solitary by Many Other Names: A Report on the Persistent and Pervasive Use of Solitary Confinement in New York City Jails* (Dec. 2023), available at https://tinyurl.com/mr2vsvcw.

[4] *See* Jane Wester, *City to Pay Up to $53 Million in Settlement*, New York Law Journal (Apr. 19, 2023), available at https://tinyurl.com/3zv6hdcn.

64.     Apart from that, West Facility's poor cleaning and unsanitary conditions are equally well reported.[5]

65.     When it comes to staffing, the Department has a litany of problems.[6] To name one thing: COs rarely face any serious consequences because there is a culture of impunity.[7]

66.     West Facility did not prove to be any easier for Plaintiff, although it became increasingly clear that was intentional on Defendants' part.

67.     For instance, Defendant Acting Warden Miller visited Plaintiff's cell on or about January 6, 2023, to reinforce Defendants' retaliatory motive. Miller said that, so long as Thompson was at West, he'd be placed in enhanced restraints even though they were not required or helpful. "You better drop your lawsuits if you know what's good for you," Miller added.

68.     Shortly after he arrived at West, several guards openly expressed that Plaintiff was sent to West because of his pending lawsuit. According to Defendants McNeil and Henry, the transfer was part of an attempt to stymie Plaintiff's various lawsuits against the City and officers.

---

[5] *See, e.g.,* Graham Rayman, *Rikers Island, NYC jails plagued with bugs, mice, cleanliness violations, says federal court monitor*, Corrections1 (Mar. 1, 2024) (finding "thousands of violations"), available at https://tinyurl.com/4spsksk6.

[6] *See, e.g.,* Graham Rayman, *Widespread deterioration at Rikers Island uncovered in NYC jails monitor report, new photos*, N.Y. Daily News (July 5, 2023) ("fire safety posts in the West Facility, which consists of temporary structures called "sprungs," were unstaffed at least 82 times for periods ranging from three hours to 18 hours"), available at https://tinyurl.com/46umhtx6.

[7] *See, e.g.,* Reuven Blau, *City to Shell Out $1.6 Million to Rikers Detainee Abused by Therapist*, The City (May 13, 2024) (allegations against DOC employees are "rarely substantiated" observing that only one correction officer has been terminated over the past five years), available at https://tinyurl.com/3rsw7jjr; Graham Rayman, *Rikers Island corrections officer suspended after jail search finds contraband cache*, Corrections1 (Mar. 7, 2024) (finding no staff suspensions for contraband in 2022), available at https://tinyurl.com/msjajj6f.

They even added that, apart from being sent to West Facility, Plaintiff would soon face other repercussions for his decision to sue (e.g., family visits would soon be cut off).

69.     Throughout, Plaintiff repeatedly made attempts at suicide and engaged in other self-injurious behavior in response to Defendants' conduct.

70.     At one point, Thompson was on suicide watch for 37 days during this entire ordeal.

71.     Worse enough, at West, Plaintiff could not make any reports/complaints— whether in writing or by phone through the Department's 311 hotline— for several reasons.

72.     West Facility does not have any drop box for inmates to make written complaints.

73.     Plaintiff's alternative—calling 311—similarly proved futile. The hotline had been removed from his telephone list (numbers allowed to call). Plaintiff was thus left to make reports to officers verbally, but unsurprisingly, officers did not take any serious action on those reports.

74.     Unlike other inmates on Rikers—who arguably received outdoor and recreational privileges—Thompson had little to zero opportunities for recreation. And that appeared deliberate by some COs' admission.

75.     Plaintiff's calling restrictions seemed to always change—left at the personal discretion of the officer that day. Sometimes, Thompson got lucky and rewarded with extra calling time, all of which served no legitimate function or purpose. For example, Captain Guan rewarded Thompson with other inmates' access codes/pins.

76.     During his time on West, Plaintiff could not initiate or file any § 1983 litigation against Defendants—at least not until several weeks after he left, i.e., this litigation (no. 23-cv-2102).

77.     Additionally, even though Plaintiff had made PREA complaints before his transfer to West Facility, Department investigators did not make any further follow-ups or even enforced their separation orders.

78.     The Department does not make any effort to hide the fact that separation orders are nothing more than a piece of paper. DOC never enforces or takes them seriously.

79.     Courts in the Second Circuit have pointed to the existence, or lack thereof, of no-contact orders as indications that a substantial risk of harm may exist to that inmate-victim. *See, e.g., Mays v. Falu*, No. 18-CV-6145 (KMK), 2019 WL 6619330, at *7–9 (S.D.N.Y. Dec. 5, 2019).

80.     Worse of all, no matter how many times an inmate protests, DOC officials remain undeterred and unbothered.

81.     Consider that Plaintiff made multiple reports about Defendant CO Branche and obtained a separation order. However, the separation order was nothing more than an exercise in futility because, Branche nonetheless continued in the same position, working in close proximity to Plaintiff and finding new ways to harass him.

82.     While at West, Plaintiff was subject to arbitrary searches, including strip searches and inside his cell, on an almost daily basis by unnamed SRT officers (badge nos. 102, 120, 182, 74, 75, 78, 77, 79, 65, 80, 88, 82, 203, 111, 113, and 112), as well as an ESU captain and officer (badge nos. 28 and 4190, respectively).

83.     In several instances, Defendants randomly confiscated or deprived Plaintiff of his property, including when he had received a gift or item in the mail, for no reason.

84.     Unlike other inmates on Rikers—who arguably received outdoor and recreational privileges—Thompson had little to zero opportunities for recreation. And that appeared deliberate by some COs' admission.

85.     Defendant Bethea openly aired her disdain for Thompson and acknowledged that other inmates could access the outdoors and common areas. In part, this was because of Bethea's relationship to CO Kenol—her biological sister—who Plaintiff had named as a defendant in another lawsuit.

86.     One of the unfortunate aspects of West Facility is the lack of privacy for inmates when showering since there are no curtains, among other things.

87.     Plaintiff often was exploited and purposely forced to shower in front of female officers, which is not a first for West Facility's detainees.[8] McNeil even added that Plaintiff would never have a shower curtain and thus be forced to shower fully exposed to female COs.

88.     In another incident on or about January 3, 2023, Captain Fluker entered Plaintiff's cell and searched it before ordering Plaintiff to strip naked, all of which appeared to be for the purpose of harassing Plaintiff. Two other CIB officers were present at the time.

89.     On or about January 9, 2023, while showering, SRT officers walked by Plaintiff every couple of minutes.

90.     Meanwhile, another high-ranking DOC official—who Plaintiff later learned was Assistant Commissioner Miller—stood outside the cell. Once Fluker and the other CIB officers left, Plaintiff heard a conversation between Fluker and the commissioner, in which Fluker stated

---

[8] *See* supra, *Solitary by Many Other Names*, p. 9 ("officers forced [an inmate] to remain naked in the squatting position while making sexually explicit comments, then pepper spayed him in the face and across his nude body" before locking him in a "shower cell for four hours").

that he would continue to harass and intimidate Plaintiff and others with litigation against the City.

91.     Defendants frequently pressed Thompson to dismiss his pending litigation, often finding new ways to impress their message on him.

92.     Defendants frequently placed Thompson in restraints, even for short trips from one cell to another, for no apparent reason.

93.     On or about January 7, 2023, Defendant CO Anderson approached Plaintiff to escort him to the yard. Anderson placed Plaintiff in restraints, however, for no apparent reason. Although, Anderson added that, should Thompson drop his litigation, the shackles "would never happen again."

94.     Thompson replied that he would think about it, but before anything else, he requested that he move out of West Facility. Anderson said he'd see what he can do.

95.     About ten days later, Plaintiff was transferred out of West to GRVC on or about January 16, 2023.

**Indifference to Medical Conditions**

96.     Both at West and GRVC, Plaintiff experienced multiple issues when it came to his health and medical conditions.

97.     Plaintiff is diagnosed with Post-Traumatic Stress Disorder (PTSD), which followed in the aftermath of his experiences on Rikers Island.

98.     In addition to PTSD, Plaintiff has asthma and struggles with breathing, and difficulty with both his hearing and walking.

99.     Plaintiff also relies on a cane for help, which he has used since at least 2022.

100.    For example, Plaintiff takes medication for high blood pressure every morning—but those morning rounds would occur in the afternoon, or whenever the CO defendants agreed.

101.    On another occasion—captured on body-worn camera—Plaintiff pleaded with Defendant Lemon for help, asking for his asthma pump. Lemon denied the request, ignoring his pleas during an asthma attack.

102.    The irregularities and delay in medication were noticeable for Thompson, who had chest pains, panic attacks, and other health conditions.

103.    To be clear, the delay and gaps in medication were not by accident. For instance, on one occasion after Plaintiff left West, Defendant Blount—who Plaintiff named as a defendant in another lawsuit—said "Make him wait!" referring to Thompson's medications. "This a**hole is suing me," Blount added, referring to Thompson.

104.    On or about February 4, 2023, Defendant Palermo escorted Plaintiff to the clinic for his daily medications. Upon arrival, Defendant Blount declined to give Plaintiff his medication, and even though Captain Palermo tried to step in and say something without much luck.

105.    Even though Defendant Palermo's efforts are noble, he nonetheless could have reported the incident to DOC leadership, or any supervisor for that matter. Instead, however, nobody did anything—and Plaintiff was left with virtually no choice.

106.    On or about February 7, 2023, Plaintiff alerted Defendants Merenych and Paulino of the missed medication issues. The officers replied that, in reality, Plaintiff had missed medications because of his ongoing cases against the City.

14

107.    A few days later, while on the way to the clinic, Thompson tried to bring up the medication issue again with Defendants Lott and Taylor on or about February 10, 2023. Both officers similarly unbothered by their own admission.

108.    "We heard about your numerous lawsuits. We are here to tell you that your services will be a lot slower than other inmates. You brought that on yourself," Lott and Taylor explained. Lott and Taylor's remarks were distressing to Thompson, who experienced a mental health emergency that day.

109.    Indeed, Plaintiff had multiple experiences where he felt like difficulty breathing and chest pain. His complaints simply were ignored by the CO defendants.

110.    On or about February 12, 2023, Plaintiff alerted officers, including Defendant Wolosik, of another medical emergency and breathing difficulties.

111.    Defendant Branche refused to call an emergency, however, leaving Thompson on the floor helpess for hours. "I'm not calling no clinic for Thompson," she exclaimed, "I hope he dies."

112.    And the abuse was not only limited to mere indifference. As if words were not enough, some defendants were more forceful and aggressive.

113.    Around that same time, Defendant Acting Warden Henry walked into Plaintiff's cell and sprayed mace or another similar chemical agent throughout the room before closing the door shut.

114.    Henry called out to Branche, instructing her to keep Thompson's cell locked. "Let him breathe in as much mace as possible. I want to send Thompson to the hospital."

115.    Barely able to breathe, Plaintiff lost consciousness and laid bare on the floor of his cell for hours. Plaintiff also began to vomit and, unable to get up, was forced to lay in his vomit for hours before a CO ever came.

116.    Defendant Captain Moody even tried to respond to Plaintiff's medical emergencies, but Defendant Henry did not allow him to assist or intervene.

117.    Defendants often tried to impede Plaintiff's ability to use the law library and prepare for his legal cases, especially his criminal case.

118.    While at GRVC, DOC staff found inventive and new methods to make Plaintiff's experience uncomfortable and degrading.

119.    On some days, Thompson could not access the law library or review evidence, which harmed both his criminal case and civil cases against the City.

120.    Other days, when allowed to access the law library, Defendants forced him to urinate and defecate in a plastic trash bag—even though Plaintiff has used that same library before and never had to resort to using a garbage bag to defecate. Plus, a bathroom is only a couple short steps away, but it illustrates the lengths to which some DOC officers will go.

121.    When Plaintiff expressed that using a plastic bag felt inhumane and humiliating, defendant Lott did not seem to care. "Use the bag or piss on yourself or on the floor," she said. Plaintiff had to use a plastic bag several times that day to urinate.

122.    And it was not a one-off incident. Plaintiff had to use a bag on several occasions, including the very next day, at the direction of Defendants Merenych and Wolosik.

123.    That week, on several occasions, Plaintiff tried to raise concerns or make a complaint with DOC supervisors. On or about February 13, 2023, for example, Plaintiff tried to

make a complaint with Defendant Captain Guan, who was wearing a body-worn camera, but Guan ignored Plaintiff's concerns and looked the other way.

124.    For the past several years, Plaintiff has also represented himself (*pro se*) in his state criminal proceedings, underscoring the importance/stress of Thompson's ability to prepare a defense.

125.    What's more, Plaintiff alleges that, as a result of Defendants' efforts to degrade and dissuade him from using the law library, both his criminal and civil cases suffered.

126.    For example, Plaintiff was forced to accept a plea deal in one criminal case, and in another case, he had a mistrial after a juror contracted COVID-19. He awaits another trial date, although he believes that Defendants' actions/conduct, at least in part, have caused delays and protracted his unnecessary detention on Rikers.

127.    As for Plaintiff's § 1983 litigation, in many cases, Plaintiff's claim did not proceed or were dismissed because of technicalities that could have been resolved, such as filing paying filing fees or responding to court orders.

128.    Separately, all the while, Plaintiff's GRVC cell had a litany of problems: rats, water bugs, vermin, and roaches, to name a few things.

129.    Defendants deliberately denied Plaintiff access to standard cleaning supplies (like a broom) by the CO defendants in an apparent attempt to further retaliate against Thompson.

130.    Nor could Thompson rely on regular access to the laundry room, which Defendant Merenych said was punishment for Thompson's lawsuits against the Department. As a result, Plaintiff began to develop sores from re-wearing the same, unwashed clothing.

131.    That's not even accounting for the overwhelming distress and depression that Plaintiff experienced as a result.

132.    Fundamentally, whether at West or GRVC, there was no reasonable basis to support or even rationalize Defendants' decisions and actions.

**Thompson's Requests for Disability Accommodations**

133.    As previously mentioned, Plaintiff has hearing problems with one ear. He also has problems with maintaining his balance and walks with a cane.

134.    These conditions affect Thompson's daily life and quality of living.

135.    Plaintiff has another unrelated issue—he is hard of hearing.

136.    As a hearing-impaired individual, Thompson needs an auxiliary aid, or reasonable accommodation, in order to hear properly.

137.    Not to mention, Plaintiff is *pro se* in his criminal proceedings and thus depends on himself to prepare and defend the criminal actions.

138.    Among other things, Plaintiff's hearing affects his ability to use the telephone— whether to, say, speak with his criminal lawyer or call family.

139.    And Plaintiff made repeated requests for accommodations to DOC employees, none of which proved to be successful.

140.    Plaintiff's ability to access the law library as well as other inmate programming was substantially hindered.

**Religious Discrimination and Harassment**

141.    Both at West and GRVC, Plaintiff experienced all kinds of harassment about his religious beliefs, particularly as a Muslim.

142.    For example, Plaintiff's experiences of forced, public nudity at West were contrary to his religious beliefs/practices as a Muslim.

143.    To make matters worse, Plaintiff was housed in cell 614, which was made up of glass entirely and allowed others to watch him around the clock in an apparent attempt to humiliate him.

144.    Plaintiff is a practicing Muslim and, as part of his beliefs, maintains a halal diet. In the past, Plaintiff received halal food without issue, although Defendants began frequently ignoring Plaintiff's diet and, on several occasions, refused to provide him with halal food.

145.    Some defendants, particularly the unnamed SRT officers, regularly tried to serve Plaintiff food with pork in it.

146.    Plaintiff experienced various forms of religious discrimination, as previously mentioned, which grew worse once he returned to GRVC from West Facility.

147.    On or about January 17, 2023, Defendant Assistant Commissioner Griffin informed Thompson that, so long as there was litigation pending against the City, Thompson would not receive halal food consistent with his religious beliefs and dietary restrictions.

148.    Defendant Griffin walked to the housing unit at GRVC (unit 1/a) and reiterated that the campaign of harassment and intimidation would not let up. "Do not give the Muslims halal food," Griffin added apparently as part of that campaign.

149.    Plaintiff had always carried a Quran as part of his belongings, but when he returned to GRVC this time, it went missing. Thompson asked the CO defendants, one of whom did not mince words: "I hate your dirty religion."

150.    When Plaintiff tried to bring up the issue of his missing Quran, Defendants indicated that DOC policy only allows an inmate to access/read a Bible.

151.    Apparently, Defendants have a command-level order—barring all religious texts except the Bible—that they used to justify their actions.

## C.    Present Litigation: Ongoing Issues and Retaliation

152.    On March 10, 2023, Plaintiff filed a complaint in the present lawsuit proceeding *pro se*. ECF No. 1.

153.    Chief Judge Swain, who previously oversaw this case, issued an order to amend, directing Plaintiff to address deficiencies in the original complaint within sixty days. ECF No. 7.

154.    Plaintiff filed a request for *pro bono* counsel on May 31, 2024, seeking assistance to amend his complaint. The court subsequently granted Plaintiff's request and appointed counsel (who was already representing Thompson in the related case). *See* ECF Nos. 7, 9, 13.

155.    At the time the first amended complaint was filed, Plaintiff was detained upstate, and his communication capabilities were limited, as previously mentioned. ECF No. 25 ¶ 122.

156.    Even more recently, Defendants' troubling practices persist and have been a flashpoint in this current litigation.

157.    Both before and during this litigation, the Department repeatedly stymied Plaintiff's right to access counsel and the courts.

158.    To name another thing, the Department continues to subject Plaintiff to bizarre facility transfers and assignments without any notice or explanation.

159.    As of last month, Plaintiff was remained inexplicably transferred to a gang-affiliated or -run unit on OBCC—known as "gangland" among its residents—where he's been forced to pay bribes to inmates for the cost of his safety.

160.    He's routinely been forced to give away items from his commissary and account to avoid being attacked or subjected to unprovoked violence, as has been the case before in years past.

161.    Plaintiff remains assigned among the Muslim Bloods.

162.    In response, the Department took over a week to provide any type of explanation or response to Plaintiff's counsel. Apparently, there was an anonymous complaint made against Thompson for bullying back in June.

163.    If that weren't enough, Plaintiff was previously housed in Lower 7 on Otis Bantum Correctional Center (OBCC), which is also known as "Harmony House," a LGBTQ+ supportive environment for inmates.

164.    Plaintiff enjoyed and appreciated the LGBT-friendly space, which provided him some solace and comfort in light of his past experience and sexual abuse on Rikers.

165.    What may be good in theory is not always good in practice, however.

166.    Plaintiff has witnessed and reported incidents of sexual activity among inmates in Harmony House with alarming frequency.

167.    Despite this, DOC officials did little to nothing to prevent or stop the widespread sexual activity.

168.    Plaintiff has repeatedly been invited, pressured, or solicited to participate in the sexual conduct by other inmates who are seemingly energized by DOC officials' tacit endorsement.

169.    Many of these individuals have tested positive for sexually transmitted diseases/infections (STI) and nonetheless continue to engage in sexual activity with inmates.

170.    There are several accounts by inmates who know a fellow detainee with an STD—and in other cases, HIV—who remain sexually active and unaffected by their status.

171.    Put another way, an inmate housed in Harmony House faces the added danger of possibly contracting an STD or worse from another inmate, whether that's through consensual activity.

172.    Perhaps worse, an inmate can unknowingly be exposed to blood or other bacteria if, say, a fight breaks out or while helping a detainee patch up an open wound from a fall in the yard.

173.    In looking the other way and ignoring rampant sexual activity among detainees, the Department does not even give inmates the courtesy of prevention, education, or other resources that could easily mitigate the circumstances.

174.    Nor does the Department offer something as simple and life changing as basic medication, e.g., PREP, which "reduces the risk of getting HIV from sex by about 99% when taken as prescribed."[9]

---

[9] *Pre-Exposure Prophylaxis*, HIV.gov (July 9, 2025) ("PrEP, or pre-exposure prophylaxis, is medicine people at risk for HIV take to prevent getting HIV from sex or injection drug use. PrEP can stop HIV from taking hold"), available at https://www.hiv.gov/hiv-basics/hiv-prevention/using-hiv-medication-to-reduce-risk/pre-exposure-prophylaxis

## CAUSES OF ACTION

### FIRST COUNT
### Retaliation
### First Amendment to the U.S. Constitution
### (Against All Defendants)

175.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

176.    To state a retaliation claim, a plaintiff must show that (1) he engaged in protected activity; (2) the defendant took adverse action against him; and (3) there was a causal connection between the protected activity and adverse action.

177.    Plaintiff engaged in protected activity—namely, filing suit against the City and filing grievances through the Department's internal process, as established by the First Amendment.

178.    Plaintiff's transfer to West Facility was nothing more than an attempt to intimidate and bully him for engaging in protected activity. The facility transfer, in and itself, constitutes adverse action.

179.    In an apparent attempt to punish Plaintiff for filing lawsuits against the DOC and its employees, Plaintiff was repeatedly subject to all forms of harassment and mistreatment.

180.    Confining a prisoner to keep lock—that is, a form of confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities—is sufficient to establish an adverse action.

181.    Plaintiff was transferred to West Facility as punishment in response to his litigation and grievances.

182.    As a result, Plaintiff has suffered damages.

## SECOND COUNT
### Indifference to Medical Conditions/Care
### Fourteenth Amendment to the U.S. Constitution
### (Against All Individual Defendants)

183.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

184.    To prevail, a plaintiff must meet two requirements: (1) that he had a serious medical need, and (2) that the defendant acted with deliberate indifference to such need.

185.    Defendants repeatedly demonstrated their indifference to Plaintiff's medical needs and overall health.

186.    Defendants frequently delayed Plaintiff's daily medication trips intentionally.

187.    On a few occasions, Plaintiff experienced medical emergencies, but whenever he informed officers, they ignored them.

188.    As a result, Plaintiff has suffered damages.

## THIRD COUNT
### Excessive Force
### Fourteenth Amendment to the U.S. Constitution
### (Against Defendants Branche, McNeil, and Henry)

189.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

190.    To establish a claim of excessive force, a pretrial detainee must show only that force purposely or knowingly used against him was objectively unreasonable.

191.    Defendants wrongfully subjected Plaintiff to excessive force.

192.    For example, Defendant Henry entered Plaintiff's cell and used pepper before closing the door shut and letting him nearly suffocate.

193.    As a result, Plaintiff has suffered damages.

## FOURTH COUNT
### Due Process – Substantive
### Fourteenth Amendment to the U.S. Constitution
### (Against Defendant City of New York)

194.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

195.    Defendants violated Plaintiff's due process rights, including his procedural due process and substantive due process.

196.    Defendants repeatedly subjected Plaintiff to enhanced restraints without justification and brazenly ignored his pleas.

197.    Defendants' conduct and actions, taken together, suggest a clear effort to punish Plaintiff.

198.    Defendant City contributes and maintains awareness of a serious risk—possibly contracting HIV, but it does nothing to warn or prevent its proliferation.

199.    Defendant City owed Plaintiff and other inmates more than their usual do-nothing approach, particularly in the context of their own state-creatd dangers. *See Matican v. City of New York*, 524 F.3d 151, 155 (2d Cir. 2008); *e.g., Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 427–31 (2d Cir. 2009).

200.    As a result, Plaintiff has suffered damages.

## FIFTH COUNT
### Due Process – Procedural
### Fourteenth Amendment to the U.S. Constitution
### (Against Defendant City of New York)

201.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

202.     To establish a procedural due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process.

203.     Defendants violated Plaintiff's due process rights, including his procedural due process and substantive due process rights, and failed to provide any type of process whatsoever.

204.     Defendants violated Plaintiff's procedural due process rights by refusing him an opportunity for a hearing, notice, and so on while on lockdown or for their use of enhanced restraints.

205.     The Second Circuit has recognized a due process right to be free from pretextual administrative confinement.

206.     Plaintiff did not have any hearing or process to contest his isolation/solitary confinement or the shackles and restraints that he was forced to wear.

207.     As a result, Plaintiff has suffered damages.

**SIXTH COUNT**
**Access to the Courts and Counsel**
**First and Sixth Amendments to the U.S. Constitution**
**(Against All Defendants)**

208.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

209.     The First Amendment protects an individual's right to the courts, including the right to petition the government, raise grievances, and so on.

210.     The Sixth Amendment similarly protects an individual's right to an attorney, and it is violated when a prison rule unjustifiably obstructs, infringes, unreasonably burdens or significantly interferes with his access to counsel.

211.     Defendants repeatedly imposed unfair and impermissible restrictions on Plaintiff's access to the courts.

212.     For example, one DOC officer informed Plaintiff that his legal mail would be withheld or disposed of.

213.     Defendants repeatedly tried to find new ways to stymie and thwart Plaintiff from accessing the courts, including to raise complaints about constitutional violations as well as to effectively defend and prepare his criminal case.

214.     Plaintiff later had to accept a plea deal as a result of Defendants' conduct.

215.     As a result, Plaintiff has suffered damages.

**SEVENTH COUNT**
**Religious Discrimination**
**First Amendment to the U.S. Constitution**
**(Against Defendants City of New York and Miller)**

216.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

217.     A plaintiff asserting a First Amendment Free Exercise Clause claim must demonstrate that he or she has a sincerely held religious belief which was substantially burdened by the defendants' conduct and that the defendants' conduct was not reasonably related to some legitimate penological interest.

218.     Plaintiff is a practicing Muslim.

219.    Defendants regularly ignored Plaintiff's dietary restrictions and, perhaps worse, served meals with pork in clear violation of Plaintiff's religious beliefs.

220.    Defendants also forced Plaintiff to shower fully exposed to female guards and other COs despite his religious beliefs, which he had tried to explain to Defendants on several occasions.

221.    Apart from that, DOC's ostensible policy forbidding a Quran was outright discriminatory on its face.

222.    Defendants did not have any legitimate penological interest to support their decisions like forcing Plaintiff to choose between pork or skipping meals/not eating.

223.    As a result, Plaintiff has suffered damages.

### EIGHTH COUNT
### Religious Discrimination
### Religious Land Use and Institutionalized Persons Act of 2000
### (Against Defendants City of New York and Miller)

224.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

225.    Under the Religious Land Use and Institutionalized Persons Act, ("RLUIPA"), "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution." 42 U.S.C. § 2000cc-1(a).

226.    Plaintiff's religious exercise was substantially burdened.

227.    RLUIPA provides institutionalized persons with "greater protection" to exercise their religious beliefs than the First Amendment does.

228.    Defendants do not have any compelling, or even legitimate, governmental interest.

229.     As a result, Plaintiff has suffered damages

## NINTH COUNT
## Equal Protection
## Fourteenth Amendment to the U.S. Constitution
## (Against Defendants City of New York and Miller)

230.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

231.     A plaintiff must show 1) he was selectively mistreated, and 2) that mistreatment was motivated by discrimination on an impermissible basis.

232.     Plaintiff experienced multiple forms of mistreatment and the like on the basis of religion as a Muslim.

233.     Defendants, especially Griffin, took great lengths to aggravate Plaintiff, including on the basis of his religion.

234.     As one example, Defendants confiscated Plaintiff's Quran and refused his requests for one, reasoning that only a Bible is allowed.

235.     Defendants did not have any legitimate penological interests in their mistreatment of Plaintiff.

236.     As a result, Plaintiff has suffered damages.

## TENTH COUNT
## Conditions of Confinement
## Fourteenth Amendment to the U.S. Constitution
## (Against All Defendants)

237.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

238.    The Fourteenth Amendment applies to Plaintiff, as a pretrial detainee, not the Eighth Amendment, which governs claims for post-conviction inmates.

239.    Plaintiff, as a pretrial detainee, has a right to be free from deliberate indifference to unconstitutional conditions of confinement. *See, e.g., Genao v. City of New York*, No. 20-CV-10573 (JGLC), 2025 WL 919022, at *7 (S.D.N.Y. Mar. 26, 2025).

240.    To establish a claim for unconstitutional conditions of confinement, a pretrial detainee must satisfy two prongs: 1) an objective prong showing that the challenged conditions were sufficiently serious and 2) a subjective prong that shows the officer-defendant acted with at least deliberate indifference to the challenged conditions.

241.    Defendants subjected Plaintiff to poor and inhumane conditions, and among other examples, withheld cleaning supplies in violation of the Fourteenth Amendment.

242.    Defendants repeatedly failed to observe DOC separation orders as serious or even legitimate.

243.    Plaintiff repeatedly complained and expressed fear regarding certain DOC guards who were supposed not have any contact with Plaintiff.

244.    Despite such complaints, Plaintiff's conditions remained unchanged.

245.    Defendants exhibited deliberate indifference to Plaintiff's reports about his health and medical conditions.

246.    As a result, Plaintiff has suffered damages

### ELEVENTH COUNT
**Failure to Protect/Intervene – Supervisory Liability**
**Fourteenth Amendment to the U.S. Constitution**
**(Against the Supervisory Defendants)**

247.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

248.    As described herein, the CO defendants and other DOC employees of all different ranks targeted Plaintiff as part of their intimidation and harassment efforts.

249.    It is a constitutional violation if an officer acts with deliberate indifference to a substantial risk of harm to an inmate that caused unquestioned and serious deprivation of basic human needs.

250.    Defendants repeatedly failed to protect or intervene in instances that resulted in violations of Plaintiff's rights.

251.    A plaintiff may establish supervisory liability under section 1983 through evidence that (1) the defendant participated directly, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed its continuance, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to a plaintiff's rights by failing to act on information indicating that unconstitutional acts were occurring. *See, e.g., Tchatat v. City of New York*, No. 14 CIV. 2385 LGS, 2015 WL 5091197, at *8 (S.D.N.Y. Aug. 28, 2015).

252.    The Supervisory Defendants were involved in multiple aspects and contexts for the duration of Plaintiff's detention.

253.    To name one thing: Defendant Griffin directly participated in the foregoing constitutional violations.

254.     Other supervisory defendants simply looked the other way despite knowing full well of the constitutional violations and misconduct.

255.     As a result, Plaintiff has suffered damages.

## TWELFTH COUNT
### Municipal Liability
### *Monell* v. *Department of Social Services*, 436 U.S. 658 (1978)
### (Against Defendant City of New York)

256.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

257.     A municipality may be liable when the deprivation of a plaintiff's rights is caused by a governmental custom, policy, or usage of the municipality. And a custom or policy need not be formally written; it may be inferred.

258.     Particularly for its failure to supervise and discipline its employees/agents, the City is liable where, as here, DOC leadership and policymakers are "knowingly and deliberately indifferent to the possibility that its officers violate the constitutional rights of individuals…"

259.     The Department's need for better supervision to protect against constitutional violations was obvious, especially where inmate civil-rights complaints are ignored or not taken seriously as here.

260.     No doubt, City's failure to supervise or even discipline its employees amounted to deliberate indifference.

261.     As a result, Plaintiff has suffered damages.

## THIRTEENTH COUNT
### Disability Discrimination
### Americans with Disabilities Act and Section 504 of the Rehabilitation Act
### (Against Defendant City of New York)

32

262.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

263.    To establish a claim, a plaintiff must demonstrate 1) that he is a qualified individual with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated; and (3) that such exclusion or discrimination was due to his disability.

264.    A plaintiff may base his claim on any of three theories of liability: disparate treatment (intentional discrimination), disparate impact, or failure to make a reasonable accommodation.

265.    Plaintiff is a qualified individual with a disability.

266.    Defendants are public entities covered by Title II of the ADA and Section 504 of the Rehabilitation Act.

267.    Title II of the ADA prohibits Defendants from discriminating against individuals with disabilities in programs and services.

268.    Likewise, Section 504 provides that "[n]o person otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded…be the denied benefits of, or be subjected to discrimination…" 29 U.S.C. § 794.

269.    Defendants engaged in multiple forms of disability discrimination.

270.    Defendants repeatedly refused to provide Plaintiff a reasonable accommodation, making arbitrary denials without justification.

271.    Defendants, moreover, failed to make an individualized inquiry despite Plaintiff's repeated requests.

272. Defendants failed to provide assistive devices, including for Plaintiff's hearing and walking.

273. Defendants are obligated to administer state programs consistent with federal law.

274. Defendants ran afoul of their obligations under both the ADA and Section 504.

275. As a result, Plaintiff has suffered damages.

## FOURTEENTH COUNT
### State Constitutional Violations
### New York State Constitution
### (Against Defendant City of New York)

276. Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

277. The New York State Constitution, Article I, §§ 3, 8, 9, 11 and 12, likewise applies here.

278. Defendants violated multiple of the aforesaid constitutional provisions.

279. In failing to adequately respond, the Department is liable for the conduct and action of its employees.

280. As a result, Plaintiff has suffered damages.

## FIFTEENTH COUNT
### Statutory Violations
### New York State Law
### (Against Defendant City of New York)

281. Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

282. Defendants are subject to Section 40 of the New York State Civil Rights Law and Section 290 of the New York State Executive Law, among others.

283.    New York Corrections Law §§ 137, 200-c, 505, 508 similarly govern and apply to correctional facilities, as here, outlining standards and various protections, among other things.

284.    Defendants' acts and conduct contravened these statutes.

285.    As a result, Plaintiff has suffered damages.

**SIXTEENTH COUNT**
**Negligence**
**(Against All Defendants)**

286.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

287.    To state a claim, a plaintiff must establish 1) the existence of a duty on defendant's part, 2) a breach of that duty, and 3) injury to the plaintiff.

288.    Defendants owed a duty to Plaintiff.

289.    Defendants breached their duty.

290.    Defendants repeatedly flouted BOC's Minimum Standards.[10]

291.    As a result, Plaintiff has suffered damages.

**SEVENTEENTH COUNT**
**Negligent Hiring, Training, and Supervision**
**(Against Defendant City of New York)**

292.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

293.    DOC failed to adequately train and manage staff.

294.    DOC had knowledge and notice of the individual defendants' wrongdoing.

---

[10] Under section 626 of the New York City Charter, a nine-person oversight body is supposed to monitor and set minimum standards of care ("Minimum Standards"), which are supposed to be binding on the Department and its officers. *See generally, e.g.,* 40 R.C.N.Y. § 1-17.

295.    The Department, however, failed to take any serious steps to remediate those problems.

296.    As a result, Plaintiff has suffered damages.

## EIGTHEENTH COUNT
### Negligent or Intentional Infliction of Emotional Distress
### (Against Defendants City of New York, Branche, Henry, Leitch)

297.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

298.    Under New York law, a claim of negligent infliction of emotional distress requires a showing of (1) extreme and outrageous conduct, (2) a causal connection between the conduct and the injury, and (3) severe emotional distress.

299.    Similarly, a claim for intentional infliction of emotional distress under New York law requires (1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress.

300.    For either claim, the conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.

301.    Defendants' conduct was extreme and outrageous.

302.    Defendants' conduct caused Plaintiff significant emotional distress.

303.    Plaintiff experienced extensive mental health issues, including panic attacks, chest pain, etc., as well as worsened his preexisting PTSD diagnosis.

304.    As a result of Defendants' conduct, Plaintiff contemplated taking his own life— suicide— and placed on suicide watch for over a month.

305.    Plaintiff was placed on suicide watch for over a month, underscoring the severity of Defendants' disregard for his condition.

306.    As a result, Plaintiff has suffered damages.

### NINETEENTH COUNT
### Violations of Local Law
### New York City Administrative Code
### (Against Defendants City of New York and Miller)

307.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

308.    Defendants' acts, omissions, and conduct ran afoul of New York City law, including the Humans Rights Law, §§ 8-101, 8-107(4), 8-603, 9-108(c), of the New York City Admin. Code, and the Rules of the City of New York.

309.    Defendants repeatedly flouted those legal mandates—whether it concerned due process or basic living conditions.

310.    Plaintiff was targeted and subjected to mistreatment because of his religion as well contrary to the City's Human Rights Law.

311.    As a result, Plaintiff has suffered damages.

### TWENTIETH COUNT
### Battery/Assault
### (Against Defendants City of New York, McNeil, and Henry)

312.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

313.    For a battery, there must harmful or offensive contact with another person, intentionally caused without consent.

314.    Here, Defendants harmed Plaintiff in more ways than one.

37

315.    Defendants did so intentionally and without any reason, or Plaintiff's consent.

316.    As a result, Plaintiff has suffered damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Kwaine Thompson respectfully requests that the Court enter

judgment and an award in his favor against Defendants, as follows:

A.    Declare that the policies, practices, actions, and omissions of Defendants violate federal and state law, as described herein, including but not limited to the U.S. Constitution, the New York State Constitution, and statutory and common law;

B.    Award any and all available damages, including punitive, compensatory, statutory, and consequential, without limitation, in an amount to be determined at trial;

C.    Award nominal damages for Defendants' violation of Plaintiff's rights;

D.    Award pre- and post-judgment interest at the highest rate allowed by law;

E.    Award reasonable attorney fees and costs pursuant to 42 U.S.C. §§ 1988, 12205, 29 U.S.C. § 794a, and all other applicable law; and

F.    Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff requests a trial by jury on all triable claims and issues of fact.

Dated:  August 18, 2025          THE ATLANTIC FOUNDATION
        New York, NY

                                 By:    _/s/ Sami Elamad_____

                                 Sami Elamad (*pro hac vice*)
                                 450 Lexington Ave., #69
                                 New York, NY 10163
                                 Tel. (646) 685-3954
                                 Fax (646) 712-9501
                                 sami@the-atlantic-foundation.org

                                 *Attorneys for*
                                 *Plaintiff Kwaine Thompson*

## <u>VERIFICATION</u>

I, **Kwaine Thompson**, am the plaintiff in the above-entitled action. I have read the

foregoing amended complaint and know the contents thereof. The same are true to my

knowledge, except as to matters therein stated to be alleged on information and belief and as to

those matters, I believe them to be true.


East Elmhurst, Queens, NY
Dated:  August  _____, 2025

_____
Kwaine Thompson