# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KWAINE THOMPSON,<br><br>     Plaintiff,<br><br> vs.<br><br>CITY OF NEW YORK, CAPTAIN ALEXANDER, ANDRE ANDERSON, STELLA BETHEA, NURSE BLOUNT, MARVA BRANCHE, ALONZO BUTLER, KAREN COLLINS, CLARENCE CURLEY, JANE DOE, SAMANTHA ELIZER, ERNEST FLUKER, ANTONIO GRAVES, THOMAS GRIFFIN, JIMMY GUAN, CHANELE HENRY, KEISHA LEMON, KEESIA LEITCH, CHRISTOPHER LOPEZ, MONIQUE LOTT, ANTHONY MARDEN, RONALD MILLER, CHRISTOPHER L. MILLER, FEDIR MERENYCH, WALTER MCNEIL, PAUL MOODIE, ANNAIS MORALES, ABRAHAM PALERMO, DEPUTY WARDEN PHILLIPS, ADAM ROLLISON, C.O. TAYLOR, MURPHY WHITE, PAUL WHITE, PRZEMYSLAW WOLOSIK, MICHAEL ZDERKO, *et al.*<br><br>     Defendants. | **No.  23-cv-2102 (JPO) (KHP)**<br>No.  22-cv-1458 (JPO) (KHP) [related]<br><br><br>**VERIFIED SECOND AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**<br><br><br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

PRELIMINARY STATEMENT ...................................................................................... 1

THE PARTIES................................................................................................................... 2

    A.   Plaintiff ............................................................................................................. 2

    B.   Defendants ......................................................................................................... 2

JURISDICTION AND VENUE ....................................................................................... 6

FACTUAL ALLEGATIONS ........................................................................................... 7

    A.   Background/Context ......................................................................................... 7

    B.   Transfer to West Facility ................................................................................. 8

    C.   GRVC – Retaliation and Denial of Medical Care ........................................ 13

    D.   Disability Accommodation Requests............................................................. 19

    E.   Religious Discrimination ............................................................................... 20

    F.   Present Litigation: Ongoing Retaliation and Current Conditions (Supplemental) ....... 21

CAUSES OF ACTION ................................................................................................... 28

PRAYER FOR RELIEF ................................................................................................. 41

JURY DEMAND ............................................................................................................ 41

VERIFICATION.............................................................................................................. 42

Plaintiff Kwaine Thompson, by and through his undersigned *pro bono* counsel, brings this action for damages and equitable relief, including declaratory relief and nominal damages, based on Defendants' violations of his rights, and alleges as follows:

### INTRODUCTION

1.      Whether you talk to a supervisor, whether you file a grievance, or whether you institute a string of lawsuits, for any inmate seeking reprieve, it makes no difference. All roads lead to the same conclusion.

2.      In March 2019, Plaintiff made his latest trip to Rikers where he was exploited and mistreated. Plaintiff later disclosed the abuse and, while still on Rikers Island, filed a string of lawsuits about his experiences between

3.      Plaintiff tried to comply with nearly every DOC rule, but it made no difference—the outcome remained the same.

4.      In response, Plaintiff faced retaliation and efforts to intimidate and harass him in an apparent attempt to dissuade him from continuing with his litigation. This complaint represents the last months of Plaintiff's detention on Rikers Island.

### PRELIMINARY STATEMENT

5.      Plaintiff brings this action under federal and state law against the City of New York and its employees following the retaliation he experienced on Rikers Island, particularly at West Facility and GRVC, after he filed suit against correctional officers.

6.      This complaint asserts claims based on Plaintiff's conditions of confinement, medical and health issues, excessive force, due-process violations, among other things, as well as violations of Plaintiff's rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq., the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101 et seq.

1

("ADA"), and state and local law, including the Human Rights Law, New York Executive Law §§ 290, et seq., Admin. Code of the City of New York §§ 8-101 et seq.

7.      As more fully explained below, Defendants deprived Plaintiff of the rights, remedies, privileges, and immunities guaranteed to every person by the First, Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution, without limitation.

## THE PARTIES

A.    **Plaintiff**

8.      Plaintiff Kwaine Thompson ("Plaintiff" or "Thompson") is a natural person and resident of the State of New York. Plaintiff was a pretrial detainee on Rikers Island.

B.    **Defendants**

9.      Defendant the City of New York (the "City") is a municipal corporation organized under the laws of the State of New York. Through its Department of Corrections ("Department" or "DOC"), the City manages and operates correctional facilities including Rikers Island.[1]

10.     Defendant Captain Alexander (Badge No. 1866) is a DOC officer on Rikers Island; she is sued in both her official and individual capacities.

11.     Defendant Andre Anderson is known as SRT Officer No. 120 in the original complaint, and he is sued in both his official and individual capacities.

12.     Defendant Stella Bethea is a correctional officer on Rikers Island; she is sued in both her official and individual capacities.

---

[1] Relevant here, the City and Department are interchangeable and synonymous with one another; whenever reference is made to one, it includes the other.

13.    Defendant Blount is a nurse who provided services to Plaintiff on Rikers Island; she is sued in both her official and individual capacities.

14.    Defendant Marva Branche is a correctional officer on Rikers Island; she is sued in both her official and individual capacities.

15.    Defendant Alonzo Butler is known as SRT Officer No. 80 in the original complaint, and he is sued in both his official and individual capacities.

16.    Defendant Karen Collins is the Warden of West Facility and directly responsible for its operation; she is sued in her official capacity.

17.    Defendant Clarence Curley is known as SRT Officer No. 102 in the original complaint, and he is sued in both his official and individual capacities.

18.    Defendant C.O. Jane Doe (Badge No. 15002) is a DOC officer/employee on Rikers Island; she is sued in both her official and individual capacities.

19.    Defendant Samantha Elizer is known as SRT Officer No. 111 in the original complaint, and she is sued in both her official and individual capacities.

20.    Defendant Ernest Fluker (a/k/a Fluka) is a captain with the Correction Intelligence Bureau ("CIB"), and he is sued in both his official and individual capacities.

21.    Defendant Antonio Graves is a correctional officer on Rikers Island; he is sued in both his official and individual capacities.

22.    Defendant Thomas Griffin is the DOC Assistant Commissioner; he is sued in both his official and individual capacities.

23.    Defendant Jimmy Guan is a captain on Rikers Island; he is sued in both his official and individual capacities.

24.     Defendant Chanele Henry is the Assistant Deputy Warden of GRVC; she is sued in both her official and individual capacities.

25.     Defendant Keisha Lemon (a/k/a Captain Lemon) is a captain on Rikers Island; she is sued in both her official and individual capacities.

26.     Defendant Keesia Leitch is a correctional officer on Rikers Island; she is sued in both her official and individual capacities.

27.     Defendant Christopher Lopez (shield no. 462) is a captain employed by the Department; he is sued in both his official and individual capacities.

28.     Defendant Monique Lott is a correctional officer on Rikers Island; she is sued in both her official and individual capacities.

29.     Defendant Anthony Marden is a correctional officer on Rikers Island; he is sued in both his official and individual capacities.

30.     Defendant Ronald Miller is the Acting Warden of West Facility; he is sued in both his official and individual capacities.

31.     Defendant Christopher L. Miller is the DOC Assistant Commissioner; he is sued in both his official and individual capacities.

32.     Defendant Fedir Merenych is a correctional officer on Rikers Island; he is sued in both his official and individual capacities.

33.     Defendant Walter McNeil (a/k/a Willie McNeil) is a correctional officer on Rikers Island; he is sued in both his official and individual capacities.

34.     Defendant Captain Paul Moodie (a/k/a Moody, Captain Moody) is a DOC officer on Rikers Island; he is sued in both his official and individual capacities.

35.     Defendant Annais Morales is the DOC Deputy Commissioner; she is sued in both her official and individual capacities.

36.     Defendant Abraham Palermo is a captain employed by the Department and assigned to GRVC; he is sued in both his official and individual capacities.

37.     Defendant Deputy Warden Phillips is a deputy warden assigned to GRVC; he is sued in both his official and individual capacities.

38.     Defendant Adam Rollison (a/k/a Rollins, Rollinson) is a captain employed by the Department and assigned to West Facility; he is sued in both his official and individual capacities.

39.     Defendant Taylor is a correctional officer on Rikers Island; he is sued in both his official and individual capacities.

40.     Defendant Murphy White is known as SRT Officer No. 74 in the original complaint, and he is sued in both his official and individual capacities.

41.     Defendant Paul White is known as SRT Officer No. 75 in the original complaint, and he is sued in both his official and individual capacities.

42.     Defendant Przemyslaw Wolosik is a correctional officer on Rikers Island; he is sued in both his official and individual capacities.

43.     Defendant Michael Zderko is known as SRT Officer No. 88 in the original complaint, and he is sued in both his official and individual capacities.

44.     Defendant Does 1 through 25, inclusive, refers to DOC employee-defendants whose identities are unknown to Plaintiff. In the original complaint, there are multiple employee-defendants whose identities are unclear, including officers that staffed West Facility like the

Department's Special Response Team ("SRT") or the Emergency Services Unit ("ESU"), for example.

45.     Accordingly, Plaintiff refers to these Doe defendants as Does 1 through 25, inclusive, until he can amend his complaint to reflect their name and information once discovered. The true names and capacities of these defendants are presently unknown to Plaintiff. Regardless, each Doe defendant is responsible in some way for the events described herein and thus liable to Plaintiff.

46.     The foregoing defendants were acting as employees, agents or representatives of the Department and performed duties and responsibilities acting under color of state law.

## JURISDICTION AND VENUE

47.     The acts set forth in this complaint arise under 42 U.S.C. § 1983 based on violations of Plaintiff's rights under the United States Constitution, unless otherwise indicated (e.g., it arises under the laws of the State of New York), in which case the Court has supplemental or pendent jurisdiction.

48.     The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343, as well as jurisdiction to issue a declaratory judgment under 28 U.S.C. §§ 2201(a) and 2202.

49.     The Court has supplemental jurisdiction over the related state and local law claims under 28 U.S.C. § 1367(a).

50.     Venue is proper under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to this suit occurred within this District.

///

## FACTUAL ALLEGATIONS

**A.      Background/Context**

51.      Plaintiff has a long, storied history with the City's jails and criminal justice system. Starting in the 1990s and until today, Plaintiff has made around thirty trips to Rikers.

52.      Throughout, Plaintiff consistently experienced the age-old stories that have been associated with Rikers Island: violence, brutality, and mistreatment. Notably, up until a brutal stabbing in 2010, Plaintiff never brought suit despite a number of injuries while in DOC custody.

53.      That 2010 attack involved, among other things, nearly 15 gang members—left unsupervised by the COs— who beat and stabbed Plaintiff and caused him to fracture his left orbital floor. Plaintiff found himself in a wheelchair after that attack.

54.      More recently, Thompson arrived on Rikers Island in March 2019 and would remain there until on or about February 14, 2023, when he would relocate upstate.

55.      As relevant here, between 2019 and 2022, Plaintiff's experiences on Rikers would give rise to his filing lawsuits in this District to protest and call attention to his conditions. He filed a string of lawsuits (*Thompson I–V*) protesting his conditions, as referenced below.

| Date Filed | Case No. | Caption | Synopsis | Status | Abbreviation |
|---|---|---|---|---|---|
| Dec 6, 2021 | 21-cv-10371 | *Thompson v. City of New York* | Denial - religious services | Settled | *Thompson I* |
| Feb 22, 2022 | 22-cv-1458 | *Thompson v. City of New York et al* | Sex abuse and improper quid pro quo with DOC guards | Pending; at trial | *Thompson II* |
| Aug 23, 2022 | 22-cv-7222 | *Thompson v. Quilty et al* | Denial of medical care, malicious prosecution | Terminated (9/5/23) | *Thompson III* |
| Mar 10, 2023 | 23-cv-2102 | *Thompson v. Lemon et al* | Retaliation for protected activities | Pending | *Thompson IV* |
| Apr 12, 2023 | 23-cv-3170 | *Thompson v. Quilty et al* | Monkeypox | Terminated (7/17/23) | *Thompson V* |

56.      In *Thompson I*, Plaintiff, along with several inmates, collectively tried to bring suit to challenge religious-based restrictions, as one example.

57.     *Thompson II* concerns Plaintiff's experience on VCBC, i.e., the related litigation, which he commenced on February 22, 2022 (proceeding initially through counsel).

58.     Almost eight months later, in or about August 2022, Plaintiff could no longer agree to participate in the quid-pro-quo exchange at GRVC and backed out. He immediately felt the blowback of that decision, which prompted *Thompson III*.

59.     *Thompson IV* follows Plaintiff's decision to withdraw, triggering a new phase of retaliation beginning at West Facility in December 2022 and ending at GRVC in March 2023.

**B.      Transfer to West Facility**

60.     Primarily intended to house inmates with infectious diseases, West Facility features single-cell units, each of which contain an individual shower stall. Detainees at West are left with zero privacy and isolated for hours on end.

61.     The Department euphemistically refers to West Facility as offering "structurally restrictive housing" for inmates that are regularly locked in solitary confinement for 23 to 24 hours a day without contact or access to the outside or social/group programming.[2]

62.     Several inmates with substantially similar stories of indefinite isolation brought a class action and successfully sued the City for its practices at West Facility.[3]

63.     Despite DOC's stated position that solitary confinement has ended, the Department continues to rely on their functional equivalent, including at West Facility.[4]

---

[2] Center for Justice at Columbia University, *Solitary by Many Other Names: A Report on the Persistent and Pervasive Use of Solitary Confinement in New York City Jails* (Dec. 2023), available at https://tinyurl.com/mr2vsvcw.

[3] *See* Jane Wester, *City to Pay Up to $53 Million in Settlement*, New York Law Journal (Apr. 19, 2023), available at https://tinyurl.com/3zv6hdcn.

[4] *See, e.g.,* David Brand, *Solitary by another name': NY lawmakers slam city's new isolation plan*, Queens Daily Eagle (Apr. 28, 2021), available at https://tinyurl.com/efr6uepy; Columbia University, *Solitary by Many Other Names,* at p. 8 ("Despite reforms, New York City jails have

64.     There is an alarming number of reports from other inmates who can attest to the conditions and practices at West Facility, including unsanitary conditions, inmate mistreatment, and the lack of oversight or accountability over guards. [5]

65.     Apart from that, West Facility's poor cleaning and unsanitary conditions are equally well reported.[6]

66.     When it comes to staffing, the Department has a litany of problems.[7] To name one thing: COs rarely face any serious consequences because there is a culture of impunity.[8]

67.     West Facility did not prove to be any easier for Plaintiff, although it became increasingly clear that was intentional on Defendants' part.

---

continued to lock people in solitary confinement in structurally restrictive housing units that it has falsely stated are general population… People in these units – including…West Facility – are still locked alone in a cell 23 hours a day or more…"); Courtney Gross, *How does DOC punish detainees on Rikers Island?*

[5] *Cf., e.g.,* Courtney Gross, *How does DOC punish detainees on Rikers Island?,* NY1 (Jan. 29, 2024) (inmate reporting West Facility is used for solitary confinement), available at https://tinyurl.com/ms3n6f7j.

[6] *See, e.g.,* Graham Rayman, *Rikers Island, NYC jails plagued with bugs, mice, cleanliness violations, says federal court monitor*, Corrections1 (Mar. 1, 2024) (finding "thousands of violations"), available at https://tinyurl.com/4spsksk6.

[7] *See, e.g.,* Graham Rayman, *Widespread deterioration at Rikers Island uncovered in NYC jails monitor report, new photos*, N.Y. Daily News (July 5, 2023) ("fire safety posts in the West Facility, which consists of temporary structures called "sprungs," were unstaffed at least 82 times for periods ranging from three hours to 18 hours"), available at https://tinyurl.com/46umhtx6.

[8] *See, e.g.,* Reuven Blau, *City to Shell Out $1.6 Million to Rikers Detainee Abused by Therapist*, The City (May 13, 2024) (allegations against DOC employees are "rarely substantiated" observing that only one correction officer has been terminated over the past five years), available at https://tinyurl.com/3rsw7jjr; Graham Rayman, *Rikers Island corrections officer suspended after jail search finds contraband cache*, Corrections1 (Mar. 7, 2024) (finding no staff suspensions for contraband in 2022), available at https://tinyurl.com/msjajj6f.

68.     On or about December 2, 2022, Plaintiff was inexplicably transferred to West Facility, where he experienced all types of retaliation.

69.     Shortly after he arrived at West, several guards openly expressed that Plaintiff was sent to West because of his pending lawsuit.

70.     According to Defendants McNeil and Henry, the transfer was part of an attempt to stymie Plaintiff's various lawsuits against the City and officers. They even added that, apart from being sent to West Facility, Plaintiff would soon face other repercussions for his decision to sue (e.g., family visits would soon be cut off).

71.     For instance, Defendant Acting Warden Miller visited Plaintiff's cell on or about January 6, 2023, to reinforce Defendants' retaliatory motive. Miller said that, so long as Thompson was at West, he'd be placed in enhanced restraints even though they were not required or helpful. "You better drop your lawsuits if you know what's good for you," Miller added.

72.     Throughout, Plaintiff repeatedly made attempts at suicide and engaged in other self-injurious behavior in response to Defendants' conduct.

73.     At one point, Thompson was on suicide watch for 37 days during this entire ordeal.

74.     Worse enough, at West, Plaintiff could not make any reports/complaints— whether in writing or by phone through the Department's 311 hotline— for several reasons.

75.     West Facility does not have any drop box for inmates to make written complaints.

76.     Plaintiff's alternative—calling 311—similarly proved futile. The hotline had been removed from his telephone list (numbers allowed to call). Plaintiff was thus left to make reports to officers verbally, but unsurprisingly, officers did not take any serious action on those reports.

77.    Unlike other inmates on Rikers—who arguably received outdoor and recreational privileges—Thompson had little to zero opportunities for recreation. And that appeared deliberate by some COs' admission.

78.    Plaintiff's calling restrictions seemed to always change depending on the assigned officer's personal discretion that day. Sometimes, Thompson got lucky and rewarded with extra calling time, all of which served no legitimate function or purpose. For example, Captain Guan rewarded Thompson with other inmates' access codes/pins.

79.    During his time on West, Plaintiff could not initiate or file any § 1983 litigation against Defendants—at least not until several weeks after he left, i.e., this litigation (no. 23-cv-2102).

80.    Worse of all, no matter how many times an inmate protests, makes complaints, or tries to faithfully follow the DOC's grievance procedure, the outcome is the same: DOC officials remain undeterred and unbothered.

81.    While at West, Plaintiff was subject to arbitrary searches, including strip searches and inside his cell, on an almost daily basis by unnamed SRT officers (badge nos. 102, 120, 182, 74, 75, 78, 77, 79, 65, 80, 88, 82, 203, 111, 113, and 112), as well as an ESU captain and officer (badge nos. 28 and 4190, respectively).

82.    In several instances, Defendants randomly confiscated or deprived Plaintiff of his property, including when he had received a gift or item in the mail, for no reason.

83.    Unlike other inmates on Rikers—who arguably received outdoor and recreational privileges—Thompson had little to zero opportunities for recreation. And that appeared deliberate by some COs' admission.

84.    Defendant Bethea openly aired her disdain for Thompson and acknowledged that other inmates could access the outdoors and common areas. In part, this was because of Bethea's relationship to CO Kenol—her biological sister—who Plaintiff had named as a defendant in *Thompson III*.

85.    One of the unfortunate aspects of West Facility is the lack of privacy for inmates when showering since there are no curtains, among other things.

86.    Plaintiff often was exploited and purposely forced to shower in front of female officers, which is not a first for West Facility's detainees.[9] McNeil even added that Plaintiff would never have a shower curtain and thus be forced to shower fully exposed to female COs.

87.    In another incident on or about January 3, 2023, Captain Fluker entered Plaintiff's cell and searched it before ordering Plaintiff to strip naked, all of which appeared to be for the purpose of harassing Plaintiff. Two other CIB officers were present at the time.

88.    On or about January 9, 2023, while showering, SRT officers walked by Plaintiff every couple of minutes.

89.    Meanwhile, another high-ranking DOC official—who Plaintiff later learned was Assistant Commissioner Miller—stood outside the cell. Once Fluker and the other CIB officers left, Plaintiff heard a conversation between Fluker and the commissioner, in which Fluker stated that he would continue to harass and intimidate Plaintiff for his litigation against the City.

90.    Defendants frequently pressed Thompson to dismiss his pending litigation, often finding new ways to impress their message on him.

---

[9] *See* supra, *Solitary by Many Other Names*, p. 9 ("officers forced [an inmate] to remain naked in the squatting position while making sexually explicit comments, then pepper spayed him in the face and across his nude body" before locking him in a "shower cell for four hours").

91.     Defendants frequently placed Thompson in restraints, even for short trips from one cell to another, for no apparent reason.

92.     On or about January 7, 2023, Defendant CO Anderson approached Plaintiff to escort him to the yard. Anderson placed Plaintiff in restraints, however, for no apparent reason. Although, should Plaintiff drop his litigation, the shackles "would never happen again," Anderson said.

93.     Thompson replied that he would think about it, but before anything else, he requested that he move out of West Facility. Anderson said he'd see what he can do.

94.     About ten days later, Plaintiff was transferred out of West to GRVC on or about January 16, 2023.

95.     But the harassment and retaliation did not end with Plaintiff's move from West Facility. Instead, it took new forms at GRVC.

**C.     GRVC – Retaliation and Denial of Medical Care**

96.     Both at West and GRVC, Plaintiff experienced multiple issues when it came to accessing medical care or service.

97.     Plaintiff is diagnosed with chronic asthma and struggles with breathing, as well as high blood pressure

98.     Plaintiff also has difficulty with both his hearing and walking. He relies on a cane for help, which he has used since at least 2022.

99.     In addition, Plaintiff is also diagnosed with Post-Traumatic Stress Disorder (PTSD), which followed in the aftermath of his experiences on Rikers Island.

100.     With respect to his blood pressure, Plaintiff is supposed to take medication every morning, but those rounds would often be missed, withheld, or cancelled. Sometimes, the appointment was rescheduled for in the afternoon (or whenever a guard agreed).

101.     Across the board, Plaintiff's medications were repeatedly withheld, delayed, or conditioned on some condition.

102.     Defendant Guan's statements to Plaintiff confirmed as much. On February 13, 2023, he explained that Plaintiff will always receive medication late as long as his litigation remains active against the Department.

103.     Earlier, on another occasion—captured on body-worn camera—Plaintiff pleaded with Defendant Lemon for help, asking for his asthma pump. Lemon denied the request, ignoring his pleas during an asthma attack.

104.     The irregularities and delay in medication were noticeable for Thompson, who had chest pains, panic attacks, and other health conditions.

105.     To be clear, the delay and gaps in medication were not by accident. For instance, on one occasion after Plaintiff left West, Defendant Blount—who Plaintiff named as a defendant in another lawsuit—said "Make him wait!" referring to Thompson's medications. "This a**hole is suing me," Blount added, referring to Thompson.

106.     On or about February 4, 2023, Defendant Palermo escorted Plaintiff to the clinic for his daily medications. Upon arrival, Defendant Blount declined to give Plaintiff his medication, and even though Captain Palermo tried to step in and say something without much luck.

107.    Even though Defendant Palermo's efforts are noble, he nonetheless could have reported the incident to DOC leadership, or any supervisor for that matter. Instead, however, nobody did anything—and Plaintiff was left with virtually no choice.

108.    On or about February 7, 2023, Plaintiff alerted Defendants Merenych and Paulino of the missed medication issues. The officers replied that, in reality, Plaintiff had missed medications because of his ongoing cases against the City.

109.    A few days later, while on the way to the clinic, Thompson tried to bring up the medication issue again with Defendants Lott and Taylor on or about February 10, 2023. Both officers similarly unbothered by their own admission.

110.    "We heard about your numerous lawsuits. We are here to tell you that your services will be a lot slower than other inmates. You brought that on yourself," Lott and Taylor explained. Lott and Taylor's remarks were distressing to Thompson, who experienced a mental health emergency that day.

111.    Indeed, Plaintiff had multiple experiences where he felt like difficulty breathing and chest pain. His complaints simply were ignored by the CO defendants.

112.    On or about February 12, 2023, Plaintiff alerted officers, including Defendant Wolosik, of another medical emergency and breathing difficulties.

113.    Defendant Branche refused to call an emergency, however, leaving Thompson on the floor helpless for hours. "I'm not calling no clinic for Thompson," she exclaimed, "I hope he dies."

114.    And the abuse was not only limited to mere indifference. As if words were not enough, some defendants were more forceful and aggressive.

115.    Around that same time, Defendant Acting Warden Henry walked into Plaintiff's cell and sprayed mace or another similar chemical agent throughout the room before closing the door shut.

116.    Henry called out to Branche, instructing her to keep Thompson's cell locked. "Let him breathe in as much mace as possible. I want to send Thompson to the hospital."

117.    Barely able to breathe, Plaintiff lost consciousness and laid bare on the floor of his cell for hours. Plaintiff also began to vomit and, unable to get up, was forced to lay in his vomit for hours before a CO ever came.

118.    Defendant Captain Moodie even tried to respond to Plaintiff's medical emergencies, but Defendant Henry did not allow him to assist or intervene.

119.    Additionally, even though Plaintiff had made PREA complaints before his transfer to West Facility, Department investigators did not make any further follow-ups or even enforced their separation orders.

120.    More specifically, Plaintiff had a separation order against Defendant Branche, which was rarely followed or applied by the Department or its staff.

121.    The Department does not make any effort to hide the fact that separation orders are nothing more than a piece of paper. DOC never enforces or takes them seriously.

122.    Consider that Plaintiff made multiple reports about Defendant CO Branche and obtained a separation order. However, the separation order was nothing more than an exercise in futility because, Branche nonetheless continued in the same position, working in close proximity to Plaintiff and finding new ways to harass him.

123.    Courts in the Second Circuit have pointed to the existence, or lack thereof, of no-contact orders as indications that a substantial risk of harm may exist to that inmate-victim. *See, e.g., Mays v. Falu*, 2019 WL 6619330, at *7–9 (S.D.N.Y. Dec. 5, 2019).

124.    Separately, Defendants often tried to impede Plaintiff's ability to use the law library and prepare for his legal cases, especially his criminal case.

125.    While at GRVC, DOC staff found inventive and new methods to make Plaintiff's experience uncomfortable and degrading.

126.    On some days, Thompson could not access the law library or review evidence, which harmed both his criminal case and civil cases against the City.

127.    For example, Plaintiff was forced to accept a plea deal in one criminal case, and in another case, he had a mistrial after a juror contracted COVID-19. He awaits another trial date, although he believes that Defendants' actions/conduct, at least in part, have caused delays and protracted his unnecessary detention on Rikers.

128.    As for Plaintiff's § 1983 litigation, including in this District, Plaintiff's claim did not proceed or were dismissed because of technicalities that could have been resolved, such as filing paying filing fees or responding to court orders.

129.    Also, it's important to note that Plaintiff's has historically represented himself (pro se) in his state criminal proceedings, underscoring the importance his ability to prepare a defense.

130.    When allowed to access the law library at GRVC, guards forced Plaintiff to urinate and defecate in a plastic trash bag—even though Plaintiff has used that same library before and never had to resort to using a garbage bag to defecate.

131.    Plaintiff was confined for extended period of time in the law library cell at GRVC without a toilet and, as a result, forced to urinate and defecate into plastic bags.

132.    On or about February 10, 2023, for example, Defendant Lott gave Plaintiff a garbage bag to use the bathroom while in the cell.

133.    If that weren't enough, a bathroom is only a couple short steps away, but it illustrates the lengths to which some DOC officers will go.

134.    When Plaintiff expressed that using a plastic bag felt inhumane and humiliating, Defendant Lott did not seem to care. "Use the bag or piss on yourself or on the floor," she said. Plaintiff had to use a plastic bag several times that day to urinate.

135.    And it was not a one-off incident. Plaintiff had to use a bag on several occasions, including the very next day, at the direction of Defendants Merenych and Wolosik.

136.    That week, on several occasions, Plaintiff tried to raise concerns or make a complaint with DOC supervisors. On or about February 12, 2023, Defendant Deputy Warden Phillips ordered Plaintiff to remain in the toilet-less cell despite repeated protests on Plaintiff's part.

137.    On or about February 13, 2023, for example, Plaintiff tried to make a complaint with Defendant Captain Guan, who was wearing a body-worn camera, but Guan ignored Plaintiff's concerns and looked the other way.

138.    Guan even went on to say that Plaintiff would not be safe from sex abuse while on Rikers.

139.    Separately, all the while, Plaintiff's living conditions at GRVC featured a litany of problems: rats, water bugs, vermin, and roaches, to name a few things.

140.    Defendants deliberately denied Plaintiff access to standard cleaning supplies (like a broom) by the CO defendants in an apparent attempt to further retaliate against Thompson.

141.    Nor could Thompson rely on regular access to the laundry room, which Defendant Merenych said was punishment for Thompson's lawsuits against the Department. As a result, Plaintiff began to develop sores from re-wearing the same, unwashed clothing.

142.    That's not even accounting for the overwhelming distress and depression that Plaintiff experienced as a result.

143.    Fundamentally, whether at West or GRVC, there was no reasonable basis to support or even rationalize Defendants' decisions and actions.

144.    Alongside these degrading conditions, Plaintiff also faced discrimination based on his disabilities.

**D.    Disability Accommodation Requests**

145.    As previously mentioned, Plaintiff has hearing problems with one ear. He also has problems with maintaining his balance and walks with a cane.

146.    Plaintiff has a documented hearing impairment and requires TTY/assistive devices for hearing. He needs an auxiliary aid, or other accessible method, in order to hear properly.

147.    Among other things, Plaintiff's hearing affects his ability to use the telephone—whether to, say, speak with his criminal lawyer or call family.

148.    Plaintiff made repeated requests for accommodations to DOC employees, none of which proved to be successful.

149.    DOC failed to provide accessible communication devices to Plaintiff despite repeated requests.

19

150.    Plaintiff was forced to attempt legal communication through inadequate means.

151.    Plaintiff had inadequate legal communications (e.g., TTY) and, as a result, was denied equal access to counsel contrary to the Americans with Disabilities Act (ADA).

152.    On several occasions, Plaintiff was unable to listen or effectively participate in court proceedings/appearances because there were no serious options.

153.    To make matters worse, Plaintiff's ability to access the law library as well as other inmate programming was substantially hindered because of his disability and the lack of accommodations.

**E.    Religious Discrimination**

154.    Both at West and GRVC, Plaintiff experienced all kinds of harassment about his religious beliefs, particularly as a Muslim.

155.    For example, Plaintiff's experiences of forced, public nudity at West were contrary to his religious beliefs/practices as a Muslim.

156.    At West, Plaintiff was housed in cell 614, which was made up of glass entirely and allowed others to watch him around the clock in an apparent attempt to humiliate him.

157.    Plaintiff is a practicing Muslim and, as part of his beliefs, maintains a halal diet. In the past, Plaintiff received halal food without issue, although Defendants began frequently ignoring Plaintiff's diet and, on several occasions, refused to provide him with halal food.

158.    Some defendants, particularly the unnamed SRT officers, regularly tried to serve Plaintiff food with pork in it.

159.    Plaintiff experienced various forms of religious discrimination, as previously mentioned, which grew worse once he returned to GRVC from West Facility.

20

160.    On or about January 17, 2023, Defendant Assistant Commissioner Griffin informed Thompson that, so long as there was litigation pending against the City, Thompson would not receive halal food consistent with his religious beliefs and dietary restrictions.

161.    Defendant Griffin walked to the housing unit at GRVC (unit 1/a) and reiterated that the campaign of harassment and intimidation would not let up. "Do not give the Muslims halal food," Griffin added apparently as part of that campaign.

162.    Due to Defendants' intimidation and discriminatory tactics, Plaintiff was forced to involuntarily fast throughout the day in order to observe his religious practices. a

163.    Plaintiff had always carried a Quran as part of his belongings, but when he returned to GRVC this time, it went missing. Thompson asked the CO defendants, one of whom did not mince words: "I hate your dirty religion."

164.    When Plaintiff tried to bring up the issue of his missing Quran, Defendants indicated that DOC policy only allows an inmate to access/read a Bible.

165.    Apparently, Defendants have a command-level order—barring all religious texts except the Bible—that they used to justify their actions.

166.    Even after Plaintiff the instant lawsuit in March 2023, Defendants' retaliatory and questionable practices persist to this day.

## F.    Present Litigation: Ongoing Retaliation and Current Conditions (Supplemental)

167.    Plaintiff commenced this action and filed the original *pro se* complaint on March 10, 2023 (ECF No. 1) consisting of 90 pages typed in all capital letters, which the court later directed him to revise in an order to amend (ECF No. 7).

168.    Plaintiff subsequently applied and received pro bono counsel for the limited purpose of assisting with filing an amended complaint. ECF Nos. 13.

21

169.     Around the time, Plaintiff remained upstate with limited communication capabilities, as previously mentioned, which limited his ability to participate. ECF No. 25 ¶ 122.

170.     On November 1, 2024, Plaintiff filed the operative complaint, the First Amended Complaint (ECF No. 25), and Defendant City filed a motion to dismiss that prompted further changes and additions by Plaintiff, as explained to the Court. ECF Nos. 121, 138, 142.

171.     Since this litigation began, Plaintiff has returned to Rikers Island in or around February 2025, where he remains as of this writing pending the resolution of his criminal cases.

172.     Whether in the past or present, however, Defendants' troubling and unconstitutional practices persist today, including inexplicable facility transfers, retaliation, denial of medical care, even this litigation began.

173.     Legal access. Plaintiff could not review or access any discovery from his criminal proceedings, despite multiple requests and follow ups. Recall he's self-represented in his criminal case.

174.     On or about March 11, 2025, the DOC general counsel office received materials/discovery from the criminal case, which Plaintiff was supposed to review in the law library. *See* ECF No. 205 at 5 (Mar. 11, 2025, Counsel Letter to Office of General Counsel).

175.     For several months later—at least until June 2025—Plaintiff, however, continued to face problems with access to the law library. *See* ECF No. 205 at 1 ("law library officers never came. And this happened all month long").

176.     Additionally, Plaintiff's counsel in this litigation personally experienced multiple issues with gaining access to his client, Mr. Thompson, as he explained to the Court in multiple filings about attorney-client visits and confidential telephone calls, among other things. *See* ECF Nos. 121, 124, 125.

177.    In an unrelated video conference call between Thompson and his counsel in *Thompson I*, one DOC employee entered the meeting and informed them that their meeting was terminated, for no apparent or clear reason. (The incident was referred to DOC's grievance process.)

178.    In this context, the Department repeatedly failed to follow or apply its own rules. *See* ECF No. 124 at 3-5 (citing, *inter alia*, the Rules of the City of New York).

179.    Facility assignments. To name another thing, the Department continues to subject Plaintiff to arbitrary facility transfers without any notice or explanation. Using facility transfers appears to be a popular method among DOC employee for imposing punishment.

180.    On or about July 30, 2025, Plaintiff was inexplicably transferred from Harmony House, an LGBTQ+ friendly space, to "Gangland," in OBCC (5 Lower).

181.    Known as "Gangland" among its residents—the unit features rival gangs. As of this writing, Plaintiff remains there assigned among "the Muslim Bloods."

182.    Plaintiff has been forced to pay bribes to inmates for the cost of his safety. He's routinely been forced to give away items from his commissary and account to avoid being attacked or subjected to unprovoked violence, as has been the case before in years past.

183.    DOC justified the transfer on the ground that apparently an anonymous complaint was filed against Plaintiff for bullying.

184.    In response to requests for information, defense counsel explained, "[A] complaint was filed against Mr. Thompson for bullying… On June 16, 2025, Mr. Thompson submitted an inmate statement alleging that no one in the unit would speak to him and that he was experiencing retaliation. A request for rehousing was submitted…" (Email from Gregory Accarino, dated August 6, 2025).

23

185.    Counsel's proffered reasoning—that Plaintiff purportedly made complaints of retaliation—is hard to reconcile. For one, it's almost two months old and seemed outdated. For another, Plaintiff could have been referring to officers, not other inmates.

186.    Mr. Accarino's response also ignored repeated requests for the name of "who has direct knowledge or direct responsibility for Mr. Thompson's facility assignment."

187.    <u>Denial of medical care</u>. On multiple occasions, Plaintiff was denied emergency medical care and requests for medical intervention despite repeated attempts to call for assistance.

188.    Plaintiff continues to make reports of medical issues without much success.

189.    On or about May 1, 2025, 6:26 P.M., Defendant C.O. Jane Doe (Badge No. 15002) refused to allow Plaintiff his medication because he filed a lawsuit, adding "I don't care if you filed lawsuits."

190.    Two weeks later, on or about May 14, DOC officers again denied Plaintiff his medication, threatening to spray him with mace if he did not comply. That medication refusal represented at least the tenth incident over the past few weeks.

191.    On or about June 8, 2025, around 2:30 P.M., Plaintiff experienced a heat stroke and collapsed in the showers. A medical emergency had been called, but the DOC nurse that day said she's not going to taking any of Plaintiff's concerns seriously.

192.    Watching everything unfold that day, Defendant Captain Azevedo shouted, "Turn that shit off!" directing officers to turn off their body-worn camera. This ordeal lasted almost three hours.

193.    On or about June 10, 2025, Plaintiff called for a medical emergency at least three times, but DOC staff refused his pleas. Officers made hand gestures directing Plaintiff to exit the clinic, which is all captured on body-worn camera and security camera footage.

194.    <u>Futile grievance procedure.</u> That seems to be a hallmark in DOC grievance procedure for inmates, which requires they file a complaint… etc.

195.    As previously mentioned, the Department fails to enforce or apply separation orders, as relevant to Plaintiff in 2023 especially with Defendant Branche. That continues to be the case today, despite repeated attempts to follow the grievance procedure. Thus, even when he tries to follow DOC's standard procedure, there is little to no difference in the outcome.

196.    Earlier this year, Plaintiff filed grievances and made multiple reports to the Department about the fact that DOC staff have failed to enforce a separation order entered between Plaintiff and Defendant Captain Alexander (who was not supposed to have any contact with Plaintiff per the separation order).

197.    Plaintiff filed multiple grievances about Defendant Alexander, including on April 24, April 30, May 1, May 14, and May 19.

198.    On May 1, 2025, for example, Plaintiff filed a grievance following an incident with Defendant Alexander on or about April 24, 2025, in which she walked up to his bed (no. 14) and stated, "Your separation order don't mean shit to me. I still do what I want, you will get maced and ticketed like I did in the clinic…"

199.    Later that week, on May 4, Plaintiff filed another grievance because Defendant Alexander issued a ticket to him and threatened to further penalize him if he protested. In her own words, "that separation order don't mean shit."

25

200.    Plaintiff filed a grievance about Alexander's misconduct, even adding that their interaction was caught on video.

201.    For example, Plaintiff filed a grievance regarding

     i.   April 24 interaction with Alexander (DOC Ref No. 885176)

     ii.   May 1 incident (DOC Ref No. 885151)

     iii.   May 14 medication issue

     iv.   June 10 incident as well.  (DOC Ref. No. 898135)

202.    The Department tolerates all sorts of misconduct at the detriment of detainees— and until it proves fatal, there's rarely ever any change. But it owes more to inmates (like Plaintiff)  than the usual do-nothing approach.

203.    As previously mentioned, for the past several months, Plaintiff lived in the Harmony House, a safe space for LGBTQ+ individuals. Harmony House at least provided Plaintiff with some solace considering his past experiences on Rikers.

204.    Once he arrived, however, Plaintiff grew alarmed by frequency of inmates engaging in sexual activity amongst each other.

205.    Almost every day, Harmony House residents engage in sexual activity with each other, based on Plaintiff's own observations and personal knowledge.

206.    Plaintiff has also repeatedly been invited, pressured, or solicited to participate in the sexual conduct by other inmates.

207.    Many of these individuals carry sexually transmitted diseases/infections (STI) and nonetheless continue to engage in sexual activity with inmates.

208.    An inmate can unknowingly be exposed to blood or other bacteria if, say, a fight breaks out or while helping a patch up an open wound from a fall in the yard.

209.    Perhaps most troubling, there are accounts by several Harmony House inmates who know a fellow detainee with an STD—and even HIV—but remain sexually active.

210.    Put another way, an inmate housed in Harmony House faces the added danger of possibly contracting an STD or worse (i.e., HIV) from another inmate, whether consensual or not.

211.    Plaintiff reported countless incidents to DOC officials about Harmony House, but from the looks of it, the Department does not seem to care.

212.    Plaintiff witnessed numerous occasions where a C.O. walked in on inmates' sexual interactions—only to tell them to stop it before going on to the next post.

213.    In looking the other way and ignoring rampant sexual activity among detainees, the Department does not even give inmates the courtesy of prevention, education, or other resources that could easily mitigate the circumstances.

214.    For its part, the Department has reportedly increased staffing for nurses to treat inmates diagnosed with an STI.

215.    However, the Department does not even offer something as simple and life changing as basic medication, e.g., PREP, which "reduces the risk of getting HIV from sex by about 99% when taken as prescribed."

216.    Putting all of that together, the Department has exposed inmates to state-created dangers for no good reason. *See Matican v. City of New York*, 524 F.3d 151, 155 (2d Cir. 2008); *e.g., Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 427–31 (2d Cir. 2009).

**CAUSES OF ACTION**

**FIRST COUNT**
**Retaliation**
**42 U.S.C. § 1983**
**(Against the Individual Defendants)**

218.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

219.    To state a retaliation claim, a plaintiff must show that (1) he engaged in protected activity; (2) the defendant took adverse action against him; and (3) there was a causal connection between the protected activity and adverse action.

220.    Plaintiff engaged in protected activity—namely, filing suit against the City and filing grievances through the Department's internal process, as established by the First Amendment.

221.    Plaintiff was transferred to West Facility as punishment in response to his litigation and grievances.

222.    Plaintiff's transfer to West Facility was nothing more than an attempt to intimidate and bully him for engaging in protected activity. The facility transfer, in and of itself, constitutes adverse action.

223.    Confining a prisoner to keep lock—that is, a form of confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities—is sufficient to establish an adverse action.

224.    In an apparent attempt to punish Plaintiff for filing lawsuits against the DOC and its employees, Plaintiff was repeatedly subject to all forms of harassment and mistreatment.

225.   Collectively, Plaintiff's grievances demonstrate a pattern of systemic retaliation: denial of medical care, denial of recreation, denial of notary and legal services, and intimidation—all seemingly tied to Plaintiff's exercise of basic legal rights.

226.   As a result, Plaintiff has suffered damages.

## SECOND COUNT
### Indifference to Medical Needs
### 42 U.S.C. § 1983
### (Against All Individual Defendants)

227.   Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

228.   To prevail, a plaintiff must meet two requirements: (1) that he had a serious medical need, and (2) that the defendant acted with deliberate indifference to such need.

229.   Defendants repeatedly demonstrated their indifference to Plaintiff's medical needs and overall health.

230.   Defendants frequently delayed Plaintiff's daily medication trips intentionally.

231.   On a few occasions, Plaintiff experienced medical emergencies, but whenever he informed officers, they ignored them.

232.   As a result, Plaintiff has suffered damages.

## THIRD COUNT
### Excessive Force
### 42 U.S.C. § 1983
### (Against Defendants Branche, McNeil, and Henry)

233.   Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

234.   To establish a claim of excessive force, a pretrial detainee must show only that force purposely or knowingly used against him was objectively unreasonable.

29

235.    Defendants wrongfully subjected Plaintiff to excessive force.

236.    For example, Defendant Henry entered Plaintiff's cell and used pepper before closing the door shut and letting him nearly suffocate.

237.    As a result, Plaintiff has suffered damages.

**FOURTH COUNT**
**Due Process**
**42 U.S.C. § 1983**
**(Against Defendant City of New York)**

238.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

239.    Defendants violated Plaintiff's due process rights, including his procedural due process and substantive due process.

240.    Defendants repeatedly subjected Plaintiff to enhanced restraints without justification and brazenly ignored his pleas.

241.    Defendants' conduct and actions, taken together, suggest a clear effort to punish Plaintiff.

242.    To establish a procedural due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process.

243.    Defendants violated Plaintiff's procedural due process rights by refusing him an opportunity for a hearing, notice, and so on while on lockdown or for their use of enhanced restraints.

244.    The Second Circuit has recognized a due process right to be free from pretextual administrative confinement.

245.    Plaintiff did not have any hearing or process to contest his isolation/solitary confinement or the shackles and restraints that he was forced to wear.

246.    As a result, Plaintiff has suffered damages.

## FIFTH COUNT
### Conditions of Confinement
### 42 U.S.C. § 1983
### (Against Defendant City of New York)

247.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

248.    The Fourteenth Amendment applies to Plaintiff, as a pretrial detainee, not the Eighth Amendment, which governs claims for post-conviction inmates.

249.    Plaintiff, as a pretrial detainee, has a right to be free from deliberate indifference to unconstitutional conditions of confinement. See, e.g., Genao v. City of New York, No. 20-CV-10573 (JGLC), 2025 WL 919022, at *7 (S.D.N.Y. Mar. 26, 2025).

250.    To establish a claim for unconstitutional conditions of confinement, a pretrial detainee must satisfy two prongs: 1) an objective prong showing that the challenged conditions were sufficiently serious and 2) a subjective prong that shows the officer-defendant acted with at least deliberate indifference to the challenged conditions.

251.    Defendants subjected Plaintiff to poor and inhumane conditions, and among other examples, withheld cleaning supplies in violation of the Fourteenth Amendment.

252.    Defendants repeatedly failed to observe DOC separation orders as serious or even legitimate.

253.    Plaintiff repeatedly complained and expressed fear regarding certain DOC guards who were supposed not have any contact with Plaintiff.

254.    Despite such complaints, Plaintiff's conditions remained unchanged.

31

255.    Defendants exhibited deliberate indifference to Plaintiff's reports about his health and medical conditions.

256.    As a result, Plaintiff has suffered damages.

**SIXTH COUNT**
**Access to the Courts and Counsel**
**42 U.S.C. § 1983**
**(Against All Defendants)**

257.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

258.    The First Amendment protects an individual's right to the courts, including the right to petition the government, raise grievances, and so on.

259.    The Sixth Amendment similarly protects an individual's right to an attorney, and it is violated when a prison rule unjustifiably obstructs, infringes, unreasonably burdens or significantly interferes with his access to counsel.

260.    Defendants repeatedly imposed unfair and impermissible restrictions on Plaintiff's access to the courts.

261.    For example, one DOC officer informed Plaintiff that his legal mail would be withheld or disposed of.

262.    Defendants repeatedly tried to find new ways to stymie and thwart Plaintiff from accessing the courts, including to raise complaints about constitutional violations as well as to effectively defend and prepare his criminal case.

263.    Plaintiff later had to accept a plea deal as a result of Defendants' conduct.

264.    As a result, Plaintiff has suffered damages.

## SEVENTH COUNT
## Religious Discrimination
## 42 U.S.C. §§ 1983, 2000cc-1
## (Against Defendants City of New York and Miller)

265.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

266.    A plaintiff asserting a First Amendment Free Exercise Clause claim must demonstrate that he or she has a sincerely held religious belief which was substantially burdened by the defendants' conduct and that the defendants' conduct was not reasonably related to some legitimate penological interest.

267.    Plaintiff is a practicing Muslim.

268.    Defendants regularly ignored Plaintiff's dietary restrictions and, perhaps worse, served meals with pork in clear violation of Plaintiff's religious beliefs.

269.    Defendants also forced Plaintiff to shower fully exposed to female guards and other COs despite his religious beliefs, which he had tried to explain to Defendants on several occasions.

270.    Apart from that, DOC's ostensible policy forbidding a Quran was outright discriminatory on its face.

271.    Defendants did not have any legitimate penological interest to support their decisions like forcing Plaintiff to choose between pork or skipping meals/not eating.

272.    Separately, under the Religious Land Use and Institutionalized Persons Act, ("RLUIPA"), "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution." 42 U.S.C. § 2000cc-1(a).

273.    Plaintiff's religious exercise was substantially burdened.

274.    RLUIPA provides institutionalized persons with "greater protection" to exercise their religious beliefs than the First Amendment does.

275.    Defendants do not have any compelling, or even legitimate, governmental interest.

276.    As a result, Plaintiff has suffered damages.

## EIGHTH COUNT
### Equal Protection
### 42 U.S.C. § 1983
### (Against Defendants City of New York and Miller)

277.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

278.    A plaintiff must show 1) he was selectively mistreated, and 2) that mistreatment was motivated by discrimination on an impermissible basis.

279.    Plaintiff experienced multiple forms of mistreatment and the like on the basis of religion as a Muslim.

280.    Defendants, especially Griffin, took great lengths to aggravate Plaintiff, including on the basis of his religion.

281.    As one example, Defendants confiscated Plaintiff's Quran and refused his requests for one, reasoning that only a Bible is allowed.

282.    Defendants did not have any legitimate penological interests in their mistreatment of Plaintiff.

283.

284.    As a result, Plaintiff has suffered damages

///

34

**NINTH COUNT**
**Disability Discrimination**
**Americans with Disabilities Act and Section 504 of the Rehabilitation Act**
**(Against Defendants City of New York and Miller)**

285.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

286.    To establish a claim, a plaintiff must demonstrate 1) that he is a qualified individual with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated; and (3) that such exclusion or discrimination was due to his disability.

287.     A plaintiff may base his claim on any of three theories of liability: disparate treatment (intentional discrimination), disparate impact, or failure to make a reasonable accommodation.

288.    Plaintiff is a qualified individual with a disability.

289.    Defendants are public entities covered by Title II of the ADA and Section 504 of the Rehabilitation Act.

290.    Title II of the ADA prohibits Defendants from discriminating against individuals with disabilities in programs and services.

291.    Likewise, Section 504 provides that "[n]o person otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded…be the denied benefits of, or be subjected to discrimination…" 29 U.S.C. § 794.

292.    Defendants engaged in multiple forms of disability discrimination.

293.    Defendants repeatedly refused to provide Plaintiff a reasonable accommodation, making arbitrary denials without justification.

294.     Defendants, moreover, failed to make an individualized inquiry despite Plaintiff's repeated requests.

295.     Defendants failed to provide assistive devices, including for Plaintiff's hearing and walking.

296.     Defendants are obligated to administer state programs consistent with federal law.

297.     Defendants ran afoul of their obligations under both the ADA and Section 504.

298.     As a result, Plaintiff has suffered damages.

### TENTH COUNT
### Municipal Liability
### *Monell* v. *Department of Social Services*, 436 U.S. 658 (1978)
### (Against Defendant City of New York)

299.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

300.     A municipality may be liable when the deprivation of a plaintiff's rights is caused by a governmental custom, policy, or usage of the municipality. And a custom or policy need not be formally written; it may be inferred.

301.     Particularly for its failure to supervise and discipline its employees/agents, the City is liable where, as here, DOC leadership and policymakers are "knowingly and deliberately indifferent to the possibility that its officers violate the constitutional rights of individuals…"

302.     The Department's need for better supervision to protect against constitutional violations was obvious, especially where inmate civil-rights complaints are ignored or not taken seriously as here.

303.     No doubt, City's failure to supervise or even discipline its employees amounted to deliberate indifference.

304.     As a result, Plaintiff has suffered damage

36

## ELEVENTH COUNT
### State Constitutional Violations
### New York State Constitution
### (Against Defendant City of New York)

305.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

306.     The New York State Constitution, Article I, §§ 3, 8, 9, 11 and 12, likewise applies here.

307.     Defendants violated multiple of the aforesaid constitutional provisions.

308.     In failing to adequately respond, the Department is liable for the conduct and action of its employees.

309.     As a result, Plaintiff has suffered damages.

## TWELFTH COUNT
### Statutory Violations
### New York State Law
### (Against Defendant City of New York)

310.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

311.     Defendants are subject to Section 40 of the New York State Civil Rights Law and Section 290 of the New York State Executive Law, among others.

312.     New York Corrections Law §§ 137, 200-c, 505, 508 similarly govern and apply to correctional facilities, as here, outlining standards and various protections, among other things.

313.     Defendants' acts and conduct contravened these statutes.

314.     As a result, Plaintiff has suffered damages.

## THIRTEENTH COUNT
### Negligence
### (Against All)

37

315.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

316.    To state a claim for negligence, a plaintiff must establish 1) the existence of a duty on defendant's part, 2) a breach of that duty, and 3) injury to the plaintiff.

317.    Defendants owed a duty to Plaintiff.

318.    Defendants breached their duty.

319.    Defendants repeatedly flouted BOC's Minimum Standards.[10]

320.    As a result, Plaintiff has suffered damages.

### FOURTEENTH COUNT
### Negligent Hiring, Training, and Supervision
### (Against Defendant City of New York)

321.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

322.    DOC failed to adequately train and manage staff.

323.    DOC had knowledge and notice of the individual defendants' wrongdoing.

324.    The Department, however, failed to take any serious steps to remediate those problems.

325.    As a result, Plaintiff has suffered damages.

///

///

---

[10]  Under section 626 of the New York City Charter, a nine-person oversight body is supposed to monitor and set minimum standards of care ("Minimum Standards"), which are supposed to be binding on the Department and its officers. *See generally, e.g.,* 40 R.C.N.Y. § 1-17.

**FIFTEENTH COUNT**
**Negligent or Intentional Infliction of Emotional Distress**
**(Against Defendants City of New York, Branche, Henry, Leitch)**

326.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

327.    Under New York law, a claim of negligent infliction of emotional distress requires a showing of (1) extreme and outrageous conduct, (2) a causal connection between the conduct and the injury, and (3) severe emotional distress.

328.    Similarly, a claim for intentional infliction of emotional distress under New York law requires (1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress.

329.    For either claim, the conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.

330.    Defendants' conduct was extreme and outrageous.

331.    Defendants' conduct caused Plaintiff significant emotional distress.

332.    Plaintiff experienced extensive mental health issues, including panic attacks, chest pain, etc., as well as worsened his preexisting PTSD diagnosis.

333.    As a result of Defendants' conduct, Plaintiff contemplated taking his own life— suicide— and placed on suicide watch for over a month.

334.    Plaintiff was placed on suicide watch for over a month, underscoring the severity of Defendants' disregard for his condition.

335.    As a result, Plaintiff has suffered damages.

### SIXTEENTH COUNT
### Violations of Local Law
### New York City Administrative Code
### (Against Defendants City of New York and Miller)

336.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

337.    Defendants' acts, omissions, and conduct ran afoul of New York City law, including the Humans Rights Law, §§ 8-101, 8-107(4), 8-603, 9-108(c), of the New York City Admin. Code, and the Rules of the City of New York.

338.    Defendants repeatedly flouted those legal mandates—whether it concerned due process or basic living conditions.

339.    Plaintiff was targeted and subjected to mistreatment because of his religion as well contrary to the City's Human Rights Law.

340.    As a result, Plaintiff has suffered damages.

### SEVENTEENTH COUNT
### Battery/Assault
### Defendant City of New York

341.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

342.    For a battery, there must harmful or offensive contact with another person, intentionally caused without consent.

343.    Here, Defendants harmed Plaintiff in more ways than one.

344.    Defendants did so intentionally and without any reason, or Plaintiff's consent.

345.    As a result, Plaintiff has suffered damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Kwaine Thompson respectfully requests that the Court enter

judgment and an award in his favor against Defendants, as follows:

A.    Declare that the policies, practices, actions, and omissions of Defendants violate federal and state law, as described herein, including but not limited to the U.S. Constitution, the New York State Constitution, and statutory and common law;

B.    Award any and all available damages, including punitive, compensatory, statutory, and consequential, without limitation, in an amount to be determined at trial;

C.    Award nominal damages for Defendants' violation of Plaintiff's rights;

D.    Award pre- and post-judgment interest at the highest rate allowed by law;

E.    Award reasonable attorney fees and costs pursuant to 42 U.S.C. §§ 1988, 12205, 29 U.S.C. § 794a, and all other applicable law; and

F.    Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff requests a trial by jury on all triable claims and issues of fact.


Dated:  September 8, 2025                    THE ATLANTIC FOUNDATION
        New York, NY

                                            By:    */s/  Sami Elamad*

                                            Sami Elamad (*pro hac vice*)
                                            450 Lexington Ave., #69
                                            New York, NY 10163
                                            Tel. (646) 685-3954
                                            Fax (646) 712-9501
                                            sami@the-atlantic-foundation.org

                                            *Attorneys for*
                                            *Plaintiff Kwaine Thompson*

## **<u>VERIFICATION</u>**

I, **Kwaine Thompson**, am the plaintiff in the above-entitled action. I have read the foregoing amended complaint and know the contents thereof. The same are true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters, I believe them to be true.


East Elmhurst, Queens, NY
Dated:  September_____, 2025


_____
Kwaine Thompson