**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KWAINE THOMPSON,

        Plaintiff,

    vs.

CAPTAIN LEMON, *et al.*,

        Defendants.

No. 23-cv-2102 (JPO) (KHP)

**ORAL ARGUMENT REQUESTED**

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN OPPOSITION TO**
**DEFENDANT CITY OF NEW YORK'S MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... ii

TABLE OF AUTHORITIES.............................................................................................. iv

PRELIMINARY STATEMENT........................................................................................ 1

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................ 2

    I. RELEVANT CONTEXT ........................................................................................ 2

    II. FACTUAL ALLEGATIONS ................................................................................. 2

    III. ONGOING RETALIATION AND CONDITIONS (SUPPLEMENTAL
    ALLEGATIONS)........................................................................................................ 6

    IV. PROCEDURAL HISTORY .................................................................................. 8

APPLICABLE STANDARDS........................................................................................... 9

    I. STANDARD OF REVIEW .................................................................................... 10

    II. MATERIALS CONSIDERED.............................................................................. 10

    III. 42 U.S.C. § 1983 FRAMEWORK........................................................................ 11

ARGUMENT ................................................................................................................... 11

    I. THE SAC COMPORTS WITH THE FEDERAL RULES AND DOES NOT
    "BLATANTLY VIOLATE" ANY COURT ORDER .............................................. 11

    II. THE SAC STATES VIABLE SECTION 1983 CLAIMS ...................................... 13

    A.    Retaliation............................................................................................. 13
        1.   Protected Activity.......................................................................... 14
        2.   Adverse Action.............................................................................. 14
        3.   Causation....................................................................................... 16

    B.    Deliberate Indifference (Medical Care) ....................................... 17
    C.    Deliberate Indifference (Conditions of Confinement).................. 20
    D.    Access to Counsel and Courts....................................................... 21
    E.    Due Process.................................................................................... 23
        1.   Procedural Due Process ................................................................. 23
        2.   Substantive Due Process ............................................................... 25

    F.    Excessive Force ............................................................................ 26
    G.    Equal Protection............................................................................ 27

III. PLAINTIFF ADEQUATELY PLED A MONELL CLAIM ......................................... 29

A.    Formal Policy ................................................................................................. 30
B.    Widespread Customs and Practices ............................................................... 31
C.    Failure to Supervise/Discipline ..................................................................... 33
D.    Final Policymaker Decisions and Ratification ............................................... 35

IV. THE CITY'S REMAINING ARGUMENTS ARE UNPERSUASIVE OR INAPT ... 37

A.    Notice of Claim .............................................................................................. 37
B.    Religious Discrimination ................................................................................ 37
C.    Disability Discrimination ............................................................................... 39
      1.    Plaintiff is a qualified individual under the ADA .................................. 39
      2.    The SAC states multiple theories of ADA violations ............................. 40
      3.    Damages and equitable relief are available under the ADA .................... 41

D.    Group Pleading .............................................................................................. 43
E.    Individual Defendants .................................................................................... 44
F.    Threshold Constitutional Violations ............................................................. 45

V. EVEN ASSUMING ARGUENDO THAT THE SAC IS DEFICIENT, PLAINTIFF
SHOULD BE GRANTED LEAVE TO AMEND ............................................................ 47

CONCLUSION ............................................................................................................... 48

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Ahlers v. Rabinowitz*,
684 F.3d 53 (2d Cir. 2012) ........................................................................ 14

*Allah v. Milling*,
876 F.3d 48 (2d Cir. 2017) ........................................................................ 12

*Amnesty Am. v. Town of W. Hartford*,
361 F.3d 113 (2d Cir. 2004) ................................................................ 31–32

*Arriaga v. Annucci*,
2024 WL 1743300 (S.D.N.Y. Apr. 23, 2024) ........................................... 20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................... 9

*Baltas v. Jones*,
2025 WL 3623291 (2d Cir. Dec. 15, 2025) .............................................. 18

*Barkai v. Mendez*,
629 F. Supp. 3d 166 (S.D.N.Y. 2022) ...................................................... 23

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................... 8

*Benjamin v. Fraser*,
264 F.3d 175 (2d Cir. 2001) ...................................................................... 22

*Booker v. Griffin*,
2024 WL 756166 (S.D.N.Y. Feb. 23, 2024) ............................................. 23

*Bounds v. Smith*,
430 U.S. 817 (1977) .................................................................................. 22

*Buari v. City of New York*,
530 F. Supp. 3d 356 (S.D.N.Y. 2019) ...................................................... 32

*Case v. Anderson*,
2017 WL 3701863 (S.D.N.Y. Aug. 25, 2017) .......................................... 19

*Darnell v. Pineiro*,
849 F.3d 17 (2d Cir. 2017) ........................................................................ 14

*Davis v. Kelly*,
160 F.3d 917 (2d Cir. 1998) ................................................... 25

*Dieng v. City of New York*,
2024 WL 4593607 (S.D.N.Y.), aff'd (2d Cir. 2025) ……...................................20

*Dolan v. Connolly*,
794 F.3d 290 (2d Cir. 2015) ................................................... 28

*Dumel v. Westchester Cnty.*,
656 F. Supp. 3d 454 (S.D.N.Y. 2023) ............................... 18–19

*Edwards v. Arocho*,
125 F.4th 336 (2d Cir. 2024) ................................................. 17

*Estelle v. Gamble*,
429 U.S. 97 (1976) ................................................................ 14

*Fecteau v. City of Mount Vernon*,
2025 WL 873018 (S.D.N.Y. Mar. 20, 2025) ..................... 30–32

*Francis v. City of New York*,
2025 WL 2977967 (S.D.N.Y. Oct. 10, 2025) ....................... 18

*Gill v. Pidlypchak*,
389 F.3d 379 (2d Cir. 2004) ................................................. 12

*Griffin v. Corp. Couns.*,
2022 WL 16926117 (S.D.N.Y. Nov. 14, 2022) ..................... 22

*Holland v. City of New York*,
197 F. Supp. 3d 529 (S.D.N.Y. 2016) ................................... 39

*Kingsley v. Hendrickson*,
576 U.S. 389 (2015) .............................................................. 11

*McDaniel v. City of New York*,
585 F. Supp. 3d 503 (S.D.N.Y. 2022) ...................................31

*Monell v. Dep't of Soc. Servs.*,
436 U.S. 658 (1978) ......................................................... 30–32

*Patrick v. LeFevre*,
745 F.2d 153 (2d Cir. 1984) ................................................. 39

*Williams v. City of New York*,
2022 WL 21828497 (S.D.N.Y. Aug. 5, 2022) ...................................................................... 31, 39

*Williams v. City of New York*,
2024 WL 3967307 (S.D.N.Y. Aug. 28, 2024) ........................................................................ 19

*Wolf v. McDonnell*,
418 U.S. 539 (1974) ............................................................................................................. 23

**STATUTES**

42 U.S.C. § 1983 ................................................................................................................. 2, 5

42 U.S.C. § 2000cc et seq. (RLUIPA) ............................................................................... 38-40

Fed. R. Civ. P. 8(a)(2) ........................................................................................................... 7

Fed. R. Civ. P. 12(b)(6) ....................................................................................................... 8-9

N.Y. Correct. Law § 137 ................................................................................................. ____

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. I .......................................................................................................... 38-40

U.S. Const. amend. VI ........................................................................................................ 21-22

U.S. Const. amend. XIV ..................................................................................................... 22-24

## PRELIMINARY STATEMENT

Plaintiff Kwaine Thompson ("Plaintiff" or "Thompson") submits the following in opposition to the pending motion to dismiss, ECF No. 157, filed by Defendant City of New York's ("Defendant" or "City").

## INTRODUCTION

This case arises from a sustained pattern of retaliation, deliberate indifference, and unlawful conditions of confinement inflicted on Plaintiff Kwaine Thompson after he protested conditions and mistreatment on Rikers Island. Put simply, he became the target of the very officials charged with his custody and care. The SAC sets out a detailed chronology of incidents across multiple DOC facilities and identifies specific officers and supervisors by name. Faced with those allegations, the City's motion to dismiss misses the forest for the trees. Rather than engage with the substance of Plaintiff's claims, the City leans heavily on strained readings of procedural history and mischaracterizations of the law.

On the merits, the City fares no better. It barely grapples with Plaintiff's core allegations, such as the First Amendment retaliation claims, dismissing them as "not adverse" allegations that DOC staff interfered with his medical care, subjected him to punitive conditions and restrictive designations, and explicitly tied that treatment to his grievances and lawsuits. It likewise understates the seriousness of the medical-indifference and conditions-of-confinement allegations and asks the Court to resolve factual disputes in its favor at the pleading stage. That is not the governing standard, at least at this pleading stage.

More fundamentally, Plaintiff's well-pleaded allegations must be accepted as true and all reasonable inferences drawn in his favor. Viewed through the proper lens, the SAC plausibly states claims for relief against the City and the individual defendants. The City's motion should be denied.

## STATEMENT OF FACTS

### I.    RELEVANT CONTEXT

Plaintiff Kwaine Thompson is a pretrial detainee who has been incarcerated on Rikers Island numerous times since the 1990s. SAC ¶ 51. Over the years, he has repeatedly encountered violence and mistreatment while in DOC custody, including a 2010 incident where he was beaten and stabbed by a group of approximately fifteen inmates and suffered a fractured orbital floor and other serious injuries. *Id*. ¶¶ 52–53.

Plaintiff returned to Rikers in or about March 2019 and remained there until February 14, 2023, when he was transferred upstate. *Id*. ¶ 54. (He later returned in 2025 before being transferred upstate again in December 2025.) Between 2019 and 2022, Plaintiff's experiences on Rikers led him to file a series of federal civil-rights complaints in this District—*Thompson I* through *Thompson V*—challenging his conditions of confinement and so on. *Id*. ¶¶ 55–59.

### II.    FACTUAL ALLEGATIONS

Over the years, West Facility has developed a reputation for itself on Rikers, *see id*. ¶¶ 59-63,[1] and even over the past few months, West continues to make headlines.[2] *Id*. ¶¶ 61-66; *see* Exh. 5. To name one thing, West has long functioned as a segregation unit at DOC guards' personal discretion, including even in the last few months, prompting an onslaught of litigation

---

[1] (citing, *inter alia*, Jane Wester, *City to Pay Up to $53 Million in Settlement*, New York Law Journal (Apr. 19, 2023); *see also* Colby Green, *Letter cites continued use of solitary confinement at Rikers*, POLITICO (Oct. 3, 2016), available at https://www.politico.com/states/new-york/city-hall/story/2016/10/letter-exposes-continued-use-of-solitary-confinement-at-rikers-106007; *see also* Letter re West Facility from BOC Michele Ovesey to DOC Heidi Grossman, Sept. 29, 2016 [https://perma.cc/H45R-R5B5].

[2] *See* Barbara Russo-Lennon, *Woman dies in custody at embattled Rikers Island; NYC's fourth in-custody death in a month*, AMNY (inmate found dead inside West Facility makes her the fourth person to die in DOC custody in less than a month), available at https://www.amny.com/news/woman-dies-custody-rikers-island-03202025/.

in state and federal courts. *See, e.g., In Re Rikers West Facility Coordinated Cases*, no. 25-cv-04515 (AT) (BCM), Exh. 12; *e.g.,* 2025 WL 3292578 (S.D.N.Y. Nov. 26, 2025). So, it probably should not have come as a surprise when Plaintiff found himself there in December 2022.

Shortly after he arrived at West, Defendants McNeil and Henry told Plaintiff that he had been sent to West because of his lawsuits and that he would face additional consequences—such as having family visits cut off—if he decided to continue with his litigation against the Department. SAC ¶¶ 69–71. To name one thing: Plaintiff was subjected to near-daily strip and cell searches by SRT and ESU staff, arbitrary property confiscations, and an almost total denial of recreation and outdoor time. *Id.* ¶¶ 77–83. On or about January 3, 2023, Defendant Captain Fluker allegedly entered Plaintiff's cell with other CIB staff, searched the cell, and ordered Plaintiff to strip naked in what Plaintiff perceived as an act of harassment, not legitimate security. *Id.* ¶ 87.

By design, West is intended for infectious diseases and other contagious, etc. Among other things, the showers lacked curtains and other basic privacy measures, and Plaintiff was intentionally forced to shower fully exposed to staff, including female officers, despite his religious objections as a practicing Muslim. *Id.* ¶¶ 85–86. On or about January 9, 2023, for example, while Plaintiff was showering, SRT officers allegedly walked by his cell every few minutes. *Id.* ¶¶ 88–89. To be sure, Defendant McNeil allegedly told him he would "never have a shower curtain" and would continue to be forced to shower in that manner. *Id.* ¶ 86. As a consequence, Plaintiff repeatedly attempted suicide and engaged in self-harm during this period in response to Defendants' conduct, and he was placed on suicide watch for approximately 37 days. *Id.* ¶¶ 72–73.

Throughout this period, Plaintiff was frequently placed in restraints, including for short movements between nearby locations, and officers explicitly linked the shackling to his lawsuits. *Id*. ¶¶ 91–93. On or about January 6, 2023, Acting Warden Miller visited Plaintiff's cell, stated that Plaintiff would be kept in "enhanced restraints" so long as he remained at West, and warned him to "drop [his] lawsuits" if he "kn[ew] what's good for [him]." *Id*. ¶ 71. As another example, SRT Officer Anderson allegedly told Plaintiff that the shackles would "never happen again" if he dropped his litigation. Id. ¶ 92.

Plaintiff left West and transferred to GRVC on or about January 16, 2023. *Id*. ¶¶ 93–95. However, at both West and GRVC, Plaintiff alleges serious and ongoing problems accessing medical care. Plaintiff has chronic asthma, high blood pressure, hearing impairment, balance and mobility issues requiring a cane, and PTSD. *Id*. ¶¶ 97–99, 145–146. He is prescribed daily blood-pressure medication that is supposed to be administered each morning, but his medication was routinely delayed, withheld, or conditioned on impermissible factors. *Id*. ¶¶ 100–101.

Multiple defendants allegedly told Plaintiff that his medications would be slowed or denied because of his lawsuits. For example, on February 13, 2023, Defendant Captain Guan told Plaintiff that he would "always receive medication late" so long as his cases against DOC continued. *Id*. ¶ 102. On or about February 4, 2023, as another example, Defendant Captain Palermo escorted Plaintiff to the clinic for his morning medications, but Blount refused to dispense them. Palermo attempted to intervene but was unsuccessful, and no one reported the incident up the chain of command. *Id*. ¶¶ 106–107. There are similar interactions with Defendants Merenych, Paulino, Lott, and Taylor, causing him significant distress and contributing to a mental-health crisis. *Id*. ¶¶ 108–110. On another occasion, Defendant Lemon

allegedly refused to provide Plaintiff an asthma inhaler while he was having an asthma attack, ignoring his pleas even though the incident was captured on body-worn camera. *Id*. ¶ 103.

On other occasions, some DOC officers were more direct and forceful. For example, Defendant Henry entered his cell and sprayed mace or a similar chemical agent throughout the enclosed space, then instructed Branche to keep the cell door shut so that Plaintiff would "breathe in as much mace as possible" and be sent to the hospital. *Id*. ¶¶ 115–116. Plaintiff alleges he lost consciousness, vomited, and was left lying in his own vomit for hours before any staff intervened. *Id*. ¶¶ 117–118.

Plaintiff further alleges substantial interference with his access to the courts and to legal materials. While at GRVC, for example, officers restricted his ability to access the law library and review discovery, despite his pro se status in his criminal proceedings. *Id*. ¶¶ 124–130. Plaintiff's ability to use the law library and participate in programming was substantially hindered. *Id*. ¶¶ 149–153. When he was permitted to use the library, Plaintiff was confined in a small cell without a toilet and forced to urinate and defecate into plastic trash bags, even though a bathroom was only a few steps away. *Id*. ¶¶ 130–135. Defendants made clear that such practices were all intentional and punitive. Defendants Lott, Merenych, Wolosik, and Phillips directed or condoned these practices, and when Plaintiff complained, supervisors such as Deputy Warden Phillips and Captain Guan refused to intervene. *Id*. ¶¶ 132–137.

More generally, Plaintiff alleges additional unsanitary and degrading living conditions at GRVC, including rats, roaches, and other vermin, and that DOC staff deliberately denied him basic cleaning supplies and laundry access, causing him to develop sores from wearing dirty clothing. *Id*. ¶¶ 139–142; *see* Exhs. 9, 13. DOC lacked any legitimate penological justification in

imposing these conditions, all of which are representative of a broader pattern of retaliation and deliberate indifference. *Id*. ¶¶ 140–144.

**Disability Discrimination.** Plaintiff alleges that he has a documented hearing impairment and mobility issues requiring a cane. *Id.* ¶¶ 145-147. Despite repeated requests, however, DOC failed to provide him with TTY or other accessible telecommunication methods to confer with his attorneys as well as for participation in court hearings/appearances. *Id*. ¶¶ 145–153. Plaintiff was thus forced to use these inadequate, inaccessible methods of communication, denying him equal access and violating the ADA. *See id.* Plaintiff also alleges other ADA violations.

**Religious Discrimination.** Additionally, Plaintiff is a practicing Muslim who requires a halal diet and holds religious objections to public nudity. *Id*. ¶¶ 154–157. As explained in the SAC, Defendants ignored his halal dietary requirements, frequently attempted to serve him pork, and, at one point, Defendant Griffin directed DOC staff *not* to provide halal meals to Plaintiff. *Id*. ¶¶ 157–161. Plaintiff also alleges that officers confiscated or refused to provide his Quran, and asserted that only a Bible was allowed under DOC policy by virtue of a command-level order. *Id*. ¶¶ 163–165. In combination with the forced public showering and other practices, these actions substantially burdened Plaintiff's religious exercise without any legitimate penological basis. *Id*. ¶¶ 154–162, 270–275.

## III. ONGOING RETALIATION AND CONDITIONS (SUPPLEMENTAL ALLEGATIONS)

After a period upstate, Plaintiff returned to Rikers around February 2025, where he has remained until December 15, 2025, when he was transferred upstate again. SAC ¶¶ 171–172. During that time, the SAC raises supplemental allegations that the retaliatory and unconstitutional practices Plaintiff previously experienced continued during the pendency of this

case. *Id.* ¶¶ 172–176. Among other things, DOC staff continued to deny or delay medications, threatened him with mace, and refused to take medical emergencies seriously, including by instructing officers to turn off body-worn cameras during incidents. *Id.* ¶¶ 187–193.

The SAC raises further allegations persistent problems with access to courts and counsel, including difficulty accessing the law library and criminal discovery. *Id.* ¶¶ 173–175. Plaintiff's counsel has also reported repeated difficulties arranging confidential attorney-client calls and visits, and at least one video conference in another case was allegedly terminated by a DOC employee without explanation. *Id.* ¶¶ 176–178.

Finally, Plaintiff alleges additional arbitrary and dangerous facility transfers, including a transfer to "Gangland" in July 2025 and a subsequent transfer to the Northern Infirmary Command (NIC). *See id.* ¶ 180; Exh. 11. On or about July 30, 2025, DOC purportedly transferred Plaintiff from his longtime facility assignment at OBCC in the Harmony House unit—a purportedly safer, LGBTQ+-focused unit—to a unit known as "Gangland," where rival gangs are housed and where Plaintiff has been forced to pay other inmates for protection. *Id.* ¶¶ 179–182. Plaintiff later relocated to NIC in an area colloquially known as "the cages," where he's placed in a cell for 23-24 hours per day, until he returned upstate in December 2025. Like West, NIC functions as a dumping ground for punishing detainees.

DOC has offered shifting explanations for the transfers, including for example, an allegedly anonymous complaint that Plaintiff was "bullying" others, which Plaintiff disputes. *Id.* ¶¶ 183–186. To some extent, that for-his-own-safety explanation sounds like the same improper tactics recently used by DOC at both West and NIC. *See, e.g.,* Exhs. 3, 4, 5, 6, 8, 10; Exh. 4 at 14 ("Some people in the NIC cages are improperly held there for what DOC calls 'Involuntary

Protective Custody'") (citing N.Y. Correct. L. § 137 (k)(i)(G)(iv) ( "No person may be held in segregated confinement for protective custody")).

The SAC previously alleged a pattern of failure to enforce PREA-related separation orders, including a purported separation order between Plaintiff and Defendant Branche that DOC staff allegedly ignored, allowing her to continue working in close proximity to Plaintiff and to harass him. *Id*. ¶¶ 119–123. In the supplemental allegations, Plaintiff continues to file grievances about staff such as Captain Alexander and others, but the grievance process is effectively futile and that separation orders remain unenforced. *Id*. ¶¶ 194–201. Separate and apart from that, the SAC describes dangerous conditions at Harmony House, including rampant sexual activity among detainees—some of whom are known to have STIs or HIV—with minimal intervention by staff, and a lack of basic prevention or education tools such as access to PrEP. *Id*. ¶¶ 203–215. Consequently, the City exposes Plaintiff and others to a serious, state-created risk of harm. *Id*. ¶¶ 210–216.

Taken together, the supplemental allegations cover a sustained pattern of retaliation, deliberate indifference to serious medical and mental-health needs, unconstitutional conditions of confinement, and discrimination on the basis of disability and religion, all against the backdrop of Plaintiff's repeated efforts to file grievances and litigate against DOC and its staff.

## IV.    PROCEDURAL HISTORY

On March 10, 2023, Plaintiff began this action—referred to as *Thompson V*—by filing a pro se civil-rights complaint and supporting exhibits. ECF No. 1. The initial pleading spanned roughly 300 pages and included numerous attachments, handwritten inserts, and all-caps narrative. Later, the Court (Chief Judge Swain) issued a screening order dated April 29, 2024, and directing Plaintiff to file an amended complaint within 60 days. ECF No. 7. The matter was later accepted as related to *Thompson v. City of New York*, No. 22-cv-1458, and reassigned to

Judge Oetken, with general pretrial matters referred to Magistrate Judge Parker. *See* ECF Nos. 10–11.

On July 30, 2024, the Court granted Plaintiff's request for pro bono counsel for purposes of amending the complaint and extended the amendment deadline. ECF No. 13. Following several address changes necessitated by his transfers within the state prison system, Plaintiff—through undersigned counsel—filed the First Amended Complaint on November 1, 2024. ECF No. 25 ("FAC"). The City requested, and was granted, a series of extensions of time to respond to the FAC. ECF Nos. 32, 47.

On January 23, 2025, the Court held a case-management conference and set a briefing schedule for the City's motion to dismiss, ECF No. 96. Plaintiff's undersigned counsel entered a limited appearance as pro bono counsel, and requested extensions of Plaintiff's opposition deadline. ECF Nos. 114-118. Soon thereafter, ongoing complications between Thompson and undersigned counsel to arrange an attorney-client visit arose following. ECF No. 121, 124, 125. On June 24, 2025, Magistrate Judge Parker issued an access order requiring DOC to provide counsel with reliable access to Plaintiff for the duration of the litigation. ECF No. 136.

Plaintiff subsequently moved, and received, leave to amend and supplement the complaint to add 2025 events that occurred after the filing of the original complaint and FAC. ECF Nos. 142, 144–146. The City did not object, ECF No. 147, and on October 31, 2025, Plaintiff filed the Verified Second Amended Complaint for Damages and Equitable Relief, ECF No. 151 ("SAC"), adopted as the operative complaint with a new briefing schedule set on the City's anticipated motion to dismiss. ECF No. 149. On November 17, 2025, the City filed the present motion to dismiss the SAC. ECF Nos. 156–157. This opposition follows.

## APPLICABLE STANDARDS

## I.    STANDARD OF REVIEW

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *See* Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Green v. Dep't of Educ. of City of New York*, 16 F.4th 1070, 1076-77 (2d Cir. 2021) (citing *Twombly*, 550 U.S. at 556). On a motion filed under Rule 12(b)(6), a court "must accept as true all well-pleaded allegations in the complaint and draw all reasonable inferences in the plaintiff's favor." *See Lively v. WAFRA Inv. Advisory Grp., Inc.,* 6 F.4th 293, 299 n.1 (2d Cir. 2021).

"A complaint submitted by a pro se plaintiff, 'however inartfully pled, must be held to less stringent standards than formal pleadings drafted by lawyers…" *Gilliam v. Greenberg Traurig LLP*, No. 23-CV-06144 (PMH), 2024 WL 4043348, at *2 (S.D.N.Y. Sept. 4, 2024) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)) (cleaned up). A pro se litigant's "pleadings and other filings are interpreted to raise the strongest claims they suggest." *Sharikov v. Philips Medical System MR, Inc*., 103 F.4th 159, 166 (2d Cir. 2024) (citing *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156-58 (2d Cir. 2017)). That's especially so here in cases alleging civil rights violations. *See Weixel v. Bd. of Educ. of City of N.Y.,* 287 F.3d 138, 146 (2d Cir. 2002).

## II.    MATERIALS CONSIDERED

Generally, in considering a motion to dismiss, the court's review is limited to the "pleadings themselves because to go beyond the allegations in the complaint would convert the Rule 12(b)(6) motion into one for summary judgment pursuant to Rule 56." *Barkai v. Mendez*, 629 F. Supp. 3d 166, 175 (S.D.N.Y. 2022) (cleaned up). The Court, however, "may consider the

facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir. 2010) (citation omitted).

While an amended complaint ordinarily supersedes the original, district courts may construe pro se original complaints and amended complaints together. *See Morris v. City of New York*, No. 21 CIV. 8930 (LGS), 2022 WL 2657220, at *1 n.1 (S.D.N.Y. July 8, 2022) (citing cases). What's more, "even if a document is not incorporated into the complaint by reference, the Court may consider it 'where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *Gilliam v. Greenberg Traurig LLP*, No. 23-CV-06144 (PMH), 2024 WL 4043348, at *3 (S.D.N.Y. Sept. 4, 2024) (quoting *DiFolco*, 622 F.3d 104, 111) (cleaned up); *Barkai*, 629 F. Supp. 3d 166, 176-77 (collecting cases).

## III.    42 U.S.C. § 1983 FRAMEWORK

To state a cause of action under 42 U.S.C. § 1983, a plaintiff must allege that some person acting under color of state law deprived him of a federal right. *See, e.g., Ahlers v. Rabinowitz*, 684 F.3d 53, 60-61 (2d Cir. 2012) (cleaned up) (citation omitted). In particular, "a plaintiff must allege that (1) the defendant was a state actor, i.e., acting under color of state law, when he committed the violation and (2) the defendant deprived the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States." *Milan v. Wertheimer*, 808 F.3d 961, 964 (2d Cir. 2015) (internal quotation marks omitted).

## <u>ARGUMENT</u>

## I.    THE SAC COMPORTS WITH THE FEDERAL RULES AND DOES NOT "BLATANTLY VIOLATE" ANY COURT ORDER

To start, the City overstates both the purpose and effect of Judge Swain's April 29, 2024 order directing Plaintiff to amend his original pro se complaint. ECF No. 7. That order was

routine. At the outset, it bears emphasizing that the April 29 order is identical to hundreds, if not more, of screening orders that are issued by the presiding judge. In fact, the same language is featured in at least twenty screening orders that have been issued this week.

Nevertheless, the original pro se complaint was nearly 90 pages long, included more than 200 pages of exhibits, mixed claims arising from multiple facilities, and—reflecting Plaintiff's pro se status—improperly attempted to assert claims on behalf of other detainees. In such circumstances, an order to amend is expected and does not impose any substantive limitation on the claims a plaintiff may later pursue. Tellingly, the defense does not cite to any authority for this proposition.

What the City truly objects to is not any violation of Judge Swain's order, but rather that it *chose* not to oppose Plaintiff's motion for leave to amend and supplement his complaint. See ECF No. 147. The Court granted that motion. ECF No. 149. Having made no objection at the amendment stage, the City cannot now recast a routine screening order—issued more than a year earlier—as a categorical bar on the very amendment the Court expressly permitted.

Recognizing as much, the City pivots to attributing a supposed "sentiment" or unspoken intent behind the Court's order, MTD at 7, rather than relying on its actual text. But the order simply instructed Plaintiff that unrelated claims must be brought in separate actions so as not to violate Rules 18 and 20. It did not bar Plaintiff from asserting those claims in any forum, and it certainly did not preclude amendment once Plaintiff obtained counsel and sought to consolidate related allegations arising from the same continuing course of conduct. Regardless, the City misunderstands the rules of joinder,[3] and the Court should not entertain a half-baked theory.

---

[3] To the extent that Defendant is arguing misjoinder, it failed to properly raise it in its motion to dismiss. Even on the merits, the City fares no better. After all, "joinder of claims, parties and remedies is strongly

In all events, the SAC comports with the Federal Rules, including Rule 8, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The SAC easily satisfies that standard. However, "Rule 8 does not demand that a complaint be a model of clarity' so long…" as the City insists. *Lively v. Wayfarer Studios LLC*, 786 F. Supp. 3d 695, 737-738 (S.D.N.Y. 2025) (cleaned up and citation omitted). "Although the Amended Complaint lacks clarity… Defendants have adequate notice of many core claims that evident from the face of the complaint." *Id.* Dismissal on Rule 8 grounds is reserved for those rare cases where "the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (citations omitted).

## II.    THE SAC STATES VIABLE SECTION 1983 CLAIMS

### A.    Retaliation

To plead a First Amendment retaliation claim, a plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the [detainee], and (3) that there was a causal connection between the protected conduct and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (citation and alteration omitted).

The City barely engages with Plaintiff's retaliation allegations. Without explaining why, it simply asserts that "Plaintiff fails to allege any conduct that would likely chill a person of ordinary firmness." MTD at 11. In doing so, the City effectively concedes the first two elements—protected activity and some form of negative conduct by DOC staff—and focuses

---

encouraged[,]" and "the impulse [should be] toward entertaining the broadest possible scope of action." *United Mine Workers v. Gibbs*, 383 U.S. 715, 724 (1966).

entirely on whether the actions alleged qualify as "adverse." Its position reduces Plaintiff's experiences to trivial background noise that would not deter an ordinary person from continuing to speak. That is wrong on both the law and the facts.

True enough, Second Circuit precedent directs courts to approach "prisoner retaliation claims with skepticism and particular care." *See Shepherd v. Keyser*, No. 21-CV-2363 (KMK), 2025 WL 2673771, at *13 (S.D.N.Y. Sept. 18, 2025) (quotation in original) (collecting cases. Not only that, as relevant here, "this general rule may not apply where there are indications of 'a retaliatory purpose—i.e., that the [officer's conduct] was meant to penalize [the plaintiff] for bringing past grievances, and to dissuade future grievances.'" *Grant v. Shields*, No. 1:19-CV-1188 EAW, 2022 WL 3587754, at *4 (W.D.N.Y. Aug. 22, 2022) (citing cases).

For the reasons explained below, the City's motion does not seriously engage with either the governing standards or the specific incidents alleged. It simply labels Plaintiff's allegations "not adverse" and moves on.

### 1. Protected Activity

Plaintiff engaged in protected speech/activity. *See, e.g.,* SAC ¶¶ 55-59.  That is not in serious dispute. Filing grievances, lodging complaints about staff misconduct, and pursuing litigation constitute core protected speech. To name one thing, pursuing a grievance or denying access to the grievance system violates right to petition government. *See, e.g., Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015); *Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir.2004) ("[Plaintiff] has sufficiently alleged . . . participation in protected activity: the use of the prison grievance system").

### 2. Adverse Action

As to the second element—whether Defendant took an adverse action against Plaintiff—the focus of the inquiry is whether the "retaliatory conduct [] would deter a similarly situated

individual of ordinary firmness from exercising his or her constitutional rights." *Davis*, 320 F.3d at 353; *see also Marshall v. Griffin*, No. 18-CV-6673, 2020 WL 1244367, at *6 (S.D.N.Y. Mar. 16, 2020).

At the heart of the City's argument is the assertion that Plaintiff's experiences do not meet the "ordinary firmness" threshold. MTD at 11. They do. The SAC alleges far more than minor inconveniences. To be specific, Plaintiff alleges that after he filed grievances and lawsuits and complained about staff misconduct, defendants:

- Interfered with his medical care, including denying or delaying prescribed blood-pressure medication

- Subjected him to punitive conditions and restrictive designations at West Facility, OBCC, and NIC, including extended isolation, denial of family/social visits and recreation

- Engaged in a pattern of targeted mistreatment across facilities, including improperly using enhanced restraints as well as strip searches and other actions that were plainly retaliatory rather than random or routine

Although "a prisoner has no liberty interest in remaining at a particular correctional facility," *see Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998), "it is well established that transfers may be adverse actions." *See, e.g., Arriaga v. Annucci*, 2024 WL 1743300, at *11(S.D.N.Y. Apr. 23, 2024); *Gunn v. Malani*, 2023 WL 2664805, at *6 (S.D.N.Y. Mar. 28, 2023); *cf. Perez v. Ponte*, 236 F. Supp. 3d 590, 615 (E.D.N.Y. 2017), report and recommendation adopted, 2017 WL 1050109 (E.D.N.Y. Mar. 15, 2017) (transfers cannot be for a retaliatory purpose). Apart from that, the SRT officers' repeated history of subjecting Plaintiff to strip searches can be particularly instructive for purposes of establishing adverse action. *See Shepherd*, 2025 WL 2673771, at *14 (quoting *Hamlett v. Everly*, No. 21-CV-6663, 2023 WL 2586230, at *4 (S.D.N.Y. Mar. 21, 2023)). Likewise, denials and restrictions on visitation can give to rise an adverse action for First Amendment purposes. *Id.* at *15.

Taken together, those kinds of actions are, by any measure, "adverse" under the First Amendment retaliation standard. A reasonable detainee, confronted with threats to his medical care and safety tied to his grievances and lawsuits, could easily be deterred from continuing.

3.  Causation

The City next argues that Plaintiff fails to allege causation because his allegations are "speculative, unsupported, vague, and conclusory." MTD at 11. But the SAC pleads far more than conjecture. The SAC plausibly alleges causation.

"As for the third prong, "a plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Arriaga*, 2024 WL 1743300, at *11 (cleaned up) (citation omitted). "When assessing whether there was a causal connection between the protected conduct and [alleged] adverse action, a court may consider: (1) the temporal proximity of the filing to the grievance and the disciplinary action; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining the plaintiff." *Gunn v. Milani*, No. 20-CV-2681, 2024 WL 4124319, at *8 (S.D.N.Y. Sept. 9, 2024) (alterations adopted) (quotation marks and citation omitted); *see also Vogelfang v. Capra*, 889 F. Supp. 2d 489, 517 (S.D.N.Y. 2012) (discussing customary indicators).

Here, Plaintiff alleges both forms of causation (direct and indirect evidence). For starters, there are explicit statements in the complaint by Defendant McNeil, Henry, and Miller tying Plaintiff's transfer, restrictive designations, and enhanced restraints to protected activity. Plaintiff further alleges a pattern of escalating adverse conduct after each instance of protected activity. Plaintiff also alleges clear temporal proximity. For example, his transfer to West Facility in December 2022 followed closely after filing multiple federal suits and PREA complaints.

Admittedly, there is a court-ordered lockdown in place, but DOC went beyond what the court order required and used extra restraints and facility assignments as punishment for litigation, with no process at all. As explained throughout, Plaintiff's complaint is replete with statements or comments made by DOC employees that brings to bear the punitive intent in their decision-making process. Take, for example, Defendant Miller's remark ("drop your lawsuits") to Plaintiff—that brings to bear the pretextual nature of these restrictive measures and makes the penological rationale look all the more bogus.

 All things considered, Plaintiff's retaliation allegations identify specific actors, specific conduct, and a coherent sequence of events linking his protected activity to the adverse action.

## B.    Deliberate Indifference (Medical Care)

To establish a claim for deliberate indifference to medical needs, a pretrial detainee must establish two elements: first, that the deprivation of medical care was sufficiently serious, and second, that the defendant acted or failed to act with a sufficiently culpable state of mind. *See e.g., Dumel v. Westchester Cnty*., 656 F. Supp. 3d 454, 463-64 (S.D.N.Y. 2023) (cleaned up).

The City disputes both elements, arguing that Plaintiff did not plead any serious medical condition and that, in any event, any delay in treatment does not meet the threshold for a constitutional violation. MTD at 12. That framing ignores the allegations as actually pleaded.

### 1.    Serious Deprivation

"[A] prisoner must first make[a] threshold showing of serious illness or injury to state a cognizable claim." *See Francis v. City of New York*, 2025 WL 2977967, at *7 (S.D.N.Y. Oct. 10, 2025) (citation and quotation marks omitted); *Dumel*, 656 F. Supp. 3d at 464. A sufficiently serious injury or harm is one where "a condition of urgency, one that may produce death, degeneration or extreme pain." *Id.*  "If [Plaintiff] makes the required threshold showing, the first element is divided into two inquiries: (1) "whether the detainee was actually deprived of

adequate medical care"; and (2) "whether the inadequacy in medical care is sufficiently serious." *Id.* quoting *Dumel*, 656 F. Supp. 3d at 464). Where, as here, the claim turns on delayed or denied treatment, the objective inquiry focuses on the consequences and risk created by the delay and denial—not the underlying diagnosis in the abstract. *See id.* (citing cases).

Here, Plaintiff alleges repeated denial or delay of prescribed medication for chronic conditions, coupled with episodes of acute distress that were met with refusal to provide timely care. Plaintiff also suffers from chronic conditions including asthma and high blood pressure and was prescribed daily medication intended to be administered each morning, yet he alleges that at West and GRVC Defendants routinely delayed or withheld that medication. Plaintiff further alleges a later incident in which he experienced a heat stroke in the showers, collapsed, and his calls for help went unanswered for hours, while a captain allegedly directed officers to turn off body-worn cameras. Plaintiff's calls for help that day went unanswered for several hours, and worse of all, one DOC captain watched all of this unfold and directed officers to turn off their body-worn cameras. *Id.* ¶ 192 (Defendant Captain Azevedo saying "Turn that sh** off" during the June 8, 2025 incident).

Additionally, Plaintiff pleads serious mental health issues that cannot be brushed aside. After all, mental-health needs are "medical needs" for Fourteenth Amendment purposes, and a pretrial detainee has a due process right to care and protection, including protection from suicide. *See Case v. Anderson*, No. 16-CV-983, 2017 WL 3701863, at *8 (S.D.N.Y. Aug. 25, 2017) (quoting *Kelsey v. City of New York*, 306 F. App'x. 700, 702 (2d Cir. 2009)). Not to mention, Plaintiff repeatedly engaged in self-injurious behavior and, at one point, was on suicide watch for over a month. No doubt, mental health is an important care of health care and well being protected by the Fourteenth Amendment. *See, e.g., Williams v. City of New York*, Williams v. City

of New York, No. 23-CV-2700, 2024 WL 3967307, at *6 (S.D.N.Y. Aug. 28, 2024) (collecting

cases for proposition that psychiatric or mental health care is important as a legal matter).

The City's effort to minimize asthma as categorically non-serious misses the point. Even

if asthma can vary, courts recognize that severe symptoms—particularly when untreated or

coupled with respiratory distress—may present a sufficiently serious medical need. *See, e.g.,*

Shepherd, 2025 WL 2673771, at *18 (citing, *inter alia, Smith v. Carpenter*, 316 F.3d 178, 183–

84 (2d Cir. 2013)) (noting that some courts have found that glaucoma and the effects of non-

treatment may be considered a serious medical condition). Even assuming, for argument's sake,

that "[Plaintiff's] precise medical condition (if any) is not clear from the complaint, he has stated

a plausible claim that there was a sufficiently serious deprivation of medical care.". *Alexander v.

City of New York*, No. 24-CV-8084 (AS), 2025 WL 3640231, at *3 (S.D.N.Y. Dec. 16, 2025); *see

id.* ("[s]ignificant pain in and of itself can be deserving of treatment").

## 2. State of Mind

Turning to the mens rea prong, since the Second Circuit's decision, *Darnell v. Pineiro,* "a

plaintiff is not required to show subjective awareness by the defendant that `[his] acts (or

omissions) have subjected the pre-trial detainee to a substantial risk of harm.'" *Ryan*, 2018 WL

354684, at *3 (alteration in original) (quoting *Darnell*, 849 F.3d at 35). Put differently, "[a]

detainee must prove that an official acted intentionally or recklessly, and not merely negligently."

*Darnell*, 849 F.3d at 36.

To start, Plaintiff pleads direct statements and conduct supporting an inference that

treatment delays were purposeful and retaliatory. For example, when Plaintiff arrived for

medication rounds, Defendant Nurse Blount allegedly told officers, "Make him wait… This

a**hole is suing me." (SAC ¶ 105.) The SAC pleads additional statements by other DOC staff

and officers tying denial of care to Plaintiff's litigation and complaints. *See, e.g.,* SAC ¶¶ 109 (Defendants Mereynch and Paulino), 110 (Defendants Lott and Taylor), 113 (Defendant Branche), 189 (Defendant Doe, Badge No. 15002). Apart from that, the SAC alleges repeated refusals to summon medical assistance despite obvious need and describes a severe emergency in which staff allegedly allowed Plaintiff to remain without timely aid for hours. Against this backdrop, the complaint has more than satisfied pleading requirements.

### C.    Deliberate Indifference (Conditions of Confinement)

To assert a conditions-of-confinement claim under the Fourteenth Amendment, a pretrial detainee must satisfy an objective and a mens rea prong. *See, e.g., Powell v. City of New York*, No. 23 CIV. 10263 (KPF), 2025 WL 27688, at *3 (S.D.N.Y. Jan. 3, 2025) (quoting *Darnell*, 849 F.3d at 30). Under the objective prong, the detainee must plausibly allege that the challenged conditions, either alone or in combination, "pose an unreasonable risk of serious damage to his health." *Vazquez v. City of New York*, No. 21-CV-1573 (PAE) (VF), 2022 WL 17370156, at *6 (S.D.N.Y. Dec. 2, 2022) (quoting *Darnell*, 849 F.3d at 30).

Here, the complaint satisfies the objective prong. It alleges persistent and overlapping deprivations across facilities, including denial of basic sanitation and hygiene, forced use of garbage bags in lieu of toilets, denial of cleaning supplies and laundry, and continued exposure to vermin and unsanitary conditions. SAC ¶¶ 130–142, 203–215. It also alleges exposure to chemical agents or toxic substances in enclosed spaces with inadequate ventilation, which courts in this District have found can itself constitute a sufficiently serious condition. *See, e.g., Powell v. City of New York*, No. 23 CIV. 10263 (KPF), 2025 WL 27688, at *5 (S.D.N.Y. Jan. 3, 2025) (citing *Gibson v. City of New York*, No. 96 Civ. 3409 (DLC), 1998 WL 146688, at *4 (S.D.N.Y. Mar. 25, 1998)). Meaning, the conditions alleged—particularly when paired with Plaintiff's

chronic medical vulnerabilities—plausibly describe an environment posing an unreasonable risk of serious harm.. Id. ¶¶ 96–118, 130–142, 187–193, 203–215.

The SAC likewise satisfies the mens rea prong. Under *Darnell,* Plaintiff "must prove that the defendant-official acted intentionally" in denying adequate medical care, "or recklessly failed to act with reasonable care. . . even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *See Darnell*, 849 F.3d at 35. For it's part, the City largely ignores this prong in its motion, focusing its analysis on the objective component, s*ee* MTD at 24, prong. In any event, Plaintiff's allegations of written grievances and oral complaints to staff are more than sufficient at the pleading stage. *See Edwards v. Arocho*, 125 F.4th 336, 344 (2d Cir. 2024) (holding that allegations that plaintiff handed a grievance to one corrections employee and orally complained to "officers making their rounds" sufficed at Rule 12); *see also Powell*, 2025 WL 27688, at *4 n.3 (citing *Edwards*).

### D.    Access to Counsel and Courts

The City largely fails to grapple with the SAC's access-to-counsel and access-to-courts allegations.[4]  Instead, it mostly discusses legal mail, which misses the much larger picture. That limited framing ignores the SAC's allegations that Plaintiff's litigation efforts were repeatedly thwarted through structural barriers and arbitrary restrictions, including allegations that some of Plaintiff's matters were dismissed or derailed on technical or procedural grounds attributable to DOC interference. The City's blinkered approach is particularly problematic because the right of access to courts gives rise to a number of "derivative rights," and restrictions on attorney access

---

[4] Plaintiff alleged multiple access-to-counsel violations under different provisions of the U.S. Constitution. The City does not raise, nor does the Court need to decide, any specific or one legal framework/constitutional provision, including any discussion of the differences between the civil counsel versus criminal counsel.  Plaintiff need not commit to a single theory, nor does the Court need to address it, at this juncture.

and legal resources can operate as mechanisms that effectively foreclose other constitutional

protections. *See Griffin v. Corp. Couns.*, No. 22-CV-8521 (LTS), 2022 WL 16926117, at *7

(S.D.N.Y. Nov. 14, 2022).

As a detainee, Plaintiff retains a constitutional right of access to the courts. See id. That

right is closely intertwined with the right to counsel, because "the right to counsel and the right

of access to the courts are interrelated, since the provision of counsel can be a means of

accessing the courts." Id. at *8 (cleaned up) (quoting Benjamin v. Fraser, 264 F.3d 175, 186 (2d

Cir. 2001)). And the Supreme Court has recognized that access-to-courts protections are

fundamental in our constitutional scheme, particularly where civil-rights claims are at stake. See

Bounds v. Smith, 430 U.S. 817, 825 (1977).

Here, the SAC plausibly alleges that DOC imposed recurring obstacles to Plaintiff's

ability to communicate with counsel and to litigate pending matters, including by obstructing

grievance and complaint mechanisms and restricting access to legal materials and the law library.

Plaintiff alleges that grievances went unanswered or unremedied; that he faced barriers to

submitting complaints (including the absence of a grievance drop box and restrictions on access

to 311); and that he was impeded from accessing the law library and reviewing discovery,

including in connection with his criminal case where he was proceeding pro se. SAC ¶¶ 74–80,

124–135, 173–178, 194–201. He further alleges that DOC imposed restrictions inconsistent with

its own stated procedures, which in practice interfered with legal communication and case

preparation. See, e.g., id. ¶¶ 173, 175–176.

At this stage, Plaintiff is not required to commit to a single constitutional provision or

doctrinal framework. The SAC pleads a coherent set of facts supporting interference with legal

access and attorney communication, and those allegations plausibly implicate the First

Amendment, the Sixth Amendment (in the criminal-case context), and the Fourteenth

Amendment's due process protections. In light of the SAC's detailed allegations—and the City's

failure to address most of them—dismissal is unwarranted.

### E.    Due Process

#### 1.    Procedural Due Process

To prevail on a procedural due process claim, a plaintiff must plausibly allege (1) a

protected liberty or property interest, and (2) a deprivation of that interest without

constitutionally adequate process. *See, e.g., Booker v. Griffin*, No. 16- cv-72, 2024 WL 756166,

at *6 (S.D.N.Y. Feb. 23, 2024); *see also Wolf v. McDonnell* (1974) 555-57.  Liberty interests

protected by the Fourteenth Amendment may arise from the Due Process Clause itself or from

state law. *See Hewitt v. Helms*, 459 U.S. 460, 466 (1983); *see also Proctor v. LeClaire*, 846 F.3d

597, 608 (2d Cir. 2017). In the confinement context, for example, a liberty interest is implicated

where the challenged restraint or placement imposes an "atypical and significant hardship … in

relation to the ordinary incidents of prison life."  *Williams v. Bonano*, No. 24-CV-1586 (KMK),

2025 WL 2711406, at *3 (S.D.N.Y. Sept. 23, 2025) (cleaned up) (citations omitted); *see also*

*Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009).

The City argues that the procedural due process claim fails because Plaintiff purportedly

does not "sufficient[ly] allege what process was due to him and the manner in which it was

denied." MTD at 23. That disregards Plaintiff's allegations and imposes a pleading burden that

the Federal Rules do not require. At this stage, Plaintiff must plausibly allege a protected liberty

interest and that he was subjected to restrictive measures without notice, an opportunity to be

heard, or meaningful review. The SAC does so, and the City's conclusory framing cannot justify

dismissal.

The SAC alleges that DOC imposed "enhanced restraints" and shackling practices on Plaintiff that were punitive in nature, repeatedly applied, and expressly linked to his litigation activity. SAC ¶¶ 91–93. Those allegations plausibly implicate a protected liberty interest. Courts recognize that detainees retain liberty interests that survive conviction, and that restraints and restrictive measures imposed as punishment or on a pretextual basis may trigger due process protections. *See, e.g., Walker v. Capra*, No. 22-CV-7638 (LTS), 2022 WL 14758290, at *5 (S.D.N.Y. Oct. 24, 2022) (collecting cases); *Booker v. Griffin,* No. 16- cv-72, 2024 WL 756166, at *8 (S.D.N.Y. Feb. 23, 2024) (citing, *inter alia*, *Soto v. Walker*, 44 F.3d 169, 173 n.4 (2d Cir. 1995)). Plaintiff further alleges he attempted to protest and challenge these restraints, but the practices continued without any meaningful process or justification communicated to him. SAC ¶¶ 91–93. Taken as true, those allegations plausibly plead that Plaintiff was subjected to a restrictive measure amounting to an atypical hardship without adequate due process.

The SAC also pleads repeated, unexplained placements and transfers into restrictive or solitary-type housing and other specialized units, including transfers that Plaintiff alleges were punitive and retaliatory. Where restrictive housing is imposed or maintained without meaningful review, due process is implicated. *See Baltas v. Jones*, No. 24-0100-PR, 2025 WL 3623291, at *3 (2d Cir. Dec. 15, 2025) ("review of a prisoner's restrictive housing with a pre-ordained outcome is tantamount to no review at all and therefore violates due process") (cleaned up). State law also contemplates periodic review of restrictive housing placements to ensure the justification remains valid. *See* N.Y. Correct. L. §§ 137(6)(h), 137; *see also* Exh. 6.

All of that is to say that the City's argument that Plaintiff failed to plead "what process was due" asks the Court for dismissal based on evidence and information that will be obtained through discovery.

2. <u>Substantive Due Process</u>

Defendant next argues that Plaintiff's substantive due process claim is foreclosed because the SAC is purportedly "devoid of allegations of affirmative government actions," and fails to plead conduct that "shocked contemporary conscience." MTD at 22. Defendant further suggests that Plaintiff's court-ordered lockdown status supplies additional justification for the challenged conduct. *Id.*

To plead a substantive due process claim, a plaintiff must (1) "identify the constitutional right at stake" and (2) "demonstrate that the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Hurd v. Fredenburgh*, 984 F.3d 1075, 1087 (2d Cir. 2021). Although there is no mechanical test for conscience-shocking behavior, the outer boundaries are well defined: "malicious and sadistic abuses of government power" intended to oppress, cause injury, or serve no legitimate governmental purpose may satisfy that standard. *Dieng v. City of New York*, 2024 WL 4593607, aff'd Dec. 16, 2025 (quoting *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 252 (2d Cir. 2001)). Ultimately, "a court must decide whether the restriction is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Allah v. Milling*, 876 F.3d 48, 55 (2d. Cir 2017).

Measured against those standards, the SAC plainly alleges affirmative actions and punitive restrictions untethered to any legitimate purpose. The SAC does not describe passive omissions; it alleges deliberate choices by DOC staff that inflicted degrading and harmful conditions. For example, Plaintiff alleges that he was confined in a law-library cell without a toilet and was forced to urinate and defecate into plastic bags, even though a bathroom was only a short distance away and access was feasible. Such conduct is not rationally related to any legitimate penological interest and, as pleaded, is punitive and gratuitously degrading. The City's

invocation of "court-ordered lockdown" does not transform an otherwise baseless and humiliating restriction into a legitimate governmental objective, nor does it authorize conditions that serve no security purpose and instead function as punishment.

The SAC also alleges a near-total denial of out-of-cell exercise and recreation during significant periods of confinement, including restrictions imposed in a manner that Plaintiff plausibly pleads was arbitrary and retaliatory. It has long been established in this Circuit that some opportunity for out-of-cell exercise is constitutionally required, and prolonged deprivation may violate due process principles. *See Williams v. Greifinger*, 97 F.3d 699, 704 n.5 (2d Cir. 1996*); see e.g., West v. City of New York,* No. 13-CV-5155, 2014 WL 4290813, at *4-6 (S.D.N.Y. Aug 28. 2014). Plaintiff's status as a pretrial detainee only underscores the point: unlike a sentenced prisoner, he may not be subjected to punitive conditions absent due process, and restrictions must be reasonably related to legitimate governmental objectives rather than imposed to punish.

### F.    Excessive Force

To prevail on an excessive force claim against jail officials, a pretrial detainee must show that (1) the use of force was deliberate and (2) that the degree of force used was "objectively unreasonable" under the circumstances, taking into account the "facts and circumstances of each particular case." *Stinson v. City of New York,* No. 18-CV-00027, 2021 WL 3438284, at *13 (S.D.N.Y. July 6, 2021) (quoting *Kingsley,* 576 U.S. at 395-97).

The complaint features a textbook excessive force example: Plaintiff alleges that Defendant Henry entered his cell and deployed pepper spray or a similar chemical agent inside the confined space. SAC ¶¶ 115–16. The SAC further alleges that, after the chemical agent was deployed, Plaintiff experienced acute distress—including loss of consciousness and vomiting— and that officers then acted to prolong Plaintiff's exposure by keeping him confined in the

contaminated cell rather than promptly decontaminating him or securing medical care. Id. ¶¶ 116–18. As pleaded, those facts support a plausible inference that the force used, and the manner in which it was applied and sustained, was objectively unreasonable. Not only that, but according to the SAC, Branche was personally involved in: she knowingly left Plaintiff in a mace-filled cell while he was in medical distress, which can be characterized as continued application of force or at least deliberate indifference.

To be sure, the use of a chemical agent is not per se unconstitutional. But that does not end the inquiry. The relevant question is whether the chemical agent was used in a manner that was objectively reasonable under the circumstances, including the amount deployed, the justification (if any), whether warnings were given, and whether officers promptly acted to reduce harm through ventilation, decontamination, and medical attention. *See Quinones v. Rollison*, No. 18-CV-1170 (AJN), 2020 WL 6420181, at *4-5 (S.D.N.Y. Nov. 1, 2020) (the inquiry is "context specific") (citations omitted).

## G.    Equal Protection

The The City argues that the SAC fails to plead an Equal Protection violation because Plaintiff does not "directly identify any similarly situated individuals who were treated differently." *See* MTD at 26. That misreads the law and the facts.

For a selective enforcement—known as a *LeClair* claim— "a plaintiff must allege (1) that he or she was treated differently from other similarly situated individuals, and (2) that the treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Bush v. City of Utica, N.Y.,* 558 F. App'x 131, 134 (2d Cir. 2014) (quoting *LeClair v. Saunders,* 627 F.2d 606, 609-10 (2d Cir. 1980)). "A plaintiff asserting a selective enforcement ... claim must present evidence of similarly situated comparators." *Walsh v. City of New York*, No. 19 CIV.

9238 (AT), 2021 WL 1226585, at *11 (S.D.N.Y. Mar. 31, 2021). But the City incorrectly turns

that principle into a pleading requirement demanding that a detainee identify by name specific

comparator detainees at the Rule 12 stage.

At the motion to dismiss stage, a litigant is not required to list each and every comparator

group to state an Equal Protection claim. *See Hu*, 927 F.3d 81 at 97. A plaintiff is only required to

show discrimination based on an impermissible consideration with comparator evidence. *Id.*

Comparator evidence can develop through discovery, particularly since this is a fact-intensive

inquiry that Circuit precedent instructs against deciding on a motion to dismiss. *See id.*; *Elliott v.

City of New York*, 723 F. Supp. 3d 249, 263 (S.D.N.Y. 2024) ("the Circuit has cautioned against

deciding whether two comparators are similarly situated on a motion to dismiss") (cleaned up).

As previously mentioned, this applies with special force where, as here,  the information needed

to identify appropriate comparators—meal-service records, religious-diet accommodations, staff

directives, and housing-unit practices—is uniquely within Defendants' possession.

Here, at the very least, the SAC asserts a selective-enforcement claim. Specifically, the

SAC alleges that Assistant Commissioner Griffin explicitly referenced Plaintiff's status as a

Muslim in connection with decisions impacting Plaintiff's religious accommodations, including

halal meals and religious materials. SAC ¶¶ 160–165. *See* SAC ¶¶ 160-165. On that basis alone,

the Court can find that Plaintiff sufficiently alleged an Equal Protection claim. *See Walsh*, 2021

WL 1226585, at *12  ("A plaintiff can satisfy this standard by "simply showing that defendants

acted out of personal dislike of the plaintiff") (quoting *Doe v. Vill. of Mamaroneck*, 462 F. Supp.

2d 520, at 554 (S.D.N.Y. 2006)). Accordingly, the City's comparator-based dismissal argument

fails. The SAC plausibly alleges differential treatment motivated by religious animus and, at

minimum, states a selective enforcement Equal Protection claim sufficient to proceed to discovery.

### III.    PLAINTIFF ADEQUATELY PLED A *MONELL* CLAIM

A municipality is not liable under 42 U.S.C. § 1983 unless a plaintiff's injuries were caused by an official policy, custom, or practice of that municipality. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *Buari v. City of New York*, 530 F. Supp. 3d 356, 397–99 (S.D.N.Y. 2019). "A plaintiff may demonstrate that such a policy or custom exists by introducing evidence of one of the following: (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policy-makers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *McDaniel v. City of New York*, 585 F. Supp. 3d 503, 513 (S.D.N.Y. 2022).

At the pleading stage, Plaintiff need only allege facts supporting a reasonable inference that his injuries were caused by such a policy or custom. *See Buari*, 530 F. Supp. 3d at 397–99; *Kye*, 2023 WL 6037973, at *8. Here, the SAC pleads multiple, overlapping Monell pathways: it alleges a formal DOC policy that, as applied, violated Plaintiff's constitutional rights; it alleges widespread customs and practices—particularly around transfers, restrictive housing, and conditions of confinement—that function as de facto policy; it alleges a persistent failure to supervise, investigate, and discipline in the face of recurring complaints and obvious constitutional risks; and it alleges policymaker-level decisions and ratification by senior DOC

officials who allegedly directed, endorsed, or conditioned punitive measures on Plaintiff abandoning protected activity.

Taken together, these allegations plausibly describe "a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage" under *McDaniel*, 585 F. Supp. 3d at 513—not a string of disconnected incidents. And because the SAC ties Plaintiff's injuries to policies, entrenched practices, deliberate indifference in oversight, and senior-official participation and ratification, it more than satisfies Monell at the motion-to-dismiss stage.

### A.    Formal Policy

One method of establishing municipal liability is by identifying a formal, written policy. "To satisfy the 'formal policy' route, the policy must be in the form of a 'policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers.'" *See, e.g., Fecteau v. City of Mount Vernon*, No. 23-CV-9173 (KMK), 2025 WL 873018, at *8–9 (S.D.N.Y. Mar. 20, 2025) (alteration in original) (cleaned up and citation omitted).

Here, the SAC alleges at least one formal DOC policy—the command-level order ("CLO") barring religious texts except the Bible (see SAC ¶¶ 164–165)—that, as applied, caused violations of Plaintiff's constitutional rights. The CLO imposed unjustifiable restrictions on Plaintiff's religious practice and ran afoul of the First Amendment. On its face, it expressed a preference for one religion (Christianity) over others. Notably, a near-identical DOC policy has been held unconstitutional and sufficient to satisfy *Monell's* formal-policy requirement. *See Williams v. City of New York*, 2022 WL 21828497, at *27 (S.D.N.Y. Aug. 5, 2022) (finding plausible *Monell* claim based on identical CLO).

B.    **Widespread Customs and Practices**

"To demonstrate a de facto policy or custom through a widespread practice, a plaintiff must 'show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions.'" *Buari*, 530 F.Supp.3d at 398–99 (quoting *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004)). A plaintiff may provide evidence of such a practice in a variety of ways, such as through government reports, *id.,* or through complaints in cases with similar allegations, *id. See id.* (collecting cases); *Fecteau*, 2025 WL 873018, at *11 (same).

Here, the SAC pleads precisely the kind of persistent, recurring conduct that constitutes a de facto municipal policy. It describes repeated DOC practices and patterns that are facially incompatible with constitutional guarantees, including the use of arbitrary facility assignments and transfers, the imposition of punitive or highly restrictive housing without legitimate penological justification, and the maintenance of conditions of confinement that fall below minimal constitutional baselines were not one-off incidents or the product of a single employee's lapse in judgment. Plaintiff alleges a sustained course of conduct spanning facilities and time, and he (and others) has consistently raised the same core complaints—through grievances, lawsuits, and other protests—placing the City on notice of ongoing violations that DOC nevertheless continued.

*First*, the SAC alleges that DOC employs arbitrary transfers and restrictive housing placements in a manner that functions as punishment and, as applied to Plaintiff, as retaliation for protected activity. DOC's repeated use of highly restrictive units—including West Facility and NIC, as relevant here—appears in the SAC as a mechanism for isolating individuals without adequate justification. *See, e.g.,* Exhs. 3, 4, 5, 6, 8. As here, Plaintiff alleges that his own transfers were driven by his litigation and grievance activity rather than any legitimate medical

31

or security need. See, e.g., SAC ¶¶ 68–71. The SAC further situates Plaintiff's allegations within a broader pattern of DOC's use of restrictive housing "in name and effect," including allegations that West operates as a de facto solitary-confinement unit—"structurally restrictive housing"— despite public claims to the contrary. SAC ¶¶ 60–67. On these allegations, DOC's housing and transfer practices are not merely harsh; they are part of an entrenched practice that predictably results in unconstitutional punishment and unconstitutional retaliation.

*Second*, the SAC alleges longstanding, systemic failures in conditions of confinement that independently support a Monell theory based on widespread practices. Whether in the past or the present, Plaintiff alleges that DOC has failed to meet basic living standards and has repeatedly deprived him of the minimum guarantees owed to a person in custody, including adequate medical care and minimally humane conditions. These allegations implicate both the Due Process Clause of the Fourteenth Amendment—through the denial of basic medical care and conditions consistent with minimal human dignity—and the prohibition on punishment embodied in the Eighth and Fourteenth Amendments. When a jail system, through repeated practices, disregards serious medical needs and maintains conditions that are unsafe, degrading, or incompatible with basic human living standards, it violates due process. And more: where those conditions and deprivations operate as punishment—through deliberate indifference, gratuitous restrictions, or harsh conditions lacking legitimate justification—they violate the constitutional ban on cruel and unusual punishment as incorporated through the Fourteenth Amendment.

In short, these allegations plausibly establish entrenched customs in facility transfers and restrictive housing, deliberate indifference to obvious and recurring risks, and a sustained failure to correct practices that predictably yield constitutional violations. That is the hallmark of a

"persistent and widespread" custom—an unofficial policy, known to policymakers and left unchecked, that effectively becomes the City's way of doing business and repeatedly results in violations of constitutional rights.

### C.    Failure to Supervise/Discipline

Next, the SAC also plausibly pleads *Monell* liability under a failure-to-supervise or failure-to-discipline theory. For municipal liability premised on inadequate supervision, "a plaintiff must plead that (1) there was a pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity, and (2) the municipality consistently failed to investigate those allegations." *Kiss*, 2024 WL 1210941, at *24 (quoting *Lopes v. Westchester County*, No. 18-CV-8205, 2020 WL 1445729, at *5 (S.D.N.Y. Mar. 25, 2020)). "Alternatively, 'a plaintiff may plead (1) that there was a pattern of actual similar constitutional violations and (2) the municipality consistently failed to discipline those involved.'" *Id.* (quoting *Tieman v. City of Newburgh*, 2015 WL 1379652, at *21 (S.D.N.Y. Mar. 26, 2015) (cleaned up)).

To start, the SAC alleges that DOC does not meaningfully supervise or oversee key custody decisions and practices—particularly CMC and SHU placements and related restrictive-housing determinations—despite their obvious constitutional stakes. Plaintiff alleges that these assignments operate in practice as punitive or retaliatory restrictions, imposed without adequate procedural safeguards and without legitimate justification. The SAC further alleges that DOC's approach persists notwithstanding repeated allegations—reflected in inmate complaints and litigation—challenging DOC's restrictive housing, facility transfers, and the use of enhanced restraints. Against that backdrop, the inference is not merely that misconduct occurred, but that the Department failed to implement supervision and oversight mechanisms sufficient to identify, investigate, and correct recurrent unconstitutional practices embedded in day-to-day operations.

Separately, the SAC also describes repeated complaints by Plaintiff about interference with access to the courts, legal mail, and counsel—core protections grounded in the First, Sixth, and Fourteenth Amendments. Plaintiff alleges ongoing problems with mail handling, communication, and attorney access, and that these issues were not treated as discrete errors but as recurring conditions of confinement. Taken as pleaded, DOC's failure to investigate and remediate these complaints reflects an institutional breakdown in supervision and accountability for conduct that predictably impairs access to legal process and chills protected activity.

More broadly, the SAC alleges a culture of impunity in which serious constitutional violations—including excessive force, deprivations of medical care, and unconstitutional conditions—do not result in meaningful investigation, discipline, or corrective action. On Plaintiff's allegations, DOC staff—including some of the individual defendants—continued to operate without effective accountability even after repeated incidents and complaints. The City's failure to respond to that pattern is itself actionable under *Monell*: where similar allegations recur and the municipality does not meaningfully investigate or discipline, the municipality can be found to have consciously disregarded known risks and effectively ratified unconstitutional conduct by allowing it to continue.

Putting these allegations together, the SAC plausibly establishes actual or constructive notice to the City through the predictable and repeated nature of the complained-of conduct, the volume of inmate complaints and requests for relief, and the obviousness of the constitutional risks posed. Yet the City failed to take meaningful steps to stop the misconduct, to discipline or retrain staff, or to implement and enforce safeguards that would prevent recurrence. As pleaded, that sustained inaction amounts to deliberate indifference and tacit authorization of consitutitonal violations.

D.     **Final Policymaker Decisions and Ratification**

"Actions by an individual with final decision-making authority in a municipality constitute official policy for purposes of a § 1983 claim." *Kiss v. Torres*, No. 21-CV-10391 (KMK), 2024 WL 1210941, at *23 (S.D.N.Y. Mar. 19, 2024) (quoting *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003)).

The SAC satisfies this route as well. It does not plead only line-level misconduct; it alleges direct participation by, and express ratification from, high-ranking DOC officials who exercised policymaking or supervisory authority in the very decisions and actions that harmed Plaintiff. Those allegations include senior officials giving orders, articulating retaliatory motives, and conditioning basic relief on Plaintiff abandoning protected activity—conduct that, if proven, constitutes municipal policy under *Monell*.

For example, Plaintiff alleges that Acting Warden Miller personally visited Plaintiff's cell at West, informed him that he would remain in "enhanced restraints" for as long as he stayed at West, and explicitly tied relief from those restraints to Plaintiff dropping his lawsuits. SAC ¶ 71. Plaintiff further alleges that Assistant Commissioner Miller discussed continuing to "harass and intimidate" Plaintiff because of his litigation, and that Captain Fluker indicated he would do so going forward. *Id*. ¶¶ 87–89. These allegations are not limited to passive after-the-fact awareness; they plausibly plead that senior officials affirmatively linked restrictive measures to Plaintiff's protected litigation activity and thereby directed or endorsed retaliation.

The SAC likewise alleges policymaker-level involvement in the deprivation of Plaintiff's religious accommodations. To name one thing: Plaintiff alleges that Defendant Assistant Commissioner Griffin instructed staff that, while his litigation was pending, Plaintiff should not receive halal meals consistent with his religious beliefs, and told staff at GRVC: "Do not give the Muslims halal food." SAC. ¶¶ 160–161. The allegation is not simply that an accommodation

request was mishandled; it is that a senior DOC official gave a categorical instruction denying religious meals, including in terms that reflect religious animus.

Plaintiff also alleges senior direction and ratification in the use of force and the conditions under which that force was imposed. Specifically, Plaintiff alleges that Defendant Warden Henry ordered chemical spray deployed in Plaintiff's cell and directed that the cell remain shut so Plaintiff would "breathe in as much mace as possible," while also preventing Captain Moodie from assisting. *Id.* ¶¶ 115–118. Allegations of that nature—an order by a warden directing the manner and severity of force and the denial of aid—support a plausible inference that unconstitutional force and punitive conditions were not anomalies, but the norm.

Alternatively, even if any of these individuals are ultimately determined not to qualify as "final" policymakers for Monell purposes, the SAC still plausibly alleges municipal liability under a ratification theory. Municipal liability may be established where there are "facts suggesting that an officer with final policymaking authority ordered, ratified, or 'was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions.'" *Hu v. City of New York*, 927 F.3d 81, 105 (2d Cir. 2019) (quoting *Amnesty Am.*, 361 F.3d at 126). The SAC's allegations—knowledge of Plaintiff's protected activity, their express statements tying punitive measures to that activity, and their alleged endorsement of ongoing restrictions—plausibly support an inference that policymaking officials either directed unconstitutional conduct or knowingly allowed it to continue.

Finally, the SAC's policymaker allegations reinforce its broader *Monell* theories, which plausibly suggest that DOC leadership was "knowingly and deliberately indifferent" to the risk that DOC officers would violate detainees' constitutional rights and failed to implement do anything about it in the face of an obvious need.

## IV.    THE CITY'S REMAINING ARGUMENTS ARE UNPERSUASIVE OR INAPT

### A.    Notice of Claim

The City argues that Plaintiff's state-law claims must be dismissed because the earlier iterations of the complaint did not expressly allege compliance with New York's notice-of-claim requirements.

However, Plaintiff filed a notice of claim. After he moved to supplement and amend to include the relevant 2025 time period, Plaintiff served and filed a Notice of Claim covering the state-law causes of action implicated by the supplemented allegations. Plaintiff has attached the submission and confirmation as Exhibit 1. The operative pleadings now encompass two relevant periods: the events beginning in or around December 2022 at West Facility through Plaintiff's transfer upstate in early 2023, and the events beginning in or around January 2025 following Plaintiff's return to Rikers. Plaintiff's Notice of Claim was served in connection with the supplemented allegations and covers the state-law claims arising from those events.

### B.    Religious Discrimination

As mentioned, the SAC pleads multiple theories of religious discrimination under the Constitution and RLUIPA.  To state a Free Exercise claim, Plaintiff must allege that "a government entity has burdened his sincere religious practice pursuant to a policy that is not neutral or generally applicable." *Kravitz v. Purcell*, 87 F.4th 111, 127 (2d Cir. 2023).

Plaintiff alleges that he is a practicing Muslim and that DOC substantially burdened his religious exercise in several concrete ways. First, Plaintiff alleges that DOC officers repeatedly forced him to endure public exposure inconsistent with his religious beliefs, including being compelled to shower without privacy measures and being subjected to strip searches without a legitimate security justification, including in front of female officers. SAC ¶¶ 85–89, 154–57. Second, Plaintiff alleges that DOC employees deliberately interfered with his religious dietary

37

requirements, including repeated attempts to serve him meals containing pork and denial of halal meals, forcing him to choose between violating his faith and going hungry. SAC ¶¶ 154–62. Third, Plaintiff alleges interference with religious materials, including confiscation or denial of access to his Quran and assertions that only a Bible was permitted under DOC policy. SAC ¶¶ 163–65.

The City's contrary argument rests on an unduly demanding—and legally incorrect— pleading standard. The City contends that Plaintiff failed to allege (1) a sincerely held religious belief, (2) DOC's notice of Plaintiff's religious beliefs and dietary restrictions, and (3) prior requests for accommodation. MTD at 24-25. In particular, the City argues that Plaintiff did not plead facts "demonstrating he has a sincerely held belief in Islam," such as a history of congregate services or other evidence of religious beliefs or their sincerity. While sincerity may be relevant, courts do not require detainees to plead an exhaustive narrative of religious observance to state a Free Exercise claim, and "scrutiny of a plaintiff's sincerity" is principally a tool for distinguishing genuine beliefs from fraud—not a basis for imposing heightened pleading requirements. *Holland*, 197 F. Supp. 3d at 541 n.9 (quoting *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir.1984)). Yet, even if that were the case, Defendant's argument still cannot stand, given that Plaintiff has long held himself out as a practicing Muslim—and DOC is well aware of his faith. *See Thompson I* (Plaintiff denied Muslim prayer services).

Nor does the City's position square with settled precedent regarding religious diets. Courts in this Circuit have long recognized that denial of food consistent with an inmate's faith can unconstitutionally burden Free Exercise rights. *See Williams v. City of New York*, 2022 WL 21828497, at *11 (S.D.N.Y., 2022) (quoting *McEachin v. McGuinnis*, 357 F.3d at 203).

Likewise, it's established that inmates are entitled to reasonable accommodation of religious beliefs, including dietary restrictions. *See, e.g., Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003). "Indeed, at the motion to dismiss stage, courts in this Circuit have found that the religious beliefs of Muslim inmates were infringed based on far less invasive conduct." *Holland v. City of New York*, 197 F. Supp. 3d 529, 539 (S.D.N.Y. 2016) (citing cases).

Despite all of this, the City invokes "legitimate penological interests" in an attempt to justify DOC's c conduct. Even accepting that security considerations may justify certain restrictions in appropriate circumstances, the SAC plausibly alleges burdens that are untethered to any legitimate objective—such as repeatedly attempting to serve pork to a Muslim detainee, denying halal meals by categorical directive, and interfering with access to religious texts. *See Williams*, 2022 WL 21828497, at *24 (questioning how enhanced restraints during recreation further the mandate of a state court lockdown order."). To borrow from *Williams*, it is unclear how or what the lockdown order has to do with Plaintiff's religious beliefs, or why the lockdown order would necessarily be relevant to, say, serving meals with pork.

## C.    Disability Discrimination

With respect to Plaintiff's disability-related claims, Defendant dispute Plaintiff's status as an individual with a disability since he was "able to fully participate in a jury trial before Your Honor." MTD at 36. Aside from that, the City argues for dismissal since Plaintiff does not discuss "the manner in which he was discriminated against" MTD at 37.

Defendant's arguments fail for several reasons, as set forth below.

### 1.    Plaintiff is a qualified individual under the ADA

First, Plaintiff is a qualified individual under the ADA's definition. In its motion, Defendant did not meaningfully contest or specify which statutory prong is at issue here. *See* 42 U.S.C. § 12102(1)(A) (actual disability), § 12102(1)(B) (record of such an impairment), §

12102(1)(C) (regarded as); *see also Hamilton v. Westchester Cnty.*, 3 F.4th 86, 90–92 & n.4 (2d

Cir. 2021) (discussing the statutory definitions). At a minimum, Plaintiff satisfies the "actual

disability" standard, which covers "a physical or mental impairment that substantially limits one

or more major life activities." *Hamilton*, 3 F.4th at 92; 42 U.S.C. § 12102(1)(A).

That conclusion follows naturally from Plaintiff's allegations regarding his hearing

impairment. As *Hamilton* explains, the ADA's definition of disability expressly encompasses

impairments that substantially limit major life activities. 3 F.4th at 92. Consistent with that

framework, DOJ regulations implementing Title II identify "hearing impairments" as an example

of a qualifying "physical or mental impairment." *Williams v. Barometre*, 2022 WL 903068, at

*16 (S.D.N.Y. 2022); *see* 28 C.F.R. § 35.108(b)(2)(i). The SAC alleges that Plaintiff is hearing-

impaired and relies on a hearing aid. On these pleaded facts, Plaintiff falls comfortably within the

ADA's definition of a qualified individual.

### 2.   The SAC states multiple theories of ADA violations

On the merits, the SAC plausibly pleads ADA violations on multiple, independent

theories, including refusal to accommodate and disparate impact/treatment.

The SAC raises allegations regarding access to legal resources illustrate the point.

Plaintiff alleges that, because of his hearing impairment and the absence of appropriate auxiliary

aids and services, he could not use the law library in a manner comparable to non-disabled

detainees. The consequences were concrete: Plaintiff could not reliably access or review

discovery, could not meaningfully communicate about or prepare litigation materials, and could

not make effective use of the library's services as they were offered. On these allegations, the

issue is not simply inconvenience; it is exclusion from, or unequal access to, a core jail "service"

that is functionally essential to protecting legal rights.

The SAC also alleges repeated refusals to provide reasonable accommodations for Plaintiff's hearing disability despite clear notice. Plaintiff allegedly requested hearing aids and related assistance on multiple occasions, and he escalated those requests through written communications, including to the Court. The SAC further alleges that undersigned counsel pursued internal avenues within DOC to address the problem, including grievances, putting DOC on direct notice of both Plaintiff's disability-related needs and the ongoing harm caused by the lack of accommodation. Yet the SAC alleges that DOC failed to provide the requested aids or otherwise implement effective alternatives.

Finally, the SAC alleges that DOC's failure to provide auxiliary aids impaired Plaintiff's ability to communicate by telephone, including with counsel. Plaintiff alleges that he requires accommodations—such as TTY-type aids and/or accessible device programming—to use telephonic communication effectively. That need is not abstract: in custody, telephone access is a primary means of communicating with attorneys and participating in one's own defense and civil litigation. Plaintiff alleges that DOC's refusal to provide accessible programming or equivalent auxiliary aids effectively foreclosed meaningful communication and imposed barriers that non-disabled detainees did not face.

Taken together, these allegations plausibly state a claim that Defendants denied Plaintiff reasonable accommodations and, as a result, denied him equal access to DOC services and programs in violation of the ADA.

### 3.  Damages and equitable relief are available under the ADA

Defendants finally argue that Plaintiff's ADA claims fail, or are moot, because  (1) the ADA does not permit damages altogether and (2) Plaintiff's transfer moots any request for injunctive relief. Thus, the complaint must be dismissed. There's some truth to that point: compensatory damages are not always available under the ADA, for example, and more

generally, courts have grappled with the scope of remedies available against municipalities and official-capacity defendants. *See generally Without Remedies: The Effect of Cummings and the Contract-Law Analogy on Antidiscrimination Spending Clause Plaintiffs*, 138 Harv. L. Rev. 1407 (2025). But those points do not carry the City's motion. Even where compensatory damages are unavailable and injunctive relief is narrowed by transfer, ADA claims are not categorically foreclosed because other forms of relief remain available

Most importantly, Plaintiff may seek nominal damages and declaratory relief. Courts in this Circuit have repeatedly recognized that nominal damages remain available at trial even where a plaintiff did not expressly plead them, and that this remedy defeats the City's attempt to treat the ADA claims as moot or legally defective. *See Fantasia v. Montefiore New Rochelle*, 2022 WL 20540940, at *5 (S.D.N.Y. June 16, 2022) (noting that a plaintiff "may seek nominal damages at trial even if she did not explicitly request nominal damages in her complaint"); *Torres v. New York State Dep't of Corr. & Cmty. Supervision*, 2024 WL 3498500, at *15 (N.D.N.Y. Mar. 13, 2024) (same); *Matchett v. Brighton Police Dept.*, No. 24-CV-6001-FPG, 2024 WL 4607728, at *6 (W.D.N.Y. 2024) (same); *Johnson v. EAC Network*, No. 24-CV-5645, 2025 WL 3084098, at *18 (E.D.N.Y. Nov. 4, 2025) (same). Thus, at a minimum, Plaintiff's pleaded ADA violations support an award of nominal damages.

Separately, the SAC alleges conduct that—if prove at trial—implicates constitutional violations through deliberate indifference. *See J.L. on behalf of J.P. v. New York City Dep't of Educ.*, No. 17CV7150(DLC), 2024 WL 2700563, at *4 (S.D.N.Y. May 24, 2024) ("a plaintiff must also make a 'showing of a statutory violation resulting from deliberate indifference to the rights secured the disabled.'"). And to the extent Defendants contend that the current pleading posture requires Plaintiff to add or clarify an official-capacity defendant to ensure the availability

of appropriate equitable or declaratory relief, Plaintiff respectfully requests leave to amend for that limited purpose.

### D.    Group Pleading

According to the City, "Plaintiff plainly fails to articulate the majority of his claims," MTD at 8, and "advances the type of group pleading that falls below the 'pleadings' watermark," *id*. at 9. That's woefully misleading, as illustrated throughout in Plaintiff's opposition papers. Not to mention, the SAC contains specific, individualized allegations as to particular officers and captains, including dates, locations, and the nature of their involvement.

This matters because the City repeatedly asserts that Plaintiff "does not even mention" certain defendants anywhere.  That's not true. However, at the pleading stage, a civil-rights plaintiff "need not … specify what each individual's actions were where the complaint gives the relevant defendants notice as to what the claim is and the grounds upon which it rests." *Josie v. City of New York*, No. 21-CV-2486, 2023 WL 3765063, at *4 (E.D.N.Y. June 1, 2023). Courts routinely uphold pleadings that are "far from precise" so long as they "make factual allegations that distinguish between the conduct of [the] defendants, listing specific actions taken by each of them." *Vantone Grp. Liab. Co. v. Yangpu NGT Indus. Co.*, No. 13-CV-7639, 2015 WL 4040882, at *4 (S.D.N.Y. July 2, 2015).

Thus, even where a complaint does not set out a separate subsection for each defendant, "such specificity is not required where, as here, the complaint gives each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." *Murphy v. City of New York*, 719 F. Supp. 3d 357, 371 (S.D.N.Y. 2024) (cleaned up). And where direct participation and failure-to-intervene theories overlap, courts permit pleading in the alternative at the Rule 12 stage; *see also Leckie v. City of New York*, 2023 WL 3168699, at *15 (S.D.N.Y. May 1, 2023).

### E.    Individual Defendants

Defendants make the conclusory point that certain defendants, each identified below, (*see* MTD at 16) should be dismissed because their involvement is not entirely clear. That is insupportable, and more importantly, Plaintiff has satisfied the pleading requirements under the Federal Rules.

- With respect to Defendant Collins, the original complaint's exhibits include a CMC designation form on which she, as warden, signs off on continuing Plaintiff's restrictive designation. That ties her directly to the West Facility isolation decisions rather than naming her solely by virtue of her title.

- With respect to Defendant Rollinson, the original complaint alleges that upon Plaintiff's arrival at West, he was introduced to Rollinson—who is described as the point person for implementing retaliatory conditions. The complaint attributes to Rollinson specific actions and threats, including directing staff how to treat Plaintiff, threatening the denial of privacy measures (including a shower curtain), threatening discipline and loss of privileges (including tablet access), and claiming he ensured West lacked a grievance mechanism so Plaintiff could not report misconduct.

- With respect to Defendant Leitch, the pleadings describe a February 4, 2023 incident in which Defendants Palermo and Marden escorted Plaintiff to the clinic for his morning blood-pressure medication; Leitch lets them in, recognized Plaintiff from prior litigation, called to the back, instructed medical staff not to administer medication, directed them to "make him wait," and told Plaintiff he would not receive morning medication so long as she was working.

- With respect to Defendant Lopez, he participated in the retaliatory efforts by DOC officials at West Facility, including through strip searches and harassment. He was also Lopez was present with CIB during the January 3, 2023 search at West Facility, as alleged in the original complaint. Even if certain details of that search are presently unknown, that is precisely the kind of fact pattern where discovery will supply the remaining details.

- With respect to Defendant Marden, he was witnessed the February 2023 incident in the clinic and refused to do anything or refer the issue. At a minimum, these allegations put him on notice of the violations of Plaintiff's constitutional rights, and he failed to intervene for purposes of establishing deliberate indifference.

- With respect to Defendant Morales, as Deputy Commissioner, she had knowledge and acted in concert with other defendants to ensure the spoilation of evidence. For example, "CO McNeil said she will make sure that any video evidence is erased or destroyed."

In identifying the challenged conduct and the individuals responsible, Plaintiff has satisfied basic pleading standards, and the City's argument provides no basis for dismissal. Plaintiff alleges defendant-specific facts where available and plausibly connects each defendant to the challenged conduct. To the extent any details remain unclear, those issues will be properly addressed through discovery, not dismissal. All things considered, it is neither fair nor realistic to expect a pro se detainee plead a complete chronology with perfect officer identification at the outset, particularly where the most of the evidence—post assignments, shield numbers, clinic staffing records, search logs, and surveillance footage—is uniquely within Defendant's possession and control.

## F.    Threshold Constitutional Violations

Finally, the City asserts—without meaningful development—that Plaintiff's allegations against certain individual defendants "do not rise to the level of constitutional violations, and therefore claims against [them] should be dismissed." MTD at 27. That's not much of an argument as it is a conclusion. Nevertheless, addressing each in turn underscores why dismissal is not appropriate here.

_Defendant Abraham Palermo._ The City contends that "Palermo took affirmative steps to attempt to ensure that plaintiff received his medication," and that such conduct cannot support a constitutional claim. MTD at 27. That's self-serving characterization is one approach. The SAC, however, alleges that Palermo was present for—and aware of—a denial of necessary medical care, and that despite that awareness, Plaintiff was left without his prescribed medication. On a motion to dismiss, the question is not whether Palermo made some effort at some point, but whether the pleaded facts plausibly support liability based on his personal involvement.

_Defendant Paul Moodie._ The City similarly argues that "Moodie took affirmative steps to try to respond to plaintiff's medical emergency," implying that no constitutional violation can lie.

*Id.* at 27. That is equally misleading and self-serving. The SAC alleges more than that. It describes an incident in which Moodie was aware of the use of force and Plaintiff's resulting medical distress, yet failed to intervene or take meaningful action to secure appropriate care or accountability.

    <u>Defendant Stella Bethea.</u> The City argues that "Bethea only made verbal comments to plaintiff" and "did not take any specific actions." *Id.* To the contrary, the SAC does not plead Bethea's conduct as mere stray remarks. If anything, the SAC alleges that Bethea openly expressed animus toward Plaintiff and acknowledged that other inmates were permitted access to outdoors and common areas, supporting the plausible inference that Plaintiff's exclusion from those privileges was deliberate.

    <u>Defendant Captain Alexander.</u> The SAC's supplemental allegations describe Alexander as an active participant in continuing retaliation and unconstitutional conditions, including threats of force and open disregard of separation orders. For example, the SAC alleges that Alexander expressly told Plaintiff that his separation order "don't mean shit," and threatened that Plaintiff would be "maced and ticketed." The SAC also alleges further retaliatory conduct, including threatening language and derogatory epithets.

    <u>SRT officers.</u> The City asserts, without analysis or supporting authority, that Plaintiff's SRT-related allegations "do not rise to the level of constitutional violations." (MTD at 27.) The SAC alleges sustained, intrusive, and punitive conduct by SRT officers, including frequent invasive searches and harassment, shower-related harassment and forced exposure, and conduct supporting religious discrimination claims—such as repeatedly attempting to serve Plaintiff food containing pork despite knowledge of his Muslim faith. Those allegations, accepted as true, plausibly implicate multiple constitutional protections, including unreasonable searches and

punitive conditions of confinement, as well as free exercise and equal protection principles. Once again, the City's conclusory dismissal of this conduct, unsupported by authority, provides no basis for dismissal.

## V.    EVEN ASSUMING ARGUENDO THAT THE SAC IS DEFICIENT, PLAINTIFF SHOULD BE GRANTED LEAVE TO AMEND

To the extent the Court credits any portion of the City's arguments, Plaintiff should be afforded an opportunity to plead additional facts and amend. Even if the Court were to identify a deficiency in the SAC, the appropriate remedy at this stage is leave to amend. Rule 15 directs that leave to amend be "freely give[n] when justice so requires." Fed. R. Civ. P. 15(a)(2). Although the decision rests within the Court's discretion, that discretion is guided by a strong preference for resolving disputes on the merits. *See Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018). Moreover, a pro se litigant "should be afforded every reasonable opportunity to demonstrate that he has a valid claim." *Matima v. Celli*, 228 F.3d 68, 81 (2d Cir. 2000) (quoting *Satchell v. Dilworth*, 745 F.2d 781, 785 (2d Cir. 1984)).

Nor has the City carried its burden to show that amendment would be futile. *See Grimes v. Fremont Gen. Corp.,* 933 F. Supp. 2d 584, 597 (S.D.N.Y. 2013); *Hill v. Curcione*, 657 F.3d 116, 123–24 (2d Cir. 2011). The City's motion largely assumes, rather than demonstrates, that any amended pleading would fail as a matter of law.

More fundamentally, the liberal standard for amendment applies with particular force here, where Plaintiff long proceeded pro se and asserts civil-rights claims. See*, e.g., Ahmed v. City of New York*, No. 24-CV-01702 (MMG), 2025 WL 934844, at *3 (S.D.N.Y. Mar. 27, 2025) (noting that the policy favoring amendment "applies with particular force when a plaintiff's civil rights are at issue" (cleaned up)). Accordingly, should the Court identify any pleading deficiency, Plaintiff respectfully requests leave to replead.

## **CONCLUSION**

For the above reasons, Plaintiff respectfully requests the Court deny Defendant's motion to dismiss or, in the alternative, grant him leave to re-plead necessary allegations and amend the complaint.

If applicable, Plaintiff respectfully requests the Court issue a *Valentin* order for any outstanding defendants, *see Valentin v. Dinkins*, 121 F.3d 72 (2d. Cir. 1997), as well as for an order directing each individual defendant to either enter an appearance or file a responsive pleading.

Dated: December 30, 2025
New York, NY

/s/ Sami Elamad*
Sami Elamad
THE ATLANTIC FOUNDATION
450 Lexington Avenue
Box 69
New York, NY 10163
Tel. (646) 685-3954
Fax (646) 712-9501
sami@the-atlantic-foundation.org

*Attorneys for Plaintiff Kwaine Thompson*

---

\* Pro bono counsel for Plaintiff by limited appearance (admitted *pro hac vice*)